1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  Fred Graves and Isaac Popoca, on their          )    No. CV-77-0479-PHX-NVW
   own behalf and on behalf of all pretrial        )
   detainees in the Maricopa County Jails,         )    **FINDINGS OF FACT AND**
10                                                 )    **CONCLUSIONS OF LAW**
                    Plaintiffs,                     )    **and**
11                                                 )    **ORDER**
   vs.                                             )
12                                                 )
                                                   )
13 Joseph Arpaio, Sheriff of Maricopa              )
   County; Fulton Brock, Don Stapley,              )
14 Andrew Kunasek, Max W. Wilson, and              )
   Mary Rose Wilcox, Maricopa County               )
15 Supervisors,                                    )
                                                   )
16                  Defendants.                     )
                                                   )
17 _____ )

18         Pending before the Court is Defendants' Renewed Motion to Terminate the

19  Amended Judgment (doc. #906).  Evidence was received and argument heard on August

20  12-15, 19-22, 28-29, 2008, and September 3-5, 2008.  The Court also has considered the

21  parties' pre-hearing and post-hearing briefs.  The Court's findings of fact and conclusions

22  of law follow.

23  **I.       Procedural Background**

24         In 1977 this class action was brought against the Maricopa County Sheriff and the

25  Maricopa County Board of Supervisors alleging that the civil rights of pretrial detainees

26  held in the Maricopa County, Arizona, jail system had been violated.  (Doc. #1.)  On

27  April 14, 1979, the case was assigned to Magistrate Judge Morton Sitver for pretrial

28  conference, determination of all pretrial matters, and findings of fact and

1    recommendations for final disposition.  (Doc. #63.)  On September 12, 1980, the case was

2    transferred from Judge William P. Copple to Judge Earl H. Carroll.  Before the scheduled

3    trial date of December 10, 1980, the parties reached a settlement of the class action.

4    (Doc. ##95-98.)

5         On March 27, 1981, the parties entered into a consent decree that addressed and

6    regulated aspects of County jail operations as they applied to pretrial detainees.  (Doc.

7    #166.)  On January 10, 1995, the 1981 consent decree was superseded by an Amended

8    Judgment entered by stipulation of the parties.  (Doc. #705.)  The Amended Judgment

9    expressly does not represent a judicial determination of any constitutionally mandated

10   standards applicable to the jails.  (*Id.* at 2, ¶ 2.)

11        On April 8, 1998, Defendants filed a motion to terminate the Amended Judgment

12   pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 and 42 U.S.C.

13   § 1997e, arguing that the PLRA mandated immediate termination of the consent decree as

14   a matter of law because it was not based on written judicial findings specified in

15   § 3626(b)(3).  (Doc. #755.)  On September 10, 1998, Judge Carroll denied the motion to

16   terminate, relying on *Taylor v. United States*, 143 F.3d 1178 (9th Cir. 1998), which held

17   the decree termination provisions of the PLRA to be unconstitutional.  (Doc. #774.)  On

18   October 8, 1998, Defendants appealed from the denial of their motion for termination.

19   (Doc. #777.)  On November 3, 1998, the *Taylor* panel opinion was withdrawn.  158 F.3d

20   1059 (9th Cir. 1998).  On December 21, 1999, the Court of Appeals for the Ninth Circuit

21   deferred submission of this case pending decisions in two other cases.

22        On January 25, 2001, the Ninth Circuit issued a memorandum decision reviewing

23   the denial of Defendants' motion to terminate the Amended Judgment.  (Doc. #799.)

24   Acknowledging that *Gilmore v. California*, 220 F.3d 987 (9th Cir.2000), held the PLRA

25   decree termination provision constitutional and controlled the appeal, it reversed and

26   remanded for proceedings consistent with *Gilmore*.  (Doc. #799.)

27        On September 25, 2001, Defendants renewed their motion to terminate.  (Doc.

28   #821).  On September 12, 2002, Judge Carroll denied Defendants' renewed motion to

1  terminate without prejudice subject to findings to be entered following an evidentiary

2  hearing.  (Doc. #840.)  On November 14, 2003, Defendants filed a pre-hearing

3  memorandum in support of a renewed motion to terminate, which operates as Defendants'

4  pending motion to terminate the Amended Judgment.  (Doc. #906.)

5        On November 25, 2003, and January 22, 2004, Judge Carroll began hearing

6  evidence on Defendants' motion.  (Doc. ##918, 939.)  The parties engaged in discovery.

7  On April 3, 2008, Judge Carroll caused the case to be reassigned, and it subsequently was

8  assigned to the undersigned judge.  (Doc. ##1222, 1234.)  On April 25, 2008, this Court

9  set Defendants' motion to terminate the Amended Judgment for evidentiary hearing

10  commencing August 12, 2008.  (Doc. #1241.)

11  **II.  Legal Standards**

12        **A.  Termination of Prospective Relief Under the PLRA**

13        Congress enacted the PLRA to prevent federal courts from micromanaging prisons

14  by mere consent decrees and to return control of the prison system from courts to "the

15  elected officials accountable to the taxpayer."  *Gilmore v. California*, 220 F.3d 987, 996

16  (9th Cir. 2000).  "[N]o longer may courts grant or approve relief that binds prison

17  administrators to do more than the constitutional minimum."  *Id.* at 999.  The PLRA

18  requires that prospective relief regarding prison conditions "extend no further than

19  necessary to correct the violation of the Federal right of a particular plaintiff or

20  plaintiffs."  18 U.S.C. §3626(a)(1).  Relief must be narrowly drawn, extend no further

21  than necessary to correct the violation, and be the least intrusive means necessary to

22  correct the violation.  *Id.*  Further, courts must "give substantial weight to any adverse

23  impact on public safety or the operation of a criminal justice system caused by the relief."

24  *Id.*

25        The PLRA also provides that any order for prospective relief regarding prison

26  conditions is terminable upon the motion of any party or intervener two years after a

27  district court has granted or approved the prospective relief, one year after the district

28  court has entered an order denying termination of prospective relief under the PLRA, or

1   two years after the enactment of the PLRA for orders issued before the PLRA's

2   enactment.  18 U.S.C. § 3626(b)(1).  The party seeking to terminate the prospective relief

3   bears the burden of proof.  *Gilmore*, 220 F.3d at 1007.  Under the statute, the defendant

4   or intervener shall be entitled to "the immediate termination of any prospective relief if

5   the relief was approved or granted in the absence of a finding by the court that the relief is

6   narrowly drawn, extends no further than necessary to correct the violation of the Federal

7   right, and is the least intrusive means necessary to correct the violation of the Federal

8   right."  18 U.S.C. § 3626(b)(2).  Such findings need not be explicit, however, "so long as

9   the record, the court's decision ordering prospective relief, and the relevant caselaw fairly

10  disclose that the relief actually meets the § 3626(b)(2) narrow tailoring standard."

11  *Gilmore*, 220 F.3d at 1007 n.25.  "If existing relief was so crafted according to the record

12  and relevant caselaw, the findings required by the statute are implicit in the court's

13  judgment."  *Id.*

14       "[A]lthough § 3626(b)(2) speaks of 'immediate termination,' and although

15  § 3626(e)(1) requires a 'prompt ruling,' a district court cannot terminate prospective relief

16  without determining whether the existing relief (in whole or in part) exceeds the

17  constitutional minimum."  *Id.* at 1007.  Further, under § 3626(b)(3), a "district court

18  cannot terminate or refuse to grant prospective relief necessary to correct a current and

19  ongoing violation, so long as the relief is tailored to the constitutional minimum."  *Id.* at

20  1007-08.  Before ruling on a motion to terminate, the district court must inquire into

21  current prison conditions unless plaintiffs do not contest defendants' showing that there is

22  no current and ongoing violation.  *Id.* at 1008.

23       Even if the existing relief qualifies for termination under § 3626(b)(2)—*i.e.*, it is

24  not narrowly drawn, extends further than necessary to correct the violation of a federal

25  right, or is not the least intrusive means necessary to correct the violation—if there is a

26  current and ongoing violation, the district court must modify the relief to meet the PLRA

27  standards.  *Id.*  Therefore, "[p]rospective relief shall not terminate if the court makes

28  written findings based upon the record that prospective relief remains necessary to correct

1   a current and ongoing violation of the Federal right, extends no further than necessary to

2   correct the violation of the Federal right, and that the prospective relief is narrowly drawn

3   and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). If

4   prospective relief remains necessary to correct a current and ongoing violation, the

5   district court's authority to modify the existing prospective relief includes authority to

6   expand or diminish the existing relief. *See Pierce v. Orange County*, 526 F.3d 1190,

7   1204 n.13 (9th Cir. 2008). Determining whether such relief meets § 3626(b)(3)'s need-

8   narrowness-intrusiveness criteria "will obviously rest upon case-specific

9   factors—namely, the extent of the current and ongoing constitutional violations." *Id.* at

10  1206.

### B.    Relevant Period for a "Current and Ongoing" Violation

12          To make the findings required to terminate prospective relief, the Court must take

13  evidence on current jail conditions, at least with respect to those remedies Plaintiffs do

14  not concede Defendants comply with constitutional requirements. *See Gilmore*, 220 F.3d

15  at 1010. Evidence of "current and ongoing" violations must reflect conditions "as of the

16  time termination is sought." *Id.*; *accord Pierce*, 526 F.3d at 1205. Congress clearly

17  anticipated that a district court would make evidentiary findings and a ruling shortly after

18  the filing of a termination motion. Congress expressly required courts to "promptly" rule

19  on termination motions and invited mandamus proceedings against a judge who failed to

20  rule promptly. 28 U.S.C. § 3626(e)(1). Congress further required an automatic stay of

21  the consent injunction until the motion to terminate is ruled on, if the motion to terminate

22  is not ruled on within 30 days. The commencement of that automatic stay can be delayed

23  "for not more than 60 days for good cause." 28 U.S.C. § 3626(e). In this case, however,

24  Defendants first sought termination in 1998 and filed their pending motion to terminate in

25  November 2003—nearly five years ago. (Doc. #906.) Congress's intended equivalence

26  between "the time termination is sought" and the time of ruling has broken down.

27          In these circumstances, Congress's intent could only be that proof of "current and

28  ongoing conditions" mean actual conditions now, not historic conditions when this

1    motion was filed five years ago.  Therefore, upon transfer of this case to the undersigned

2    judge, the Court ordered the parties to jointly plan for discovery and trial regarding jail

3    conditions during the period of July 1, 2007, through June 30, 2008.  (Doc. #1241.)  The

4    one-year period would permit the parties to use existing quarterly reports, distinguish

5    "ongoing" conditions from temporary aberrations, and address current conditions rather

6    than those of the past.  Subsequently, upon request of the parties, the relevant evidentiary

7    period was reduced to July 1, 2007, through May 31, 2008, to facilitate providing

8    information to the expert witnesses before their tours and inspections of jail facilities.

9    (Doc. #1257.)

10       **C.    Standard for Finding a Current and Ongoing Violation of the Federal
                 Right**

11            The Fourteenth Amendment Due Process Clause protects a pretrial detainee from

12   punishment prior to an adjudication of guilt in accordance with due process of law.  *Bell*

13   *v. Wolfish*, 441 U.S. 520, 534-35 (1979).  "This standard differs significantly from the

14   standard relevant to convicted prisoners, who may be subject to punishment so long as it

15   does not violate the Eighth Amendment's bar against cruel and unusual punishment."

16   *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008).  A pretrial detainee's

17   due process rights are at least as great as a convicted prisoner's Eighth Amendment

18   rights.  *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Oregon*

19   *Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) ("[E]ven though the pretrial

20   detainees' rights arise under the Due Process Clause, the guarantees of the Eighth

21   Amendment provide a *minimum standard of care* for determining their rights....").  The

22   "more protective" Fourteenth Amendment standard applies to conditions of confinement

23   for pretrial detainees and requires the government to do more than provide minimal

24   necessities.  *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004).  "[T]he Eighth

25   Amendment provides too little protection for those whom the state cannot punish."

26   *Hydrick v. Hunter*, 500 F.3d 978, 994 (9th Cir. 2007).

27

28

1    To prevail on a Fourteenth Amendment claim regarding conditions of

2  confinement, a pretrial detainee generally need not satisfy the Eighth Amendment's

3  "deliberate indifference" standard of culpability. *Jones*, 393 F.3d at 933-34 (involving

4  civil detainees).  In some circumstances, however, courts have applied the "deliberate

5  indifference" standard to pretrial detainees' claims under the Fourteenth Amendment.

6  *See Redman v. County of San Diego*, 942 F.2d 1435, 1442-43 (9th Cir. 1991) (en banc)

7  (the "deliberate indifference" standard applied where an eighteen-year-old, 130-pound

8  pretrial detainee with no prior convictions was placed in an enclosed cell with a twenty-

9  seven-year-old, 165-pound inmate incarcerated for violating parole upon conviction for a

10  sex offense and identified as an "aggressive homosexual," and the pretrial detainee was

11  raped); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (relying on *Redman*, the court

12  reasoned that  "pretrial detainees' rights under the Fourteenth Amendment are comparable

13  to prisoners' rights under the Eighth Amendment" and applied Eighth Amendment

14  standards); *Anderson v. County of Kern*, 45 F.3d 1310, 1313 n.1 (9th Cir. 1995) (finding it

15  unnecessary to decide "whether under some circumstances, the 'deliberate indifference'

16  standards under the Eighth and Fourteenth Amendments diverge" for § 1983 action

17  brought by pretrial detainees and convicted prisoners).  Nevertheless, subsequent opinions

18  have applied the Fourteenth Amendment "punishment" standard rather than the Eighth

19  Amendment "deliberate indifference" standard to pretrial detainees' claims. *See, e.g.*,

20  *Pierce*, 526 F.3d at 1205.

21    A detainee's desire to be free from discomfort does not rise to the level of a

22  fundamental liberty interest under the Fourteenth Amendment:

23    Not every disability imposed during pretrial detention amounts to
      "punishment" in the constitutional sense, however.  Once the Government
24    has exercised its conceded authority to detain a person pending trial, it
      obviously is entitled to employ devices that are calculated to effectuate this
25    detention.  Traditionally, this has meant confinement in a facility which, no
      matter how modern or how antiquated, results in restricting the movement
26    of a detainee in a manner in which he would not be restricted if he simply
      were free to walk the streets pending trial.  Whether it be called a jail, a
27    prison, or a custodial center, the purpose of the facility is to detain.  Loss of
      freedom of choice and privacy are inherent incidents of confinement in such
28    a facility.  And the fact that such detention interferes with the detainee's

1
2

> understandable desire to live as comfortably as possible and with as little
> restraint as possible during confinement does not convert the conditions or
> restrictions of detention into "punishment."

3  *Bell*, 441 U.S. at 537.  As a minimum standard, however, the Eighth Amendment requires

4  that prison officials ensure that inmates receive adequate food, clothing, shelter,

5  sanitation, and medical care and take reasonable measures to guarantee the safety of the

6  inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hoptowit v. Ray (Hoptowit I)*,

7  682 F.2d 1237, 1246 (9th Cir. 1982).  The Eighth Amendment protects against conditions

8  of confinement likely to cause serious illness and needless suffering in the future:  "a

9  remedy for unsafe conditions need not await a tragic event."  *Helling v. McKinney*, 509

10  U.S. 25, 33 (1993).  But even under the Eighth Amendment, standards for determining

11  constitutional conditions are not fixed:

12
13
14
15
16

> Underlying the eighth amendment is a fundamental premise that
> prisoners are not to be treated as less than human beings.  The amendment
> is phrased in general terms rather than specific ones so that while the
> underlying principle remains constant in its essentials, the precise standards
> by which we measure compliance with it do not.  It follows that when
> confronting the question whether penal confinement in all its dimensions is
> consistent with the constitutional rule, the court's judgment must be
> informed by current and enlightened scientific opinion as to the conditions
> necessary to insure good physical and mental health for prisoners.

17  *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (citations omitted); *see Trop v.*

18  *Dulles*, 356 U.S. 86, 100 (1958) ("The [Eighth] Amendment must draw its meaning from

19  the evolving standards of decency that mark the progress of a maturing society.").

20  Further, courts must consider the effect of each condition of confinement in its context,

21  "especially when the ill-effects of particular conditions are exacerbated by other related

22  conditions."  *Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981).

23        To evaluate the constitutionality of pretrial detention conditions that are not

24  alleged to violate any express constitutional guarantee, a district court must determine

25  whether those conditions amount to punishment of the detainee. *Bell*, 441 U.S. at 535;

26  *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).  "For a

27  particular governmental action to constitute punishment, (1) that action must cause the

28  detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental

1    action must be to punish the detainee." *Pierce*, 526 F.3d at 1205 (quoting *Bell*, 441 U.S.

2    at 538).  To constitute punishment, the governmental action must cause harm or disability

3    that either significantly exceeds or is independent of the inherent discomforts of

4    confinement, but it does not need to cause a harm independently cognizable as a separate

5    constitutional violation, *e.g.*, deprivation of First Amendment rights.  *Demery*, 378 F.3d at

6    1030.  To determine whether an action's purpose is punitive, in the absence of evidence

7    of express intent, a court may infer that the purpose of a particular restriction or condition

8    is punishment if the  restriction or condition is not reasonably related to a legitimate

9    governmental objective or excessive in relation to the legitimate governmental objective.

10   *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at 1028 (citing

11   *Bell*, 441 at 538).

12          Legitimate governmental objectives that may justify adverse detention conditions

13   include maintaining security and order and operating the detention facility in a

14   manageable fashion.  *Pierce*, 526 F.3d at 1205.  "[M]aintaining institutional security and

15   preserving internal order and discipline are essential goals that  may require limitation or

16   retraction of the retained constitutional rights of both convicted prisoners and pretrial

17   detainees."  *Bell*, 441 U.S. at 546.  Retribution and deterrence are not legitimate

18   governmental objectives.  *Demery*, 378 F.3d at 1030-31.  The cost or inconvenience of

19   providing adequate conditions is not a defense to the imposition of punishment.  *See*

20   *Spain v. Procunier*, 600 F.2d 189, 199-200 (9th Cir. 1979).

21          To determine whether detention restrictions or conditions are reasonably related to

22   maintaining security and order and operating the institution in a manageable fashion,

23   courts ordinarily should defer to the expert judgment of correction officials in the absence

24   of substantial evidence that indicates officials have exaggerated their response to these

25   considerations.  *Bell*, 441 U.S. 540 n.23.  A reasonable relationship between the

26   governmental objective and the challenged condition does not require an "exact fit," a

27   showing that it is the "least restrictive alternative," or proof that the policy does in fact

28   advance the legitimate governmental objective.  *Valdez v. Rosenbaum*, 302 F.3d 1039,

1  1045 (9th Cir. 2002).  But it does require evidence that the correction officials' judgment

2  was rational, *i.e.*, they might have reasonably thought that the policy would advance a

3  legitimate governmental objective.  *Id.*

4         Thus, to find that a condition of confinement for pretrial detainees constitutes a

5  current and ongoing violation of the constitutional minimum under the Fourteenth

6  Amendment, the Court must determine that the condition:

7         (1)    imposes some harm to the pretrial detainees that significantly exceeds or is

8                independent of the inherent discomforts of confinement *and*

9         (2)    (a) is not reasonably related to a legitimate governmental objective *or*

10                (b) is excessive in relation to the legitimate governmental objective.[1]

11  Although pretrial detainees' claims arise under the Fourteenth Amendment Due Process

12  Clause, the Eighth Amendment guarantees provide a minimum standard of care for

13  determining a pretrial detainee's rights.  *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.

14  1986).

15                **1.    Population/Housing Limitations (Overcrowding)**

16         "Prison officials have a duty to take reasonable steps to protect inmates from

17  physical abuse."  *Hoptowit I*, 682 F.2d at 1250 (district court's finding of "an atmosphere

18  of fear of excessive violence" supported finding the government had been deliberately

19  indifferent to the safety needs of inmates).  Overcrowding can violate the Eighth

20  Amendment if it results in specific effects that form the basis for an Eighth Amendment

21

22         [1]     The Court applies the *Bell* punishment test here instead of the four-part
23  "reasonable relation" test of *Turner v. Safley*, 482 U.S. 78 (1987), urged by Defendant
    Arpaio because the Ninth Circuit Court of Appeals rejected use of the *Turner* test in
24  similar circumstances in *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004).  In
25  *Demery*, the Court of Appeals explained that it has continued to apply *Bell* even after the
    Supreme Court's decision in *Turner*, and it is powerless to overrule the decision of a prior
26  Ninth Circuit panel.  *Id.*  The Court of Appeals further explained that *Turner* is inapposite
    because it dealt with convicted prisoners, not pretrial detainees, and it involved an Eighth
27  Amendment cruel and unusual punishment challenge, not a claim brought under the
28  Fourteenth Amendment.  *Id.* at 1028-29.

1   violation, such as by causing increased violence, diluting constitutionally required

2   services to the extent that they fall below the minimum Eighth Amendment standards, or

3   by reaching a level "unfit for human habitation." *Hoptowit I*, 682 F.2d at 1249; *see*

4   *Toussaint v. Yockey*, 722 F.2d 1490, 1492 (9th Cir. 1984) (affirming preliminary

5   injunction prohibiting double-celling of administrative segregation prisoners where

6   district court found "double-celling engenders violence, tension and psychiatric

7   problems"). But overcrowding cannot be found to be unconstitutional under the Eighth

8   Amendment without evidence that it has, in fact, increased violence, deprived pretrial

9   detainees of constitutionally required services, or violated contemporary standards of

10  decency. *Rhodes v. Chapman*, 452 U.S. 337, 347-49 (1981).

11          Exclusive reliance on per capita square footage recommendations or a jail's rated

12  capacity is insufficient to find that population is unconstitutional. *Hoptowit I*, 682 F.2d at

13  1249. Consideration must also be given to how much time inmates must spend in their

14  cells each day, whether any increased violence was disproportional to the increase in

15  population itself, and whether overcrowding has caused any other constitutional

16  deprivations. *Id.*

17                          **2.      Dayroom Access**

18          Denial of access to a dayroom with other inmates did not violate prisoners' Eighth

19  Amendment rights where the prisoners were placed in administrative segregation as a last

20  resort for their own safety or the safety of others and provided exercise, family visits, and

21  telephone access. *Anderson v. County of Kern*, 45 F.3d 1310, 1315-16 (9th Cir. 1995).

22  However, "[g]iven the conditions and average duration of confinement in administrative

23  segregation and similarly restrictive classifications, failure to provide detainees with the

24  opportunity for some daily out-of-cell movement raises serious constitutional questions."

25  *Pierce*, 526 F.3d at 1213.

26

27

28

1

     **3.**     **Temperature**

2

     "The Eighth Amendment guarantees adequate heating." *Keenan v. Hall*, 83 F.3d

3

1083, 1091 (9th Cir. 1996) (citing *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)).

4

The Eighth Amendment does not guarantee a comfortable temperature. *Id.*

5

     **4.**     **Sanitation, Safety, Hygiene, and Toilet Facilities**

6

     "Prisoners have the right not to be subjected to the unreasonable threat of injury or

7

death by fire and need not wait until actual casualties occur in order to obtain relief from

8

such conditions." *Hoptowit v. Spellman (Hoptowit II)*, 753 F.2d 779, 783-84 (9th Cir.

9

1985).

10

     Vermin infestation throughout a prison is inconsistent with the adequate sanitation

11

required by the Eighth Amendment. *Id.* at 783.

12

     If a prison's plumbing is in such disrepair that it deprives inmates of basic

13

elements of hygiene and seriously threatens their physical and mental well-being, it

14

constitutes cruel and unusual punishment under the Eighth Amendment. *Id.*

15

     "Failure to provide adequate cell cleaning supplies [] deprives inmates of tools

16

necessary to maintain minimally sanitary cells, seriously threatens their health, and

17

amounts to a violation of the Eighth Amendment." *Id.* at 784.

18

     **5.**     **Medical, Dental, and Psychiatric Care**

19

     Jails and prisons must provide adequate care for inmates' serious medical, dental,

20

and mental health needs:

21

        The Eighth Amendment requires that prison officials provide a
system of ready access to adequate medical care.  Prison officials show

22

deliberate indifference to serious medical needs if prisoners are unable to
make their medical problems known to the medical staff.  Access to the

23

medical staff has no meaning if the medical staff is not competent to deal
with the prisoners' problems.  The medical staff must be competent to

24

examine prisoners and diagnose illnesses.  It must be able to treat medical
problems or refer prisoners to others who can.  Such referrals may be to

25

other physicians or facilities within the prison, or to physicians or facilities
outside the prison if there is reasonably speedy access to these other

26

physicians or facilities.  In keeping with these requirements, the prison must
provide an adequate system for responding to emergencies.  If outside

27

facilities are too remote or too inaccessible to handle emergencies promptly
and adequately, then the prison must provide adequate facilities and staff to

28

handle emergencies within the prison. These requirements apply to physical, dental and mental health.

*Hoptowit I*, 682 F.2d at 1253.

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (internal quotations, citations, and footnotes omitted). However,

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Whether a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence, and a court "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

 "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."). The Eighth Amendment prohibits deliberate indifference not only to an inmate's current health problems, but also to conditions of confinement that are very likely to cause future serious illness and needless suffering. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). But a "mere difference of opinion between the prison's medical staff and the inmate as to the

1  diagnosis or treatment which the inmate receives does not support a claim of cruel and

2  unusual punishment." *Ramos*, 639 F.2d at 575.

3      Mere delay in medical care, without more, is insufficient to state a claim against

4  prison officials for deliberate indifference. *Shapley v. Nevada Bd. of State Prison*

5  *Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Extreme discomfort and pain resulting from

6  delay, however, is cognizable under § 1983. *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.

7  1986). Budgetary constraints do not justify delay in treatment for a serious medical need.

8  *Id.*

9      Further, a district court may infer a policy of deliberate indifference from evidence

10  of medical understaffing. *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th

11  1988), *vacated and remanded*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d 235 (9th Cir.

12  1989) (limited number of psychiatric staff permitting only minutes per month per

13  disturbed inmate implied any psychological illness inmate had would go undiagnosed and

14  untreated).

15      The Eighth Amendment requires that prisoners be provided with "a system of

16  ready access to adequate dental care." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.

17  1989). Although dental care is one of the most important medical needs of inmates, delay

18  in providing a prisoner with dental treatment does not by itself constitute an Eighth

19  Amendment violation. *Id.*

20      Inadequate medical records may create a risk of unnecessary pain and suffering in

21  violation of the Eighth Amendment:

22      Defendants have a constitutional obligation to provide inmates with
        adequate medical care. A necessary component of minimally adequate
23      medical care is maintenance of complete and accurate medical records.
        Defendants have a constitutional obligation to take reasonable steps to
24      obtain information necessary to the provision of adequate medical care. . . .

25      The harm that flows to class members from inadequate or absent
        medical records is manifest. Eighth Amendment liability in this regard is
26      not predicated on the failure of counties to deliver medical records. It is
        predicated on the failure of defendants to take reasonable steps to
27      implement policies that will aid in obtaining necessary medical information
        about class members when they are transferred from county jails to the
28      CDC.

- 14 -

1    *Coleman v. Wilson*, 912 F. Supp. 1282, 1314 (E.D. Cal. 1995) (record citations omitted).

2    ### 6.    Intake Areas

3        "[I]n considering whether a prisoner has been deprived of his rights, courts may

4    consider the length of time that the prisoner must go without these benefits.  The longer

5    the prisoner is without such benefits, the closer it becomes to being an unwarranted

6    infliction of pain."  *Hoptowit I*, 682 F.2d at 1258 (citation omitted).  Depriving a pretrial

7    detainee of a bed or mattress for two nights in jail without legitimate governmental

8    purpose violates the Fourteenth Amendment.  *Thompson v. City of Los Angeles*, 885 F.2d

9    1439, 1448 (9th Cir. 1989).

10    ### 7.    Recreation Time Outside

11        "There is substantial agreement among the cases in this area that some form of

12    regular outdoor exercise is extremely important to the psychological and physical well

13    being of the inmates."  *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979).  "The cost

14    or inconvenience of providing adequate facilities is not a defense to the imposition of a

15    cruel punishment."  *Id.*

16        "Exercise is one of the basic human necessities protected by the Eighth

17    Amendment.  Moreover, the Fourteenth Amendment requires that pre-trial detainees not

18    be denied adequate opportunities for exercise without legitimate governmental objective.

19    Determining what constitutes adequate exercise requires consideration of the physical

20    characteristics of the cell and jail and the average length of stay of the inmates."  *Pierce*,

21    526 F.3d at 1211-12 (internal quotations and citations omitted).  Pretrial detainees who

22    are held for more than a short time and spend much of their time inside their cells are

23    ordinarily entitled to five to seven hours of exercise per week outside of their cells.  *Id.* at

24    1212.  Detainees' access to dayrooms may affect determination of what constitutes

25    adequate exercise if the dayrooms provide space and equipment for detainees to actually

26    exercise.  *Id.* at 1212 n.22; *see Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984) (denial

27    of outside exercise to administrative segregation inmates confined to their cells for as

28    much as 23½ hours a day raised substantial constitutional question).

1   **8.   Food**

2      "The Eighth Amendment requires only that prisoners receive food that is adequate

3   to maintain health; it need not be tasty or aesthetically pleasing.  The fact that food

4   occasionally contains foreign objects or sometimes is served cold, while unpleasant, does

5   not amount to a constitutional deprivation."  *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th

6   Cir. 1993); *see also Toussaint v. Yockey*, 722 F.2d 1490, 1493 (9th Cir. 1984) (preliminary

7   injunction vacated as to requirement that administrative segregation prisoners be served

8   the same types and quantities of food as the general population inmates because the

9   district court's findings did not include any factual support for that portion of the

10  injunction).  Food provided to inmates must not only be "nutritionally adequate," but also

11  "prepared and served under conditions which do not present an immediate danger to the

12  health and well being of the inmates who consume it."  *Ramos v. Lamm*, 639 F.2d 559,

13  570-71 (10th Cir. 1980).

14      **9.   Staff Members, Training, and Screening**

15      The Eighth Amendment provides inmates with a right to safe conditions of

16  confinement, including an adequate level of personal security.  *Hoptowit II*, 753 F.2d at

17  784.  Housing inmates in cells with solid doors and no means of communicating with

18  guards violates the Eighth Amendment because inmates are unable to make their medical

19  problems known to medical staff, and even previously healthy inmates may have a

20  medical emergency or be injured in a fall or accident.  *LeMaire v. Maass*, 12 F.3d 1444,

21  1458-59 (9th Cir. 1993).

22  **III.   Findings of Fact and Conclusions of Law**

23      **A.   The Parties**

24      1.   Plaintiffs are the class of all pretrial detainees who are housed in the

25  Maricopa County Jails.

26      2.   Defendant Joseph Arpaio ("Defendant Arpaio") is the Maricopa County

27  Sheriff and is responsible for managing the Maricopa County Jails.

28

3.     Defendants Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson, and Mary Rose Wilcox ("the Board Defendants") are the members of the Maricopa County Board of Supervisors.

4.     Health services within Maricopa County Jails are organized under a separately funded department of Maricopa County designated Correctional Health Services.

5.     Although not a named party to this litigation, the interests of Correctional Health Services are represented by the attorneys representing the individual Board Defendants.

**B.     Amended Judgment Paragraphs to Be Terminated Upon Stipulation**

6.     Plaintiffs do not contest Defendants' motion to terminate the following paragraphs in the Amended Judgment:  1-8, 16-17, 20-22, 24-42, 44, 48-55, 63, 65-66, 68, 73-83, 86-94, 96-97, 99-101, 105-113, and 115-116.

7.     Plaintiffs also do not contest Defendants' motion to terminate with respect to the references in ¶ 9 to First Avenue, Madison, Avondale, and Mesa jails, which have been closed, and the reference in ¶ 84 to First Avenue jail, which has been closed.

**C.     Population/Housing Limitations (Overcrowding) (AJ ¶¶ 9-15)[2]**

8.     The Amended Judgment states in paragraphs 9 through 15:

9.     Through the operation, management and funding of the jails, defendants shall endeavor to achieve, in good faith and as expeditiously as possible, and to maintain the following population limitation and inmate housing goals:

A.     For any cell at the First Avenue Jail facility (previously referred to as "Central Jail") used to house a pretrial detainee, there shall be no more than three inmates in any eight-person cell; no more than two inmates in any four-person cell; and no more than one inmate in any one or two person cell.  For the purpose of determining the capacity of an individual cell, the parties agree to abide by the cell size designations reflected in the floor plans for the First Avenue Jail facility attached as Exhibit "A".

---

[2]     "AJ ¶ __" refers to a paragraph of the Amended Judgment.

B.   No pretrial detainee housed in the Towers, Madison, Durango, Avondale (Southwest), Estrella, and Mesa (Southeast) jail facilities shall be housed in a cell containing more than one other inmate.

C.   The total number of inmates housed in any dormitory in the Estrella jail used to house pretrial detainees shall not exceed 100.

D.   Pretrial detainees shall be incarcerated in jail cells or dormitories and shall not be housed in a dayroom or any other temporary housing facility of any kind.

E.   Pro per inmates representing themselves on criminal charges, who have demonstrated a legitimate need to collect and maintain voluminous legal documents, will be housed alone, provided sufficient cell space is available.

F.   Double bunking of pretrial detainees may only occur in cells (i) with two permanent bunks and (ii) with access to a dayroom in which no inmate beds are located.

G.   The defendants agree that the maximum population goal, not including any tent or other temporary housing facility, within any facility being used to house pretrial detainees shall be as follows:

| FACILITY | MAXIMUM POPULATION GOAL |
| --- | --- |
| First Avenue | 417 |
| Madison | 1905 |
| Durango | 872 |
| Avondale | 56 |
| Towers | 720 |
| Estrella | 880 |
| Southeast | 60 |

The parties recognize that developing alternatives to incarceration of pretrial detainees is an element of reducing jail population, and that the reduction of the population of pretrial detainees in the jail system, where there is no threat to public safety, is a goal of this Amended Judgment.

10.   The defendants agree to make good faith efforts, within their respective powers to achieve the pretrial detainee housing goals set forth above.  When a pretrial detainee is presented to the Sheriff by a competent authority for confinement in the jails and the jail population levels, the requirements of the classification system, and/or the maintenance of internal order or security within the jail system prohibit the Sheriff from housing that pretrial detainee in accordance with the population goals in this Amended Judgment, the Sheriff shall promptly notify in writing the Maricopa County Board of Supervisors or its designee (which shall be the Justice and Law [E]nforcement Agency of the Maricopa County Manager's Office pending further written notice) and the authorized representative of the plaintiff-class, if any, of that population/housing situation.  The Sheriff will also report to the Board or its designee whenever the total system wide inmate population, not including tents or other temporary housing

facilities, exceeds 95% of the system wide jail capacity.  The Board or its designee shall meet on an emergency basis to evaluate the situation and recommend corrective action.

11.  Even when in compliance with the population limitation and inmate housing goals set forth in this Amended Judgment, defendants shall endeavor to house, in any cell, the lowest number of pretrial detainees possible in light of all relevant circumstances, including the requirements of the inmate classification systems and the internal order and security of the jail system.

12.  As of the date of this Amended Judgment, the Maricopa County Board of Supervisors has implemented a multi-element inmate population reduction program (the "Board's program").  The primary purpose of this program is to meet the population goals set out in this Amended Judgment. A summary of the Board's program and a description of its objectives, which may be amended and supplemented from time to time, is attached to this Amended Judgment as Exhibit "B."  Within their statutory responsibilities, each of the defendants shall participate in and commit themselves to the success of this program.

13.  In conjunction with the adoption and implementation of the Board's program, the Board has established, under the auspices of the Justice and Law Enforcement Agency of the County Manager's Office, a jail population management group ("JPMG") to monitor the progress of the Board's program in achieving its goals and to otherwise identify and address issues relating to the size of the inmate population incarcerated in the jails.

14.  Counsel for plaintiffs (or his designee or successor, or the designee of his successor) shall have permanent observer status on the JPMG, and shall be entitled to receive notices of all meetings; to receive reasonable advance notice of any proposed material change in the Board's program; and to personally attend and participate at all meetings of the JPMG.

15.  For so long as the JPMG or any equivalent organization is in existence, the Justice and Law Enforcement Agency of the Maricopa County Manager's Office shall prepare, on not less than an annual basis, a detailed report to the JPMG (the "Annual Report"), including, among other matters:

A.    county jail population data for the preceding twelve (12) months;

B.    a comparison of population statistics for the preceding twelve (12) months with data for each of the previous three (3) years;

C.    a summary of all implemented, abandoned, completed and planned Board program elements; and

D.    a documented summary (including empirical analysis when practicable and meaningful) of the success or lack of success of each Board program element during the preceding twelve (12) months.

E.   a detailed inventory of the then current capacity of each of the housing units of the jails.

9.   The Eighth Amendment requires that prisoners be confined in conditions that protect their mental and physical health and draws its meaning from evolving standards of decency that mark the progress of a maturing society.

10.   Overcrowding can violate the Eighth Amendment if it causes increased violence, dilutes constitutionally required services, or violates contemporary standards of decency.

11.   The Fourteenth Amendment requires that conditions of confinement for pretrial detainees not constitute punishment, *i.e.*, not impose some harm that significantly exceeds the inherent discomforts of confinement and is excessive in relation to the legitimate governmental objective.

12.   Plaintiffs contend that overcrowding at the 4th Avenue Intake, the Towers jail, the Estrella jail, the Durango Housing Units D8 and D9, and the court holding cells at Madison violates pretrial detainees' constitutional rights by increasing threats to their personal safety from increased violence among inmates, increasing risks to their health from communicable diseases and unsanitary conditions, and imposing inhumane conditions.

13.   Defendant Arpaio contends that none of the Maricopa County Jails is overcrowded because from June 2007 through April 2008 the daily inmate population never exceeded the maximum inmate capacity for each facility.

14.   Defendant Arpaio further contends that paragraphs 9-15 of the Amended Judgment exceed the minimum required under the Eighth Amendment.

15.   The specific requirements of paragraphs 9-15 of the Amended Judgment, which require goals and good faith efforts, exceed the minimum required under either the Eighth Amendment or the Fourteenth Amendment and, therefore, must be modified.

16.   The facilities that house Maricopa County Jail pretrial detainees are the 4th Avenue jail, the Lower Buckeye jail, the Towers jail, the Estrella jail, and the Durango jail.

17.   Maricopa County Sheriff's Office Policy DI-1 establishes housing categories for all classifications of inmates based on age, sex, and security level.  The following housing categories apply to pretrial detainees:

1.   <u>General Population</u>:  inmates who have no special housing requirements.

2.   <u>Closed Custody</u>:  inmates who pose a serious threat to life, property, staff, other inmates, or to the orderly operation of the jail and may be locked in their cells for up to twenty-three hours daily.

3.   <u>Administrative Segregation</u>:  inmates whose safety is, or may be, threatened from within the jail, who may be segregated from general population inmates, and who are allowed out of their cells for one hour daily plus offered recreation as time and staffing permit.

4.   <u>Medical</u>:  inmates who need a higher level of medical care than can be provided in general population housing or segregation units or need to be isolated due to communicable disease and usually are housed in a jail infirmary or at the Maricopa County Medical Center.

5.   <u>Psychiatric</u>:  inmates who need a higher level of psychiatric care than can be provided in general population housing or segregation units.

6.   <u>Disciplinary</u>:  inmates who violate jail rules and regulations, as determined by hearing sergeants, and may be housed separately from the general population, including lockdown for up to twenty-three hours daily.

7.   <u>Security Segregation</u>:  inmates who pose a threat to the orderly operation of the jail and need immediate temporary segregation pending reclassification, reassignment, or placement into another housing category.

**Towers Jail**

18.   The Towers jail consists of six housing units, each of which contain four pods.  Each pod consists of fifteen cells.  All of the cells contain three-bed bunks, and inmates are triple-celled in most cells.  Each cell is approximately 10.5 feet by 4.3 feet.

- 21 -

19.  The Towers jail houses administrative segregation, disciplinary segregation, security segregation, and medium custody general population pretrial detainees.  The segregation inmates at the Towers jail are confined to their cells for up to twenty-three hours per day.

20.  Two of the pods at the Towers jail have cells with virtually solid cell front doors in which the only opening is a small slot through which mail and meals are passed. These pods typically house some type of segregation inmate.

21.  One of the pods at the Towers jail has eight cells with metal cell door fronts that contain four vertical slots that are covered by heavy wire mesh.

22.  Segregation pretrial detainees are assigned to triple-bunked cells at the Towers jail.

23.  Confining three segregation pretrial detainees in one cell at the Towers jail for approximately twenty-two or twenty-three hours per day constitutes punishment in violation of pretrial detainees' Fourteenth Amendment rights.

24.  Prospective relief is necessary to correct this current and ongoing violation of pretrial detainees' constitutional rights.

**Estrella Jail**

25.  The Estrella jail houses female pretrial detainees in four housing units and eight dorms, which include maximum general population, administrative segregation (minimum, medium, and maximum), closed custody (minimum, medium, and maximum), "nature of charges" (*e.g.*, child abuse), disciplinary segregation, and security segregation (minimum, medium, and maximum) classifications.  The cells have either two-bed or three-bed bunks without ladders or guard rails.  Each cell has approximately twenty-eight square feet of unencumbered space.

26.  The general population pretrial detainees housed at the Estrella jail have approximately sixteen hours of dayroom access each day.

27.  The pretrial detainees at the Estrella jail in segregation, closed custody, and "nature of charges" classifications spend up to twenty-three hours per day in their cells.

28.   Confining three segregation pretrial detainees in one cell at the Estrella jail for approximately twenty-two or twenty-three hours per day would constitute punishment in violation of pretrial detainees' Fourteenth Amendment rights.

29.   However, currently pretrial detainees are not assigned to the top bunks of the triple-bunks because the top bunks are considered to be too dangerous.

30.   Therefore, there is no current and ongoing violation of pretrial detainees' constitutional rights at the Estrella jail regarding overcrowding.

### Durango Jail

31.   During the relevant period, the Durango jail housed medium security pretrial detainees in seven housing units and two dorms.  The dorms (D8 and D9) are comprised of double rows of three-tiered metal bunks without ladders to get to the upper bunks.  Each dorm has a capacity of 258.  As of June 16, 2008, there were 251 inmates housed in D8 and 249 inmates housed in D9.

32.   Triple-bunking in open dorms, without more, does not violate pretrial detainees' constitutional rights.

### Portable Beds

33.   Portable beds were used at the Lower Buckeye jail during the relevant period and removed in May 2008 shortly before inspections conducted for this litigation.

34.   Portable beds were used  in the dayrooms of the housing units at the Durango jail and removed in April 2008.

35.   Using portable beds in cells significantly reduces the amount of unencumbered space in the cells day and night, requires one inmate to sleep close to the toilet in unsanitary conditions, requires the other two cellmates to wake the inmate on the floor in order to use the toilet at night, increases the probability of injury when an inmate climbs down from the top bunk without a ladder and needs to avoid stepping on the portable bed below, and is likely to increase the level of tension among cellmates.

1       36.   Using portable beds in dayrooms significantly reduces the amount of

2   unencumbered space in the dayrooms and requires those inmates assigned to portable

3   beds to use toilets in cells assigned to others.

4       37.   When detention officers were ordered to remove all of the portable beds at

5   a jail, they were able to find a hard bed for each inmate by repairing unused cells and

6   transferring inmates to other facilities.

7       38.   Chronic use of portable beds in lieu of maintaining cells with hard beds or

8   transferring inmates to other facilities violates pretrial detainees' constitutional rights.

9       39.   As of July 2008, no portable beds were in use at any of the Maricopa

10   County Jail facilities, but the Court may assume that if prospective relief is not granted,

11   Maricopa County Jails are likely to return to the longstanding practice discontinued only

12   days before inspections for this litigation were to begin.

13       40.   Therefore, prospective relief is necessary to correct a violation of pretrial

14   detainees' constitutional rights.

15

16   **Court Holding Cells at Madison**

17       41.   Pretrial detainees who have court appearances while housed in Maricopa

18   County Jails are transported from a housing unit to the court holding cells located in the

19   old Madison jail facility where they may remain for as long as eight hours in crowded,

20   dirty conditions.

21       42.   Although overcrowding itself does not violate pretrial detainees'

22   constitutional rights, if it is not reasonably related to legitimate governmental objectives

23   and it causes risk of harm to pretrial detainees' safety and health, it does violate pretrial

24   detainees' constitutional rights.

25       43.   At times, the court holding cells are so overcrowded that pretrial detainees

26   do not have room to sit or adequate access to toilet and sink facilities.

27       44.   Overcrowding in the court holding cells causes sanitation problems and

28   health risks to pretrial detainees.

45.   Overcrowding in the court holding cells is not reasonably related to a legitimate governmental objective.

46.   Overcrowding in the court holding cells at Madison violates pretrial detainees' constitutional rights.

47.   Prospective relief is necessary to correct this current and ongoing violation of pretrial detainees' constitutional rights.

### 4th Avenue Intake Holding Cells

48.   Most pretrial detainees are taken to the 4th Avenue Intake upon arrest.

49.   During the intake process, pretrial detainees are moved in and out of different holding cells.

50.   The number of pretrial detainees held in each intake holding cell fluctuates greatly.

51.   Although there is no posted maximum occupancy in the intake holding cells, the maximum number of inmates that should be held in each cell is approximately thirty to thirty-five.

52.   Often, substantially more than thirty-five pretrial detainees are held in one cell.

53.   At times, intake holding cells are so overcrowded that there is not room for all inmates to sit on benches, and at times there is not room for all inmates to sit anywhere, even on the floor.

54.   At times, inmates sleep on the concrete floor, and sometimes there is not enough room for inmates to sleep on the floor without coming into physical contact with other inmates.

55.   At times, the intake holding cells are too crowded for inmates to move to use the toilet and sink.

56.   Overcrowding in the 4th Avenue Intake holding cells is not reasonably related to a legitimate governmental objective.

57.   Overcrowding in the 4th Avenue Intake holding cells violates pretrial detainees' constitutional rights.

58.   Prospective relief is necessary to correct this current and ongoing violation of pretrial detainees' constitutional rights.

59.   Paragraphs 9-15 of the Amended Judgment will be modified to state: "Defendants shall not house more than two pretrial detainees in one cell at the Towers jail if the pretrial detainees usually are confined to their cell for twenty-two hours or more per day.  Defendants shall not make routine use of portable beds in cells or dayrooms. Defendants shall not place more pretrial detainees in a court holding cell at Madison or in a 4th Avenue Intake holding cell than can sit in the holding cell without making physical contact with another person."

60.   Prospective relief regarding overcrowding, as modified in the preceding paragraph, extends no further than necessary to correct the violation of the federal right, is narrowly drawn, and is the least intrusive means to correct the violation.

### D.   Dayroom Access (AJ ¶¶ 18-19)

61.   The Amended Judgment states in paragraphs 18 and 19:

> 18.   Pretrial detainees, at jail facilities other than First Avenue, including those opened subsequent to the effective date of this Amended Judgment which utilize a dayroom arrangement, shall be provided complete freedom of access between cell and dayroom during waking hours, at least sixteen hours each day.  For those facilities not utilizing a dayroom arrangement, pretrial detainees shall be provided equivalent access to resources and free space as in dayrooms.  Before pretrial detainees are placed in any facility plan without a dayroom arrangement, the defendants shall provide counsel for the plaintiff class, if any, a detailed summary of the proposed housing arrangement including the availability of resources and free space.

> 19.   Pretrial detainees at all jail facilities shall have access to a television, tables and benches sufficient for the number of persons who will be utilizing each dayroom.  Defendants shall also provide small games such as checkers, chess, etc. in each dayroom.

62.   The Eighth Amendment does not require dayroom access, but the Fourteenth Amendment requires that pretrial detainees be given some opportunity for out-of-cell movement.

63.   Plaintiffs do not contend that pretrial detainees' dayroom access is constitutionally required.

64.   Plaintiffs do contend that, under the current conditions, access to dayrooms does not compensate for insufficient outdoor recreation or reduce the unconstitutional effects of overcrowding in the housing units.

65.   Defendant Arpaio contends paragraphs 18 and 19 of the Amended Judgment exceed the constitutional minimum and Maricopa County Jails are in compliance with those provisions except where dayroom access has been reduced from sixteen to eight hours for safety and security purposes.

66.   Requiring sixteen hours of daily dayroom access exceeds the constitutional minimum.

67.   Requiring small games to be provided in dayrooms exceeds the constitutional minimum.

68.   Therefore, paragraphs 18 and 19 of the Amended Judgment exceed the constitutional minimum and must be terminated.

69.   Although not constitutionally required, the amount of dayroom access provided and the amount of available dayroom space per pretrial detainee are factors to be considered in determining whether pretrial detainees are provided adequate living space and outdoor exercise.

70.   Maricopa County Sheriff's Office Policy DI-1 states that general population pretrial detainees "will normally receive access to dayrooms at a minimum of 16 hours daily."

71.   General population inmates at the Towers, Estrella, and Durango jails have access to dayrooms approximately sixteen hours per day.

72.   In the 4th Avenue jail, general population inmates have access to dayrooms approximately eight hours per day.

73.   Dayroom access at the 4th Avenue jail was reduced from sixteen to eight hours daily to reduce inmate violence.

74.   In the Towers jail, administrative segregation, disciplinary segregation, and security segregation inmates have access to dayrooms no more than one hour per day, during which time they must also tend to their personal hygiene needs, including taking showers and cleaning their cells.

75.   In the Estrella jail, closed custody, administrative segregation, disciplinary segregation, security segregation, and "nature of crimes" inmates have access to the dayrooms no more than one hour per day, during which time they must also tend to their personal hygiene needs, including taking showers and cleaning their cells.

76.   In the Durango jail,  administrative segregation, disciplinary segregation, and security segregation inmates have access to the dayrooms no more than one hour per day.

77.   Because pretrial detainees do not have a constitutional right to dayroom access apart from adequate opportunity for out-of-cell movement and sufficient space within cells, there is no current and ongoing constitutional violation regarding dayroom access.

78.   Paragraphs 18 and 19 of the Amended Judgment will be terminated because they exceed the constitutional minimum.

**E.   Temperature (AJ ¶ 23)**

79.   The Amended Judgment states in paragraph 23:

> 23.   Defendants shall provide pretrial detainees with heating and cooling systems and all equipment and structures necessary to provide healthful and comfortable living conditions.

80.   The Eighth Amendment requires that the temperature of the areas in which pretrial detainees are held or housed does not threaten their health or safety.

81.   The Fourteenth Amendment requires that the temperature of the areas in which pretrial detainees are held or housed must not constitute punishment, *i.e.*, deviations from a reasonably comfortable temperature must be reasonably related to a legitimate governmental objective.

82.   Plaintiffs contend that temperatures in some of the Maricopa County Jail housing units present a health risk for pretrial detainees on psychotropic medications and reduce the ability of pretrial detainees to exercise in their cells.

83.   Defendant Arpaio contends there is no current or ongoing violation of federal rights regarding temperature.

84.   Defendant Arpaio is not constitutionally required to provide pretrial detainees with "comfortable" living conditions to the extent the uncomfortable conditions are rationally related to maintaining security and order and operating the institution in a manageable fashion.

85.   Defendant Arpaio is constitutionally required to maintain heating and cooling systems necessary to provide healthful living conditions for pretrial detainees.

86.   Temperatures in most of the Maricopa County Jail housing areas are maintained at a reasonably comfortable level, but ambient temperatures in some of the Towers cells and peripheral areas have exceeded 85° F.

87.   Air temperatures in excess of 85° F. greatly increase the risk of heat stroke and other heat-related illnesses for pretrial detainees who are taking psychotropic medications.

88.   Defendant Arpaio does not have a list of all pretrial detainees taking psychotropic medications and cannot readily determine where pretrial detainees taking psychotropic medications are housed.

89.   Detention officers generally do not know which pretrial detainees are taking psychotropic medications.

90.   Defendant Arpaio does not ensure that pretrial detainees taking psychotropic medications are housed at temperatures that provide healthful living conditions.

91.   There is no current and ongoing violation of pretrial detainees' constitutional right to be housed in living conditions maintained at a healthful temperature

1   generally, but there is a current and ongoing violation of that right for pretrial detainees

2   taking pyschotropic medications.

3         92.   Prospective relief remains necessary to correct a current and ongoing

4   violation of a federal right to living conditions maintained at a healthful temperature for

5   pretrial detainees taking pyschotropic medications.

6         93.   Paragraph 23 of the Amended Judgment will not be terminated and will be

7   modified to state: "Defendants shall provide pretrial detainees who are taking prescribed

8   psychotropic medications with housing in which the temperature does not exceed 85° F."

9         94.   Prospective relief regarding temperature, as modified in the preceding

10  paragraph, extends no further than necessary to correct the violation of the federal right, is

11  narrowly drawn, and is the least intrusive means to correct the violation.

12         **F.   Sanitation, Safety, Hygiene, and Toilet Facilities (AJ ¶¶ 43, 45-47)**

13         95.   The Amended Judgment states in paragraphs 43 and 45-47:

14              43.   Defendants shall provide a fire protection service sufficient to
                assure the safety of staff, pretrial detainees and visitors at the jails and a
15              system of fire inspection and testing of equipment by local fire officials at
                least every three months.  Defendants shall assure that all jails comply with
16              the current fire safety code promulgated by the National Fire Protection
                Association.

17
                45.   Defendants shall provide for the prompt removal of pretrial
18              detainees from cells with inoperable toilets and sinks to a place where such
                facilities are available.
19
                46.   Defendants shall provide pretrial detainees with sufficient, safe
20              cleaning supplies to enable pretrial detainees to properly clean their cells.
                Defendants shall assure that cells, including but not limited to medical
21              isolation cells, are properly cleaned and sanitized prior to occupancy by
                pretrial detainees.
22
                47.   Defendants shall maintain a written plan for daily housekeeping
23              and regular maintenance of the jail.  Defendants shall provide toilets,
                showers, and sinks to pretrial detainees that are in good repair and can be
24              cleaned properly.

25         96.   The Eighth Amendment requires that prisoners be provided basic elements

26  of hygiene, sanitation, and safety, including freedom from unreasonable threat of injury

27  from fire and from vermin and rodent infestation.

28

1        97.   The Fourteenth Amendment requires that pretrial detainees be held and

2    housed in conditions that do not constitute punishment, *i.e.*, confinement conditions may

3    be unpleasant, but not excessively unpleasant in light of the legitimate governmental

4    objectives those conditions serve.

5    **Fire Protection**

6        98.   Regarding paragraph 43 of the Amended Judgment, Plaintiffs contend

7    Defendant Arpaio's failure to perform quarterly evacuation drills required by the

8    International Fire Code places pretrial detainees in potentially life threatening

9    circumstances in violation of both the Eighth and Fourteenth Amendments.

10        99.   Defendant Arpaio contends paragraph 43 of the Amended Judgment

11    exceeds the constitutional minimum.

12        100.   Paragraph 43 of the Amended Judgment exceeds the constitutional

13    minimum to the extent that it requires the Maricopa County Jails to comply with the

14    current fire safety code promulgated by the National Fire Protection Association and

15    requires fire inspection and equipment testing by local fire officials.

16        101.   In each of its facilities the Maricopa County Jails has fire protection

17    equipment, provides fire safety training for jail staff, and conducts emergency evacuation

18    drills and training.

19        102.   The Maricopa County Jails do not conduct fire drills or other emergency

20    drills that include evacuating inmates because doing so would present a substantial risk to

21    the safety and security of inmates and staff.

22        103.   Therefore, there are no current and ongoing violations of pretrial

23    detainees' constitutional rights regarding paragraph 43 of the Amended Judgment.

24    **Toilets, Sinks, and Showers**

25        104.   Regarding paragraph 45 of the Amended Judgment, Plaintiffs do not

26    contend that Defendant Arpaio does not usually remove pretrial detainees from cells with

27    inoperable toilets or sinks.

28

105.   Defendant Arpaio usually removes pretrial detainees from cells with inoperable toilets or sinks within a reasonable time.

106.   There are no current and ongoing violations of pretrial detainees' constitutional rights regarding paragraph 45 of the Amended Judgment.

107.   Regarding the second sentence of paragraph 47 of the Amended Judgment, which requires the Maricopa County Jails to provide toilets, showers, and sinks to pretrial detainees that are in good repair and can be cleaned properly, Plaintiffs contend that toilets and sinks in the 4th Avenue Intake holding cells are unsanitary, the toilets in the 4th Avenue Intake holding cells often are not functional, and the toilets and showers at the Towers, Durango D8 and D9, and Estrella jails often are not functional.

108.   Plaintiffs contend that the ratios of pretrial detainees to toilets in the 4th Avenue Intake holding cells, Durango D8 and D9 housing units, Estrella dorms, and court holding cells at Madison exceed reasonable standards.

109.   Defendant Arpaio contends that pretrial detainees are provided with functioning plumbing and not punished by non-functioning plumbing.

110.   In all housing areas, Defendant Arpaio provides toilets, showers, and sinks to pretrial detainees, which are frequently repaired.

111.   In the 4th Avenue Intake holding cells and the court holding cells at Madison, Defendant Arpaio provides toilets and sinks, but they are often unsanitary, and frequently there is insufficient soap and toilet paper to maintain basic elements of hygiene and sanitation.

112.   The excessive ratios of pretrial detainees to toilets at the 4th Avenue Intake holding cells, Durango D8 and D9 housing units, Estrella dorms, and court holding cells at Madison are the result of overcrowding (*see* III.C *supra*), but pretrial detainees do not have a constitutional right to a certain ratio of pretrial detainees to toilets.

113.   Although toilets, showers, and sinks in the Maricopa County Jails require frequent repair, Defendant Arpaio's current provision of functioning toilets, showers, and

1  sinks does not violate pretrial detainees' constitutional rights except  in the 4th Avenue

2  Intake holding cells and the court holding cells at Madison.

3    114.   Therefore, there are current and ongoing violations of pretrial detainees'

4  constitutional rights regarding the second sentence of paragraph 47 of the Amended

5  Judgment in the 4th Avenue Intake holding cells and the court holding cells at Madison.

6  **Cleaning Supplies, Sanitation, Housekeeping, and Maintenance**

7    115.   Regarding paragraph 46 of the Amended Judgment, Plaintiffs contend

8  Defendant Arpaio does not consistently provide pretrial detainees with adequate supplies

9  to clean their cells and shared areas.

10    116.   Defendant Arpaio contends pretrial detainees are provided with sufficient

11  cleaning supplies.

12    117.   Defendant Arpaio provided inmates with sufficient cleaning supplies, and

13  even brought in trustees to assist with cleaning, shortly before the jail inspections for this

14  litigation.

15    118.   Defendant Arpaio provides inmates with cleaning supplies, but does not

16  consistently provide sufficient supplies for effective cleaning.

17    119.   Failure to consistently provide pretrial detainees with sufficient cleaning

18  supplies for effective cleaning causes an unconstitutional health risk to pretrial detainees.

19    120.   Administrative segregation pretrial detainees are provided cleaning

20  supplies and expected to clean their cells during the one hour they have out of their cells

21  to shower and make telephone calls.

22    121.   Failure to provide administrative segregation pretrial detainees with

23  adequate opportunity to clean their cells causes an unconstitutional health risk to pretrial

24  detainees.

25    122.   Rats and/or mice remain a chronic problem in Maricopa County Jails,

26  which Defendant Arpaio has made some efforts to eradicate.

27    123.   Cells are not consistently cleaned and sanitized prior to occupancy by

28  pretrial detainees thereby causing an unconstitutional health risk.

1    124.   There are, therefore, current and ongoing violations of pretrial detainees'

2    constitutional rights regarding paragraph 46 of the Amended Judgment.

3    125.   Regarding the first sentence of paragraph 47 of the Amended Judgment,

4    Plaintiffs do not contend that a written plan for daily housekeeping and regular

5    maintenance is constitutionally required.

6    126.   Defendant Arpaio contends that a written plan for daily housekeeping and

7    regular maintenance exceeds the constitutional minimum.

8    127.   Paragraph 47 of the Amended Judgment exceeds the constitutional

9    minimum to the extent it requires, "Defendants shall maintain a written plan for daily

10   housekeeping and regular maintenance of the jail."

11   128.   Therefore, paragraph 43, paragraph 45, and the first sentence of paragraph

12   47 of the Amended Judgment will be terminated, paragraph 46 will not be terminated, and

13   the second sentence of paragraph 47 will not be terminated and will be modified to state:

14   "Defendants shall provide functional and sanitary toilets and sinks, with toilet paper and

15   soap, to pretrial detainees in 4th Avenue Intake and the court holding cells at Madison."

16   129.   Prospective relief remains necessary to correct a current and ongoing

17   violation of the federal right to sanitary living conditions, and paragraph 46 of the

18   Amended Judgment and the second sentence of paragraph 47 as modified extend no

19   further than necessary to correct the violation of the federal right, are narrowly drawn,

20   and are the least intrusive means to correct the violation.

21   **G.   Medical, Dental, and Psychiatric Care (AJ ¶¶ 56-62, 64, 67, 69-70)**

22   130.   The Amended Judgment states in paragraphs 56-62, 64, 67, and 69-70:

23   56.   Defendants shall provide a receiving screening of each pretrial
     detainee, prior to placement of any pretrial detainee in the general
24   population.  The screening will be sufficient to identify and begin
     necessary segregation, and treatment of those with mental or physical
25   illness and injury; to provide necessary medication without interruption; to
     recognize, segregate, and treat those with communicable diseases; to
26   provide medically necessary special diets; and to recognize and provide
     necessary services to the physically handicapped.

27   57.   All pretrial detainees confined in the jails shall have access to
28   medical services and facilities which conform to the standards designated

as "essential" by the National Commission on Correctional Health Care ("NCCHC") Standards for Health Services in Jails, as amended from time to time. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate on-site medical services.

58. Defendants shall assure that all policies, procedures, and programs instituted pursuant to the preceding paragraph are fully implemented and that each pretrial detainee is provided health services in conformity with such policies, procedures, and programs.

59. A copy of all then-current Correctional Health Services policies, procedures and programs shall be made available to plaintiffs' counsel for inspection and/or copying upon reasonable request.

60. Defendants shall ensure that orders by the responsible health care authority and its qualified health care personnel are not interfered with or overridden by security staff.

61. Defendants shall ensure that the pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff.

62. Defendants shall maintain unit dose records of all psychiatric and narcotic prescription medications administered to pretrial detainees. All other prescription medications shall be recorded in the pretrial detainees' medical records indicating the type and amount of medication dispensed and the date.

64. Defendants shall provide a monitoring system by which pretrial detainees may be assured that sick call requests are delivered to the responsible health care authority and its qualified health care personnel in a timely manner by security staff and that written responses from health care personnel are also handled in a timely manner.

67. Defendants shall provide sufficient equipment to provide emergency medical treatment to the pretrial detainees at the jails when needed.

69. Defendants shall provide pretrial detainee with dental care in cases of emergency.

70. Defendants shall arrange for and obtain written evaluations of health care services within the jails by independent persons, organizations or agencies experienced in evaluating such services, which evaluations shall utilize generally accepted standards for correctional facilities as described by the NCCHC. Reports shall be obtained based upon the regular review schedule (currently one every three years) of the NCCHC or other independent reviewing agency; provided, however, that an annual, interim internally-prepared report shall be provided to the attorney for the plaintiff class, if any, at the same time that such report is provided to the independent review organization.

131.   The Eighth Amendment requires that the Maricopa County Jails provide a system of ready access to adequate medical, dental, and mental health care; medical staff competent to examine prisoners and diagnose illnesses; timely treatment for prisoners' medical problems or referral to others who can; and an adequate system for responding to emergencies.

132.   The Eighth Amendment requires that the Maricopa County Jails not be deliberately indifferent to prisoners' serious medical, dental, and mental health needs, including conditions that are likely to cause serious illness and needless suffering in the future.

133.   The Fourteenth Amendment requires that Maricopa County Jails provide pretrial detainees with access to care to meet their serious medical, dental, and mental health needs, which means that in a timely manner, a pretrial detainee can be seen by a clinician, receive a professional clinical judgment, and receive care that is ordered.

134.   The Fourteenth Amendment requires that the Maricopa County Jails not withhold or delay medical, dental, or mental health care unless doing so is reasonably related to a legitimate governmental objective.  Budgetary constraints do not justify delay in treatment for a serious medical need.

135.   Plaintiffs contend the medical, dental, and mental health care provided to pretrial detainees at the Maricopa County Jails is grossly inadequate and that Defendants disregard pretrial detainees' serious health needs and unnecessarily subject them to pain and substantial risk of significant injury and deterioration of their health.

136.   Plaintiffs further contend that systemic deficiencies prevent pretrial detainees from receiving timely access to care to meet their serious medical and mental health needs, care based on professional medical judgments, and the care that is ordered.

137.   Defendant Arpaio contends the only constitutional obligation regarding medical, mental health, and dental care applicable to him is that jail officials must not interfere with an inmate's ability to obtain medical care and treatment, and there is no

1   evidence that jail officials systematically interfere with inmates obtaining medical care
2   and treatment.

3       138.   The Board Defendants contend the Court should terminate the prospective
4   relief provided in paragraphs 56-62, 64, 67, and 69-70 of the Amended Judgment because
5   there are no current and ongoing systemic violations of any federal rights contained in the
6   Amended Judgment.

7       139.   The Board Defendants argue that because the parties stipulated to
8   incorporate in the Amended Judgment the "essential" standards for health services in jails
9   of the National Commission on Correctional Health Care ("NCCHC"), Correctional
10  Health Services adopted policies conforming to NCCHC standards, and Correctional
11  Health Services substantially complies with all of the "essential" NCCHC standards,  they
12  have met their burden in proving there are no current and ongoing violations of pretrial
13  detainees' federal rights.

14      140.   The Court decides independently whether there are current and ongoing
15  violations of pretrial detainees' constitutional rights and does not rely on any
16  determinations made by an accrediting organization such as the NCCHC.

17      141.   The NCCHC standards represent NCCHC's recommended practices for
18  jail health services and consist of seventy-two standards grouped under nine general
19  areas.  Each standard is classified as either "essential" or "important."  Standards, whether
20  classified as "essential" or "important," may not apply in a particular situation.

21      142.   The NCCHC "essential" standards do not specifically focus on all of
22  pretrial detainees' constitutional rights.

23      143.   Some of the NCCHC "essential" standards address administrative
24  functions and are not narrowly tailored to meet constitutional requirements.

25      144.   Although the NCCHC standards may be helpful for a jail, the Court
26  makes its findings based on the Eighth and Fourteenth Amendments of the United States
27  Constitution.

28

**Medical, Dental, and Mental Health Needs**

145.   The Maricopa County Jails booked more than 93,000 pretrial detainees from June 1, 2007, through May 31, 2008.  It houses approximately 8,000 pretrial detainees daily.  Some pretrial detainees remain in the Maricopa County Jails for days, and others for years.

146.   A substantial number of pretrial detainees in the Maricopa County Jails require medical treatment and/or prescription medication.

147.   Many of the pretrial detainees in the Maricopa County Jails have alcohol and drug addictions, physical injuries, and chronic diseases, such as diabetes, asthma, hypertension, seizure disorders, and Parkinson's disease.

148.   Many pretrial detainees have physical conditions, including dental care needs, caused or exacerbated by their living conditions before incarceration, such as illegal drug use,  homelessness, inadequate health care, and inadequate nutrition.

149.   It is estimated that twenty percent of the pretrial detainees housed in the Maricopa County Jails are seriously mentally ill.  Many of these have schizophrenia, bipolar disease, anxiety disorders, attention deficit disorder, and other serious chronic mental illnesses.

150.   Providing appropriate treatment and care for the large number of individuals with serious mental illness is a significant statewide problem, and state facilities and services are inadequate to sufficiently address the problem.

151.   Often people with serious mental illness, who are untreated or undertreated, commit minor crimes and end up in the Maricopa County Jails.

152.   Because the state hospital for the seriously mentally ill is overcrowded, the Maricopa County Jails often must house and provide treatment for those who should receive in-hospital psychiatric care.

153.   Although many pretrial detainees' medical and mental health care needs could be addressed more effectively and efficiently through public services outside of

1   criminal justice institutions, they frequently are not, and the responsibility for doing so

2   falls upon the Maricopa County Jails.

3   **Maricopa County Jails Medical Facilities**

4   154.   The 4th Avenue jail contains an intake center with its own dedicated health

5   personnel whose responsibility is to process incoming pretrial detainees.  The 4th Avenue

6   jail also contains an outpatient clinic.  Correctional Health Services has clinics on the

7   second, third, and fourth floors, each of which consists of three examination rooms and

8   two offices.  A central clinic is located in the basement comprised of a medication room,

9   three examination rooms, four offices, an x-ray area, laboratory, a medical records room,

10  and a dental office.  The clinic provides medications administration, sick call, chronic

11  care clinics, outpatient psychiatric care, dental care, and radiology services.

12  155.   The Lower Buckeye jail contains various medical, mental health, and

13  dental facilities, including a 60-bed infirmary, and a 260-bed inpatient psychiatric facility.

14  Outpatient care is provided as well as infirmary care at this facility.  The outpatient clinic

15  has seven offices, four examination rooms, a medical records room, two medication

16  rooms, a specimen processing area, and a two-chair dental office.  The scope of services

17  at the infirmary includes follow-up care for transfers from area hospitals following

18  surgical procedure and treating illness or injury that requires acute care.  Health services

19  administration is also located at the Lower Buckeye jail.  The 260-bed psychiatric facility

20  is available for patients who need a higher level of psychiatric care than can be provided

21  in general population housing.

22  156.   The Towers, Estrella, and Durango jails all contain outpatient clinics.  The

23  Towers jail has an office, medication room, a specimen processing area,  two medical

24  examination rooms, and a mental health interview room.  The Estrella jail contains an

25  office, dental office, medication room, a specimen processing area, medical records room,

26  and four examination rooms.  The Durango jail has three examination rooms, a specimen

27  processing area, a medication room, two offices, and a medical records area.

28

**Receiving Screening**

157.   Paragraph 56 of the Amended Judgment requires Defendants to provide a receiving screening of each pretrial detainee prior to placement of any pretrial detainee in the general population.  Paragraph 56 further requires the screening to be sufficient to identify and begin necessary segregation, treatment, medication, special diets, and accommodations.

158.   Paragraph 56 of the Amended Judgment does not exceed the constitutional minimum because the required receiving screening is essential to providing adequate medical, mental, and dental health care for pretrial detainees and maintaining jail safety and security.

159.   All pretrial detainees entering the jail system, with the exception of self surrenders, are processed through the 4th Avenue jail.  The central intake unit has three health assessment stations.  There is a Correctional Health Services technician at each station who is either a Certified Nursing Assistant, a Medical Assistant, and/or an Emergency Medical Technician.  The technicians in the intake unit are trained to perform screenings.

160.   All incoming detainees receive a screening when they arrive and prior to booking.  It takes eight minutes on average to complete this process.

161.   The intake technicians often ask pretrial detainees the screening questions very quickly in a noisy environment that lacks privacy and is not conducive to pretrial detainees giving thoughtful responses to very personal questions.

162.   Although the 4th Avenue jail has clinical facilities to allow pretrial detainees following their initial pre-intake screening to proceed to a post-intake area and have a more comprehensive evaluation done by a clinician, a secondary screening at booking often does not occur.  The number of pretrial detainees who receive the more comprehensive screening is significantly less than the number of pretrial detainees with serious medical needs who are booked.

163.   During the intake screening, health personnel are instructed to check for a history of substance abuse or intoxication, diabetic care, seizure medications, and wound care.

164.   However, the intake screening often does not capture basic and necessary information from detainees, including an adequate history from those suffering from chronic diseases.

165.   Screening also is intended to identify persons with mental illnesses, who are to be scheduled for appropriate follow-up consistent with their level of need.  Mental health screening questions include mental health treatment history, prescription medications, outpatient treatment provider, history of suicide attempts and self-injury, and current thoughts of suicide, in addition to subjective observations of the pretrial detainee's appearance and behavior noted.

166.   Mental health staff are available for immediate assessment in the intake area seven days a week, twenty-four hours per day.

167.   In addition, the booking area contains ten "safe cells" in which persons determined to be at imminent risk of harm to themselves or others can be housed temporarily until the risk is reduced or the person is transferred to the inpatient psychiatric unit at Lower Buckeye jail or the county psychiatric hospital.

168.   However, many pretrial detainees with serious mental illness are not identified and assessed by a mental health clinician during the intake process.

169.   Pretrial detainees are to be provided immediate care, if needed, at the time of screening.  If appropriate, pretrial detainees are to be transported to the hospital for further analysis and care not available on-site either to be returned later for booking or booked in Ward 41 at the Maricopa Medical Center.

170.   Pretrial detainees who are not identified as requiring immediate care may not receive any care for at least two weeks, following a more thorough health assessment.

1      171.  During screening, when pretrial detainees identify that they are on

2  medications, staff are trained to verify these medications, obtain orders, and initiate

3  administration of the medications in a timely fashion.

4      172.  However, incoming pretrial detainees with chronic medical problems,

5  such as diabetes, hypertension, and HIV disease, often do not receive their medications

6  a timely manner.  Many people do not know the name or address of their pharmacy, or

7  they might not have a pharmacy because they were prescribed medication in prison.

8      173.  For certain psychotropic medications, when verification indicates the

9  pretrial detainee has been prescribed a medication not on the jail's medication formulary,

10  sometimes a two-week order for the non-formulary medication is written to permit

11  continuity while the process to order non-formulary medication is undertaken.

12      174.  However, for some pretrial detainees, Correctional Health Services

13  prescribes a formulary medication instead of the non-formulary medication the pretrial

14  detainee was taking before arrest.

15      175.  Following the receiving screening, Correctional Health Services  makes

16  efforts to obtain outside medical records of pretrial detainees.

17      176.  Once processed, pretrial detainees are turned over to the detention staff of

18  the jail, who then officially accept pretrial detainees into the jail.  Upon admission,

19  pretrial detainees receive handbooks that are available in English and Spanish, which

20  contain information on the availability of health care services, procedures for requesting

21  care, fees for certain services, and the facility's health grievance procedures.  Pretrial

22  detainees also are to be given oral instructions on how to obtain medical care.

23      177.  Systemic deficiencies in the screening process significantly impair

24  continuity of care and result in failure to identify pretrial detainees with immediate

25  medical needs.

26      178.  Therefore, paragraph 56 of the Amended Judgment will not be terminated

27  because it does not exceed the constitutional minimum and there are continuing and

28  ongoing violations of pretrial detainees' constitutional rights.

179.  Prospective relief in paragraph 56 of the Amended Judgment remains necessary to correct a current and ongoing violation of the federal right to adequate medical, mental health, and dental care, extends no further than necessary to correct the violation of the federal right, is narrowly drawn, and is the least intrusive means to correct the violation.

### National Commission on Correctional Health Care ("NCCHC") Standards for Health Care in Jails

180.  Regarding paragraph 57 of the Amended Judgment, pretrial detainees have a constitutional right to access to adequate health care, but there is no constitutional requirement that the adequacy of health care be defined by the NCCHC.

181.  Paragraph 57 of the Amended Judgment will be modified to terminate the references to the NCCHC, which exceed the constitutional minimum.

### Access to Adequate Health Care

182.  Paragraph 57 of the Amended Judgment does not exceed the constitutional minimum to the extent it requires Defendants to ensure pretrial detainees' ready access to care to meet their serious medical, dental, and mental health needs, which means that in a timely manner, a pretrial detainee can be seen by a clinician, receive a professional clinical judgment, and receive care that is ordered.

Staffing

183.  Correctional Health Services provides medical, mental health, and dental care through a combination of county employees and independent contractors.

184.  Correctional Health Services fills vacant positions with independent contractors and over-time services of county staff.

185.  Correctional Health Services has difficulty filling vacant positions for psychiatrists.

Initiating Treatment

186.  Within fourteen days of booking, pretrial detainees usually receive medical and mental health assessments that are more thorough than the brief screening

during intake and are performed by nurses, physician assistants, nurse practitioners, or physicians.

187.  Sometimes pretrial detainees receive medical care because their family members, attorneys, or clergy have requested it.

188.  Sometimes pretrial detainees receive medical care based on a detention officer's referral.

189.  Pretrial detainees seeking medical care must complete sick call request forms and hand them to nursing staff, usually the Licensed Practical Nurse administering medications in the morning.

190.  Sick call requests are to be triaged by nurses within twenty-four hours, seven days a week, without actually seeing the pretrial detainees who have submitted the sick call requests.

191.  Although the nurses administering medications are expected to talk to pretrial detainees submitting sick call requests and to record additional information for triaging and treatment, they do not consistently do so well.

192.  Some pretrial detainees do not speak or write English; some are not literate at all.  They have difficulty communicating about their health care needs in writing on the sick call request forms.

193.  Pretrial detainees frequently are denied access to adequate medical, mental health, and dental care because they do not receive a timely in-person assessment of the urgency of their need for treatment.

<u>Medical Records and Information Management</u>

194.  Clinicians at the Maricopa County Jails often cannot provide a professional medical judgment because Correctional Health Services does not have a medical record and information system capable of timely providing health care professionals with the information they need to diagnose and treat pretrial detainees appropriately, including laboratory results and results of specialty consults.

1    195.   Correctional Health Services does not maintain a list of pretrial detainees

2    with chronic diseases and cannot readily determine where they are housed and what

3    medications have been prescribed for them.

4    196.   Correctional Health Services does not maintain a list of pretrial detainees

5    on prescription medications.

6    197.   Detention officers often do not know which pretrial detainees in their

7    custody are on medications that may have adverse side effects.

8    198.   Detention officers often do not know which pretrial detainees in their

9    custody are taking psychotropic medications and may suffer heat-related illnesses if

10   subjected to temperatures exceeding 85° F.

11   199.   Correctional Health Services does not maintain a list of pretrial detainees

12   identified as seriously mentally ill and cannot readily determine where they are housed

13   and what medications have been prescribed for them.

14   200.   Because Correctional Health Services does not have ready access to the

15   number and location of seriously mentally ill pretrial detainees, it cannot determine

16   whether it has enough qualified mental health staff available to provide adequate mental

17   health services.

18   201.   Correctional Health Services does not know how many hours of

19   psychiatric service it provides to pretrial detainees.

20   202.   Although electronic record management is not constitutionally required,

21   the volume of pretrial detainees housed in the Maricopa County Jails suggests that

22   Correctional Health Services likely cannot manage medical records, track inmate

23   locations for pretrial detainees with medical needs, and produce reports necessary for

24   health care staff  and detention officers to provide access to adequate health care without

25   an electronic system.

26                    <u>Discipline of the Seriously Mentally Ill</u>

27   203.   Detention officers often do not know which pretrial detainees in their

28   custody have been identified as seriously mentally ill.

204.   There is no jail policy requiring that mental health staff be notified or involved in the disciplinary process of mentally ill detainees, and mental health clinical staff are not consulted about disciplinary actions against mentally ill detainees.

205.   Some pretrial detainees have been punished for behavior related to serious mental illness.

206.   The vast majority of seriously mentally ill pretrial detainees are not housed in the Lower Buckeye psychiatric unit, and seriously mentally ill pretrial detainees may be placed in segregation at other housing facilities without detention staff's knowledge that the pretrial detainees are seriously mentally ill.

207.   Lockdown for twenty-three hours per day, alone or with cellmates, can be seriously detrimental to the condition of a seriously mentally ill pretrial detainee.

208.   Although seriously mentally ill pretrial detainees require more supervision when placed in segregation, they usually receive less.

<u>Treatment of the Seriously Mentally Ill</u>

209.   Thorazine is an antipsychotic medication with potentially severe and permanent side effects, including extremely painful involuntary muscle spasms of the neck, tongue, eyes or other muscles, a profound restlessness and constant movement of the feet and legs, drug-induced Parkinsonism (a resting tremor with some muscle rigidity), and tardive diskenesia (potentially permanent and disfiguring involuntary movements around the face).

210.   Although Correctional Health Services witnesses testified they would not prescribe thorazine as a first line of treatment, in fact, Correctional Health Services has prescribed thorazine for many psychotic, and even some not psychotic, pretrial detainees without justification for its use. Correctional Health Services psychiatrists sometimes prescribe thorazine as a sleep aid.

211.   Some of the seriously mentally ill pretrial detainees are housed in the psychiatric unit at the Lower Buckeye jail, and the most seriously mentally ill of those are housed in cells that do not permit psychiatrists and pretrial detainees to have visual

1   contact while communicating or to have private therapeutic communications.  Mental

2   health staff frequently provide cell-side treatment without privacy in other housing units

3   as well.  In some cases, this detriment to therapeutic treatment is necessary to preserve the

4   safety and security of staff and pretrial detainees; in some cases, it is not.

5          212.   Many of the pretrial detainees housed at the Lower Buckeye jail

6   psychiatric unit need hospital level psychiatric care.

7          213.   The psychiatric unit at the Lower Buckeye jail does not provide hospital

8   level psychiatric care.

9          214.   Many of the pretrial detainees housed at the Lower Buckeye jail

10  psychiatric unit are maintained in segregation lockdown with little or no meaningful

11  therapeutic treatment, which results in needless suffering and deterioration.

12         215.   Although mental health staff are on site twenty-four hours a day, seven

13  days a week, psychiatrists are not.  Therefore, acutely psychotic pretrial detainees, pretrial

14  detainees on suicide watch, and pretrial detainees in restraints or on forced medications,

15  are being treated after hours and on weekends without the personal supervision of a

16  psychiatrist.

17         216.   Regarding paragraph 57 of the Amended Judgment, Defendants do not

18  ensure that pretrial detainees receive access to adequate medical and mental health care

19  because Correctional Health Services does not provide timely in-person assessment of the

20  urgency of their need for treatment, is not able to readily retrieve information from

21  pretrial detainees' medical and mental health records and housing records, and does not

22  identify and appropriately treat many pretrial detainees with serious mental illness.

23         217.   Prospective relief remains necessary to correct a current and ongoing

24  violation of the federal right to adequate medical and mental health care.

25         218.   Therefore, paragraph 57 of the Amended Judgment will not be terminated,

26  but will be modified to state:  "All pretrial detainees confined in the jails shall have ready

27  access to care to meet their serious medical and mental health needs.  When necessary,

28  pretrial detainees confined in jail facilities which lack such services shall be transferred to

1    another jail or other location where such services or health care facilities can be provided

2    or shall otherwise be provided with appropriate alternative on-site medical services."

3        219.   Prospective relief granted in paragraph 57 of the Amended Judgment, as

4    modified in the preceding paragraph, extends no further than necessary to correct the

5    violation of the federal right, is narrowly drawn, and is the least intrusive means to correct

6    the violation.

7                          **Policies, Procedures, and Programs**

8        220.   Pretrial detainees' constitutional rights do not include requiring the

9    Maricopa County Jails to implement policies, procedures, and programs that it adopts and

10   to provide health services in conformity with its policies, procedures, and programs.

11       221.   Therefore, paragraph 58 of the Amended Judgment will be terminated

12   because it exceeds the constitutional minimum.

13       222.   Pretrial detainees' constitutional rights do not include requiring the

14   Maricopa County Jails to provide copies of its policies, procedures, and programs to

15   Plaintiffs' counsel.

16       223.   Therefore, paragraph 59 of the Amended Judgment will be terminated

17   because it exceeds the constitutional minimum.

18                        **Interference with Health Care Orders**

19       224.   Paragraph 60 of the Amended Judgment, which prohibits security staff

20   from interfering with or overriding orders by the responsible health care authority and its

21   qualified health care personnel, does not exceed the constitutional minimum.

22       225.   Detention officers often do not know which pretrial detainees are

23   receiving health care or have been prescribed medication.

24       226.   Detention officers do not currently handle sick call requests.

25       227.   Detention officers, on occasion, report their observations that pretrial

26   detainees may require health care.

27       228.   Custody staff do not knowingly interfere with or override orders by

28   Correctional Health Services personnel regarding health care for pretrial detainees.

229.   Therefore, paragraph 60 of the Amended Judgment will be terminated because there is no current and ongoing violation of pretrial detainees' constitutional rights related to this paragraph.

**Prescription Medications Without Interruption**

230.   Paragraph 61 of the Amended Judgment, which requires Defendants to ensure that pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff, does not exceed the constitutional minimum.

231.   Providing pretrial detainees' prescription medications without interruption is essential to constitutionally adequate medical care.

232.   Lapses in medication for certain medical conditions, *e.g.*, HIV, seizure disorders, diabetes, organ transplants, can be life threatening even if the lapse is only a few days.

233.   In addition to inconsistencies in obtaining necessary prescription information during the intake process, Correctional Health Services does not consistently ensure that all pretrial detainees actually receive all prescribed medications as ordered.

234.   Prescription orders are recorded in pretrial detainees' individual paper records, but Correctional Health Services is not able to generate a list of pretrial detainees in each housing facility to whom prescription medications are to be administered.

235.   Licensed Practical Nurses administer medications to pretrial detainees on "pill passes" through the jail housing facilities twice a day.

236.   During the pill pass, the pill nurse has the individual medical records of pretrial detainees who are to receive medication at a facility, which may number in the hundreds, and he or she records those who come forward when pill pass is called and receive medication.

237.   During the pill pass, the pill nurse also receives sick call requests from pretrial detainees and is expected to determine the urgency of any of the sick call requests.

238. The pill nurse does not have a list of which pretrial detainees are supposed to come for medication.

239. The pill nurse does not know whether a pretrial detainee who is supposed to receive medication is at court, recreation, church, or sleeping.

240. It may take the pill nurse several days to determine that a pretrial detainee has missed or continues to miss his or her prescribed medications.

241. If a pretrial detainee does not come to pill pass to receive medication, when it is noticed, the pill nurse may enter into the pretrial detainee's medical record that he or she refused medication, even if the pill nurse does not know in fact why the pretrial detainee did not come to the pill pass.

242. Some "evening" pill passes have been conducted as early as 3:00 p.m. even though some of the prescribed medications are to be taken at bedtime and are known to cause drowsiness.

243. Therefore, paragraph 61 of the Amended Judgment will not be terminated because it does not exceed the constitutional minimum and there are current and ongoing violations of pretrial detainees' constitutional rights.

244. Prospective relief provided in paragraph 61 of the Amended Judgment remains necessary to correct a current and ongoing violation of the federal right to adequate medical, mental health, and dental care, extends no further than necessary to correct the violation of the federal right, is narrowly drawn, and is the least intrusive means to correct the violation.

### Prescription Records

245. Regarding paragraph 62 of the Amended Judgment, pretrial detainees' constitutional rights do not include a specific right to "unit dose records" of all psychiatric and narcotic prescription medications administered to pretrial detainees, but they do include the right to complete and accurate medical records indicating the type and amount of medication dispensed and the date.

246.   Although the medical record keeping system is inadequate for Correctional Health Services and detention staff to readily determine which pretrial detainees have certain medical needs and medication prescriptions and where those pretrial detainees are located, there is no current and ongoing violation regarding maintaining individual medical records for pretrial detainees.

247.   Therefore, paragraph 62 of the Amended Judgment will be terminated because it exceeds the constitutional minimum regarding maintaining "unit dose records," and because there is no current and ongoing violation of the remainder of paragraph 62.

**Monitoring System for Sick Call Requests**

248.   Regarding paragraph 64 of the Amended Judgment, although pretrial detainees have a constitutional right to access to medical care, they do not have a constitutional right to a system to monitor the delivery of sick call requests to the health care providers and delivery of written responses to pretrial detainees.

249.   Further, the procedure of submitting written sick call requests and receiving written responses occurs regularly, often without any practical benefit to the pretrial detainee who is told only that an appointment with a medical provider will be scheduled at some undetermined date in the future.

250.   Therefore, paragraph 64 of the Amended Judgment will be terminated because it exceeds the constitutional minimum.

**Emergency Medical Equipment**

251.   Paragraph 67 of the Amended Judgment does not exceed the constitutional minimum because sufficient equipment to provide emergency medical treatment is essential to adequate medical care.

252.   The Maricopa County Jails provides sufficient equipment, including oxygen and automated external defibrillators, to provide emergency medical treatment to pretrial detainees at the jails as needed.

253.   Therefore, paragraph 67 of the Amended Judgment will be terminated because there is no current and ongoing violation of pretrial detainees' constitutional rights related to this paragraph.

**Emergency Dental Care**

254.   Paragraph 69 of the Amended Judgment does not exceed the constitutional minimum because pretrial detainees have a constitutional right to adequate dental care.

255.   Correctional Health Services has two dentists who provide dental care to pretrial detainees at the Lower Buckeye jail, the 4th Avenue jail, and the Estrella jail. Pretrial detainees housed at other facilities are transported to one of these jails for their dental care.

256.   The dental staff have appropriate equipment to treat dental emergencies.

257.   Dental staff attempt to schedule pretrial detainees for routine dental examinations if they have been in the Maricopa County Jails for a year.

258.   Many pretrial detainees have not had adequate preventive dental care before incarceration, and tooth extractions often are necessary by the time they receive emergency treatment in jail.

259.   When a pretrial detainee submits a sick call request for non-emergent dental care, it often takes several weeks before the pretrial detainee is examined by a dentist, which is not an unreasonable delay of treatment.

260.   When a pretrial detainee requests emergency dental treatment, any delay in treatment usually is caused by the ineffective sick call request and triage system, not by inadequate dental care services.

261.   Therefore, paragraph 69 of the Amended Judgment will be terminated because there is no current and ongoing violation of pretrial detainees' constitutional rights related to this paragraph.

**Independent Evaluations of Health Care Services**

262.   Regarding paragraph 70 of the Amended Judgment, pretrial detainees do not have a constitutional right to require the Maricopa County Jails to obtain an independent evaluation of health care services it provides.

263.   Therefore, paragraph 70 of the Amended Judgment will be terminated because it exceeds the constitutional minimum.

264.   Paragraphs 56, 57, and 61 of the Amended Judgment will not be terminated, but paragraph 57 will be modified.

265.   Paragraphs 58-60, 62, 64, 67, 69, and 70 of the Amended Judgment will be terminated because paragraphs 58, 59, 64, and 70 exceed the constitutional minimum and there is no current and ongoing violation of paragraphs 60, 62, 67, and 69.

**H.   Intake Areas (AJ ¶¶ 71-72)**

266.   The Amended Judgment states in paragraphs 71 and 72:

71.   Defendants shall continuously monitor conditions, including the population of pretrial detainees, in the designated intake areas. Defendants shall formulate, adopt and implement programs designed to reduce overcrowding and improve conditions for pretrial detainees in the intake areas and to reduce the time of incarceration in the intake areas.

72.   With respect to the intake areas, defendants shall adopt the following goals:

A.   No pretrial detainee shall be incarcerated in an intake area for more than forty-eight (48) hours;

B.   Pretrial detainees in the intake areas shall have access to toilet and wash basin facilities;

C.   Pretrial detainees incarcerated in an intake area for twenty-four (24) continuous hours shall be provided with a blanket and a bed or mattress on which to sleep.

D.   Defendants shall ensure that a report reflecting the length of stay of pretrial detainees in the intake area is generated by the Sheriff and made available to counsel for the plaintiff class, if any, upon implementation of the Sheriff's LEJIS 2.0 computer system, or by January 1, 1995, whichever occurs first.

267.   The Eighth Amendment requires that the Maricopa County Jails take reasonable measures to guarantee the health and safety of prisoners.

268. The Fourteenth Amendment requires that pretrial detainees not be subjected to confinement conditions that constitute punishment, *i.e.*, conditions that pose a risk to health and safety beyond that which is reasonably related to legitimate governmental objectives.

269. Plaintiffs contend that the conditions in the 4th Avenue Intake present an unconstitutional risk to pretrial detainees' health and safety because the intake areas are overcrowded, unsanitary, and inadequately monitored.

270. Defendant Arpaio contends that paragraphs 71 and 72 of the Amended Judgment do not include enforceable standards and that he has formulated and adopted plans to reduce crowding and improve conditions in intake.

271. Defendant Arpaio admits he is constitutionally required to provide pretrial detainees with humane conditions of confinement, including adequate food, clothing, shelter, and medical care, and to take reasonable measures to guarantee the safety of pretrial detainees.

272. The second sentence of paragraph 71 of the Amended Judgment, which requires Defendant Arpaio to develop and implement programs regarding the intake areas, exceeds the constitutional minimum and that portion of paragraph 71 must be terminated.

273. Paragraph 71's requirement that Defendant Arpaio "continuously monitor conditions, including the population of pretrial detainees, in the designated intake areas" does not exceed the constitutional minimum because Defendant Arpaio cannot protect the health and safety of pretrial detainees in intake areas without continuously monitoring conditions.

274. Conditions Defendant Arpaio must monitor under paragraph 71 include not only population in the intake areas, but also the number of inmates per holding cell; provision of adequate food and water; inmates' access to toilets, toilet paper, sinks, and soap; sanitation of the holding cells; the length of time each pretrial detainee is held in intake; provision of a bed and blanket for any pretrial detainee held in intake more than

twenty-four continuous hours; violence among inmates; and any emergent medical conditions.

275.  Paragraph 72 of the Amended Judgment exceeds the constitutional minimum to the extent it requires Defendant Arpaio to adopt certain goals regarding intake areas.

276.  However, some of the goals identified in paragraph 72 of the Amended Judgment relate to constitutional rights of pretrial detainees.

277.  The requirement under subparagraph 72(A) that no pretrial detainee be incarcerated in an intake area for more than forty-eight hours exceeds the constitutional minimum.

278.  The requirement under subparagraph 72(B) that pretrial detainees in the intake areas shall have access to toilet and wash basin facilities does not exceed the constitutional minimum.

279.  The requirement under subparagraph 72(C) that pretrial detainees incarcerated in an intake area for twenty-four continuous hours shall be provided with a blanket and a bed or mattress on which to sleep does not exceed the constitutional minimum.

280.  The requirement under subparagraph 72(D) that Defendants report length-of-stay information for pretrial detainees in the intake area does not exceed the constitutional minimum because such information is necessary for determining whether pretrial detainees must be provided with a blanket and a bed or mattress for sleeping.

281.  Most pretrial detainees are taken to the 4th Avenue Intake area upon arrest.

282.  During the pre-booking stage, pretrial detainees undergo a very short medical screening, are searched, and have their photographs taken.  At this point, pretrial detainees are accepted into intake at the 4th Avenue jail and placed in an "identification" holding cell where they are held until they are interviewed by pretrial services.

283.  After the pretrial service interview, pretrial detainees typically are placed in "court" holding cells to await their initial court appearance.

284.  The booking process from pre-booking through the initial court appearance typically takes two to four hours.

285.  After pretrial detainees go to their initial court appearance, they are placed in a "classification" holding cell.

286.  Each intake identification and classification holding cell consists of a concrete floor, two concrete benches, one uncovered toilet, and one sink.

287.  The classification process typically takes two to six hours.

288.  After classification, pretrial detainees typically receive jail clothing within two to four hours.

289.  After receiving jail clothing, pretrial detainees are placed in holding cells to wait to be transported to their assigned jail housing units.  It typically takes two to three hours to be transported to a housing unit.

290.  The jail intake process should take no more than twenty-four hours.

291.  Defendant Arpaio's records regarding a pretrial detainee's length of stay in intake document when a pretrial detainee begins the intake process and when he or she is assigned to a housing unit, but they may not indicate how long a pretrial detainee waited in a holding cell to be transported to a housing unit.  The records also may not indicate how long a pretrial detainee was physically located at the 4th Avenue Intake if he or she was taken to a hospital or to the United States Immigration and Customs Enforcement.

292.  From June 1, 2007, through May 31, 2008, 93,065 pretrial detainees were booked into the 4th Avenue Intake.  Of these, 21,987 (24%) were in intake more than twenty-four hours, 1,910 were in intake more than forty-eight hours, and 358 inmates were in intake more than seventy-two hours.

293.  Regardless of the length of time a pretrial detainee remains in the intake process, Defendant Arpaio does not provide the pretrial detainee with a bed and blanket unless the pretrial detainee is placed in an isolation cell.

294.   As previously found, intake holding cells often are overcrowded, without room for all inmates to sit, sleep, or move to use the toilet and sink.

295.   At times, the intake holding cells are extremely dirty, and the sinks and toilets unsanitary and inoperable.

296.   At times, the intake holding cells do not have toilet paper, and pretrial detainees are not provided with toilet paper when they request it.

297.   At times, the intake holding cells do not have soap for pretrial detainees to wash their hands after using the toilet.

298.   During intake, inmates usually have no access to a shower until they receive their jail uniforms.

299.   Some inmates have not been permitted to take a shower in intake before putting on their jail uniforms.

300.   When inmates are brought into intake, usually little is known about their mental and physical conditions, sexual orientation, and security threat levels.

301.   During intake, repeat offenders charged with serious violent crimes may be placed in holding cells with individuals charged with DUI or criminal speeding.

302.   There are no panic buttons or intercom systems in the intake holding cells.

303.   Pretrial detainees placed in intake holding cells usually can communicate with a detention officer only when the door is opened to move pretrial detainees in or out of a holding cell.

304.   Although security cameras record activity within intake holding cells, detention officers do not continuously watch the security cameras.

305.   Security staff provide only minimal visual and audio supervision of the intake holding cells.

306.   Detention officers do not conduct routine security walks on a regular basis in the intake areas.

307.   Detention officers do not continuously monitor the intake holding cells.

308.  The intake incident reports do not include every incident that occurs in the intake holding cells, even some that require pretrial detainees to receive medical treatment.

309.  Defendant Arpaio does not consistently take reasonable measures to guarantee the safety of the pretrial detainees during the intake process, which constitutes a current and ongoing violation of pretrial detainees' constitutional rights.

310.  Prospective relief remains necessary to correct a current and ongoing violation of the federal right to physical safety.

311.  Paragraph 71 of the Amended Judgment will be modified to delete the second sentence, which exceeds the constitutional minimum, and the first sentence will not be terminated because there are current and ongoing violations of pretrial detainees' constitutional rights.

312.  Paragraph 71 of the Amended Judgment, as modified, extends no further than necessary to correct the violation of the federal right to physical safety, is narrowly drawn, and is the least intrusive means to correct the violation.

313.  Portions of paragraph 72 of the Amended Judgment that exceed the constitutional minimum will be terminated.

314.  Prospective relief remains necessary to ensure that pretrial detainees have access to toilet and wash basin facilities in the holding cells in intake areas.

315.  Prospective relief remains necessary to ensure that pretrial detainees incarcerated in the intake area for more than twenty-four hours are provided with a blanket and a bed or mattress on which to sleep.

316.  Prospective relief remains necessary to ensure that length-of-stay information is available for enforcement of the order that pretrial detainees incarcerated in the intake area for more than twenty-four hours are provided with a blanket and a bed or mattress on which to sleep.

317.  Therefore, paragraph 72 of the Amended Judgment will be modified to state: "Defendants shall ensure that pretrial detainees always have access to toilet and

1    wash basin facilities in the holding cells in intake areas.  Defendants shall ensure that

2    pretrial detainees incarcerated in an intake area for more than twenty-four hours are

3    provided with a blanket and a bed or mattress on which to sleep.  Defendants shall ensure

4    that a report reflecting the length of stay of pretrial detainees in intake areas is generated

5    by the Sheriff and made available to Plaintiffs' counsel."

6           318.  Paragraph 72 of the Amended Judgment, as modified in the preceding

7    paragraph, extends no further than necessary to correct the violation of the federal right, is

8    narrowly drawn, and is the least intrusive means to correct the violation.

9    **I.    Recreation Time Outside (AJ ¶¶ 84-85)**

10          319.  The Amended Judgment states in paragraphs 84 and 85:

11                84.   Except for pretrial detainees in special management and those
            who do not desire outdoor recreation, pretrial detainees shall be allowed
12          one hour per day six days per week in the outdoor exercise areas with
            reasonable space for physical activities and a reasonable variety of
13          recreation and exercise equipment for use by the pretrial detainees, such as
            basketball, volleyball, table tennis, other equipment, so that inmates may
14          engage in physical activities during their outdoor recreation period.  At the
            First Avenue jail, the one hour shall not include transit time.
15
                85.   Pretrial detainees in special management shall be entitled to the
16          same outdoor exercise rights as in paragraph 84, above, provided, however,
            that pretrial detainees reasonably classified as a special security risk shall
17          be provided exercise as practicable.

18          320.  The Eighth Amendment requires that inmates have opportunity for some

19   form of regular outdoor or vigorous physical exercise, deprivation of which may not be

20   justified solely by cost or inconvenience.

21          321.  The Fourteenth Amendment requires that pretrial detainees not be denied

22   adequate opportunities for outdoor or vigorous physical exercise without a legitimate

23   governmental objective.

24          322.  The Maricopa County Jails do not have indoor facilities for vigorous

25   physical exercise equivalent to outdoor exercise.  For convenience of expression,

26   "outdoor exercise" will be used in this order to mean outdoor or vigorous physical

27   exercise.

28

323.  Determining what constitutes adequate opportunities for exercise requires consideration of the physical characteristics of the cell and dayroom access if the dayrooms provide space and equipment for detainees for vigorous physical exercise.

**Outdoor Exercise for General Population Pretrial Detainees**

324.  Regarding paragraph 84 of the Amended Judgment, Plaintiffs contend that Defendant Arpaio's failure to provide sufficient time for outdoor exercise at the Towers, Durango, and Estrella jails violates pretrial detainees' constitutional rights.

325.  Plaintiffs further contend that Defendant Arpaio's failure to provide sufficient space for outdoor exercise at the 4th Avenue jail violates pretrial detainees' constitutional rights.

326.  Plaintiffs do not contend that Defendant Arpaio is constitutionally required to provide exercise and recreation equipment, and Defendant Arpaio's decision not to provide exercise and recreation equipment is reasonably related to safety and security purposes.

327.  Defendant Arpaio contends there is no ongoing and current constitutional violation because pretrial detainees, except those classified as special management, are provided opportunity to engage in recreational activities one hour per day, six days per week.

328.  Maricopa County Sheriff's Office Policy DI-1 states that general population pretrial detainees at all jails shall be allowed one hour of recreation six days a week.

329.  However, general population pretrial detainees at the Towers, Durango, and Estrella jails do not receive one hour of recreation per day, six days per week.

330.  Towers and Estrella jails are unable to offer pretrial detainees one hour of recreation per day, six days per week, because they do not have enough staff and recreation yards.

331.  Durango jail would be able to offer pretrial detainees one hour of recreation per day, six days per week, if it had fewer inmates.

1     332.  General population inmates at the Towers, Estrella, and Durango jails
2     have access to dayrooms approximately sixteen hours per day.

3     333.  Dayroom access permits some out-of-cell movement for general
4     population pretrial detainees.

5     334.  The dayrooms do not have exercise equipment, but inmates may walk and
6     do push-ups in the dayrooms if space permits.  Vigorous physical exercise is not practical
7     and is prohibited in the dayrooms.

8     335.  The dayrooms do not provide sufficient opportunity for exercise to justify
9     reducing pretrial detainees' opportunity for outdoor exercise to less than one hour per
10    day, four days per week, the constitutional minimum.

11    336.  Defendant Arpaio's contention that pretrial detainees can do physical
12    exercise in their cells, or in their cells and dayrooms, sufficient to meet their
13    constitutional entitlement is unworthy of belief, and the Court does not believe it.

14    337.  Requiring that general population pretrial detainees at the Towers,
15    Estrella, and Durango jails be given opportunity for outdoor exercise at least one hour per
16    day, four days per week, does not exceed the constitutional minimum.

17    338.  Towers, Estrella, and Durango jails do not offer general population
18    pretrial detainees at least one hour of recreation per day, four days per week, and there is,
19    therefore, a current and ongoing violation of the pretrial detainees' federal right to
20    outdoor exercise.

21    339.  At the 4th Avenue jail, general population inmates are locked down sixteen
22    hours per day.

23    340.  At the 4th Avenue jail, each pod, which has a maximum capacity of thirty-
24    six inmates, has access to a 620-square-foot recreation yard one hour per day.  If the pod
25    is filled to capacity and all of the inmates wanted outdoor exercise, each inmate would
26    have approximately 17 square feet in which to exercise.

27

28

341.   The 4th Avenue jail recreation yards do not provide sufficient space to satisfy pretrial detainees' constitutional right to outdoor exercise one hour per day, four days per week.

342.   Under these circumstances, there is a current and ongoing violation of general population pretrial detainees' constitutional right to outdoor exercise at the 4th Avenue jail.

343.   Some inmates decline outdoor exercise because they are not allowed to have water with them during outdoor exercise, and no drinking water is available in the recreation yards.

344.   Permitting pretrial detainees to exercise outdoors without drinking water when the outside temperature exceeds 85° F. does not satisfy the constitutionally required opportunity for outdoor exercise.

345.   Paragraph 84 of the Amended Judgment must be modified because Defendant Arpaio's failure to provide exercise and recreation equipment is reasonably related to a legitimate governmental objective and therefore does not unconstitutionally punish pretrial detainees.

346.   Regarding the remainder of paragraph 84 of the Amended Judgment, there is a current and ongoing violation of general population pretrial detainees' constitutional right to approximately one hour per day, at least four days per week, of outdoor exercise at the Towers, Durango, and Estrella jails that is not reasonably related to a legitimate governmental objective.

347.   Further, there is a current and ongoing violation of pretrial detainees' constitutional right to outdoor exercise at the 4th Avenue jail that is not reasonably related to a legitimate governmental objective because the recreation yards are too small to permit each pretrial detainee an actual opportunity to exercise approximately one hour per day, four days per week.

348.   Paragraph 84 of the Amended Judgment will be modified to state: "Pretrial detainees classified as general population who are housed at the Towers,

1   Durango, Estrella, and 4th Avenue jails shall be allowed a minimum of one hour, at least

2   four days per week, in areas that permit outdoor recreation or equivalent fresh air

3   recreation with sufficient space for pretrial detainees to move freely."

4       349.  Paragraph 84 of the Amended Judgment, as modified in the preceding

5   paragraph, extends no further than necessary to correct a current and ongoing violation of

6   the federal right to outdoor exercise, is narrowly drawn, and is the least intrusive means to

7   correct the violation.

8                 **Outdoor Exercise for Special Management Pretrial Detainees**

9       350.  Regarding paragraph 85 of the Amended Judgment, special management

10   pretrial detainees include those classified as administrative segregation (including "nature

11   of crimes"), closed custody, disciplinary custody, and security segregation.

12       351.  Pretrial detainees classified as security segregation are segregated

13   temporarily and do not have a constitutional right to outdoor exercise during the brief

14   time during which they are classified as security segregation.

15       352.  Pretrial detainees classified as disciplinary segregation have a

16   constitutional right to outdoor exercise for one hour per day, four days per week, after the

17   first seven days of their disciplinary period, unless security or safety risks prohibit such

18   activity.

19       353.  Pretrial detainees classified as closed custody pose a serious threat to life,

20   property, staff, other inmates, or to the orderly operation of the jail and may be offered

21   outdoor exercise less than general population inmates because of their special security

22   and safety risks.

23       354.  Pretrial detainees classified as administrative segregation, who are

24   segregated from the general population for their own safety, have a constitutional right to

25   the same amount of outdoor exercise as general population inmates, *i.e.*, one hour per day,

26   four days per week.

27

28

355.  Pretrial detainees confined in medical and psychiatric units may be provided outdoor exercise as appropriate for their individual medical and psychiatric conditions.

356.  Pretrial detainees who are in lockdown twenty-three hours per day and also entitled to outdoor exercise must be offered outdoor exercise in addition to their one hour out-of-cell time to be used for showers, cell cleaning, and telephone calls.

357.  Pretrial detainees classified as administrative segregation are not routinely provided with outdoor exercise one hour per day, four days per week.

358.  Pretrial detainees classified as disciplinary segregation and who do not present security or safety risks are not routinely provided with outdoor exercise one hour per day, four days per week, after the first seven days of their disciplinary period.

359.  Maricopa County Jails could provide administrative segregation and disciplinary segregation pretrial detainees opportunity for outdoor exercise one hour per day, four days per week, if it had more staff, more recreation yards, and/or fewer inmates.

360.  Defendant Arpaio has not shown that denial of adequate outdoor exercise to administrative segregation and disciplinary segregation pretrial detainees is reasonably related to a legitimate governmental objective because inconvenience and cost do not justify deprivation of pretrial detainees' constitutional rights.

361.  There is, therefore, a current and ongoing violation of the constitutional right of administrative segregation and disciplinary segregation pretrial detainees to outdoor exercise, and prospective relief remains necessary to correct the violation.

362.  Paragraph 85 of the Amended Judgment will not be terminated because prospective relief remains necessary to correct a current and ongoing violation of special management pretrial detainees' federal right to outdoor exercise, but will be modified to state:  "Pretrial detainees in administrative segregation shall be entitled to the same outdoor exercise rights as general population pretrial detainees.  Pretrial detainees in disciplinary segregation who do not present security or safety risks shall be entitled to the same outdoor exercise rights as general population detainees after the seventh day of their

disciplinary period. Time for outdoor exercise will be in addition to the one hour out-of-cell time that is permitted for non-recreational purposes for pretrial detainees in lockdown for twenty-two hours or more per day."

363. Paragraph 85 of the Amended Judgment, as modified, extends no further than necessary to correct a current and ongoing violation of the federal right to outdoor exercise, is narrowly drawn, and is the least intrusive means to correct the violation.

**J.    Food (AJ ¶¶ 95, 98)**

364. The Amended Judgment states in paragraphs 95 and 98:

> 95.   Defendants shall provide food to pretrial detainees that meets or exceeds the dietary allowances as stated in the Department of Agriculture's Guide to Daily Food Choices.

> 98.   Defendants shall provide reasonable, nutritional substitutions for pretrial detainees who are prohibited from eating certain foods due to established religious beliefs that demand they adhere to dietary practices or because they are vegetarians.

365. The Eighth Amendment requires that pretrial detainees be provided food that is adequate to maintain the pretrial detainees' health and that is prepared under conditions that do not threaten their health and well being.

366. The Fourteenth Amendment requires that the taste and appearance of food provided to pretrial detainees not constitute punishment, *i.e.*, not be more distasteful than is inherent in institutionalized confinement.

367. Regarding paragraph 95 of the Amended Judgment, Plaintiffs contend that Defendant Arpaio's failure to provide adequate nutritional food violates pretrial detainees' constitutional rights.

368. Defendant Arpaio contends paragraph 95 of the Amended Judgment exceeds the constitutional minimum and there is no current and ongoing violation of federal rights.

369. No persuasive evidence was presented to show that the Department of Agriculture's Guide to Daily Food Choices exceeds minimal requirements for adequate nutrition.

370.  Therefore, paragraph 95 of the Amended Judgment does not exceed the constitutional minimum by requiring Defendant Arpaio to meet or exceed the Department of Agriculture's Guide to Daily Food Choices as long as the term "Department of Agriculture's Guide to Daily Food Choices" is construed as referring to the Department of Agriculture's current version of its dietary guidelines.

371.  Maricopa County Sheriff's Office Policy DG-1 and Policy DG-2 require that inmates be provided two or more meals during each 24-hour period, sufficient to provide a minimum of 2900 calories daily, and the interval between the evening and morning meals not exceed fourteen hours.

372.  Maricopa County Jails employ one dietician, who is responsible for ensuring that basic nutritional needs of pretrial detainees are met according to the National Research Council's recommended dietary allowances.

373.  When the Maricopa County Jails dietician prepares monthly menus, he intends to comply with the United States Dietary Guidelines.

374.  In 2003, the Maricopa County Jails dietician wrote that, in his professional opinion, the activity level of Maricopa County Jail inmates fell between sedentary and lightly active, which indicated that they would require an average of 2400 to 2500 calories daily.  Maricopa County Jails wrongfully deny opportunity for most pretrial detainees to have a minimum of four hours outdoor exercise per week, which exercise would take pretrial detainees above a sedentary lifestyle.

375.  The United States Dietary Guidelines recommend that males ages 19-30 with a sedentary activity level have 2400 calories daily and that males ages 19-30 with a moderately active lifestyle should have 2600-2800 calories daily.

376.  The Maricopa County Jails dietician currently plans menus that he estimates would provide approximately 2400 to 2500 calories daily.

377.  Maricopa County Jails do not comply with its policies requiring inmates to be served 2900 calories daily.

378.  Maricopa County Sheriff's Office Policy DG-1 requires that a written nutritional analysis be prepared annually by a qualified nutritionist/dietician to compare the nutritional values of meals served against national standards.

379.  The Maricopa County Jails dietician prepared the annual analysis for the February 2007 menu, but to do so, he substituted specific fruits and vegetables for the items identified only as "fruit" and "vegetable" without knowing what foods actually were served to any pretrial detainees.

380.  When the Maricopa County Jails dietician prepared the annual analysis for the June 2008 menu, he learned that Maricopa County Jails kept a sample of meals served for the previous thirty days for quality assurance purposes, and he used those samples to determine what foods had been served to at least some of the pretrial detainees.

381.  Maricopa County Jails provide pretrial detainees two meals each day:  a sack meal in the morning and a warm meal in the late afternoon or early evening.

382.  Pretrial detainees may purchase additional food from the Canteen, which earned a net profit of $5,144,507.99 in fiscal year 2007.

383.  The morning meal is served to each pretrial detainee in a transparent plastic bag referred to throughout the record as a "Ladmo bag."[3]

384.  The menu for each Ladmo bag in May 2008 and June 2008 is:

        2 hoagie rolls (3-oz. each)
        5 oz. meat or 4 oz. peanut butter
        1 snack item
        2 condiment packets or 2 jelly
        2 pieces fresh fruit
        1 milk

385.  The menu for each dinner meal in May 2008 and June 2008 includes:

        1 dinner roll (2 oz.)

---

        [3]     The term "Ladmo bag" derives from a character in the 1954-1989 local Phoenix children's television program "The Wallace and Ladmo Show."  At live events, Ladmo (Ladimir Kwiakowski) would distribute paper bags to children with food and toy treats (not a meal as such).  Once understood by youngsters in the Phoenix community as a bag of surprises, the term now survives in the Maricopa County Jails.

1

          2 "margarine reddie"
          1 pepper packet

2

          1 cup vegetables
          1 dessert or 1 fresh fruit

3

      386.  In addition, the dinner menus include one of the following groups of

4

items:

5

          2 "pizza stix," 1 cup potatoes, and 4 oz. cheese sauce

6

          4 oz. "pizza stix," 1 cup rice, and 2 oz. cheese sauce
          4 oz. chili beans and 1 cup rice

7

          8 oz. chili beans and 1 cup rice
          1 cup macaroni and 1 cup cheese sauce

8

          4 oz. meat sauce and 1 cup spaghetti
          8 oz. meat sauce and 1 cup spaghetti

9

          4 oz. marinara sauce/meatballs and 1 cup spaghetti
          1 cup sloppy joe and 1 cup rice

10

          1 cup sloppy joe and 1 cup potatoes
          1 cup chicken stew and 1 cup potato

11

          1 cup BBQ chicken and 1 cup potatoes
          6 oz. baked chicken, 1 cup potatoes, and 2 oz. chicken gravy

12

          4 oz. baked chicken, 1 cup potatoes, and 2 oz. chicken gravy
          1 cup turkey & gravy and 1 cup rice

13

          1 cup turkey & gravy and 1 cup potatoes
          1 cup BBQ ham and 1 cup rice

14

          1 cup ham stew and 1 cup potatoes
          4 oz. Italian sausage wraps, 1 cup rice, and 2 oz. cheese sauce

15

          4 oz. Italian sausage wraps, 1 cup rice, and 2 oz. teriyaki sauce
          4 oz. "stuffed sandwich" and 1 cup potatoes

16

          4 oz. hot dog, 1 cup potatoes, and 2 oz. brown gravy

17

      387.  It is impossible to determine from the menus the nutritional or caloric

18

value of items identified only as "meat," "fresh fruit," "vegetables," "dessert," or "snack

19

item."

20

      388.  The Maricopa County Jails dietician's opinion is that there is no

21

nutritional difference among different fruits, vegetables, meats, and starches, and it is

22

unnecessary to distinguish a cup of lettuce from a cup of green beans, a banana from an

23

apple, or a hot dog from turkey.

24

      389.  The Maricopa County Jails dietician's opinion is that French fries, diced

25

potatoes, rice, and macaroni are of equal nutritional value.

26

      390.  The Maricopa County Jails dietician's opinion is that one ounce of beef

27

has the same nutritional value as one ounce of turkey.

28

1          391.  The Maricopa County Jails dietician's opinions regarding nutritional

2  equivalents are not credible, and the Court does not believe them.

3          392.  Maricopa County Sheriff's Office Policy DG-1 requires that menus of

4  meals actually served be retained for five years to verify the provisions of a nutritionally

5  adequate diet.

6          393.  During the relevant time period, Defendant Arpaio did not keep menus of

7  meals actually served.

8          394.  Pretrial detainees often receive food that is different than that stated on the

9  Maricopa County Jails monthly menus, and not all inmates ordered to receive the same

10  diet actually receive the same food at the same meal.

11          395.  Although Maricopa County Sheriff's Office Policy DG-1 requires that any

12  substitutions in the planned menu be of equal nutritional value and properly documented,

13  not all substitutions are documented, and none of the menu substitutions from April

14  through May 2008 were approved by the Maricopa County Jails dietician.

15          396.  The snack item included in a Ladmo bag usually is pre-packaged cookies,

16  a snack cake, a Twinkie, cheese and crackers, or a candy bar.

17          397.  A Ladmo bag may include an artificially flavored drink instead of milk.

18          398.  The fruit provided in the Ladmo Bags often is overripe or bruised and

19  frequently inedible.

20          399. The bread provided in the Ladmo Bags frequently is moldy and entirely or

21  in part inedible..

22          400.  In 2003, the Maricopa County Jails dietician wrote that Maricopa County

23  Jails receive "a tremendous amount of donated food, which arrives on a daily basis," and

24  the "calorie content of the menu will change on a daily basis, depending on the types of

25  meats and deserts [sic] and fruit donated."

26          401.  Maricopa County Jails currently receive a large volume of donated food,

27  which is fed to inmates.

28

402.   Maricopa County Jails staff do not know who donated the food, the circumstances under which it was donated, or the age of the food.

403.   Extra meals are prepared and transported to jail facilities to replace meals containing moldy or spoiled food items.

404.   Inmates must request a replacement meal before leaving the serving line, but often are not allowed time to inspect their meals before leaving the serving line.

405.   If inmates are not permitted to obtain edible food to replace inedible portions of their meals, they have not been provided with all of the food included in the Maricopa County Jails dietician's nutritional analysis.

406.   Defendant Arpaio cannot establish what edible food inmates actually received during much of the relevant period.

407.   Defendant Arpaio cannot establish that pretrial detainees are served adequate nutrition.

408.   The Maricopa County Jails dietician's opinion that pretrial detainees are served adequate nutrition is not supported by the evidence, is contrary to evidence, and is unworthy of belief.  The Court does not believe it.

409.   Food served to pretrial detainees is prepared either at the Maricopa County Sheriff's Office Food Factory or at the smaller Estrella jail kitchen.

410.   The warm evening meals often contain a meat and sauce or gravy product referred to as "cook/chill" because it is cooked in 300-gallon tanks, pumped into two-gallon bags, and chilled, to be reheated before serving.

411.   The evening meals usually contain a starch, such as potatoes, rice, or beans, which have been found to include small rocks.

412.   Defendant Arpaio currently employs two food sanitarians to monitor food production and distribution at both the Food Factory and the Estrella jail kitchen.

413.   The jail sanitarians have instituted an improved process for washing potatoes to avoid having rocks in the potatoes served to inmates.

414.  The Maricopa County Jails food production facilities appear to be well managed, well maintained, and operated in accordance with industry standards.

415.  Although there was some evidence that meals are not always maintained at safe temperatures during the distribution process, this does not constitute a current and ongoing constitutional violation based on Defendant Arpaio's policies, procedures, and efforts to ensure safe temperatures during distribution and ongoing improvement work by the jail sanitarians.

416.  Therefore, prospective relief remains necessary to correct a current and ongoing violation of the pretrial detainees' federal right to adequate nutrition.

417.  Paragraph 95 of the Amended Judgment will not be terminated because Defendant Arpaio has not met his burden of proving there is no current and ongoing violation of pretrial detainees' constitutional right to adequate nutrition.

418.  Paragraph 95 of the Amended Judgment will be modified to reflect current terminology as follows:  "Defendants shall provide food to pretrial detainees that meets or exceeds the United States Department of Agriculture's *Dietary Guidelines for Americans*."

419.  Paragraph 95 of the Amended Judgment, as modified in the preceding paragraph, extends no further than necessary to correct the violation of the federal right to adequate nutrition, is narrowly drawn, and is the least intrusive means to correct the violation.

420.  Regarding paragraph 98 of the Amended Judgment, Plaintiffs do not contend that Defendant Arpaio has failed to "provide reasonable, nutritional substitutions for pretrial detainees who are prohibited from eating certain foods due to established religious beliefs that demand they adhere to dietary practices or because they are vegetarians," except to the extent that he fails to comply with paragraph 95 for all pretrial detainees.

421. Paragraph 98 of the Amended Judgment will be terminated because there is no evidence of a current and ongoing violation of pretrial detainees' rights to an alternative meal based on religious or vegetarian dietary practices.

**K.    Staff Members, Training, and Screening (AJ ¶¶ 102-104)**

422. The Amended Judgment states in paragraphs 102 through 104:

> 102. Defendants shall assure that each pretrial detainee is visually observed by detention officers in a manner and frequency that complies with the guidelines contained in the Manual of Standards for Adult Local Detention Facilities, Commission on Accreditation, American Correction Association, December 1977.

> 103. Defendants shall assure that detention officers are in a position to respond promptly to calls for help by pretrial detainees.

> 104. Defendants shall assure that written reports are recorded and statistics are compiled, of all instances of inmate or officer abuse, injuries, violence, assaults, sexual assaults, suicides, deaths and inmate riots and demonstrations, in a manner conducive to informed access by the Court.

423. The Eighth Amendment requires that the Maricopa County Jails take reasonable measures to guarantee the health and safety of prisoners.

424. The Fourteenth Amendment requires that pretrial detainees not be subjected to confinement conditions that constitute punishment, *i.e.*, conditions that pose a risk to health and safety beyond that which is reasonably related to legitimate governmental objectives.

425. Plaintiffs contend Defendant Arpaio does not ensure that each pretrial detainee is visually observed frequently enough to protect the pretrial detainee's health and safety, does not consistently ensure that detention officers are in a position to respond promptly to calls for help by pretrial detainees, and does not record and compile statistics for all instances of inmate or officer abuse, injuries, violence, assaults, sexual assaults, suicides, deaths, and inmate riots and demonstration.

426. Defendant Arpaio contends paragraphs 102-104 of the Amended Judgment exceed the constitutional minimum and that detention officers perform the necessary functions, such as security walks and monitoring to provide for the safety, security, and control of the inmates.

427.  Paragraph 102 of the Amended Judgment exceeds the constitutional minimum to the extent that it requires compliance with "the guidelines contained in the Manual of Standards for Adult Local Detention Facilities, Commission on Accreditation, American Correction Association, December 1977," and that portion of paragraph 102 will be terminated.

**Visual Observation of Pretrial Detainees**

428. Pretrial detainees' constitutional rights require that detention officers visually observe each pretrial detainee as frequently as necessary to protect the pretrial detainees' health and safety.

429.  There are no panic buttons or intercom systems in any of the holding or housing areas that would permit pretrial detainees to contact detention officers in the event of inmate violence or medical emergency.

430.  Detention officers do not perform security walks in the 4th Avenue Intake areas or the Madison court holding cells.

431.  Detention officers provide only minimal visual and audio supervision of the pretrial detainees in the 4th Avenue Intake holding cells and the Madison court holding cells by looking into a cell when a door is opened to move pretrial detainees into and out of the cell.

432.  Security cameras in the 4th Avenue Intake holding cells do not sufficiently protect pretrial detainees' health and safety because detention officers do not continuously watch what is being recorded by the security cameras.

433.  In the 4th Avenue psychiatric unit, many pretrial detainees are locked down in single cells for twenty-three hours per day and have only brief contact with detention and health care staff at their cell doors.

434.  In segregation units, pretrial detainees are locked down for twenty-three hours per day and unable to contact a detention officer except when a detention officer passes by during a security walk.

1    435.  Many pretrial detainees housed in segregation units are seriously mentally

2    ill and/or have chronic medical conditions.

3    436.  Security cameras do not permit effective visual and audio supervision of

4    pretrial detainees while they are locked down or inside their cells.

5    437.  Detention officers usually perform security walks in housing units

6    approximately every twenty-five minutes.

7    438.  In special management locations and heightened classification facilities,

8    security walks are conducted by two officers, rather than one.

9    439.  Detention officers have been unaware that pretrial detainees were

10   assaulted in their cells until the scheduled security walk.

11   440.  The only way a detention officer can monitor the welfare of each pretrial

12   detainee is to actually look into each locked cell, but security walks often are performed

13   too quickly to permit a detention officer to actually look into each locked cell.

14   441.  Detention officers do not visually observe pretrial detainees as frequently

15   as necessary to protect the pretrial detainees' health and safety in the 4th Avenue Intake

16   areas, the Madison court holding cells, the 4th Avenue psychiatric unit, and segregation

17   units.

18   442.  There is a current and ongoing violation of pretrial detainees'

19   constitutional rights regarding paragraph 102 of the Amended Judgment, as modified by

20   this order.

21   443.  Prospective relief remains necessary to correct a current and ongoing

22   violation of the federal right to protection of health and safety.

23   444.  Paragraph 102 of the Amended Judgment will be modified to state:

24   "Defendants shall assure that each pretrial detainee in the 4th Avenue Intake areas, the

25   Madison court holding cells, the 4th Avenue psychiatric unit, and segregation units is

26   visually observed by detention officers in a manner and frequency that protects the

27   pretrial detainee's health and safety."

28

445.  Paragraph 102 of the Amended Judgment, as modified in the preceding paragraph, extends no further than necessary to correct the violation of the federal right to protection of health and safety, is narrowly drawn, and is the least intrusive means to correct the violation.

### Detention Officers Positioned to Respond Promptly to Pretrial Detainees' Calls for Help

446.  Pretrial detainees' constitutional rights require that detention officers be in a position to respond promptly to calls for help by pretrial detainees.

447   At the Towers and Estrella jails, there is one control tower for each housing unit, which is located in the middle of four housing pods.  The cells and dayroom in each housing pod are separated from other housing pods and the control tower by a door and Plexiglas windows.  Each control tower is encased in Plexiglas, creating a third barrier between the officer in the control tower and pretrial detainees locked in their cells in the housing pods.

448.  Although detention officers perhaps could respond more quickly to calls for help if the control tower was not separated by barriers, such protection is reasonably related to the legitimate governmental objectives of safety and security.

449.  Therefore, there is not a current and ongoing violation of pretrial detainees' constitutional rights regarding paragraph 103 of the Amended Judgment.

450.  Paragraph 103 of the Amended Judgment will be terminated.

### Incident Reports

451.  Paragraph 104 of the Amended Judgment, requiring incident reports of all instances of inmate or officer abuse, injuries, violence, assaults, sexual assaults, suicides, deaths, and inmate riots and demonstrations, does not exceed the constitutional minimum because such reports are relevant to prospective relief necessary to correct current and ongoing violations of pretrial detainees' constitutional rights.

452   Incident reports are not prepared for every incident of inmate violence, including some incidents for which pretrial detainees required medical treatment.

1     453.  There is a current and ongoing violation of pretrial detainees'

2    constitutional rights regarding paragraph 104 of the Amended Judgment.

3     454.  Prospective relief remains necessary to correct a current and ongoing

4    violation of the federal right to protection of health and safety, and paragraph 104 of the

5    Amended Judgment will not be terminated.

6     455.  Paragraph 104 of the Amended Judgment extends no further than

7    necessary to correct the violation of the federal right to protection of health and safety, is

8    narrowly drawn, and is the least intrusive means to correct the violation.

9     456.  Therefore, paragraph 102 of the Amended Judgment will be modified,

10   paragraph 103 will be terminated, and paragraph 104 will not be terminated.

11   **L.    Reports and Record Keeping (AJ ¶ 114)**

12    457.  The Amended Judgment states in paragraph 114:

13       114.  Defendants agree to provide counsel for the plaintiff-class, if
         any, the following information on a quarterly basis: (1) jail population
14       statistics for each facility for the preceding period; (2) health inspection
         reports for the preceding period; (3) Custody Bureau statistics reflecting
15       incidents reported during the preceding period; (4) copies of the Inmate
         Services Division's monthly reports; (5) any summary notice of
16       Department of Agriculture nutritional requirements; (6) all security
         overrides issued during the preceding period; and (7) reports of the fire
17       inspectors.  The defendants also agree to make good faith efforts to
         respond to reasonable requests for additional information from counsel for
18       the plaintiff-class.

19    458.  The Eighth Amendment requires that the Maricopa County Jails take

20   reasonable measures to guarantee the health and safety of prisoners.

21    459.  The Fourteenth Amendment requires that pretrial detainees not be

22   subjected to confinement conditions that constitute punishment, *i.e.*, conditions that pose

23   a risk to health and safety beyond that which is reasonably related to legitimate

24   governmental objectives.

25    460.  Plaintiffs contend that if the Court finds any current and ongoing

26   violations of pretrial detainees' constitutional rights, the relief granted should include

27   reports to the Court with copies to Plaintiffs' counsel providing information specifically

28   related to those violations.

461.  Defendant Arpaio contends paragraph 114 of the Amended Judgment exceeds the constitutional minimum.

462.  Portions of paragraph 114 of the Amended Judgment exceed the constitutional minimum, but reporting requirements specifically related to correcting current and ongoing violations of pretrial detainees' constitutional rights do not exceed the constitutional minimum.

463.  Prospective relief remains necessary to correct current and ongoing violations of pretrial detainees' federal rights.

464.  Paragraph 114 of the Amended Judgment will be modified to state: "Defendants will maintain records of their compliance with the Second Amended Judgment and will provide quarterly summaries of those records to Plaintiffs' counsel."

465.  Paragraph 114 of the Amended Judgment, as modified in the preceding paragraph, extends no further than necessary to correct the violation of the federal right to protection of health and safety, is narrowly drawn, and is the least intrusive means to correct the violation.

**M.   Dispute Resolution (AJ ¶ 116)**

466.  The Amended Judgment states in paragraph 116:

> 116.  In the event of a dispute regarding the scope or meaning of any provision of this Amended Judgment, or the compliance of any party with any provision of this Amended Judgment, the parties shall meet and confer in an effort to resolve such dispute.  In the absence of agreement on the subject, the parties shall submit their differences to non-binding mediation before a person selected by the chief judge of the federal district court in the State of Arizona.  No application for order to show cause or other request for an Order of the District Court relating to enforcement of this Amended Judgment may be filed unless it is accompanied by a certificate from the selected mediator certifying that, after personal consultation and good faith efforts, the parties have been unable to resolve the dispute.  Said certificate shall be accompanied by a report of the mediator summarizing the dispute, and setting out the mediator's recommended resolution, if any.

467.  Plaintiffs do not oppose Defendants' motion to terminate the Amended Judgment with respect to paragraph 116.  (Doc. #1614 at 2.)

468.  The parties excluded paragraph 116 from the paragraphs relevant to the evidentiary hearing in their joint proposed final pre-hearing order, and paragraph 116 was

1   not identified as relevant to the evidentiary hearing in the final pre-hearing order.  (Doc.

2   ##1443, 1458.)

3         469.  However, the Board Defendants have argued in their post-hearing brief

4   that if the Court denies their motion to terminate the Amended Judgment or grants it in

5   part, the statutory automatic stay is lifted and paragraph 116 would remain in effect.

6   (Doc. #1612 at 14-15.)

7         470.  PLRA requires termination of prospective relief that is not necessary to

8   correct a current and ongoing violation of a constitutional right, narrowly drawn, and least

9   intrusive.  18 U.S.C. § 3626(b).

10         471.  Paragraph 116 of the Amended Judgment exceeds the constitutional

11   minimum and will be terminated.

12         472.  Termination of paragraph 116 of the Amended Judgment does not

13   preclude further orders regarding mediation during the remedial and enforcement stages

14   of this proceeding.

15   **N.   Second Amended Judgment to Be Entered**

16         473.  Based on the foregoing findings of fact and conclusions of law,

17   Defendants' motion to terminate the Amended Judgment will be granted as to paragraphs

18   1-8, 16-22, 24-45, 48-55, 58-60, 62-70, 73-83, 86-94, 96-101, 103, 105-113, and 115-116

19   and denied as to paragraphs 9-15, 23, 46-47, 56-57, 61, 71-72, 84-85, 95, 102, 104, and

20   114.  The Court will enter by separate document a Second Amended Judgment that

21   effects the termination of certain provisions of the Amended Judgment and restates those

22   provisions that remain in effect.

23   **O.   Ending of the Automatic Stay; Further Enforcement Proceedings**

24         474.  With this order and the entry of the Second Amended Judgment this day,

25   Defendants' Renewed Motion to Terminate the Amended Judgment (doc. #906) is ruled

26   upon and concluded this day.  By operation of 18 U.S.C. § 3616(e)(2)(B), this ruling ends

27   the § 3616(e)(2)(A) automatic stay of the Amended Judgment, which now resumes its

28   force and effect as restated and changed in today's Second Amended Judgment.

475.  This leaves the parties in the following status.  Plaintiffs have proven, or Defendants failed to disprove, current and ongoing violations of constitutional right and of the Amended Judgment as originally written or as narrowed by the Second Amended Judgment.  Defendants are in breach of the Amended Judgment as found in these findings and conclusions and as it is restated and narrowed by the Second Amended Judgment entered this day.

476.  With this conclusion to Defendants' Renewed Motion to Terminate the Amended Judgment (doc. #906), there is now no matter pending before the Court.  As in any case closed by entry of a permanent injunction, enforcement for non-compliance with the permanent injunction may be sought by an aggrieved Plaintiff.  Such enforcement may be in the form of further specific orders to implement the permanent injunction and/or contempt remedies to give incentive to cease the violations of the permanent injunction.

477.  The Court contemplates that the parties will confer immediately about prompt compliance with the Second Amended Judgment, and new proceedings will be brought at Plaintiffs' initiative to enforce the Second Amended Judgment if Plaintiffs are not satisfied.  A status conference will be set on December 5, 2008, with written status reports due by December 2, 2008, concerning anticipated enforcement proceedings.

**P.    Attorney Fees**

478.  Pursuant to 42 U.S.C. § 1988(b) for the award of attorney fees, Plaintiffs are the prevailing parties on Defendants' Renewed Motion to Terminate the Amended Judgment (doc. #906) and its predecessors.

479.  Subject to the limitations of 42 U.S.C. § 1997e(d), Plaintiffs are entitled to award of attorney fees incurred in defending against the motion.  Fees may be claimed under the procedures in Fed. R. Civ. P. 54(d)(2) and LRCiv 54.2 upon entry of this order. If enforcement proceedings become  necessary, future fees may be claimed and will be determined and awarded at appropriate intervals during the enforcement proceedings.

**IV.   Order**

Based on the foregoing findings of fact and conclusions of law,

IT IS ORDERED that Defendants' Renewed Motion to Terminate the Amended Judgment (doc. #906) is **granted** as to paragraphs 1-8, 16-22, 24-45, 48-55, 58-60, 62-70, 73-83, 86-94, 96-101, 103, 105-113, and 115-116 and **denied** as to paragraphs 9-15, 23, 46-47, 56-57, 61, 71-72, 84-85, 95, 102, 104, and 114.  For the convenience of the parties, those provisions of the Amended Judgment that remain in effect, as originally written or as modified by this order, are restated in the Second Amended Judgment entered this day.

IT IS FURTHER ORDERED setting a hearing on **December 5, 2008 at 11:00 a.m.** to address contemplated enforcement proceedings.  The parties shall file written status reports by December 2, 2008, concerning whether Defendants are then in compliance with the Second Amended Judgment and each party's proposed proceedings or course of action concerning enforcement.  This order does not preclude any party from commencing enforcement proceedings at an earlier time.

DATED this 22nd day of October, 2008.

_____
Neil V. Wake
United States District Judge

# TABLE OF CONTENTS

I.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.   Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.   Termination of Prospective Relief Under the PLRA . . . . . . . . . . . . . . . .   3

    B.   Relevant Period for a "Current and Ongoing" Violation . . . . . . . . . . . . .   5

    C.   Standard for Finding a Current and Ongoing Violation
        of the Federal Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

        1.   Population/Housing Limitations (Overcrowding) . . . . . . . . . . .   10

        2.   Dayroom Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

        3.   Temperature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

        4.   Sanitation, Safety, Hygiene, and Toilet Facilities . . . . . . . . . . .   12

        5.   Medical, Dental, and Psychiatric Care . . . . . . . . . . . . . . . . . . .   12

        6.   Intake Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        7.   Recreation Time Outside . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        8.   Food . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

        9.   Staff Members, Training, and Screening . . . . . . . . . . . . . . . . . .   16

III.  Findings of Fact and Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . .   16

    A.   The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

    B.   Amended Judgment Paragraphs to Be Terminated Upon Stipulation . . . .   17

    C.   Population/Housing Limitations (Overcrowding) (AJ ¶¶ 9-15) . . . . . . . .   17

        Towers Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

        Estrella Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

        Durango Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

        Portable Beds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

        Court Holding Cells at Madison . . . . . . . . . . . . . . . . . . . . . . . . .   24

        4th Avenue Intake Holding Cells . . . . . . . . . . . . . . . . . . . . . . . . .   25

    D.   Dayroom Access (AJ ¶¶ 18-19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

    E.   Temperature (AJ ¶ 23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

F.   Sanitation, Safety, Hygiene, and Toilet Facilities (AJ ¶¶ 43, 45-47) . . . .   30

Fire Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Toilets, Sinks, and Showers . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 31

Cleaning Supplies, Sanitation, Housekeeping, and Maintenance . . 33

G.   Medical, Dental, and Psychiatric Care (AJ ¶¶ 56-62, 64, 67, 69-70) . . . .   34

Medical, Dental, and Mental Health Needs . . . . . . . . . . . . . . . . . .  38

Maricopa County Jails Medical Facilities . . . . . . . . . . . . . . . . . . . 39

Receiving Screening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

National Commission on Correctional Health Care ("NCCHC")
Standards for Health Care in Jails . . . . . . . . . . . . . . . . . . . . . . . . . 43

Access to Adequate Health Care . . . . . . . . . . . . . . . . . . . . . . . . . 43

Staffing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Initiating Treatment   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Medical Records and Information Management . . . . .. . . . 44

Discipline of the Seriously Mentally Ill . . . . . . . . . . . . . .  45

Treatment of the Seriously Mentally Ill . . . . . . . . . . . . .  46

Policies, Procedures, and Programs . . . . . . . . . . . . . . . . . . . . . .  48

Interference with Health Care Orders . . . . . . . . . . . . . . . . . . . . . 48

Prescription Medications Without Interruption . . . . . . . . . . . . . . .49

Prescription Records . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . .  50

Monitoring System for Sick Call Requests . . . . . . . . . . . . . . . . . . 51

Emergency Medical Equipment . . . . . . . . . . . . . . . . . . . . . . . . . .51

Emergency Dental Care . .. . . . . . . . . . . . . . . . . . . .. . . . . . . . . . .52

Independent Evaluations of Health Care Services . . . . . . . . . . . . 53

H.   Intake Areas (AJ ¶¶ 71-72) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.    Recreation Time Outside (AJ ¶¶ 84-85) . . . . . . . . . . . . . . . . . . . . . . . 59

Outdoor Exercise for General Population Pretrial Detainees . . . . . 60

Outdoor Exercise for Special Management Pretrial Detainees . . . . 63

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

J.   Food (AJ ¶¶ 95, 98) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

K.   Staff Members, Training, and Screening (AJ ¶¶ 102-104) . . . . . . . . . . . 72

    Visual Observation of Pretrial Detainees . . . . . . . . . . . . . . . . . . . 73

    Detention Officers Positioned to Respond Promptly
    to Pretrial Detainees' Calls for Help . . . . . . . . . . . . . . . . . . . . . . . 75

    Incident Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

L.   Reports and Record Keeping (AJ ¶ 114) . . . . . . . . . . . . . .. . . . . . . . . . 76

M.   Dispute Resolution (AJ ¶ 116) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

N.   Second Amended Judgment to Be Entered . . . . . . . . . . . . . . . . . . . . . . . 78

O.   Ending of the Automatic Stay; Further Enforcement Proceedings . . . . . . 78

P.   Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

IV.   Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . 80