1  Jorge Franco, Jr. (No. 013834)
   E-Mail: jf@jhc-law.com
2  JENNINGS, HAUG & CUNNINGHAM, L.L.P.
   2800 North Central Avenue, Suite 1800
3  Phoenix, Arizona 85004-1049
   Telephone: 602-234-7800
4  Facsimile:  602-277-5595

5  Attorneys for Defendants Fulton Brock, Don Stapley,
6     Andrew Kunasek, Max Wilson and Mary Rose Wilcox

7

8

9              UNITED STATES DISCTRICT COURT

10                  DISTRICT OF ARIZONA

11  | Fred Graves, Isaac Popoca, on their | Case No. CV-77-0479-PHX-NVW
    | own behalf and on behalf of a class of |
12  | all pretrial detainees in the Maricopa | **NOTICE OF FILING SIXTH**
    | County Jails, | **REPORTS OF DR. LAMBERT N.**
13  | | **KING AND DR. KATHRYN A.**
    |                Plaintiffs, | **BURNS**
14  |
15  | vs. |
16  | Joseph Arpaio, Sheriff of Maricopa |
    | County; et al.; |
17  |
    |                Defendants. |
18

19       Pursuant to this Court's Order dated January 28, 2009 (#1769), defendants

20  Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson and Mary Rose Wilcox,

21  through undersigned counsel, hereby give notice of filing the sixth reports of

22  Lambert N. King, M.D., Ph.D., F.A.C.P. dated March 31, 2011 and Kathryn A. Burns,

23  M.D., M.P.H. dated April 2011.   The reports are attached hereto.

24

25

26

27

28

DATED this 6th day of April, 2011.

JENNINGS HAUG & CUNNINGHAM, L.L.P.


Jorge Franco, Jr.
2800 N. Central Avenue, Suite 1800
Phoenix, AZ 85004-1049
Attorneys for Defendants Fulton Brock, Don
   Stapley, Andrew Kunasek, Max Wilson and
   Mary Rose Wilcox

# CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2011, I electronically transmitted **NOTICE OF FILING SIXTH REPORTS OF DR. LAMBERT N. KING AND DR. KATHRYN A. BURNS** to the Clerk's Office for the United States District Court, District of Arizona, using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Larry A. Hammond, Esq.
Sharad H. Desai, Esq.
Christina C. Rubalcava
Osborn Maledon, P.A.
2929 N. Central Avenue, Suite 2100
Phoenix, AZ 85012-2793
lhammond@omlaw.com
dhill@omlaw.com
sdesai@omlaw.com

Margaret Winter, Esq. (admitted *pro hac vice*)
Gabriel Eber, Esq. (admitted *pro hac vice*)
Eric Balaban, Esq. (admitted *pro hac vice*)
ACLU National Prison Project
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
mwinter@npp-aclu.org
geber@npp-aclu.org
ebalaban@npp-aclu.org

Daniel J. Pochoda, Esq.
ACLU
P.O. Box 17148
Phoenix, AZ 85011
dpochoda@acluaz.org

Michele M. Iafrate, Esq.
Courtney Cloman, Esq.
Iafrate & Associates
649 N. Second Avenue
Phoenix, AZ 85003-0001
michele.iafrate@azbar.org

I further certify that on April 7th 2011, a copy of the attached document was delivered to:

The Honorable Neil V. Wake
United States District Court, District of Arizona
401 W. Washington Street, SPC 52
Suite 524
Phoenix, AZ  85003-7640


s/ K. Cecil
kc/4982-2

# Sixth Report on Medical Compliance with Second Amended Judgment

## *Graves v. Arpaio*

## No. CV – 77-0479-PHX-NVW

## Lambert N. King, MD, PhD, FACP

## March 31, 2011

## Part A - Background

On January 25, 2011 and February 28-March 1, 2011, I conducted site visits of Correctional Health Services (CHS) in the Maricopa County Jail (MCJ) system.  This report is a summary of my recent observations and updated recommendations concerning medical services in the Maricopa County Jail system.  It is hereby respectfully submitted to Honorable Judge Neil V. Wake of the United States District Court for the District of Arizona, in response to the requirements of the Second Amended Judgment (SAJ) issued by Judge Wake on October 22, 2008.

Since my first site visit to Maricopa County Jail on March 30 to April 1, 2009,  I have submitted five prior reports to Judge Wake.  I also prepared and submitted a report titled **Expert's Report on Compliance with Medical Provisions of Second Amended Judgment** on August 20, 2010.  For this Sixth

1

Report, I considered prior findings and recommendations and have updated and revised many of them in the form of a Corrective Action Plan (CAP). This CAP is responsive to the requirements of Paragraphs 6, 7 and 8 of Judge Wake's Second Amended Judgment.  These requirements are the following:

Paragraph 6:  "Defendants shall provide a receiving screening of each pretrial detainee, prior to the placement of any pretrial detainee in the general population.  The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental and physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped."

Paragraph 7:  "All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs.  When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or location where such services or health facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services."

Paragraph 8: "Defendants shall ensure that pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff."

In an Order dated January 3, 2009, Judge Wake ordered, "upon stipulation of the parties, that medical expert Dr. Lambert King and mental health expert Dr. Kathryn Burns are appointed to serve as independent evaluators of the Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment and to be compensated by Defendants for their services." The same Order also specified that the "Experts will evaluate the delivery of medical and mental health care at Maricopa County Jails, identify deficiencies, assist Correctional Health Services ("CHS") in developing a corrective action plan, if needed, to achieve compliance with the Second Amended Judgment, and submit reports on compliance to the court at 120-day intervals."

During the past two years, Dr. Burns and I have consistently fulfilled the responsibilities of the Court's appointed experts, as specified in Judge Wake's Order of January 28, 2009. Litigation in the case of *Graves vs. Arpaio* has been underway for decades prior to the appointment of the Court's Experts in medical and mental health care.   Prior to appointment of the medical and mental health experts by Judge Wake, evidence

3

was presented concerning systematic deficiencies in standards of medical care in the Maricopa County Jails. Concerning the duration of this litigation, Judge Wake said during a hearing in this matter on January 21, 2011, "We don't have that same level of stress here except this is an old case. The judgment's been around. I'm trying to avoid unnecessary difficulties for anybody consistent with moving this along diligently." Judge Wake further stated that Plaintiffs and Defendants "have done a good job and I expect that to continue to focus on things that are useful and not create unnecessary burdens for either side."

The CHS medical care program in the Maricopa County Jails was evidently substandard and troubled prior to Judge Wake's Order of January 28, 2009. This was no small problem, since CHS is responsible each year for the medical evaluation of more than 115,000 intake medical evaluations and a daily inmate population of over 7,200 men and women, many of whom have complex acute and chronic medical conditions. Moreover, CHS staffs six jails and nine health care locations in the MCJ system. Over the past two years, I have acknowledged a number of improvements CHS has made in scope and quality of its medical care services. These improvements have been documented in my previous reports to the Court. Over the past six months, the executive leadership of CHS has been fundamentally changed, whereby the Executive Director,

4

Medical Director and Nursing Director positions have been filled by health care professionals whose qualifications and prior experience make them well-suited to take those timely and complex actions necessary to achieve full compliance with the requirements of the SAJ.  Based on extensive conversations with them, I believe these three CHS leaders are working diligently and in good faith to ensure that medical care of persons admitted and confined in the Maricopa County Jails will meet all requirements of the Court's Second Amended Judgment.

Although CHS has made progress toward compliance, there is evidence, based mainly on review of selected medical records, that further major actions are necessary to fulfill the requirements of Paragraphs 6, 7 and 8 of the Court's Second Amended Judgment.  While perhaps seemingly paradoxical, the foregoing two observations are not surprising in view of the status of medical care in Maricopa County Jails only a few years ago and the complexity and acuity of illness among the large population that CHS serves.

In Part E of this Sixth Report (Corrective Action Plan), I have updated and revised several of the "Remedies" that I recommended in my August 20, 2010 **Expert's Report on Medical Compliance with Medical Provisions of Second Amended Judgment.**  This Corrective Action Plan represents

5

my best efforts to assist the new leadership of CHS as they work toward compliance with the medical requirements of the SAJ. At the same time, a corrective action plan, if it is to be successful, cannot be totally static or written in stone.   For example, provision of more appropriate medications to treat patients suffering from withdrawal from heroin abuse involves processes and medications that are intensively regulated by state and federal agencies such as the Drug Enforcement Administration.  Thus, the pathway to an appropriate corrective action may involve sequential alternative actions, with the outcome of each next step being dependent on securing prior regulatory approvals.

Fundamentally, neither the ten remedies I previously recommended or the Corrective Action Plan contained in this Sixth Report are intended to replace Judge Wake's articulation of Paragraphs 6, 7, and 8 of the Second Amended Judgment as the definitive measure of medical care compliance. Plaintiffs' and Defendants' Counsel and CHS have expressed agreement with many aspects of my prior recommendations, most of which are adapted in whole or in part in the Corrective Action Plan proposed in this Sixth Report.  If differences remain on the part of Plaintiffs or Defendants, I am readily available to discuss and address them jointly with both parties.  I will also continue to encourage Plaintiffs and Defendants representatives to join me and the leaders of CHS

6

in meeting regularly together to review medical records, policies and procedures, and ongoing plans and efforts to improve medical services consistent with SAJ requirements.

## Part B – List of Sources and Documents Reviewed

The content of this report was informed by the following sources and methods:

1. Continued reviews of CHS policies and procedures pertaining to the objectives of the Second Amended Judgment (SAJ).

2. Discussions with executive and clinical leaders of CHS about their current and anticipated actions to assure access to and provision of proper medical care as stipulated in Paragraphs 6, 7 and 8 of the SAJ.

3. On January 25, February 28 and March 1, 2011, I reviewed 38 medical records, all of which were among a list of medical charts that CHS had provided for review by Plaintiffs' Counsel.  Thirty of these records were among those that by Plaintiffs' Counsel had reviewed and critiqued in written reviews in advance of my recent site visits.

4. I reviewed the detailed professional resumes of the CHS Executive Staff including the Department Director, Thomas Tegeler , RN, MPH, CCHP, NEA-BC;  Medical

7

Director, Jeffrey J. Alvarez, MD, CCHP; Director of Nursing, Katie Wingate, RN, MSN, CCHP; Finance Manager, Lisa A. Gardner, BS; HR Consultant, Diane M. Shook, MBA, SPHR; and Don J. Wright, BS, MBA, Clinical IT Director .

5. **Correctional Health Services Standard Operating Procedure** titled INFIRMARY ADMISSION/CARE DELIVERY/NURSING ACUITY AND DISCHARGE, as revised on 01/03/11.

6. CHS Clinical Policy, titled GRIEVANCE MECHANISM FOR HEALTH COMPLAINTS, as revised 10/12/10.

7. **Maricopa County Correctional Health Services Special Needs Treatment Plan Guidelines: Diabetes Mellitus**, September 29, 2010.

8. Minutes and appended documents of the monthly meetings of the Maricopa County Correctional Health *Services Quality Improvement Council from August for* 2010.

9. Team Charter and minutes of the CHS Patient Health Care Request CQI Team from August through November, 2010.

10. Team Charters and minutes of the Health Assessment CQI Teams for the LBJ, Durango, and 4th Avenue facilities. These minutes document meetings from September through November, 2010.

11.    "Grievance Drill Down" annual report, dated December 31, 2010.

12.    CHS Health Needs Request Reports, for October, November and December, 2010

13.    CHS Health Assessment Audits for April, July, August, September October, and November, 2010.

14.    CHS/MCSO Statistical Monthly Report for July 2010 – December 2010.

15.    List of 4th Avenue Intake Pre-Booking Refusals for January and February, 2011.

16.    Maricopa County Correctional Health Services, Continuous Quality Improvement Plan, July 1, 2010 – June 30, 2011.

17.    Maricopa County Correctional Health Services, Continuous Quality Improvement Program, FY 2010 Annual Evaluation.

18.    Maricopa County Correctional Health Services, Continuous Quality Improvement Annual Plan, July 1, 2010 – June 30, 2011.

19.    CHS, Patient Satisfaction Survey Results, for LBJ Outpatient, 4th Avenue, Towers, Tents, MHU, Estrella, Durango. These anonymous surveys were completed by patients seen in CHS Clinics on a particular day in late January or early February 2011.

20.    CHS I-EHR PROGRAM TIMELINE, as of January 2011.

21.     National Commission on Correctional Health Care, Technical Assistance Report of the Health Care Services at Maricopa County Sheriff's Office, December 22, 2010.

22.     **PLAINTIFFS' STATEMENT REGARDING DISCOVERY DISPUTE**, filed with the Court on March 9, 2010.

23.     **DEFENDANT MARICOPA COUNTY BOARD OF SUPERVISOR'S STATEMENT RE: DISCOVERY DISPUTE**, filed with the Court on March 10, 2011.

24.     Judge Wake's **ORDER** of March 10, 2011.

25.     **RESPONSE TO DEFENDANTS' STATEMENT RE DISCOVERY DISPUTE**, filed with the Court on March 18, 2011.

26.     **DEFENDANT MARICOPA COUNTY BOARD OF SUPERVISOR'S MOTION TO VACATE JUNE 14, 2011 EVIDENTIARY HEARING**, filed with the Court on march 21, 2011.

## Part B - Observations and Findings

1. During the past six months, CHS appointed a new Executive Director (Thomas J. Tegeler, RN, MPH, CCHP, NEC-BC); new Medical Director (Jeffrey Alvarez, MD,

CCHP); and new Director of Nursing (Katie Wingate, RN, MSN, CCHP). All three of them are highly qualified in their respective professional disciplines and bring substantial experience in correctional health care, public health, hospital and ambulatory care.

2. To the best of my knowledge, this is the first time the Maricopa County Board of Supervisors has appointed a CHS Executive Director who has extensive qualifications and experience in nursing services. Mr. Tegeler's prior work included service as the Chief Nurse Executive of the Davis Grant Medical Center at the Travis Air Force Base in California. The previous executive director had considerable administrative experience in Maricopa County government but lacked the great advantage possessed by a capable executive who is also a highly qualified and experienced health care professional.

3. As the new CHS Medical Director, Dr. Jeffrey Alvarez brings Board Certification in a primary care specialty – Family Medicine – recognized by the American Board of Medical Specialties (ABMS). Neither of the two previous CHS Medical Directors was certified in an ABMS-recognized specialty. Prior to being appointed as the CHS Medical Director, Dr. Alvarez provided direct patient care of excellent quality to patients in the CHS Estrella Jail Clinic. Finally, it is important to note that Dr. Alvarez is bilingual. This is a

very useful asset in communicating with and caring for Spanish-speaking MCJ patients.

4. As the new CHS Director of Nursing, Katie Wingate brings many years of prior experience in nursing care, care of persons who have mental illness, care of the elderly, and correctional health care.  Before joining CHS, she was the Nursing Program Manager for the Arizona Department of Corrections.  Her span of responsibilities in this position included supervision of 11 nursing supervisors in ten prison complexes and direct clinical supervision of 34 psychiatric nurses.

5. With the appointment of Thomas Tegeler as Executive Director and Katie Wingate as Director of Nursing, it is apparent that CHS leadership team now possesses greater authority and expertise to identify, assess and improve any nursing-related problems affecting compliance with the SAJ.  For this reason, I do not believe that the selection and employment of a correctional health care nursing specialist is necessary to assist me in monitoring compliance or to advise CHS on improvement of nursing components of the MCJ health care system.

6. The CHS Health Assessment Audits for 2010 show a notable increase in the percentage of patients whose Health Assessment/Physical Examination and tuberculin skin test (PPD) was completed within 14 days of their booking date.

12

Overall compliance was 94.3% in November 2010 compared to 77.3% in April 2010.

7. Since August 2010, Dr. Alvarez has led and facilitated a system-wide multidisciplinary CQI team to measure and improve processes related to inmate Health Care Requests (HCR). A computer-supported data base was established as of October 1, 2010. In December 2010, there were 6,990 HCR's, of which 4,849 were related to medical issues. The average time period between the time CHS received these requests and the time that the requests were triaged (screened and assigned an action) was 14.1 hours. Based on recommendations from the NCCHC pre-survey team, the improvement team has made several revisions designed to decrease the time to triage.

8. The current CHS Continuous Quality Improvement Annual Plan is well-structured and includes the following elements: Scope; Structural Framework and Communication; CQI Council; Quality Oversight Committee, CQI Initiatives for FY 2010-2011; Performance Measures; Measurement and Methodology; Education and Training; Confidentiality; Annual Evaluation; and Resource Information. The current Annual Plan is consistent with the requirements for accreditation of the National Commission on Correctional Health Care. It is also comparable in its content and scope with CQI plans associated with major community-based health care organizations.

9. CHS/MCSO 2010 monthly statistical reports also show:  a) average Daily Census (ADC) in the LBJ Infirmary was 47.7 days; b) average Length-of-Stay (LOS) for patients in the LBJ Infirmary was 19.8 days.

10.   CHS/MCSO 2010 monthly statistical reports also show: a) average number of monthly offsite Specialty Appointments was 227 of which 207 (91.2%) were kept; b) among the average monthly number 20 Specialty Appointments not kept, 5.8 were classified as canceled by the outside provider, 6.0 to being in Court, and 2.7 to MCSO issues.

11.   CHS/MCSO 2010 monthly statistical reports also show: a) average monthly offsite emergency service transports were 150.7, of which 76.8 were transported by non-MCSO staff; b) among the average number of 76.8 of patients transported by non-MCSO staff, 71.2 were by outside ambulance from CHS and 4.5 by the Phoenix Fire Department from CHS.

12.   CHS/MCSO 2010 monthly statistical reports also show: a) average monthly number of Health Care Grievances was 153.8, which is a rate of 0.68 per 1000 Average Daily Population (ADP); percent of Health Care Grievances Resolved without Sustained of Partially Sustained outcome was 99.63%

14

13. CHS/MCSO 2010 monthly statistical reports also show: a) average monthly number of Occurrence Reports received was 105.2, which is a rate of 0.43 per 1000 ADP; b) average monthly number of inmate injuries associated with Occurrence Reports was 15.2.

14. The CHS Clinical Guidelines for Diabetes were revised as of September 29, 2010. During my recent site visits, I discussed with Dr. Alvarez the need to add routine dental/periodontal evaluation to the list of actions necessary for all patients diagnosed with diabetes. I will also be discussing with Dr. Alvarez the need to cross-reference the diabetes clinical guideline with the guideline for hypertension. The reason for doing this in because targets for blood pressure control need to be more stringent than those for patients whose only cardiovascular risk factor is hypertension.

15. Review of the 4th Avenue Intake Pre-Booking Refusals for January and February demonstrates that CHS has a active patient safety program in place to refer to outside medical facilities those persons needing immediate further evaluation and treatment prior to booking. Over the two month period, fifty-five such patients were referred to offsite medical facilities prior to booking at the 4th Avenue facility. Clinical reasons for these pre-booking refusals and offsite medical referrals were varied. They included a spectrum of traumatic injuries, uncontrolled diabetes, hypertensive

emergencies, delirium tremens, drug withdrawal syndromes, infections, cognitive impairment and other neurologic deficits.   The volume and timeliness of these pre-booking refusals and offsite medical referrals are consistent with the requirements of Paragraph 6 of the SAJ.

16.   CHS recently conducted patient satisfaction surveys in all of its outpatient clinic locations.  The survey methodology preserved patient anonymity and the questions were appropriate and consistent with those employed in patient satisfaction surveys by community-based health care organizations.  While the results were specific to each of seven CHS locations, the overall levels of patient satisfaction were positive.  The highest rates of positive responses (87 to 98%) were to the question, "I feel the medical staff treat me with respect."  Somewhat lower rates of positive responses (72 to 90%) were to the question, "I am able to see someone from the medical staff in a timely manner when I have a medical problem."

17.   A review of average mortality rates for persons in custody of the Maricopa County Jail system shows a significant decline in death rates for 2008-2010 in comparison with the previous three to seven years. These average annual mortality rates are expressed per 100,000 local jail inmates, which is the convention used to compare the fifty largest jail jurisdictions by the U.S. Bureau of Justice Statistics.  For example, there were six deaths of persons in jail custody in

Maricopa County in 2008, during which the average daily jail population was 9,236. The calculated death rate would then be 64.96 per 100,000 local jail inmates. These aggregate death rates encompass deaths due to all causes, including illnesses, suicide, accidents and homicide. Based on information for 2007 from the Bureau of Justice Statistics, 51.4% of deaths of people in custody in U.S jails were due to illnesses, not including AIDS; 3.9% to AIDS; 25.9% to suicide; 7.2% to drug or alcohol intoxication; 1.6% to accidents; 1.8% to homicide; and 8.3% to other or unknown causes. <u>The average MCJ total mortality rate for the three year period of 2005-2007 was 152/100,000 compared to 61/100,000 the three year period of 2008-2010.</u> This 60% decline in mortality is remarkable. It is likely associated in part with improvements in health care quality and access, although other as yet unidentified factors may have contributed.

18.   Timeline for Implementation of Pharmacy and Electronic Health Record Systems – Please refer to Part E, CAP-10 of this Sixth Report.

## Part C – CHS Update on Nursing Staffing

On March 22, 2011, Thomas Tegeler, CHS Executive Director, provided me with the following summary concerning work that

he and Katie Wingate are doing to improve the scope and quality of CHS nursing services. I have chosen to include their complete analysis in this report for the following reasons. First, it contains a useful description of the complex processes that must be completed in order to expand the number of available nurses. Second, it reflects the knowledge and insight that Mr. Tegeler and Ms. Wingate are applying as they identify and respond to challenges in improving nursing care services. Finally, a number of the specific actions proposed in their analysis and plan are appropriate for inclusion in the Corrective Action Plan that I have included in this Sixth Report.

The CHS analysis in nursing staffing is as follows:

"CHS staffs 6 jails and 9 health care facilities in the Maricopa County Jails system. Currently the workforce at CHS is comprised of 88.3 FTE Registered Nurses, 58.6 FTE Licensed Practical Nurses, 63 FTE Correctional Health Technicians, and one discharge planner (RN). Staff funding for 24/7 coverage at the clinics was reduced in 2005 allowing for 24/7 coverage at the following clinics: Mental Health Housing Unit, Infirmary, and Intake. Due to an increase in medically complex patients, the majority of clinics had no choice but to expand back to 24/7 coverage. Unfortunately this expansion occurred with no additional nurses, which has added a burden to the existing staff, particularly in providing the necessary nursing support during the day shift. Registry costs have escalated to ensure coverage. Recently, CHS surveyed nursing staff to gauge interest in 12 hours shifts which would allow us to increase coverage and at the same time reduce registry costs. The results indicated that a significant number of nurses were

interested in exploring alternative scheduling including 12 hour shifts. Clinics that are currently operating 24/7 include the Infirmary, Mental Health Housing Unit, Lower Buckeye Jail Outpatient, 4th Avenue Intake, Durango and Estrella. We anticipate that the revised staffing patterns for these clinics will include 12 hour shifts whenever possible to help stabilize RN coverage.  Plans are underway to expand to 12 hour shift coverage at Tents and Towers, currently staffed on dayshift for 10 hours. CHS plans to convert the 4th Avenue Outpatient Clinic to 24/7 coverage in the future. It is calculated  that additional LPN's will be needed to receive medications delivered directly to the medication rooms of the clinics as opposed to a central drop off location and redistribution along with a transition from stock medication to patient specific. This change will be necessitated by Federal and State regulations."

## Proposed Nursing Staffing

"For budget year FY12, we initially proposed adding 11 FTE's including 6 RN, 2 LPN, and 3 CHT.  The additional positions will allow us to partially staff the Self Surrender Unit, which currently diverts nurses from LBJ Outpatient when self surrender numbers are overwhelming or when the one dedicated Self Surrender nurse is off duty. Further, we are proposing that RN coverage be expanded in the Self Surrender Unit to 24/7 to handle those patients as well as ICE coordination. To address discharge planning needs, these nurses will be responsible for coordinating this activity at LBJ Intake since Westside clinic patients are transported there for discharge or transfer to other facilities, including the state prison. Full time coverage for Self Surrender will probably necessitate adding additional staff. Recently the CHS Medical Director shared plans to expand physician coverage at Intake that will require additional staff, including providers as well as clinical and administrative support. Maintaining the flexibility to respond quickly to evolving clinical needs balanced with the constraints of the county budget is a challenge for CHS, both clinically and administratively. In the past two budget cycles,

CHS has been fortunate to see an increase in clinical staff, including 9 medical detention offices to assist with patient transports within the clinics. As we move forward, a stand-alone supplemental request for FY12 funding will be submitted to address the staffing needs not addressed in the initial budget. In addition, data is being collected to support the level of staff necessary for expanding coverage and emergent processes."

## Proposed Timeline

"Upon the start of Fiscal Year 2012 which begins July 1, 2011 CHS HR will begin the recruitment process. Typically it takes 1–2 weeks to get applications, another 2 weeks to complete interviews, selection, and credentialing process. We anticipate Tents/Towers will be converted to 12 hours first. Expanding 24/7 coverage at the 4th Avenue Outpatient clinic will be challenging since more nurses will be needed. and the status of the county budget has not been finalized. LPNs will be hired as quickly as possible due to DEA requirements. Additional staffing at Self-Surrender is planned for early August. RN and CHT positions to support the expanded physician coverage at Intake will take place after recruitment in July but no later than late August 2011."

# Part D - Medical Record Reviews

1. A CHS patient with MCP # P713874 was screened at the 4th Avenue Intake unit at 11:29 AM on 11/09/10.  His prior medical history included diabetes, seizures, hypertension, and eye cataracts.  His blood glucose (sugar) level was elevated and he received insulin as well as orders for Neurontin (to prevent seizures), Simvastatin

20

(for elevated blood lipids) and aspirin. The following day, he was seen in the 4th Avenue Jail Clinic. Throughout the day, he was treated with insulin plus intravenous fluid for uncontrolled diabetes. Subsequent blood sugar measurements on 11/11/10, 11/12/10, 11/13/10, 11/14/10, and 11/15/10 showed continued uncontrolled diabetes. On 11/15/10, the patient had an apparent seizure likely due to low rather than high blood sugar. He was treated by a nurse who should have informed a physician but did not do so. The patient had other probable seizures due to low blood sugar on 11/17/10 and 11/18/10, both of which were treated by a nurse who did not inform a physician. The patient was admitted to the LBJ Infirmary on 11/20/10. I reviewed this patient's record with the CHS Medical Director, Dr. Jeffrey Alvarez, who agrees that this patient with Type I insulin dependent diabetes should have been referred to the LBJ Infirmary either on the day of his jail admission or on the following day. Dr. Alvarez also agrees that the CHS nurses who treated this patient for probable hypoglycemic seizures on three separate days should have called a physician to evaluate this patient. As a follow-up, I recommend that this patient's record be reviewed with the nurses involved to ascertain why they did not inform a physician and be counseled as appropriate. Another pertinent recommendation is that

<u>the CHS procedure for tracking and follow-up of "man-down" events should be reviewed to be sure that timely communication with and follow-up by a physician always occurs</u>.

2. A patient with MCJ # P629538 has severe advanced liver disease. On 10/30/10 at 2:20 PM, the patient complained of "liver" pain and had a fever with temperature of 101.1.  He was evaluated by a nurse who did not inform a physician.  The patient continued to have abdominal pain and fever overnight and the following morning.  At 7:05 PM, a physician was called and directed that the patient be sent to an outside hospital emergency department where the patient was admitted and had surgery for appendicitis. He was hospitalized for a week before returning to the LBJ Infirmary where his subsequent care has been appropriate.

3. A patient with MCJ # P716240 was screened at the 4th Avenue Intake Unit on 11/18/10 and reported being on the Humulin form of insulin.  His blood sugar was moderately elevated and he had a prior history and an episode of diabetic ketoacidosis and Mallory-Weiss syndrome (upper gastric or esophageal bleeding from arteries that may rupture due to extreme vomiting).  He was treated the following day for recurrent vomiting and diabetes.  Treatment included intravenous fluids and a

blood test showed an elevated white blood count and other results that suggested possible dehydration. After being sent back to his housing unit, he was seen the next day because of vomiting bloody fluid. He was then assessed further and referred to an outside hospital where he was admitted for two days for treatment of diabetic ketoacidosis. This patient's record illustrates, as have multiple other prior cases, the risk of lapses in treatment and evaluation of patients who receive intravenous hydration in jail facilities outside of the LBJ Infirmary.

4. A patient with MCJ # P704310 is a 56 year old man who gave a history of high blood pressure when he was screened at the 4th Avenue Intake Center on 10/06/10. Several appropriate anti hypertensive medications were ordered and given on 10/07/10. On 10/08/10, a physician observed that the patient might be exhibiting altered mental status and wanted to refer him to an outside emergency department for further evaluation. However, the patient refused. Dosages of antihypertensive medications were increased and the drug Neurontin (usually used for treatment of pain or to prevent seizures) was prescribed at a higher dose based on information from the patient's treatment prior to jail entry. On 10/13 and 10/16/10, the patient complained of headaches. He was observed to be disoriented on

10/16/10 and was sent to an outside hospital where he was admitted and treated effectively for acute kidney failure. The acute kidney failure may have been due to toxicity from one or more of his medications (Diovan and Neurontin) and inadequate fluid intake in the jail. Based on retrospective review of the medical record, it is clear that the intended referral to an ED on 10/08/10 was medically indicated. Once the patient refused, the best alternative course would have been to send this patient to the LBJ Infirmary for more detailed evaluation including timely laboratory tests such as a basic metabolic panel which was not drawn at the jail until 10/15/10, one day prior to transfer to the outside hospital. This patient's medical conditions were complex and he was not able to give the CHS physicians clear information about his multiple medications and prior medical history on intake. However, review of this patient's medical record demonstrates multiple lapses in continuity and coordination of care; need to be more proactive in acquisition of laboratory results for such complex patient's whose clinical conditions are not well understood on admission to the jail; timely referrals to the LBJ Infirmary; and more effective procedures and systems to track and care for such patients. <u>As such, I recommend that this case be reviewed and discussed formally with all CHS providers in an appropriate</u>

conference so that all staff can benefit educationally and participate in considering quality improvement-related options.

5. A patient with MCJ # 670869 was screened at 4th Avenue on 06/18/10 at which time he was noted to have abdominal, thigh and skin sequelae of six previously treated gunshot wounds.  Over the next two months, he was seen by CHS staff for complaints of abdominal pain. A CT scan of the abdomen was requested on 08/27/10, approved on 09/03/10 and done on 09/17/10 at which time the results identified presence of chronic abscesses in subcutaneous extraperitoneal abdominal tissues.  The patient was sent to a hospital where he was further evaluated and treatment with antibiotics was initiated. This patient's condition was unusual and subtle in some respects.  Nevertheless, I believe it would be worthwhile for CHS to further review why there was a three week delay between the ordering and performance of the abdominal CT scan.

6. A patient with MCJ # P712610 was screened at the 4th Avenue Jail on 11/05/10 and reported taking Coumadin to prevent a recurrence of deep venous thrombosis in his legs.  Although an appropriate dose of Coumadin was ordered and administered, the patient's medication administration record indicates that Coumadin was not given the next three days after intake and also on

11/31/10.  It is unlikely that the initial three day lapse would have resulted in a recurrence of venous thrombosis.  However, this medication error is indicative of the ongoing need for better systems and staff performance in documenting and assuring the reliability of administration of essential medications including Coumadin.

7. A 43 year old patient with MCJ # P687337 was screened at the 4th Avenue Jail on 08/13/10.  He gave a history of a prior stroke, left sided weakness and treatment with Dilantin and Neurontin to prevent seizures.  Over the next 10 days, the patient manifested signs of Dilantin toxicity which was confirmed on a blood test on 08/23/23.  During an 18 day stay in the jail, medical evaluation and management of this patient's anticonvulsant therapy failed to meet an appropriate standard of care.

8. A female patient (MCP # not available) was treated in the Estrella Jail for abscesses of the hip between 07/31/10 and 01/10/11.  Several antibiotics were prescribed and there is documentation in the medical record concerning possible allergy to Bactrim, although the patient's history was not typical for such an allergy.  The patient was Spanish-speaking and Plaintiffs Counsel expressed concern about her knowledge of the possible allergy.  On two dates, the patient was cared for by Dr. Alvarez who is

fluent in Spanish.  Overall, this patient's medical care was appropriate, although a culture and sensitivity test of fluid from the abscess is always helpful in a jail environment to detect the presence of methacillin resistant staphylococcus aureus and, if present, to determine drug sensitivity levels.

9. From 12/23/10 to 01/13/11, a patient with MCJ # P725329 was treated in the Estrella Jail with three anticonvulsant medications – Dilantin, Valproic acid and Tegretol.  The medication administration record for a two month period is blank for 30 out of 136 drug administration actions.  <u>Because this is a relatively recent record, I recommend that CHS review it carefully in order to better understand why there were so many gaps in care and to determine what aspects of staff education and/or supervision may be merited.</u>  This is also another example of the importance of near term implementation of an electronic prescription order entry and medication documentation system.

10.     A patient with MCJ # P717801 was booked at 4th Avenue Jail on 11/23/10 and gave a history of being on Coumadin.  The initial INR test (to monitor and determine subsequent safe and effective doses of Coumadin) was elevated above safe levels and was below effective treatment levels three days later.  There was also an initial failure to accept and activate an order for

Coumadin, a failure that was detected by CHS in an Occurrence Report.  Subsequent monitoring and adjustment of Coumadin levels were also substandard. <u>Considered in the context of recurrent lapses in clinical and medication management of Coumadin therapy, I recommend that CHS conduct a comprehensive review of its practices, policies, documentation and tracking in this regard</u>.  I recognize that problems in administration and safe management of high risk anticoagulation drugs, especially Coumadin, are common in major health care systems and facilities throughout the country. All such systems, including CHS, need to implement more robust and effective methods to enhance safety for patients on these types of high risk medications.

11.     A 42 year old patient with MCJ # P720402 was screened at the 4th Avenue Jail on 12/04/10 at which time no significant abnormalities or complaints were noted.   On 12/10/10, the patient requested to be seen, stating that he had hand and back pain due to "injuries due to abuse beating from guards while handcuffed" on 12/05/10.  X-rays of the hand and back were not done until 12/22/10.  These x-rays showed no fractures or dislocation except for a flexion contracture deformity of the fifth distal interphalangeal joint, a finding that was identified after a re-reading of the x-rays on 01/03/11. <u>I recommend that CHS further evaluate this patient's hand</u>

28

<u>function and also take any actions that are appropriate
regarding the allegation of abusive actions by correctional
staff on 12/05/10</u>.

12.    I reviewed the medical record of a 28 year old woman
(MCJ # 719570) who died in the Estrella Jail on 12/07/10,
after she collapsed in a shower and was non-responsive
despite cardiopulmonary resuscitation efforts.  She had
been screened on 12/01/10, reported having asthma and
being on multiple medications.  She was noted to have
marked obesity.  A "Pre-Booking Assessment Medical
Clearance Report" dated 12/01/10 showed normal blood
pressure, pulse rate, respiratory rate and blood oxygen
levels.  On 12/02/10, she submitted a request to be seen
for severe persistent headaches.  She was then seen by a
nurse on 12/04/10 at which time systolic blood pressure
was moderately elevated at 151 mm Hg.  The nurses'
assessment note indicates that the patient described her
headache both as "sudden onset" and the "same as usual".
The nurse recommended aspirin and because the patient
said she had not been drinking the water in the jail, gave
water and encouraged her to drink water as usual.  On
12/06/10, the patient submitted another request to be seen
for headache.  A nurse sent a written response
recommending administration of Tylenol for the headache.
The patient's sudden death occurred later that day.  The
report of an autopsy was not complete as of March 1, 2001,

but the cause of death according to the death certificate was subarachnoid hemorrhage due to rupture of one of the arteries supplying the brain.  This type of cerebrovascular catastrophe is rare in a young person and was likely unrelated to this patient's other medical problems of obesity and asthma. The patient's headache symptoms may have been associated with an arterial aneurysm (out-pouching); however, this is speculative, lacking full results of the autopsy.  The systolic blood pressure elevation was not severe and not likely to have caused a cerebral arterial aneurysm or rupture.  The patient apparently did not complain of neck pain or stiffness which is often present with the onset of a subarachnoid hemorrhage.  Other observations regarding quality of care are not appropriate without additional information, including the final autopsy report.  It is appropriate, however, for CHS to review its nursing protocol with respect to evaluation of patients with sudden onset of severe headache.  I will discuss this recommendation with Dr. Alvarez and offer such advice as may be helpful.

Among the other medical records that were reviewed and critiqued in January 2011 by Plaintiffs' Counsel, there are numerous other examples of deficiencies in quality and documentation of care.  I agree with Plaintiff's Counsel that

many of these deficiencies can logically be placed into the
following categories:

- Delays in care and stabilization of incoming (Intake
  Center) patients,
- Incomplete or incorrect nursing assessments and lack of
  actual or timely communications from nurses to medical
  practitioners.
- Medication errors of commission, omission and and MAR
  documentation.

It is important to note that the records summarized above
were drawn from a very selective sampling methodology
requested by Plaintiffs' Counsel.  This sampling methodology
effectively identifies adverse events associated with care of
complex patients, most of whom have multiple chronic serious
medical conditions.  For example, the sample includes all
patients who were transferred from CHS facilities to an outside
hospital or emergency department during a prior four month
period.  Furthermore, from among a total of approximately 110
medical records made available for their review, Plaintiffs'
Counsel forwarded to me a list of thirty-five written
summaries.  I do not know if Plaintiffs' Counsel reviewed other
records and if so, whether negative or positive observations
were made.  Because of the sampling methodology used to
identify these cases, it is not possible to extrapolate the results

31

of to a random sample of the larger CHS patient population or even to the entire CHS population with chronic illnesses. This ambiguity is a major question that I will address in subsequent record reviews conducted in concert with CHS as described in the Corrective Action Plan detailed in Part E of this Sixth Report.

Despite the highly selective sampling methodology used in selecting the records reviewed recently by Plaintiffs' Counsel and me, these records do reflect a higher than acceptable prevalence of quality of care deficiencies in the context of the SAJ.

## Part E – Corrective Action Plan

Judge Wake's Order of January 3, 2009 includes a provision for the Court's appointed medical and mental health experts to assist CHS in preparation of a Corrective Action Plan, if needed, to achieve compliance with pertinent requirement of the SAJ. Because compliance with Paragraphs 6, 7, and 8 of the SAJ has not been achieved, and CHS has agreed that further actions are consistent with their needs and objectives, I have worked closely with CHS' executive leaders to prepare the Corrective Action Plan that is detailed in the following section of this report. The substance of this plan largely mirrors the content of the ten remedies that were proposed in

my **Expert's Report on Compliance with Medical Provisions of Second Amended Judgment**, dated August 20 2010. Based on current circumstances, including a new CHS leadership team, I have made a number of modifications and additions in the content and format of my previously proposed remedies.  For the most part, I think these changes are in line with the understanding and agreement of CHS leadership. As is usually the case with any major health care organization committed to a Continuous Quality Improvement (CQI) Program, further adaptations within this Corrective Action Plan may well be necessary and appropriate going forward over the next 12 to 18 months.

To the extent that Counsel for Plaintiffs and Defendants may disagree with any aspect of this CAP, I ask that they consider the following points:

- I will be intensively monitoring implementation of all aspects of this plan with the expectation that positive outcomes will be evident in terms of accessibility, coordination and continuity of health care and a reduction in potentially preventable adverse events
- If specific aspects of the CAP prove ineffective or insufficient to achieve needed improvements in health care quality, I will propose and support whatever changes are necessary.

33

- I will continue to offer to facilitate regular joint meetings with CHS leaders and Plaintiffs' and Defendants' Counsel to discuss implementation of the CAP, joint review and discussion of medical records, policies and procedures and measures that may be useful in assessing compliance.

The Corrective Action Plan I propose at this time has the following components and projected timelines. Many components will also be monitored and assessed with respect to their implementation and outcomes as part of CHS' Continuous Quality Improvement Plan.

## CAP – 1: Physician and Provider (PA and NP) Staffing at the 4th Avenue Intake Center

At the 4th Avenue Jail Intake Center, CHS will expand its professional coverage to include 24 hour per day presence of at least one licensed physician, physician assistant (PA) or nurse practitioner (NP) qualified by training, experience, licensure or certification to identify, assess, treat and, when necessary, refer out, all newly received pretrial detainees who have or are at risk for serious acute or chronic illnesses, physical handicaps, debilitation or other vulnerabilities associated with their physical or mental condition. All new physicians employed to provide expanded coverage will be

Board- certified in Internal Medicine, Family Medicine or Emergency Medicine.   Physician Assistants or Nurse Practitioners participating in coverage will be skilled in the basic procedures and emergency care needed to cover the Intake Department. They will at all times have either on-site or telephonic back-up by a physician. During the 168 hours comprising each week, 80 hours will be covered by physician assistants and 88 hours by physicians.  Expanded weekday night shift coverage will be in place no later than June 1, 2011.  Weekend and holiday coverage will start no later than August 1, 2011.  CHS will document staffing by shift on a monthly basis and report actions taken to secure expanded physician coverage

## CAP – 2:  **Timely Assessment and Treatment Plans at Intake for Patients with Significant Medical Problems**

Simultaneous with expansion of physician and PA/NP coverage of the Intake Center, CHS will steadily increase its capacity to complete medical evaluations and institute treatment plans promptly after initial Reception Screening, including prescribing of essential medications, for all patients with significant acute or chronic medical conditions.  The objective is for all such patients to have a "hands-on" examination and completion of an initial assessment and plan to include the ordering of medications, pertinent labs and a

scheduled follow-up specific to their needs. The foregoing tasks will be completed no later than 24 hours after initial jail entry, and in most instances much sooner. The expanded Intake Center physician and PA/NP coverage will enable CHS to fulfill requirements of the RECEIVING SCREENING Standard J-E-02 of the 2008 <u>Standards for Health Services in Jails</u> of the National Commission on Correctional Health Care (NCCHC). Furthermore, CHS will be better prepared to provide, no later than the first 24 hours after Receiving Screening, an initial health assessment for all persons identified with *clinically significant findings* in compliance within NCCHC Standard J-E-04 on INITIAL HEALTH ASSESSMENT. The foregoing services will be implemented between April 1 and August 1, 2011. As practitioner staffing increases in the 4th Avenue Intake Center, CHS will steadily achieve increases in the proportion of patients with clinically significant findings who have their initial health assessment completed within 24 hours after Receiving Screening.

## CAP – 3: **Timely Referrals and Transport of Intake Center Patients Needing Infirmary Care**

In my August 20, 2010 Expert's Report on Compliance, I proposed that the 4th Avenue Jail Intake Center adapt its facilities and add equipment and staff suitable for patients who need an Infirmary level of care, but who cannot be

transferred to the LBJ because of pre-arraignment status or
other reasons.  I am modifying my original recommendation in
this regard for the following reasons:

- On behalf of the MCSO, Defendants have responded that
  pre-arraignment or classification status does not pose
  significant obstacles to transferring patients timely to
  the LBJ Infirmary.
- The MCSO has agreed to expand the proximate space
  available to the Intake Center.  This expansion of space
  will be beneficial in helping CHS to better evaluate,
  observe and treat more patients during the first 24
  hours after reception screening.
- While beneficial, additional available space proximate to
  the Intake Center is not suitable for conversion to an
  infirmary level of care.

Because of the foregoing considerations it will be necessary for
CHS to ensure that all newly received patients whose clinical
condition indicates need for an infirmary level of care will be
transferred to the LBJ Infirmary no later than 24 hours after
booking.  CHS will also need to establish a formal, continuous
system of medical record review/monitoring to confirm that
this 24 hour timeline is being met.  It is feasible for the
objective of CAP – 3 to be implemented as of April 1, 2011.
This component will be assessed through ongoing monthly

and quarterly review by CHS and by me of representative medical records.  The overall rate of monthly transfers from the 4th Avenue Intake Center to the LBJ Infirmary will also be tracked, trended and reported.


CAP – 4: **Health Assessments for Persons in Non-Acute and Stable Condition**

With implementation of CAP – 1 and CAP – 2, there will be a substantial decrease in the number of persons who will need to have their Initial Health Assessments (also known as Health Appraisals) completed between day 2 and day 14 following their Receiving Screening evaluations.  The majority of such persons will have no significant acute or chronic medical conditions at the time of entry to the 4th Avenue Intake Center. A small number of such patients will exhibit onset of acute medical problems during their initial two weeks of incarceration and need to be promptly seen and evaluated with a complete Initial Health Assessment by a physician or PA/NP.  For the far greater number of newly admitted persons who are in good condition, completion of the Initial Health Assessment can safely be done within 14 days after arrival at the 4th Avenue Jail.

At this time, Dr. Alvarez is reviewing several options with respect to content and effectiveness of the CHS Initial Health Assessment form and process. Among the questions he is considering are which types of professional personnel (CMT's, RN's, MD's, PA's, and NP's) should be involved in completing the Initial Health Assessment including the traditional Physical Examination for persons with no history of acute or chronic medical problems. Specific NCCHC standards pertain to these questions, especially with respect to scope of practice, training and oversight. Another important consideration concerns what components of the traditional periodic physical examination are supported by evidence-based recommendations of authoritative professional organizations, such as the U.S. Preventive Services Task Force. During the next sixty days, I will be having frequent detailed discussions with Dr. Alvarez regarding the content of the physical examination within the CHS appraisal and which professional personnel are appropriate for completion of this clinical task. By June 1, 2011, I will provide a more specific recommendation in this regard.

## CAP – 5: **Nursing Care Staffing Expansion**

CHS currently has a full-time equivalent (FTE) complement of 88 Registered Nurses (RN), 59 Licensed Practical Nurses (LPN), 63 Correctional Health Technicians (CHT), and one RN

Discharge Planner.  For their budget year 2010, CHS leadership has proposed adding 11 FTEs, including 6 RNs, 2 LPNs and 3 CHTs.  They also anticipate a stand-alone supplemental budget request for 2012 funding will be submitted to address staffing needs not addressed in the original proposal.

In order to achieve compliance with SAJ requirements, I believe it is essential that the initial and supplemental requests noted above be approved by the Maricopa County Board of Supervisors and implemented as soon as possible by CHS.  My most recent reviews of medical records show that there continues to be an unacceptable frequency of gaps in continuity of medical care and medication administration, as well as lapses in quality and documentation of RN-generated patient assessments and coordination of care between medical and nursing personnel.  With the planned expansion of practitioner staffing in the 4th Avenue Infirmary and the resultant increase in Day 1 Initial Health Assessments, expanded RN and LPN staffing will be critically needed.

In recent discussions with me, CHS has also recognized the need to have an RN who has expertise in chronic wound care evaluation and treatment.  This is a particular need for some patients served within the LBJ Infirmary but also for referrals from the other eight CHS outpatient health facilities.

40

It is reasonable to expect that the initially proposed nursing staffing for budget year 2012 can be phased-in between April 1 and September 1, 2012, including recruitment of an RN wound care specialist.  Between April 1 and July 1, 2011, I will be in communication with CHS leadership to identify any other additions to nursing staffing required after September 1, 2011.

**CAP – 6:  Physician Staffing and Chart Documentation at the LBJ Infirmary**

CHS has a well-written policy that defines the three levels of medical/nursing services available to patients in the LBJ Infirmary.  Each of these three service levels is linked with a specified frequency with which the Infirmary's assigned physicians are expected to evaluate and document periodic medical evaluations and updates in each patient's plan of care.  These frequencies are medically appropriate.  However, my medical record reviews have identified a serious problem with the legibility of many physician generated Infirmary admission and progress notes. These types of illegible medical record entries truly impede effective communication and coordination among the physicians, nurses and other staff that need to understand and advance the plan of care. Therefore, I have asked Dr. Alvarez to identify and implement

41

an effective corrective action to ensure legibility of Infirmary physician entries as well as any other similar situations he becomes aware of in CHS health facilities.  It is reasonable to expect that this objective be accomplished by June 1, 2011.

In concert with the changes described in CAP-1 and CAP-2, it is predictable that there will be a significant increase in the number and acuity of patients referred from the 4th Avenue Intake Center to the LBJ Infirmary on weekends and holidays. For this reason and also on the basis of prior experience, there are compelling medical reasons for the LBJ Infirmary to have on-site part-time (four hours per day) practitioner coverage on weekends and holidays.  The primary duty of the practitioner providing this coverage will be to see and evaluate any new patients admitted to the Infirmary after 5 PM the prior day and also to evaluate and write progress notes for any other patients whose clinical condition dictates the need for such an evaluation.  I propose that CHS phase-in this expanded physician coverage of the LBJ Infirmary between April 1 and August 1, 2011.

## CAP – 7: **Evaluation and Treatment of Patients at Risk for Alcohol and Opiate Withdrawal Syndromes**

CHS already has in place use of the CIWA Scale (Clinical Institute for CIWA scale Withdrawal Scale for Alcohol) for

evaluation of patients at risk for alcohol withdrawal syndrome. CHS also has in place a treatment protocol for use of Librium, a benzodiazepine medication) that is consistent with authoritative professional recommendations including *Pharmacological Management of Alcohol Withdrawal – A Meta-analysis and Evidence Based Guideline* by M.F. Mayo-Smith, <u>JAMA</u> 1997; 278(2): 144-152:  From the American Society of Addiction Medicine Committee on Practice Guidelines.

With respect to evaluation of persons at risk for opiate withdrawal syndromes, CHS is not now using a separate, distinct scale and validated evaluation scale such as the Clinical Opiate Withdrawal Scale (COWS) or the Clinical Institute Narcotic Assessment (CINA) Scale.  <u>By July 1, 2011 CHS will utilize the COWS to evaluate incoming patients with a prior history of use of opiates of any type including heroin, methadone, and analgesic such as oxycodone, dilaudid and codeine.  For patients with a prior history of both alcoholism and opiate dependence/addiction, both the CIWA-Ar and COWS will be utilized.</u>

CHS currently relies on use of clonidine, hydroxyzine, and loperamide for treatment of patients at risk for opiate withdrawal syndrome, including those who are being treated in community-based methadone treatment programs prior entry into the 4th Avenue Intake Center.  As has been stated

repeatedly in my prior reports, patients participating in legal methadone treatment programs should continue to receive methadone maintenance after during their pre-trial detention. In addition, since methadone is medically preferable to clonidine in most respects, methadone needs to be available within the MCJ for use in an opiate withdrawal treatment protocol for patients who are heroin dependent. Two other drugs – Suboxone and Subutex – are also acceptable alternatives.

Dr. Alvarez and I are having ongoing discussions about his diligent efforts to secure the approvals and community partnerships necessary to provide methadone maintenance after jail entry and use of methadone or other drugs for treatment of opiate withdrawal. Multiple regulatory, legal, licensure and training issues remain to be resolved. There appear to be three main options, which are not necessarily mutually exclusive. These options are the following:

- A licensed and community-base drug addiction treatment network might be engaged to come into MCJ facilities to evaluate, counsel and treat patients receiving methadone maintenance or at risk for opiate withdrawal and addiction counseling and follow-up addiction treatment.
- CHS may be able to obtain Opiate Treatment Program (OTP) certification by the Substance Abuse and Mental

44

Health Services Administration (SAMHSA) linked to OTP accreditation through the National Commission on Correctional Health Care.  The requisite standards for accreditation are available in the 2004 NCCHC publication, <u>Standards for Opiod Treatment Programs in Correctional Facilities</u>.

- Individual physicians employed by CHS might complete the additional training needed to obtain a SAMHSA DATA (Drug Addiction Treatment Act of 2000) Waiver for use of Suboxone (buprenorphine) and Subutex (buprenorphine plus naloxone hydrochloride) in treatment of opiate addiction.

All of these options involve approvals from state and federal agencies including the US Drug Enforcement Administration. I estimate that another three months (July 1, 2011) will be needed to establish a feasible plan, implementation of which can hopefully be completed by December 1, 2011.  This projected date reflects the substantial time required to complete any of the three options outlined above.

## CAP – 8 – **Review and Revisions of Policies and Procedures**

On concert with its application and preparation for an accreditation survey by NCCHC, CHS has reviewed and revised numerous policies, procedures, clinical guidelines and

protocols.  This ongoing work is consistent with the following objectives as stated in my August 20, 2010 Expert's Report:

- Clinical guidelines that meet nationally established professional recommendations are in place for evaluation and management of chronic diseases (including asthma, chronic lung disease, epilepsy/seizure disorders, cardiac disease, diabetes, lipid disorders, hepatitis c infection, chronic liver disease, chronic kidney disease, human immunodeficiency virus infection/AIDS);
- Nursing policies and procedures and protocols for assessment are to be reviewed in detail and any changes necessary have been made to assure appropriate nursing care in handling sick call requests and encounters, emergency encounters and appropriate referrals to physicians, physician assistants or nurse practitioners;
- Nurses have been properly trained, oriented, and evaluated in their use of these policies, procedures and protocols.

CHS is making progress in accomplishing the foregoing objectives.  I will be reviewing their continued efforts regularly and in detail with Dr. Alvarez, Thomas Tegeler and Katie Wingate.  It is reasonable to project that the foregoing objectives can be completed by August 1, 2011.

46

CAP – 9 – **Continuous Quality Improvement (CQI) Program**

Through application of the methods established in its current CQI Annual Plan, CHS will include the following actions:

- Systematic reviews of patient records by senior and peer medical staff to measure access, timeliness, appropriateness, coordination, and continuity of medical and nursing care.   Written findings and recommendations will accompany identification of any lapses or problems in care.
- Medical record reviews will be sufficient in number to be representative of broad range of acute (for example, alcohol withdrawal syndrome) or chronic conditions and of patients residing in all jail facilities.
- Medical record reviews will assess whether clinically appropriate care is documented, including patient assessments whenever orders for medication or diagnostic tests are initiated.
- Under the direction of the Medical Director, CHS will conduct annual clinical performance reviews of the employed physicians, physician assistants, and nurse practitioners.  These reviews will be documented and include consideration of the results of medical record

47

reviews, professional development and education, and maintenance of specialty board certification.

- CHS clinical and executive leaders will regularly identify and review all deaths or other adverse patient outcomes and occurrences. When indicated, methods of root cause analysis as recommended by the Joint Commission on Accreditation of Health Care Organizations will be employed and documented.

- At least quarterly, CHS utilization management activities will be reviewed and evaluated to document that practitioner requests for specialist consultations, offsite diagnostic and treatment procedures are completed in a timely manner.

- CHS will institute and maintain comprehensive tracking and monitoring systems for Patient Health Care Requests. Regular reviews will be conducted to validate that inmates are seen in a timely manner and that written responses to their requests are informative and professional.

- CHS will track and monitor of individual medication profiles and medication administration records to ensure continuity of administration, prevention of adverse drug reactions, and dosages consistent with individual patient needs and physiological characteristics. Fully adequate attention to this action remains dependent on initiation of the electronic medical order entry and medication

administration record systems currently being developed jointly by CHS and Diamond Pharmacy Services.

Most of the foregoing actions are either already in place or implemented by CHS.  For those actions not already in place, it is reasonable to expect completion by September 1, 2011.

## CAP – 10: Electronic Order Entry, Medication Administration and Health Record Systems

There has been a delay in implementation of the electronic pharmacy order entry project due to a recent Drug Enforcement Administration directive that each CHS clinic site have a separate DEA license.  Another factor was the need to add data lines to the older Durango and Estrella Sites.  The new "go live" timeline for the electronic order entry and medication administration record systems is June 1, 2011.  I agree with this timeline as part of the Corrective Action Plan.

Regarding development of the Electronic Health Record System, a Request for Proposals (RFP) document has been approved by the Maricopa County Materials Management Department.  Selection of a Vendor/System and the HER Contract Award is slated to occur in July 2011.  This will be followed by a series of steps including hardware installation; Net deployment; building work flow; content design; testing;

49

and training. Full activation of the system is projected for June 2013.   As part of this Corrective Action Plan, the foregoing milestones will be incorporated and monitored.

**CAP – 10: Internal and External Validation of Structure, Processes and Outcomes Pertinent to SAJ Requirements**

The new CHS leadership team is settled in place.  It is now appropriate and feasible to establish a more robust and consistent framework to evaluate compliance with SAJ requirements.  Going forward, there are three components I believe are most important:

- CHS and the MCSO need to complete their preparations for a NCCHC accreditation survey and to achieve full accreditation.  Many of the structure and process requirements for NCCHC accreditation are essential for a stable and effective jail health care system.  Achievement and maintenance of accreditation are also a positive factor in recruitment of qualified practitioners and nurses.
- CHS will continue to enhance its CQI program and to accomplish the tasks and objectives specified in CAP-8 and CAP – 9 as previously described.
- Beginning in late May 2011, I will be conducting quarterly medical record reviews jointly with CHS.  The

standardized methodology of these reviews will allow for sequential comparison of results from one quarter to the next. Medical records selected for review will be sufficient in number to characterize and compare outcomes for typical patient populations, including those with and without chronic illnesses.

This concludes my Sixth Report.


Respectfully submitted,

/s/

Lambert N. King, MD, PhD, FACP

51

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

*Graves v. Arpaio*                                    No CV 77-0479-PHX-NVW

SIXTH REPORT OF KATHRYN A. BURNS, MD, MPH
ON CORRECTIONAL HEALTH SERVICES COMPLIANCE
WITH SECOND AMENDED JUDGMENT
APRIL 2011

This report is being filed following a February 2011 site visit to the Maricopa County Jails. I visited the jails February 14-17, 2011. I toured the Mental Health Unit (MHU) and other mental health treatment space, met with mental health supervisory staff and reviewed a number of documents in addition to reviewing medical records. The medical records reviewed focused almost exclusively on records of inmates with serious mental illness.

I toured mental health treatment space and reviewed medical records at Lower Buckeye Jail, 4th Avenue Jail, Estrella and Durango. Since the time of the last site visit in 2010, Towers Jail is no longer being used to house pre-trial detainees; it is housing only sentenced inmates. I did not visit Towers Jail. Fifty (50) medical records were reviewed.

This report is organized around the item headings in my August 2010 Compliance Report and January 2011 site visit report and addendum. It is focused on the activity and progress of Correctional Health Services (CHS) and the provision of mental health care to pre-trial detainees. Information from the medical record reviews is included under the relevant topic areas but also summarized at the end of the report.

1

Intake/Receiving Screening

CHS continues to conduct intake screening of all inmates as they are booked into the jail. Timeframes for follow-up of positive screenings have been updated and are in the process of implementation. The screening instrument has been updated and will be entirely electronic starting in early April.

Review of the medical records indicates the screenings are timely and appropriately identify persons in need of immediate mental health attention, medication orders and other types of referral. The screening instrument and process appear to be appropriately sensitive and specific. However, there were three instances in which follow-up was not timely in response to a positive screen; two of the three involved female inmates. CHS is aware that responsiveness to a positive screening is a critical necessity. A Quality Improvement study is planned to address implementation of the electronic screening process and compliance with follow-up timeframes.

Health Need Requests (Inmate Self-Referrals) and Staff Referrals

The new Health Needs Request (HNR) system was put into place in November 2010 and includes a mechanism to track referrals and responses. It was too soon to have seen dramatic improvement in the HNR process in February, though all mental health-related requests were seen face-to-face rather than screened on paper only. Three of the 50 clinical files reviewed contained problematic HNR responses; one case involved HNRs from August and September (before the new processes were implemented) and in one case the HNR was incorrectly routed to medical rather than mental health. By the time the error was discovered, the inmate was released. (The HNR was incorrectly routed through medical because the inmate had identified it as a medical rather than mental health request

though the narrative clearly identified it as mental health; a careful read by medical triage would have sent the request to mental health initially saving time and permitting a response though this particular HNR was not of a critical nature.) In the third instance, the handling of the HNR was of less concern than the larger issue involving screening and Mental Health Unit follow-up.

Mental Health Unit (MHU)

Admission and discharge criteria have been formalized and implemented. Length of stay data is being maintained. Staff have been educated about the availability of the Maricopa County Health System for psychiatric hospitalization if hospitalization is deemed necessary though the transfer process had not yet been utilized at the time of the site visit. Inmate-patients returning from outside mental health emergency treatment or hospitalization are automatically admitted to MHU upon return to the jail. Much progress has been made in privacy of care and group treatment in the MHU. Confidential individual and group treatment space has been identified, physically modified as necessary and is in use. The culture of seeing patients at the cell front is changing.

On another bright note, treatment and programming for patients that are historically very difficult to treat are quite good: treatment plans are comprehensive and individualized and MHU staff do not push to have these patients discharged back into the general population quickly. These are the types of patients that other correctional systems and facilities sometimes view as untreatable and manipulative and mental health staff refuse to treat. CHS MHU staff should be applauded for their work with this subset of patients. Further, there is good coordination with the other jails around discharge planning for this group of inmates.

Unfortunately, there are a sizable number of patients that are getting discharged prematurely and many are not receiving timely or adequate follow-up upon release to one of the other jails. Premature release cases most often involve inmates admitted as a precaution directly from the booking process due to statements made while under the influence or while withdrawing from drugs and/or alcohol. Such inmates are rapidly assessed and discharged quickly from MHU but some return for readmission in short order - an indication that perhaps the assessment was not thorough enough or occurred too soon to accurately assess mental state in the absence of drugs and alcohol. This issue is further complicated by the lack of medical treatment space to manage arriving inmates that are intoxicated or withdrawing and the MHU staff's concern to ensure adequate MHU admission bed space is available for emergency admissions both from booking and other jails. It is complicated but must be addressed jointly by CHS medical and mental health leadership and line staff.

The problem that occurred most frequently with respect to the MHU was untimely and inadequate outpatient follow-up in the other jails upon discharge. CHS planned to address the timeliness issue through changing the process for scheduling the follow-up appointments. The follow-up had been scheduled by the receiving jail but CHS changed the protocol to make MHU staff responsible for scheduling the follow-up appointments in the Jail Management System as a result of this finding. Future audits should find improvement in this critical area. Adequacy of outpatient follow-up is related to the frequency (or infrequency) of contacts with psychiatry and other mental health staff as well as the type(s) of treatment interventions provided. These findings are discussed more fully under Outpatient Treatment.

At the time of the site visit, suicide prevention and clinical restraint policies had been revised. The draft revisions are currently in the process of review and discussion. (Note: There had been one suicide prior to this site visit, another suicide occurred in late February and a third inmate died by suicide in early March. CHS is in the process of critically reviewing these incidents and conducting psychological autopsies.)

<u>Outpatient Care</u>

Problems with outpatient care were identified in fifteen of the 50 records. Problems included infrequent treatment intervals; treatment of caseload inmates only in response to HNR rather than planned, regular contact; and over-reliance of psychotropic medication as essentially the sole treatment intervention. Significant improvement in this area is not expected until CHS develops and implements outpatient admission and discharge criteria; frequency of intervention by discipline; frequency of treatment team meetings and treatment plan updates; and group and individual interventions. By mutual agreement, revising the outpatient level of care was postponed to permit earlier and undivided attention to other critical areas and to encourage the use of line staff to develop the outpatient guidelines through a quality improvement team process.

<u>Coordination of medical and mental health care</u>

CHS undertook a number of initiatives to ensure better coordination between medical and mental health providers for inmates with both types of problems. The medical policy regarding treatment of pregnant women was revised to reflect referral and coordination with mental health; psychiatric disorders are now documented on the medical problem list in front of each chart and the problem list document itself was

redesigned to better integrate medical and mental health care; and psychiatric providers have been instructed to review medical chronic care flow sheets during psychiatric clinics raising their level of awareness.  Four files reviewed contained problems related to medical care follow-up of mental health patients: one related to medical handing of a HNR, one related to seizure disorder that doesn't appear to be followed by medical, and one related to not receiving prescription medications timely following MHU discharge.   The most serious case involved the lack of coordination with medical in a psychiatric patient with psychogenic polydipsia - a condition that causes metabolic abnormalities that can lead to death.  (The patient had abnormal laboratory results but was not treated for them or followed by medical for the problem.  Fortunately, an adverse incident did not result and the patient was discharged to inpatient psychiatric care at the state hospital.)

Treatment for Incompetent Criminal Defendants

There is nothing new to report on this topic.  As noted previously, use of the Maricopa County Health System for psychiatric hospitalization had not yet started at the time of the site visit.

Psychotropic medications

Thirteen cases involved issues with respect to psychotropic medication management.  They were divided into problems of two types: prescriptive issues and follow-up issues.  Prescriptive issues included:  problems with prescriber medication choice(s); continued problems with medication renewal or discontinuation without a face-to-face appointment; delays in recognition (and subsequent utilization) of Court Ordered Treatment (COT); and one failure to provide a non-formulary medication in spite of receipt

of verification. The issues involving follow-up included cases in which the follow-up interval after starting medications was too long; failure to address noncompliance or reports of side effects timely; and medication continuity problems with inmate housing or job assignment changes. Psychiatric provider peer review processes should begin to identify and address prescriptive and interval issues while the more general medication audits should find and correct noncompliance and continuity with housing moves.

Staffing

There is no update with regard to staffing other than to report that last year's newly created positions have been filled and there has been notable improvement in the capacity to provide treatment in privacy due to the additional escort officers and treatment space. Additional psychiatric and clerical/support time have also yielded beneficial results.

Continuous Quality Improvement (CQI)

A number of initiatives are underway: the HNR process was revised, implemented and monthly compliance audits were started. An audit instrument for MHU levels of care is under development. A system to track and analyze major mental health incidents is in place. Peer review efforts are underway for mental health staff, psychologists and psychiatric providers. A quarterly medical-psychiatric committee meeting has begun.

Segregation/Discipline

CHS is now notified of all caseload inmates with serious mental illness who receive a disciplinary infraction. The relevant policies must now be written or revised to reflect the practice and inform CHS staff on documentation requirements. Mental health care to inmates in segregation is provided under private conditions. The place and circumstances

of the interaction is documented in the chart note and an audit of the privacy expectation as reflected in the charting is planned.

Training

      I was provided the training curriculum lesson plans used in providing 16-hours of mental health-related training to *all* Maricopa County Sheriff's Office correctional officers. In general, the content appears relevant, accurate and appropriate.  Further, although I have not seen the actual training, it is clear from the lesson plans that a number of methods are used to convey the information such as lecture, film, discussion and role play; different learning styles are addressed and important points are reinforced in multiple ways. However, for reasons sited in my Fifth Report, I continue to believe that the modest quality improvement recommendation for a joint mental health-custody staff committee to review the curriculum in order to revise or supplement it as necessary for officers assigned to posts dealing with inmates most at risk and at highest risk of serious mental health problems (booking/receiving area, MHU and all segregation unit posts) remains relevant and appropriate.

Medical records review

      As noted previously, I reviewed 50 medical records during the site visit.  The sample included nine cases that were referred by plaintiffs' counsel; other records were selected at random from lists of seriously mentally ill caseload inmates.  Attention was focused primarily on the last six months of care to determine whether more recent changes have lead to improvement rather than focusing on past problems and deficiencies already identified and acknowledged as problematic by CHS.

Most of the findings have been reported when discussing the various topics in the preceding sections and won't be repeated here except in summary/table format at the end of this section. Items not previously mentioned include: 12/50 files reviewed revealed no deficiencies with respect to the level of mental health care provided: the inmate-patient appeared to be receiving an appropriate level of care, was being seen at appropriate intervals, had been enrolled into treatment at screening or thereafter as necessary in a timely fashion, was receiving medications appropriate for condition, etc. (One of the twelve reviewed was identified as being on the mental health caseload according to the caseload list but the inmate-patient was not actually on the caseload nor did he appear to require services based on his screening and assessment results. This is a database clean-up issue, not a care issue. Notably, there were many fewer of these cases identified this visit than in the past and CHS has dedicated some support resources to clean-up inaccuracies and update information in the database.)

| Record Review Issue or Problem | # records* |
|---|---|
| None | 12 |
| Intake/Receiving Screening | 3 |
| Health Needs Request | 3 |
| MHU Stay | 7 |
| MHU Follow-up | 12 |
| Outpatient | 19 |
| Coordination with Medical | 4 |
| Medication prescription | 6 |
| Medication follow-up | 6 |

* Some file reviews had more than one problem such as premature MHU discharge and missed timely outpatient follow-up appointment, so the problems total exceeds 50.

**Conclusion**

There has been significant progress in physical plant modifications for confidential care, policy and procedure implementation and developing processes for self-monitoring through continuous quality improvement. The revised policies and procedures for suicide prevention and clinical restraint are in draft form. The MHU is treating difficult patients, developing comprehensive treatment plans for them and coordinating discharge planning with outpatient providers. More group interventions are being provided to all inmates in MHU. Staffing has improved with psychiatric providers as well as some support staff to assist with scheduling, tracking and filing tasks and there are additional dedicated escort officers which has helped get inmate-patients to mental health appointments in treatment spaces that are private. Pretrial detainees are no longer housed in Towers Jail.

Areas that continue to need improvement include premature MHU discharge, MHU follow-up after discharge, integrating medical and mental health care and psychotropic medications. Mental health outpatient care too often consists of medication management with infrequent supportive contacts by other mental health clinicians though there is a plan to address outpatient level of care after improvements to more critical areas of care such as screening, health need requests and MHU operations are more firmly established.

Respectfully submitted,

*Kathryn A. Burns, MD, MPH*

Kathryn A. Burns, MD, MPH
April 5, 2011