1  **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails,<br><br>Plaintiffs,<br><br>vs.<br><br>Joseph Arpaio, Sheriff of Maricopa County; Fulton Brock, Don Stapley, Andrew Kunasek, Max W. Wilson, and Mary Rose Wilcox, Maricopa County Supervisors,<br><br>Defendants. | No. CV-77-00479-PHX-NVW<br><br>**ORDER** |

Before the Court are Defendant Arpaio's Motion Regarding Detention Staff Training Relating to Mental Health Issues, Defendant Maricopa County Board of Supervisors' Motion to Vacate June 14, 2011 Evidentiary Hearing, Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts, and a discovery dispute. (Docs. 1949, 1953, 1954, 1959, 1963.) No one has requested oral argument on any of the pending motions pursuant to LRCiv 7.2(f) although oral argument and/or evidentiary hearing on these issues has been suggested as an alternative to a decision on the briefs in a few of the numerous documents filed. In the final reply on these motions, filed May 12, 2011, CHS Defendants join Plaintiffs in requesting an

expedited ruling on Defendants' Motion to Vacate June 14, 2011 hearing, which the Court hereby grants.

**I.      Background**

        **A.      The Second Amended Judgment**

This class action, alleging that the civil rights of pretrial detainees held in the Maricopa County Jails had been violated, was brought against the Maricopa County Sheriff and the Maricopa County Board of Supervisors in 1977. In 1981, the parties entered into a consent decree, which was superseded in 1995 by the stipulated Amended Judgment. The Amended Judgment expressly did not represent a judicial determination of any constitutionally mandated standards applicable to jails.

In 1998, Defendants moved to terminate the Amended Judgment pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 and 42 U.S.C. § 1997e. Their motion was denied based on Ninth Circuit law holding the decree termination provisions of the PLRA unconstitutional. In 2000, the Ninth Circuit held the PLRA decree termination provision constitutional in another case and subsequently reversed and remanded this case in January 2001. In September 2001 and November 2003, Defendants renewed their motion to terminate the Amended Judgment. In April 2008, this case was reassigned to the undersigned judge.

In August and September 2008, a thirteen-day evidentiary hearing was held. During that process, Plaintiffs agreed not to contest termination of certain paragraphs of the Amended Judgment. On October 22, 2008, Defendants' Renewed Motion to Terminate the Amended Judgment pursuant to the PLRA was granted in part and denied in part, and the provisions of the Amended Judgment remaining in effect were restated in the Second Amended Judgment entered the same day. (Docs. 1634, 1635.) The Second Amended Judgment consists of those provisions of the Amended Judgment for which "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal

right," "is narrowly drawn," and is "the least intrusive means to correct the violation." *See* 18 U.S.C. § 3626(b)(3).

On November 21, 2008, Defendants filed a notice of appeal with the Court of Appeals for the Ninth Circuit. On October 13, 2010, the Court of Appeals affirmed the Second Amended Judgment. On November 2, 2010, Defendant Arpaio filed a petition for rehearing en banc, which was denied on March 25, 2011. On April 4, 2011, the Court of Appeals mandate issued revesting jurisdiction in this Court.

### B. Terminating the Second Amended Judgment

Congress enacted the PLRA to prevent federal courts from micromanaging prisons by mere consent decrees and to return control of the prison system from courts to "the elected officials accountable to the taxpayer." *Gilmore v. California*, 220 F.3d 987, 996 (9th Cir. 2000). "[N]o longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999. The PLRA requires that prospective relief regarding prison conditions "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. §3626(a)(1).

The PLRA also provides that any order for prospective relief regarding prison conditions is terminable upon the motion of any party or intervener two years after a district court has granted or approved the prospective relief, one year after the district court has entered an order denying termination of prospective relief under the PLRA, or two years after the enactment of the PLRA for orders issued before the PLRA's enactment. 18 U.S.C. § 3626(b)(1). The party seeking to terminate the prospective relief bears the burden of proving prospective relief no longer is necessary to correct a current and ongoing constitutional violation. *Gilmore*, 220 F.3d at 1007.

Under § 3626(b)(3), a "district court cannot terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum." *Id.* at 1007-08. Before ruling on a motion to terminate, the district court must inquire into current prison conditions unless

- 3 -

1 plaintiffs do not contest defendants' showing that there is no current and ongoing
2 violation. *Id.* at 1008. If prospective relief remains necessary to correct a current and
3 ongoing violation, the district court's authority to modify the existing prospective relief
4 includes authority to expand or diminish the existing relief. *See Pierce v. Orange County*,
5 526 F.3d 1190, 1204 n.13 (9th Cir. 2008). Determining whether such relief meets
6 § 3626(b)(3)'s need-narrowness-intrusiveness criteria "will obviously rest upon case-
7 specific factors—namely, the extent of the current and ongoing constitutional violations."
8 *Id.* at 1206.

### C. Enforcing the Second Amended Judgment

10 After the Second Amended Judgment was issued on October 22, 2008, the parties
11 began efforts to achieve compliance. On January 28, 2009, upon stipulation of the
12 parties, the Court appointed medical expert Dr. Lambert King and mental health expert
13 Dr. Kathryn Burns as independent evaluators of Defendants' compliance with the medical
14 and mental health provisions of the Second Amended Judgment. The Court greatly
15 appreciates the assistance Dr. King and Dr. Burns have provided to the Court and the
16 parties in identifying areas of need, documenting progress, and recommending strategies
17 for achieving full compliance with the Second Amended Judgment.

18 On April 7, 2010, the Court ordered the parties "to meet and confer to develop a
19 proposed procedure for achieving and demonstrating Defendants' complete compliance
20 with the Second Amended Judgment, including a procedure for Plaintiffs to submit fee
21 applications at appropriate intervals to be paid promptly by Defendants." (Doc. 1880 at
22 4.) The order explained, "The Court's purpose is to set a procedure by which full
23 compliance with the Second Amended Judgment is either confirmed or specific
24 implementing remedies are ordered and complied with by the end of this year." (*Id.*)

25 On June 18, 2010, the parties filed a joint report regarding nonmedical provisions
26 of the Second Amended Judgment, in which Defendant Arpaio asserted that the Maricopa
27 County Jails are in complete compliance with the nonmedical provisions of the Second
28 Amended Judgment. Plaintiffs disputed that assertion with respect to portions of those

provisions. On July 30, 2010, the parties filed a Supplemental Joint Report Regarding Nonmedical Provisions of the Second Amended Judgment, which addressed food provided to pretrial detainees in the Maricopa County Jails. Plaintiffs did not dispute that the menu provided by Defendant Arpaio satisfied the Second Amended Judgment's food requirements, but contended that inmates' food journals indicated that they were not receiving the amount of vegetables stated in the menu and were still consistently receiving inedible moldy bread and oranges. Defendants explained that inmate journals likely did not include vegetables incorporated in the stew and that production records document actual weights of vegetables added to the stew in addition to the side vegetables served. Defendants further explained procedures followed to prevent moldy bread or oranges from being served and to provide replacement meals should any moldy bread or oranges be included in the meals served.

Also on July 30, 2010, the parties filed a Joint Report Re: Medical/Mental Health Provisions of the Second Amended Judgment. The parties recommended that the Court-appointed medical and mental health care experts file compliance reports offering their assessments of the areas contemplated by the Second Amended Judgment that they perceive as resolved and those that they believe remain unresolved, together with their remedial proposals for each unresolved area of inmate medical and mental health care. The experts' compliance reports were filed on August 25, 2010. Plaintiffs subsequently filed a notice that they had no objections to the experts' proposed remedies.

On August 27, 2010, the Court held a status hearing regarding the parties' proposed timeline for discovery and the remaining proceedings in this case. Defendants' proposal included the following paragraph:

> 4. By September 9, 2010, the parties will notify the Court, the parties and the consultants/experts, whether they accept or object to any of the consultant's/expert's findings and remedial recommendations. If neither party objects to a consultant's/expert's findings and remedial recommendations, the Court will adopt those findings and that remedy as an order of the Court.

- 5 -

(Doc. 1895 at 16.) During the status hearing, referring to the paragraph quoted above, the Court stated:

> Your proposal had suggested that if you are able to agree on a course of action, that it would be automatically adopted by the Court. Now, if you are able to agree and the experts agree, it is highly likely that I will agree. But I cannot give that authority away in advance. I have to be persuaded.
>
> So that part, this last sentence on Paragraph 4, I'm going to have to change that so that whatever you agree on still needs to be presented to the Court. Now, as I said, it's very unlikely I will disagree. But I will need to make a judgment that the course of action is appropriate.

(Doc. 1908 at 35-36.)

After the Court of Appeals affirmed the Second Amended Judgment, Defendant Arpaio filed a motion to terminate paragraphs 2-5 and 9-16 of the Second Amended Judgment on October 28, 2010, but filed a petition for rehearing en banc on November 2, 2011. On November 17, 2010, the Court denied Defendant Arpaio's motion to terminate for lack of jurisdiction without prejudice to refiling it after the Court of Appeals' mandate issued and jurisdiction was revested in this Court.

On January 20, 2011, the parties filed a Joint Case Management Plan Regarding Health Care, which stated that Defendants had resolved most of their disagreements with the medical and mental health experts' proposed remedies and identified two issues on which Defendants continued to disagree with the recommendations. Defendant Maricopa County Board of Supervisors indicated that it had made a voluntary choice not to oppose the experts' remaining recommendations and to pursue all of the other remedies proposed by the experts even though not all were contemplated by, or appropriate under, the Second Amended Judgment. During a status conference on January 21, 2011, the Court set an evidentiary hearing regarding "physician staffing" issues for June 14, 2011, ordered briefing on "detention staff training" issues, and stated that these orders did not preclude resolution of other enforcement issues should any arise. The Court subsequently set a schedule, as jointly proposed by the parties, for discovery related to "physician staffing" issues in preparation for the anticipated June 14, 2011 evidentiary hearing.

1    During the January 21, 2011 status conference, Plaintiffs stated they did not
2 believe that Defendants were in full compliance with the nonmedical provisions of the
3 Second Amended Judgment, but that additional remedies were unnecessary. Plaintiffs
4 indicated they would communicate with Defendants regarding any outstanding issues and
5 attempt to resolve them before the appellate mandate issued and Defendant Arpaio would
6 be able to renew his motion to terminate the nonmedical provisions of the Second
7 Amended Judgment.
8    On March 9 and 10, 2011, the parties filed separate statements regarding a
9 discovery dispute, which they subsequently supplemented with further briefing. Plaintiffs
10 had retained Dr. Todd Wilcox as their medical expert, and they wished to tour the
11 Maricopa County Jails with Dr. Wilcox March 21-25, 2011, and to conduct specific
12 discovery. Defendant Maricopa County Board of Supervisors objected to the request
13 because it believed the purpose of the discovery was to obtain evidence for the June 14,
14 2011 hearing on "physician staffing," the issue had been resolved, and there now was no
15 need for the hearing or related discovery. Defendant Arpaio also opposed Plaintiffs' use
16 of Dr. Wilcox because of alleged bias. On March 18, 2011, Defendant Maricopa County
17 Board of Supervisors moved to vacate the June 14, 2011 evidentiary hearing because it
18 believed the "physician staffing" issues were resolved. On April 4, 2011, in addition to
19 responding to the motion to vacate the hearing, Plaintiffs filed a Motion for an Order
20 Adopting the Unopposed Recommended Remedies of the Court's Experts.

21 **II.    Discovery Dispute Filed March 9 and 10, 2011 (Docs. 1953, 1954, 1955)**

22    Defendants denied Plaintiffs' request to schedule a tour of the Maricopa County
23 Jails on March 21-25, 2011, with a medical expert of their choice, to review medical
24 charts of class members on-site, to speak with class members in a manner that provides
25 audio privacy, and to speak with medical clinical and administrative staff. Plaintiffs
26 presented the request for the purpose of monitoring Defendants' compliance with the
27 Second Amended Judgment and not limited to "physician staffing" issues for the June 14
28 evidentiary hearing. The Court has previously ordered that "upon reasonable notice to the

1  Defendants, Plaintiffs' counsel may tour the Maricopa County Jails facilities, speak with
2  pretrial detainees and staff, and review records on-site." (Doc. 1769.) Whether Dr.
3  Wilcox's testimony will be permitted at a possible evidentiary hearing in the future does
4  not affect Plaintiffs' present right to retain an expert to assist them in monitoring
5  Defendants' compliance with the Second Amended Judgment. Therefore, Plaintiffs'
6  Statement Regarding Discovery Dispute (Doc. 1953) will be deemed a motion to compel
7  discovery and will be granted.

**III.  Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts (Doc. 1963)**

Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts includes "a proposed Order incorporating the recommendations of the Court's experts," which includes Dr. Burns' recommendations verbatim. (Doc. 1963 at 2 n.1.) Dr. Burns' recommendations generally address modifying medical and mental health policies, procedures, records management, and forms.

Because "Dr. King's recommended remedies are intermixed with discussion and explication," Plaintiffs have attempted to "extract his actual recommendations from the remaining text and to set forth only the recommended remedies in the proposed Order." (*Id.*) However, the Corrective Action Plan included in Dr. King's April 6, 2011 report does not purport to be final and definitive. Dr. King expressly states that "further adaptations within this Corrective Action Plan may well be necessary and appropriate going forward over the next 12 to 18 months." (Doc. 1966 at 37.)

Further, Plaintiffs' proposed Order converts some of Dr. King's "discussion and explication" into orders for which compliance is not currently possible and may not ever be possible. For example, with regard to evaluation and treatment of patients at risk for alcohol and opiate withdrawal symptoms, the proposed Order states in part:

> 2.  Patients participating in legal methadone treatment programs **will continue to receive methadone maintenance** after [*sic.*] during their pre-trial detention. **Methadone will be available within the MCJ** for use in an opiate withdrawal treatment protocol for patients who are heroin dependent. Two other drugs — Suboxone and Subutex — are also acceptable alternatives.

- 8 -

> 3. Between July 1, 2001 and December 1, 2011, CHS will work diligently to secure the approvals and community partnerships necessary to provide methadone maintenance after jail entry and use of methadone or other drugs for treatment of opiate withdrawal, including approvals from state and federal agencies including the US Drug Enforcement Administration.

(Doc. 1963-2 at 21, emphasis added.)  In contrast, Dr. King's report states:

> [P]atients participating in legal methadone treatment programs should continue to receive methadone maintenance after [sic.] during their pre-trial detention.  In addition, since methadone is medically preferable to clonidine in most respects, methadone needs to be available within the MCJ for use in an opiate withdrawal treatment protocol for patients who are heroin dependent.  Two other drugs — Suboxone and Subutex — are also acceptable alternatives.
>
> Dr. Alvarez and I are having ongoing discussions about his diligent efforts to secure the approvals and community partnerships necessary to provide methadone maintenance after jail entry and use of methadone or other drugs for treatment of opiate withdrawal. **Multiple regulatory, legal, licensure and training issues remain to be resolved.**  There appear to be three main options, which are not necessarily mutually exclusive.  These options are the following:
>
> • A licensed and community-base[d] drug addiction treatment network **might be** engaged to come into MCJ facilities to evaluate, counsel and treat patients receiving methadone maintenance or at risk for opiate withdrawal and addiction treatment.
>
> • CHS **may be able to** obtain Opiate Treatment Program (OTP) certification by the Substance Abuse and Mental Health Services Administration (SAMHSA) linked to OTP accreditation through the National Commission on Correctional Health Care. . . .
>
> • Individual physicians employed by CHS **might** complete the additional training needed to obtain a SAMHSA DATA (Drug Addiction Treamtne Act of 2000) Waiver for use of Suboxone (buprenorphine) and Subutex (buprenorphine plus naloxone hydrochloride) in treatment of opiate addiction.
>
> All of these options involve approvals from state and federal agencies including the US Drug Enforcement Administration. **I estimate that another three months (July 1, 2011) will be needed to establish a feasible plan**, implementation of which can hopefully be completed by December 1, 2011.  This projected date reflects the substantial time required to complete any of the three options outlined above.

(Doc. 1966 at 48-49, emphasis added.)

Moreover, some provisions of the proposed Order cannot be fully complied with presently.  For example, quoting from Dr. King's recommendations, the proposed Order states, "CHS will track and monitor of [*sic.*] individual medication profiles and

- 9 -

medication administration records," followed by the statement, "Fully adequate attention to this action remains dependent on initiation of the electronic medical Order entry and medication administration record systems currently being developed jointly by CHS and Diamond Pharmacy Services." (Doc. 1963-2 at 23.) Other provisions only set forth general plans, *e.g.*:

> Regarding the development of the Electronic Health Record System, a Request for Proposals (RFP) document has been approved by the Maricopa County Materials Management Department. Selection of a Vendor/System and the HER Contract Award is slated to occur in July 2011. This will be followed by a series of steps including hardware installation; Net deployment; building work flow; content design; testing; and training. Full activation of the system is projected for June 2013. As part of this Corrective Action Plan, the foregoing milestones will be incorporated and monitored.

(*Id.*)

The Court can and will enforce the Second Amended Judgment and will issue orders regarding ancillary matters as needed to give effect to the Second Amended Judgment. But the PLRA does not permit the Court to order prospective relief that extends further than necessary to correct a current and ongoing constitutional violation. Moreover, the Court will not order general aspirational statements that cannot be specifically enforced. Therefore, Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts (Doc. 1963) will be denied.

**IV.  Defendant Maricopa County Board of Supervisors' Motion to Vacate June 14, 2011 Evidentiary Hearing (Doc. 1959)**

Defendant Maricopa County Board of Supervisors seeks to vacate the June 14, 2011 evidentiary hearing that was set to decide "physician staffing" issues, which Defendant believes have been resolved. On April 6, 2011, the sixth reports of Dr. King and Dr. Burns were filed and include some revisions to previous recommendations. In response to Defendant's motion to vacate the evidentiary hearing, Plaintiffs state they believe that "the revised recommendations will help Defendants achieve full compliance with the Second Amended Judgment so long as these remedies are adopted as a court order to implement the Second Amended Judgment." (Doc. 1964 at 2.) Plaintiffs further

1  state they would agree with Defendant that the June 14, 2011 evidentiary hearing is
2  unnecessary if the Court should decide to grant Plaintiffs' Motion for an Order Adopting
3  the Unopposed Recommended Remedies of the Court's Experts without requiring
4  testimony on the matter. However, for the reasons stated above, the Court will deny
5  Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the
6  Court's Experts and will not hear testimony on the matter. Therefore, the condition for
7  Plaintiff's agreement to vacate the June 14 hearing is not satisfied.

8  At this point, it is unclear whether the parties agree that the medical and mental
9  health experts' revised proposed remedies regarding "physician staffing" provide a plan
10 for Defendants to achieve full compliance with the medical and mental health provisions
11 of the Second Amended Judgment. On March 18, 2011, Plaintiffs said:

> From Plaintiffs' perspective, Dr. King's and CHS's new plan (attached as Exhibit A to CHS's Statement Re Discovery Dispute), which was provided to Plaintiffs on March 11, departs significantly from Dr. King's original, more stringent recommendations regarding intake staffing – and it considerably dilutes his earlier recommendations, which he had strongly defended as necessary as recently as his January 2011 report. Plaintiffs have the right, after reviewing Dr. King's upcoming compliance report, and after conducting discovery at MCJ with their own medical expert, to reach their own conclusions as to whether this new plan is adequate to bring the Defendants into full compliance with the Second Amended Judgment on the issue of physician staffing.

18 (Doc. 1957 at 5.) On April 4, 2011, Plaintiffs said that "the revised recommendations
19 will help Defendants achieve full compliance" if adopted as a court order. (Doc. 1964 at
20 2.)

21 Thus, the Court cannot determine whether there is need for an evidentiary hearing
22 on "physician staffing." Moreover, the Court cannot determine from the parties'
23 submissions whether a "nursing issue" exists and whether it should be addressed in
24 conjunction with any remaining "physician staffing" issue. It appears, however, that if an
25 evidentiary hearing is required to resolve any remaining disputes regarding the nursing
26 and/or physician staffing components of a compliance plan, holding the evidentiary
27 hearing on June 14, 2011, would not permit adequate time for discovery and preparation.
28

- 11 -

Therefore, the evidentiary hearing set for June 14, 2011, will be vacated, and a status/case management conference will be set in its place.

**V.  Defendant Arpaio's Motion Regarding Detention Staff Training Relating to Mental Health Issues (Doc. 1949)**

**A.  Dr. Burns' Recommendations Are Limited to Determining Whether Additional or Revised Detention Staff Training Is Needed and Do Not Purport to Be Based on Evidence of a Systemic Constitutional Violation.**

In her report filed August 25, 2010, Dr. Burns had not found evidence of a need for additional training for detention officers and said she hesitated to adopt Plaintiffs' recommendations (*see* Docs. 1900 at 37-38, 1897-2 at 14) as part of a remedial plan. Instead, she recommended that Defendants' Continuous Quality Improvement program determine whether additional training is needed and whether the current curriculum should be revised or supplemented:

> I believe that Segregation/Discipline and Training of Correctional Staff are topics that can and do impact access to care within correctional facilities nearly universally. However, in this particular case, the severity of mental health staffing shortages and the lack of treatment programming options has precluded my ability to truly assess the degree to which Segregation/ Discipline and Correctional Staff Training have independently impacted access to care. I believe it is premature therefore to offer a detailed remedial plan for these areas because the effects of the additional mental health staff, treatment interventions to segregated inmates and modification of the MHU to house high custody inmates and actually provide confidential individual and group treatment have not been measured. On general principle, I do not disagree with any of the [Plaintiffs'] recommendations but hesitate to adopt them as part of a remedial plan without further evidence of need. However, because the issues are so ubiquitous in correctional settings, I do offer the following recommendations for the Continuous Quality Improvement program:
>
> . . . .
>
> 1. Analyze the number, appropriateness and timeliness of security staff referrals to mental health to determine whether additional training is needed for all custody staff;
>
> 2. Charter a small committee of supervisory mental health and custody staff to review the mental health training curriculum for officers to revise or supplement as necessary for those officers assigned to posts dealing with inmates most at risk and a highest risk of serious mental health problems, namely, the booking/receiving area, the MHU and all segregation housing areas; . . . .

(Doc. 1905-1 at 21.)

In her report filed January 4, 2011, Dr. Burns noted Defendant Arpaio's objection to her recommendations regarding detention staff training, but did not change those recommendations. Again, she stated her recommendation that the training curriculum be reviewed to determine whether there was need to revise or supplement it. She mentioned three incidents of physical mistreatment by detention staff of restrained inmates in the MHU as examples of events that possibly could be prevented by additional training. Defendant Arpaio, however, asserts that all three mentioned incidents involved the same detention officer, he was not assigned to the MHU, he has been charged with aggravated assault, and no amount of training likely could have prevented his actions.

In her report filed April 6, 2011, Dr. Burns stated that for reasons stated in her previous report, she continues to believe that her "modest quality improvement recommendation . . . remains relevant and appropriate." Dr. Burns' recommendations regarding detention staff training are not remedies to cure noncompliance with the Second Amended Judgment. She merely suggests that the Continuous Quality Improvement program include detention staff training in its assessment and improvement cycle.

**B. Although the Second Amended Judgment Does Not Expressly Require the Assessment and Improvement of Detention Staff Training, the Court May Order Additional or Revised Detention Staff Training If It Is Needed for Defendants to Comply with the Second Amended Judgment.**

As discussed above, the Second Amended Judgment consists of only those provisions of the Amended Judgment for which "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right," "is narrowly drawn," and is "the least intrusive means to correct the violation." *See* 18 U.S.C. § 3626(b)(3). Plaintiffs expressly did not contest termination of paragraphs 106 and 107 of the Amended Judgment, which stated:

> 106. Defendants shall ensure that all new detention officers receive a basic training course consisting of not less than forty hours prior to being assigned to any detention-related duty.

- 13 -

> 107. Defendants shall ensure that ongoing training be provided continuously during employment of all detention officers to sharpen their skills, reinforce their knowledge and understanding of the fundamentals of their jobs, and familiarize them with new developments in the field and new policies and procedures of the institution, in a reasonable manner. Said training shall include, but not be limited to the following: . . . (m) recognition of the signs and symptoms of mental illness and mental retardation; . . . .

(Docs. 166, 1635 at 17.) Thus, detention staff training is not directly required by the Second Amended Judgment.

However, that does not mean that Defendants need not assess whether additional or revised detention staff training is required to satisfy the Second Amended Judgment. Paragraph 7 of the Second Amended Judgment provides: "All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs." In order to terminate the Second Amended Judgment, Defendants must prove there is no current and ongoing constitutional violation regarding paragraph 7, *i.e.*, all pretrial detainees in the Maricopa County Jails actually do have ready access to care to meet their serious medical and mental health needs. Ready access to medical and mental health care involves both medical and detention staff:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (internal quotations, citations, and footnotes omitted). Defendant Arpaio is not relieved of all obligations under paragraphs 6, 7, and 8 merely because they fall primarily within the purview of Correctional Health Services. Until the Second Amended Judgment is terminated, all of the Defendants will be subject to enforcement of each of its provisions.

Defendant Arpaio's motion "requests that Plaintiffs be precluded from re-litigating the issue of detention staff training as it pertains to mental health issues." Dr. Burns' recommendations do not attempt to revive terminated provisions; she merely suggests that Defendants assess whether additional or different detention staff training should be

- 14 -

provided. If Defendants are unable to prove that all pretrial detainees have ready access to care to meet their serious medical and mental health needs, both Defendant Arpaio and Defendant Maricopa County Board of Supervisors are obligated to find and remove any barriers to access, which may include inadequate mental health training for detention staff. But that issue is not presently before the Court.

IT IS THEREFORE ORDERED that Defendant Arpaio's Motion Regarding Detention Staff Training Relating to Mental Health Issues (Doc. 1949) is denied, Defendant Maricopa County Board of Supervisors' Motion to Vacate June 14, 2011 Evidentiary Hearing (Doc. 1959) is granted without prejudice, and Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts (Doc. 1963) is denied.

IT IS FURTHER ORDERED granting Plaintiffs' discovery request for counsel and their medical expert to tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records on-site, upon reasonable notice to Defendants (Doc. 1953).

IT IS FURTHER ORDERED vacating the evidentiary hearing set for June 14, 2011.

IT IS FURTHER ORDERED setting a status conference for **9:30 a.m., June 14, 2011**. By **June 7, 2011**, the parties shall file a joint case management report stating (1) whether there is need for an evidentiary hearing regarding nursing and/or physician staffing and (2) whether there is need for an evidentiary hearing on any other matter at this time.

DATED this 16th day of May, 2011.

_____
Neil V. Wake
United States District Judge