Jorge Franco, Jr. (No. 013834)
E-Mail: jf@jhc-law.com
JENNINGS, HAUG & CUNNINGHAM, L.L.P.
2800 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-1049
Telephone: 602-234-7800
Facsimile:  602-277-5595

Attorneys for Defendants Fulton Brock, Don Stapley,
   Andrew Kunasek, Max Wilson and Mary Rose Wilcox

## UNITED STATES DISCTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails, | Case No. CV-77-0479-PHX-NVW |
| Plaintiffs, | **NOTICE OF FILING SEVENTH REPORT OF DR. KATHRYN A. BURNS** |
| vs. | |
| Joseph Arpaio, Sheriff of Maricopa County; et al.; | |
| Defendants. | |

Pursuant to this Court's Order dated January 28, 2009 (#1769), defendants Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson and Mary Rose Wilcox, through undersigned counsel, hereby give notice of filing the Seventh Report of Kathryn A. Burns, M.D., MPH dated August 2011.   The report is attached hereto.

DATED this 9th day of August, 2011.

JENNINGS HAUG & CUNNINGHAM, L.L.P.


/s/ Jorge Franco, Jr.
Jorge Franco, Jr.
2800 N. Central Avenue, Suite 1800
Phoenix, AZ  85004-1049
Attorneys for Defendants Fulton Brock, Don
    Stapley, Andrew Kunasek, Max Wilson and
    Mary Rose Wilcox

# CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2011, I electronically transmitted **NOTICE OF FILING SEVENTH REPORT OF DR. KATHRYN A. BURNS** to the Clerk's Office for the United States District Court, District of Arizona, using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Larry A. Hammond, Esq.
Sharad H. Desai, Esq.
Christina C. Rubalcava
Osborn Maledon, P.A.
2929 N. Central Avenue, Suite 2100
Phoenix, AZ 85012-2793
lhammond@omlaw.com
dhill@omlaw.com
sdesai@omlaw.com


Margaret Winter, Esq. (admitted *pro hac vice*)
Gabriel Eber, Esq. (admitted *pro hac vice*)
Eric Balaban, Esq. (admitted *pro hac vice*)
ACLU National Prison Project
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
mwinter@npp-aclu.org
geber@npp-aclu.org
ebalaban@npp-aclu.org


Daniel J. Pochoda, Esq.
ACLU
P.O. Box 17148
Phoenix, AZ 85011
dpochoda@acluaz.org


Michele M. Iafrate, Esq.
Courtney Cloman, Esq.
Iafrate & Associates
649 N. Second Avenue
Phoenix, AZ 85003-0001
michele.iafrate@azbar.org

1

      I further certify that on August 9, 2011, a copy of the attached document was delivered to:

2

The Honorable Neil V. Wake

3
United States District Court, District of Arizona
401 W. Washington Street, SPC 52

4
Suite 524

5
Phoenix, AZ  85003-7640

6

7

/s/ Kim Cecil

8
kc/4982-2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

*Graves v. Arpaio*                                              NoCV 77-0479-PHX-NVW

SEVENTH REPORT OF KATHRYN A. BURNS, MD, MPH
ON CORRECTIONAL HEALTH SERVICES COMPLIANCE
WITH SECOND AMENDED JUDGMENT
AUGUST 2011

This is the seventh report filed to update the Court on Correctional Health Services

(CHS) compliance with the terms of the Court's Second Amended Judgment as it pertains to

the delivery of mental health care to pretrial detainees confined in the Maricopa County

Jails. Dr. Lambert King, medical consultant, and I visited the jails June 27-29, 2011. As in

prior visits, I met with CHS administrative and supervisory medical and mental health staff;

toured the Mental Health Unit (MHU); visited Lower Buckeye Jail (LBJ), 4th Avenue Jail and

Estrella; and reviewed a number of documents and medical records. In addition, I

interviewed several inmates classified as seriously mentally ill (SMI) that are housed in

segregated housing units, observed a group session in the MHU and spoke with the inmates

after the group about the treatment they receive.

Dr. Dawn Noggle, CHS Director of Mental Health, and I reviewed the format and

contents of the Mental Health Report that is compiled and sent to me monthly. I have asked

for some revisions in terms of the types of information being presented and requested the

inclusion of some other types of data. I reviewed the Psychological Autopsies and Incident

Reviews pertaining to the three inmate deaths by suicide that have occurred. (I had

independently reviewed the medical records of these inmates prior to the site visit and

discussed and compared my findings with those of CHS.) I reviewed the status of the

Continuous Quality Improvement program, some recently completed studies, minutes of the Quality Improvement Council and clinic subcommittees.  Dr. King and I reviewed some critical incidents and discussed them with one another as well as with Dr. Noggle and Dr. Jeffrey Alvarez, CHS Medical Director.  We reviewed the documentation from CHS' review of the incidents, the issues identified and plans of correction developed in response.

I have organized this report according to the format and recommendations made in my Fifth Report and Addendum.


### *Intake/Receiving Screening*

CHS has done extensive work on the Intake/Receiving Screening process:  The policy and procedures have been revised to include a triage determination of how soon a detainee who screens positive requires a follow-up mental health assessment and psychiatric provider appointment.  The triage category and date(s) for scheduled follow-up appointments are documented on the mental health screening form which becomes part of the paper medical record.

Further, the number of intake/screening questions has been expanded substantially for both medical and mental health items.  Additional items have been added, the sequencing of items was improved and all portions of the screening are now electronic. Moving to an electronic process has permitted all of the mental health related questions to be extracted into a one-page report for each detainee (rather than the previous scattered questions and a supplemental form.)  A sample mental health screening report extracted from the larger screening process is attached at the end of this report as Appendix A: Mental Health Screen Report.  The revised screening instrument and electronic process

2

were implemented April 6, 2011.

A Quality Improvement audit was completed at the end of April to determine whether inmates with mental health needs received timely assessment and treatment after booking. One hundred twenty-nine receiving screens were reviewed; three inmates were released at intake leaving a sample of 126. Of them, 123 (97.6%) were assigned a mental health triage code number. (This represents and improvement of more than 8% when compared to a study conducted in March prior to the consolidated electronic process.) The next part of the audit attempted to answer whether the appropriate triage code was assigned at intake based upon the responses to the screening questions. Audit results indicated that the appropriate urgency code was assigned in 85% of the cases. Follow-up appointments were scheduled in the Jail Management System (JMS) for 91% of the cases requiring follow-up. Lastly, 64% of the inmates for whom a follow-up appointment was made were actually seen as scheduled. (Inmates released prior to the scheduled appointment were excluded from this sample.) These results will be used to develop a plan of correction targeting better performance in ensuring patients are seen face-to-face within the targeted time frame. (Prior to the advent of the electronic process, an audit showed only 45% of the scheduled appointments were kept.) One step in the quest for improvement starting July 1 is to expand psychiatric provider coverage at the 4th Avenue intake clinic to include evening hours (coverage to midnight) three nights per week. (At the time of the site visit, there were no evening hours.) The process will be audited again within six months.

Findings in the records reviewed (Appendix B: Case Reviews) are consistent with the findings of CHS internal study: improvement is needed in the areas of assigning the

appropriate triage code and ensuring appointments actually occur as scheduled.

### *Health Needs Requests (Inmate Self-Referrals) and Staff Referrals*

CHS revised the Health Needs Request (HNR) policy and procedures to include a face-to-face triage of HNRs related to mental health needs within 24-48 hours and created a database to track all HNRs and triage response times. Data is available starting in January 2011.

In April, 1223 mental health-related HNRs were received and 91.1% were triaged face-to-face within 48-hours. In May, 1589 mental health-related HNRs were received and 90% were triaged within 48-hours. (Note that the policy requires a face-to-face triage of all mental health-related requests.) This represents overall data and demonstrates CHS is exceeding the agreed upon compliance threshold of 85% in terms of timeliness overall. Durango clinic did not reach the overall performance threshold and the process and challenges there were reviewed. Subsequently, Saturday hours were added to mental health staff coverage and performance improved from 75% (April) to 80.9% (May) of HNRs triaged face-to-face within 48-hours. Other procedural improvements are planned at Durango. (For example, changing the procedure to shorten the time it takes for medical nurses who do the initial paper review of all HNRs and enter day and time of receipt to forward mental health-related requests to mental health staff.)

Note that the database and analysis of results deal only with whether the triage occurred within 48-hours of receipt and include a triage urgency code. (The urgency code is a number between 1 and 4 with a code of 1 being the most urgent and a code of 4 meaning the follow-up will occur as previously scheduled or there is no need for follow-

4

up.)  A quality improvement study will be necessary to review the clinical judgment rendered with respect to appropriately classifying the urgency of the response, the appropriateness of recommended follow-up (such as referral to a psychiatric provider, admission to MHU or increased frequency of mental health contacts and counseling) and whether the timeframes for the planned follow-up were met.  Now that the basic elements of tracking receipt and response timeframes to HNRs are in place, a quality improvement audit is possible.

Findings in the records reviewed and summarized at the end of this report in Appendix B demonstrate the improvement in triage response rate but there is a need for a more clinically oriented review of the triage decision and recommended follow-up, particularly as it relates to more timely referrals for psychiatric follow-up on issues related to medications (not simply telling the detainee to ask the psychiatric provider about their concern at their next regularly scheduled appointment) and increasing the frequency and/or type of intervention in response to a clinical need.  Referrals to mental health from other jail staff, including medical and detention staff should also be tracked for timeliness of triage response as well as clinical appropriateness of triage response classification decisions.  Record review findings demonstrated some problems with mental health responses to referrals from other jail staff.  (Appendix B: Cases #3, #5 and #9)

***Mental Health Unit (MHU)***

CHS progress in addressing issues and concerns in the MHU is mixed:  many advances have been made but serious problems persist.  Advances are substantial and include:

Revising the system for scheduling the follow-up appointments at outpatient facilities when a patient is discharged from the MHU.   Prior to the procedural revision, the receiving outpatient facility was responsible for scheduling mental health professional and psychiatric provider follow-up upon the patient's return.  There were many problems with continuity of care and patients were not seen timely under this process.  A procedural change requiring the MHU staff to schedule outpatient follow-up through the Jail Management System (JMS) has been made.  This required additional staff training to show them how to use JMS to schedule appointments at the other sites as well as ensuring that follow-up interval recommendations were incorporated into the process.  Training was completed and the new procedure is in place.  A Quality Assurance audit to determine the effectiveness of the new procedure is planned for July.

There has been a near exponential increase in the number of group treatment opportunities offered.  Each mental health professional conducted 24-31 groups during April; 105 groups were held and there were 14 cancellations.  (The reason for cancellation is also tracked.  In April, the reasons for cancellation were staff absences and patient refusals.)  The average group size is 5.5 inmates.  I had the opportunity to sit in on a group and speak with the participants during the site visit.  (This particular group was being held in a group treatment room on the MHU housing unit.  Patients were seated in chairs without handcuffs or leg irons.)  The facilitator was very professional and managed to get all of the participants engaged in meaningful discussion about the topic.  All of the men in the group were very enthusiastic about the addition of group treatment options in the MHU.

A criticism that has been leveled regarding group treatment has been that it has

been reserved as a modality for only lower custody level inmates (so that they could be out of their cells and out of cuffs) while higher custody (or more acutely ill) inmates remained in their cells (meal slot in the solid cell door open to permit some sound penetration) with a mental health professional attempting to engage them in some form of activity such as exercise or music appreciation while walking around the dayroom. (Individual interactions with higher custody inmates were also conducted almost exclusively at the cell front without regard for confidentiality.) Another improvement has been the creation of secure, confidential individual and group treatment space on all MHU housing units. The installation of secure therapeutic modules arranged in a group room to permit congregate activity of closed custody inmates was completed in late June. Out-of-cell group treatment for closed custody inmates was scheduled to start the week of July 11, 2011.

Other areas in which progress is underway:

Dr. Noggle has a meeting scheduled for August 8 with the Presiding Judge over Probate and Comprehensive Mental Health Court to work through the details of being able to transfer inmates to Desert Vista inpatient psychiatric care when necessary for immediate care (i.e., before decompensating to the point of requiring Court Ordered Treatment (COT) and/or if COT is denied.) This will likely require the court granting a "conditional release" of the patient from the jail to the hospital. The scheduled meeting is to work through the procedural and legal requirements to access acute inpatient psychiatric care via the intergovernmental agreement with Maricopa County Health System.

CHS is working on a mechanism to transfer Restoration to Competency (RTC) patients whose clinical need exceeds that which can be provided in the MHU to Arizona

State Hospital until they are stabilized to the extent that they can safely return to MHU or their criminal case disposition has been determined (i.e., their competency has been restored or they have been declared non-restorable.) This mechanism will require further procedural development but CHS has identified a funding source to pay for the state hospital care, which should increase the likelihood of procedural success.

In spite of the progress made, serious issues persist in MHU. Chart reviews continued to illustrate problems with inadequate, incomplete admission assessments; premature release; unilateral discharge decisions made by MHU without discussion, coordination or continuity of care with outpatient providers; concerns about the frequency, intensity and quality of treatment interventions in the MHU. There was a critical incident involving dehydration and serious adverse medication reactions in the same patient that were not timely addressed and required emergency transport out for medical care in the community on two separate occasions. (The incident is detailed in the Appendix B - Case #5 and CHS has scheduled a root cause analysis Quality Assurance review in early July.) This incident is particularly noteworthy because the patient was confined to the acute unit of the MHU for three and a half months where intervention and monitoring are by definition, most intense and frequent, and yet, his physical and psychiatric conditions deteriorated dramatically. (He was in his cell for weeks on end, refusing to eat and shower. When taken out for emergency treatment, his hair and feet were described as being matted with feces.) The case is also complicated by the patient having been sent to jail for RTC which actually delayed his access to acute inpatient psychiatric care. Review of this case also served to highlight the physical condition of the cells in the MHU, particularly those in the acute care units. The dayroom areas were painted more than a year ago but the cell

8

interiors were not. Custody has policies with respect to cleaning and disinfecting the cells but in spite of periodically disinfecting surfaces, the floors, walls and windows appear grimy and stained with what appears to be dirt, feces and/or blood in some instances. Some of the Plexiglas or lexan windows that are supposed to permit visibility into the cells are so scratched that visibility is reduced.   These conditions are most prominent in the acute and sub-acute housing units but also exist to a lesser extent throughout the MHU.   I recognize that this is a jail environment and that maintaining cleanliness presents many challenges.  Nevertheless, the MHU is intended to be a therapeutic environment but the conditions inside the cells appear filthy in spite of applying surface disinfectant.  Acutely mentally ill inmates are confined under these conditions for twenty-three or more hours per day, sometimes for many days on end.  This environment is not therapeutic for them nor hygienic for other inmates and staff who work there.

Suicide Prevention Program

The Suicide Prevention Policy and procedures were revised.  A stand-alone policy on the use of therapeutic restraints was written.  The use of seclusion as a step in suicide prevention has been eliminated.  (Also, there is no stand-alone seclusion policy: therapeutic seclusion as a separate level of care or procedure no longer exists.)  The policies were effective May 9, 2011.  Staff training on both policies occurred April 25 – May 20, 2011.  All three of the suicides reviewed occurred prior to the adoption and training on the suicide prevention program revisions.  More comprehensive suicide risk assessments, timely referrals to psychiatric care and improved coordination with medical providers would have significantly impacted the mental health management of those cases and may have resulted in different outcomes.   The implementation of the policy and procedural

9

improvements and training will be reviewed during future site visits.

### *Outpatient Care*

Outpatient care was not a focus of this visit as CHS acknowledged that attention has not yet been focused on this level of care.   (Intake screening, HNR, quality improvement, work on electronic medication administration records, suicide prevention policy revision, staff training on new procedures and other initiatives were appropriately given priority over outpatient care revisions.)  Although not unexpected given CHS' decision to prioritize other initiatives over outpatient care, chart review findings demonstrate that problems with outpatient care previously identified continue to exist.   These issues are quite serious and include infrequent contact/treatment intervals, even when patients are not doing well; over-reliance on psychotropic medication as essentially the sole treatment intervention in many instances; contact in response to HNR rather than pro-active, planned, clinically driven and focused treatment interventions; poor continuity of care upon discharge from MHU; and concerns that the clinical threshold to refer a patient to a higher level of care is too high.  The latter includes decisions to refer patients for a psychiatric assessment, refer to a psychiatric provider sooner than the appointment previously scheduled when necessary, and referring to MHU level of care or psychiatric hospitalization if appropriate.

### *Coordination of Medical and Mental Health Care*

This is an area to which CHS must devote substantial attention and scrutiny as evidenced by these recent critical incidents: MHU patient transferred out to hospital for medical care *twice*; pregnant methamphetamine intoxicated mentally ill woman gave birth in bathroom at Estrella; suicide during alcohol withdrawal; and an instance of mental

10

health staff failing to assess an inmate in response to a medical referral. (Cases # 5, 4, 2 and 3 summarize these incidents in Appendix B.)

Some initiatives that CHS has already implemented to address coordination of care include: a joint psychiatric and medical provider meeting that occurs every other month. A psychologist assigned to the LBJ infirmary attends weekly staffing meetings held on infirmary patients to ensure mental health involvement in care issues. The CHS medical director, mental health director and nursing director are planning to attend the morning MHU meeting together once weekly in order to assure better and more rapid care coordination starting in July as a response to the MHU patient emergency medical transfer incident.

The quality assurance reviews of critical incidents have become much more comprehensive, appropriately self-critical, and focused on implementing improvements. CHS understands that proactive quality improvement studies in addition to reactive critical incident reviews are required in order to better examine medical and mental health care coordination. I strongly recommend starting with a quality improvement study focused on the management of arriving inmates that are intoxicated or experiencing withdrawal from drugs and/or alcohol based upon their being in need of medical monitoring and at risk of medical and psychological complications including suicide. I have added this recommendation to the section of this report dealing with Continuous Quality Improvement as well.

## Treatment for Incompetent Criminal Defendants

As noted earlier in the section reviewing MHU, there has been no change to these processes or improved access to inpatient care since the last site visit but a funding stream has been identified to purchase state hospital care when necessary and a meeting is scheduled with the Mental Health Court to work through the legal requirements necessary for a transfer to Desert Vista.  In the meantime,  detainees committed to the jail under this status continue to be unable to timely access a higher level of care (inpatient) even when their condition is critical.   (See MHU case discussed above and in Appendix B, Case #5.)


## Psychotropic Medications

In addition to having revised the policy, a number of important initiatives are underway with regard to improvements in this area.  Firstly, monthly reports from the vendor, Diamond, demonstrate there have been no policy violations with respect to polypharmacy (prescribing multiple similar medications to the same person) for the past three months.  Second, a system in which jail staff will be able to access electronic medical records of patients receiving outpatient services through Magellan is underway.  (The software is being loaded onto computers in July.)  Thirdly, a meeting with the Magellan medical director has been scheduled for July as well in order to begin to address continuity of care across systems with respect to medication prescribing patterns and formulary considerations.

A database to accurately track COT has been developed and is currently functional so that treatment is not delayed when an order already exists and so that opportunities for seeking renewed orders under clinically appropriate circumstances are not missed.  A

12

quality improvement audit concerning psychotropic medication was completed in May 2011 and compared to similar audits conducted quarterly. The medical records of one hundred patients who reported taking psychotropic medications at the time of booking during the month of March were reviewed. Audit findings demonstrated that 74% of patients in the sample were seen by a psychiatric provider and the average number of days between a referral and psychiatric provider visit was 5.5 days. (Previously, the average was 7 days.) No psychotropic medication was ordered for 26 of the 100 patients but the rationale for the determination that medication was not necessary was not documented for 21 of the patients - an area that continues to need improvement. The average length of time for a patient to actually receive medication after an order for medication is written is less than one day but the average number of days from booking to actual medication administration continues to lag behind: it's 5.5 days. (This does represent an improvement over the 9-day average in the November 2010 audit and the 7-day average found during the February 2011 audit.) The number of missed doses of medication has improved as well but still, 38% of patients did not receive at least one dose (and sometimes more) of medication. The most common reasons coded on the medication administration record for the missed dose(s) were: "patient not in cell, no show" 47%; "medication not available" 21% and no code listed (blank space) 18%. The audit also found that a psychiatric provider conducted a face-to-face assessment for medication renewal orders for 12 of the 13 patients still in jail at medication renewal time. In general, findings in the medical records reviewed are consistent with the audit findings but the audit only looks at whether a face-to-face appointment occurred for medication renewal orders; there were many instances of medication adjustments (dosage changes, discontinuations, etc.) without the

13

face-to-face assessments in the records I reviewed at Estrella.

Unfortunately, the electronic medication administration record (EMAR) project was unable to be launched as anticipated in the interim since the last site visit. Although a very large amount of staff time and training was expended for this initiative, it became apparent when attempting to "go live" that there were major incompatibility problems between JMS and EMAR software. (JMS provides the names, basic demographic information and inmate location within the jail system – jail, housing unit, cell number, etc.) It was anticipated that EMAR would assist in reducing missed doses of medication and improve accuracy of documentation when doses were missed by eliminating redundant, overlapping, vague or nonsensical coding. Further time and effort to launch EMAR is required though CHS did not have a new proposed schedule for implementation at the time of the site visit. However, it is imperative that this initiative becomes operational as soon as possible. All attention will soon be focused on adoption and implementation of an electronic health record which often takes *years* to fully operationalize; having a functional medication administration and accurate recording system will help ensure that this aspect of care is not disrupted throughout that lengthy process.

### ***Staffing***

Mental health staffing levels and vacancies are reported to me in the monthly report. Most recent (June 2011) staffing reports indicate very few mental health staff vacancies (less than 3 full-time equivalent positions overall in the field of psychologist and mental health professional/associate; all current psychiatrist positions are filled.) The positions created and posted from last year's mental health staffing plan analysis have been filled, including the detention escort positions. Currently, a review of nursing staffing needs in

14

the MHU is underway and the results and recommendations will be available within the next month.

### *Continuous Quality Improvement (CQI)*

The CQI system within the jails has evolved considerably over the course of the past year. I included findings from some of the studies/audits that have been undertaken recently in relevant sections of this report. In addition to system-wide audits/studies, a joint medical-mental health local CQI committee has been formed in each jail where process and outcome studies involving issues unique to the specific jail are being undertaken. Mental health peer review is now routine. Comprehensive multidisciplinary reviews of adverse incidents occur timely and information is shared with all providers. Dr. King and I had the opportunity to review the findings of the incident reviews and found them to be generally well done. Health and mental health care staff are well represented on the incident reviews but detention staff are not yet routinely included in the process (with the exception of involvement of detention staff in some of the MHU reviews.) The routine inclusion of custody staff in this process is encouraged so that any issues involving the interaction between health care and custody staff or issues involving custody procedures may also be identified and addressed as necessary.

Recommendation: A Quality Improvement study should be undertaken focusing on intoxication and withdrawal protocols and include medical and mental health care coordination. (Cases #2 and #4 in Appendix B illustrate some issues/problems associated with current practice.)

15

## *Segregation/Discipline*

The policy has not yet been revised to reflect the process through which mental health staff are notified and consulted regarding discipline of inmates with mental illness. Consequently, there is nothing new to report at this time.

## *Training*

Dr. Noggle reported "MCSO issued a request for additional training for all MHU officers around the topics of trauma, stress and compassion fatigue/self care.  All shifts received the first 30-minutes of the training in June.  Another 30-minute block of training will be provided in the coming quarter. "   In addition, as previously noted, training on the revised suicide prevention and therapeutic restraint policy revisions was also conducted during the interval between site visits.

## *Medical records review*

I reviewed eighteen medical records during the site visit.   Synopses of each case reviewed are attached to this report as Appendix B.  I have included more detail than in previous reports particularly in reviewing five cases that involved critical incidents. Findings from the reviews have been referenced throughout this report and include serious issues with respect to outpatient mental health care, coordination of medical and mental health care including treatment of alcohol and other drug withdrawal, MHU quality of care and discharge planning and concern about the thresholds for referral/access to higher levels of care.

**CONCLUSION**

CHS has made significant progress in a number of areas since the last site visit:  the intake/receiving screening process has been updated substantially and made entirely electronic; the HNR process is now documented, tracked and audited; the suicide prevention policy and procedures have been updated and implemented; the number and types of group treatment available in MHU have increased dramatically; staff training on several important areas has occurred and perhaps most importantly, Quality Improvement tools and processes are now in place that permit CHS to do meaningful self-monitoring/analysis of issues, incidents and processes.

CHS experienced some technological glitches since the last visit which will impact goal attainment in psychotropic medication management.  After expending much staff time and effort, the EMR project could not be launched due to incompatibility between JMS and the EMR software.  Additionally, a strategic decision was made for CHS to use the county office of information technology for future project leadership including the plans for an electronic health record.  (Previously, CHS had their own staff person to lead IT initiatives but were not satisfied with his performance.)  CHS does not believe this change will negatively impact the time frame for review of vendor responses to the Request for Proposals for an electronic health record and may actually facilitate implementation when a product/vendor is selected.

A number of critical areas needing focused attention and improvement continue to exist:  outpatient level of care expectations including setting appropriate clinical thresholds for referral to higher levels of care; review of MHU quality of care including comprehensiveness of assessment, monitoring and coordination of discharge planning and

17

follow-up; and coordination of medical and mental health care, with particular emphasis on treatment of alcohol and other drug intoxication and withdrawal.  I included a new recommendation for a Quality Improvement study focused on current intoxication and withdrawal protocols in this report based upon a review of some recent critical incidents in which alcohol and/or drug use negatively impacted the delivery of care.  In addition, although some progress has been made and there are plans for continued development, improved access to timely psychiatric hospitalization has not yet occurred.


Respectfully submitted,

*Kathryn A. Burns, MD, MPH*

Kathryn A. Burns, MD, MPH
August 8, 2011



# Intake Mental Health Screening

**Booking#:** P734098     **DOB:** 1/1/1976     **Gender:** M     **Facility:** INTK     **ACCEPTED:** 2/25/2011 7:54:00 AM

**LName:** Zphxtesta     **FName:** Adam     **MName:**     **SFX:**

| | |
|---|---|
| Are you presently taking prescription medications or have any medication with you? | NO |
| What medications? | |
| Pharmacy/location: | |
| Have you ever served in the U.S. Military? | NO |
| Have you been in or around combat situations? | N/R |
| Comment: | |
| Have you ever been victimized? | NO |
| Comment: | |
| Have you ever been sexually assaulted? | NO |
| Comment: | |
| Do you want to talk to someone about having been assaulted or victimized? | NO |
| Received help from Department of Developmental Disabilities (DDD)? | NO |
| Difficulties learning or ever in special education classes? | NO |
| Ever have or do you have a guardian now? | NO |
| Have you ever attempted suicide? | N/R |
| When/how? | |
| Are you thinking of hurting yourself/suicidal? | N/R |
| Plan: | |
| Has anyone in you family attempted or committed suicide? | N/R |
| Have you ever been designated as Seriously Mentally Ill (SMI)? | N/R |
| Do you currently believe that someone can control your mind by putting thoughts into your head or taking thoughts out of your head? | N/R |
| Do you currently feel that other people know your thoughts and can read your mind? | N/R |
| Have you currently lost or gained as much as two pounds a week for several weeks without even trying? | N/R |
| Have you or your family or friends noticed that you are currently much more active than you usually are? | N/R |
| Do you currently feel like you have to talk or move more slowly than you usually do? | N/R |
| Have there currently been a few weeks when you felt like you were useless or sinful? | N/R |
| Are you currently taking any medication prescribed for you by a physician for any emotional or mental health problems? | N/R |
| Have you ever been in a hospital for emotional or mental health problems? | N/R |
| Have you been treated for mental illness? | N/R |
| When/what for? | |
| Do you have a case manager? | N/R |
| Case Manager's name and clinic: | |
| Did the person refuse to answer all questions? | YES |
| Excessive emotional distress to incarceration? | NO |

Seen in intake:    Y    N         By:    MHP    Provider

SCHEDULE IN JMS:                            ENTER INTO BEHAVIORAL HEALTH DATABASE

| | Date: | Complete | Urgency | Comments: |
|---|---|---|---|---|
| MH ASSESS | | Y  N | | |
| MH F/U | | Y  N | | |
| PY EVAL | | Y  N | | |

| | |
|---|---|
| ENROLL MH CCC: | |
| DX: | STATUS: |
| CONSENT FOR TX: | |
| MH ASSESS: | |
| PY EVAL: | |
| SNTP: | COT/DATE: |

ADDITIONAL INFORMATION:

COMMENTS:

SIGNATURE/DATE:

SIGNATURE/DATE:

CHS0527  0311

APPENDIX B - CASE REVIEWS JUNE 2011 SITE VISIT

| #1 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
|  | 03/27/73 | 10/06/10 | 10/06/10 | Not completed | None |

Death review (Suicide)

37-year old man booked into the jail 10/6/10. He underwent receiving screening at the time of his booking and there were no indications for a mental health referral. No supplemental mental health screening was in the file.

On 10/21/10, the inmate submitted a Health Needs Request (HNR) requesting mental health services. He was seen by a mental health staff person the following day who documented that he was "to be scheduled" for a more comprehensive mental health assessment. However, the appointment for the assessment was not scheduled due to an error or oversight of the mental health staff person.

A month later, 11/27/10, detention staff referred the inmate to medical as an emergency because the inmate's mother telephoned them and said that the inmate told her that he was depressed and threatening to kill himself. A medical nurse saw the inmate and called the physician on call to discuss the case. An order for a dose of medication, Vistaril, to address the inmate's anxiety was received and the patient received the medication. The medical nurse also completed a referral to mental health on behalf of the inmate, but it did not contain the information relayed from detention staff about the mother's phone call and the inmate's contemplating suicide.

11/28/10, a mental health practitioner saw the patient in response to the nursing referral and planned to follow-up with the patient in four weeks. No referral to psychiatry was made in spite of the medication administered the previous evening. Two weeks later, 12/10/10, patient died as a result of having hung himself in his cell.

I identified the following problems concerning the care and management of this patient:

*Failure to follow-up on original HNR 10/22/10 with a mental health assessment*

*Inadequate evaluation by MHP 11/28/10*
- *no treatment records requested*
- *no referral to psychiatry*
- *no suicide risk assessment*
- *inappropriately long follow-up interval planned*

*No psychiatric follow-up scheduled following telephone order for meds11/27/10*

CHS REVIEW:

Dr. Noggle completed a psychological autopsy citing a number of findings and noting the lack of urgency code on the medical referral; no mental health assessment completed; and the lack of information about the mother's phone call relayed to mental health.

The case was subsequently also reviewed through the CHS Critical Incident Review Committee on March 7, 2011. The committee identified the same issues and developed the following corrective action recommendations/plans:

Mental health assessments need to be consistently scheduled and documented.

Nurse referrals to mental health must indicate relevant information from detention or other sources (e.g., patient threatening to harm himself)

There must be a sick call appointment the next day following a report of a patient being suicidal.

A specific radio channel will be used for man-down situations (emergencies.)

CHS staff will follow-up with detention staff regarding use of radios and operation of elevators during a medical emergency.

| #2 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 01/14/73 | 02/22/11 | 02/22/11 | None | None |

Death Review (Suicide)

This was the 9th booking for this 38-year old man in the Maricopa County Jail.

On the day of his booking, he was seen in ED at Phoenix Baptist Hospital after his arrest for complaints of weakness and feeling like he was going to have a seizure; seen, released and booked into jail.

Receiving screening: acknowledged alcohol and mental health history but denied history of suicide attempts or thoughts; appeared intoxicated; answered all supplemental screening questions negative except "under influence" noted; no disposition is noted on the screening form.

Physician orders indicate he was put on withdrawal precautions (periodic monitoring of vital signs; no meds) He refused the vital sign assessments.  He was prescribed metoprolol for HTN as per the ED recommendation.

Problem list indicates history of depression and mood disorder; history of suicide attempt.

He was not referred to mental health or seen in spite of a positive intake screening,

2/26/11 – A man-down was called for assistance:  the inmate had hung himself in his cell.  He died.

Review of other jail stays:

11/7/10-12/8/10 – refused medical follow-up and chronic care for HTN, physical exam, PPD; receiving screening was positive for alcohol use and appeared under the influence; no mental health referral generated; supplemental screening answered all questions "No" and no disposition documented on the form.  Also refused withdrawal assessments.

11/19/10 – refused CHS Brief MH/Suicide Health Assessment by RN but the form was completed with information obtained through "chart review" and "Y" marked for suffer depression or under care, take meds or ever prescribed them, and MH treatment in community or jail (note that these options are not helpful in distinguishing current from past conditions); inmate was *referred to mental health but no assessment was completed*

5/19/10 (release date unclear but there is some document dated 5/25 in the file, there's no CIWA assessment sheets)

Receiving screening indicates hospitalized for detox in 2009; alcohol abuse and history of withdrawal; "Y" on "head injury/facial laceration, bruising/bleeding, bloody  clothes" – no indication of which if any of these conditions existed at the time (no accompanying note or progress note describing his condition); "N" on all supplemental mental health questions

1/5/10-3/13/10 Receiving screening indicates positive for alcohol and history of treatment for "schyzo" with plans for a "MHP evaluation if staying."

Per orders 1/26/10, he was enrolled in MH CCC for Psychotic Disorder NOS on that date, had a MH Assessment 1/11/10, a Psychiatric Evaluation 1/22/10 and a Special Needs Treatment Plan 1/26/10 and there was a plan for follow-up in 60 days and treatment plan update in 6 months (*Intervals too long for patient that just arrived, has been given a very serious diagnosis and no follow-up for two months!*)

Mental Health Assessment – referred to MD and follow-up with PhD

Psychiatrist appointment 1/22/10 – Risperdal and Benadryl started

Psychiatrist appointment 2/22/10 – Risperdal and Benadryl discontinued, thorazine started per inmate request/insistence (HNR)

File does contain records from DOC treatment.

Special Needs Treatment Plan – "supportive counseling, cognitive restructuring" but planned sessions are Q8 weeks.

11/2/09-11/2/09 – receiving screening positive for alcohol and withdrawal; denied any mental health

6/2/09-6/23/09 – receiving screening positive for alcohol, denied mental health, no referral generated; supplemental screening all "N"; DOC records indicate diagnoses of Depression, Alcohol Dependence and Amphetamine Dependence

6/25/07-8/30/07 –Receiving screening indicated having taken thorazine and Prozac but last taken in 2/07 while

2

in prison.  Health appraisal indicates suicide attempt in '05, history of depression.

Self referral 6/28/07;  MH Assessment 7/10/07 – referred for psychiatric evaluation; MAR from prison for July '06 indicates no show for prescribed thorazine.

<u>11/20/05-?</u>  (There's an MD note 12/15/05)  Used shoelaces to attempt hanging in holding tank in Dysart before 4th Avenue receiving; placed on watch in restraint chair and admitted to P3 MHU 11/23/05-11/29/05 and discharged to Towers.  (Petitioned for inpatient care 11/21/05 from 4th Ave but the petition was denied.)

<u>3/9/05-3/9/05</u>

I identified the following problems concerning the care and management of this patient:

- *No treatment to prevent or ameliorate alcohol withdrawal.*
- *No system to flag or otherwise indicate history of suicide attempt.  (This inmate had a history of attempted hanging when he was in a correctional facility.)  Consider a "flag" in JMS for situations such as these and an immediate referral for mental health assessment with this history and current risk factors.*
- *No coordination or referral with mental health assessment for known history of depression and suicide attempt.*

---

CHS REVIEW:

Dr. Noggle completed a psychological autopsy and noted similar potential missed opportunities including assessment and treatment of withdrawal symptoms, record review would have identified history of prior suicide attempt, no mental health follow-up appointment was scheduled.

The CHS Quality Assurance Incident Review Committee reviewed the case in its entirety on March 23, 2011. The following action steps were identified:

Nurse to go cell side if the withdrawal assessment is refused.  Protocol changed to include withdrawal ratings simultaneous to medication administration rather than separate process.  (In general, inmates do come out for medications even when they decline to cooperate/participate in withdrawal monitoring.)

Nursing practice to require referral to mental health if withdrawal assessments are refused and the nurse is concerned about the inmate.

A mental health appointment must be scheduled for a positive screen.

If a mental health issue is identified during the inmate's health appraisal, an immediate referral to mental health should be generated.

Review the mental health referral policy and revise to incorporate the above recommendations if necessary.

Mental health staff should conduct rounds on all inmates in single cells that are on extended lock-down status.

Review policy regarding early treatment of alcohol withdrawal if the inmate has a known history of having experienced a difficult (complicated) withdrawal.

| #3 | DOB | DOA | RS | MHA | Psychiatry |
|----|-----|-----|-----|-----|------------|
|    | 05/15/59 | 02/17/11 | 02/17/11 | 02/21/11 | None |

**Death Review (Suicide)**

History of HTN, diabetes, stomach ulcer and asthma, remote closed head injury; was sent out to Maricopa Co for influenza – seen there and returned; MH Screening Supplement 2/17/11 – no disposition noted.

Medical referral 2/21/11 to mental health - MH Assessment 2/21/11 – Depression and anxiety 9-10 on a scale of 10, tearful and reported hallucinations; no suicide risk assessment; follow-up 2 weeks planned; no referral to psychiatry

Re-referred by medical 2/23/11 but not seen: "was seen on 2/21/11 by mental health staff and follow-up is scheduled." Inmate hung himself 02/27/11, died 03/02/11.

I identified the following issues:

- *Threshold for referral to psychiatry set too high*
- *Failure to assess the inmate in response to a second medical referral*
- *Lack of comprehensive suicide risk assessment*
- *Follow-up interval of 2 weeks too long given his condition 2/21/11.*

**CHS REVIEW**

Dr. Noggle completed a psychological autopsy and identified the same issue of failing to see the patient in response to the medical referral. She did not identify the planned interval for the next appointment as a problem. The mental health staff person conducting the assessment 02/21/11 reported that an offer for referral to a psychiatrist was extended but the inmate refused. (Neither the offer nor the refusal are documented, nor is the recommendation for psychiatric assessment.)

The CHS Quality Assurance Incident Review Committee reviewed the case in its entirety on March 23, 2011. Committee identified the following issues:

Training on suicide risk assessment for mental health staff

Mental health referrals are to be seen within 24-hours of referral in a private setting,

Providers document telephone referrals in a progress note.

More radio training for CHS staff is necessary.

The following recommendations/opportunities for improvement were identified and distributed to all CHS staff:

All mental health referrals must be seen within 24-hours.

1. Providers are required to document phone call referrals to mental health in progress note recording the name of the person spoken with.
2. Providers document other referrals (such as to priest) in progress note.
3. CHS staff adopt language "Man-down: hanging" when making radio calls in clinic.
4. If CHS employee is only responder to man-down (or require more staff) employee should ask detention to request all medical staff to attend man-down.

4

| #4 | DOB | DOA | RS | MHA | Psychiatry |
|----|-----|-----|-----|-----|-----------|
|    |     | 04/22/11 | 04/22/11 |     |           |

This case was reviewed as a result of concerns raised by plaintiffs' counsel: the patient delivered a baby in the bathroom of a housing unit at Estrella. The inmate was booked into the jail on Friday night, April 22, 2011. She appeared pregnant and under the influence of drugs. She refused pregnancy testing, was placed on CIWA checks for withdrawal and scheduled for the first available obstetric appointment on Monday. She was sent from intake to Estrella on Saturday morning and told the nurse there that she needed to go to the hospital. She agreed to provide a urine sample that tested positive for pregnancy. Other laboratory tests were positive for methamphetamine. The inmate was sent back to her housing unit. On Sunday, the inmate returned to the clinic with multiple complaints. Vital signs normal and fetal heart rate 135. A nursing note describes her as dramatic, bizarre, screaming and demanding to go to the hospital. A provider is telephoned and Tylenol is ordered. The patient is sent back to her housing unit. At 1:24 AM, a man-down is called because the patient is in labor. She delivered a baby boy at 1:33 AM in the bathroom of the housing unit. Both were taken by ambulance to the local hospital and admitted for a day. The inmate returned to jail on Tuesday, April 27 and is currently housed in the MHU. The case was reviewed by the CHS Quality Assurance Review Committee who identified the following "Lessons Learned – Recommendations/Opportunities for Improvement"

1. Staff will review medical records timely, including reading previous booking for pertinent information.
2. If applicable, OB forms from previous booking will be copied and filed in current booking medical record with updated patient label.
3. Nursing staff will access current and archived OB Log in computer for pregnancy history.
4. Nursing staff will obtain UDS order for pregnant females and use CHS UDS kit.
5. Provider will document LMP and EDC on problem list.
6. Nursing staff will document EDC on comment line for 2319 appointments in JMS.
7. Nursing staff will assess/evaluate each situation independent of peripheral issues (e.g., history of inappropriate behavior.)
8. Key for OB is readily available on the board at Estrella.
9. Man-down cart at Estrella contains OB pack.

Plaintiffs' counsel received a letter from other inmate on the housing unit relaying concerns that the patient was in labor for several hours but detention staff attributed her behavior to withdrawal and/or minimized her pain and discomfort and did not call or send her to medical promptly. Another inmate wrote that the patient was in extreme pain and "howling" in the bathroom but not checked by detention staff. Both describe detention staff as extremely callous, withholding timely access to medical, verbally abusive and profane. In addition to these concerns, plaintiffs raised serious concerns regarding the medical management of this case and possible mental health concerns.

The CHS review and resulting recommendations are focused primarily on medical care. It is not clear that CHS Review Team had access to information about security staff as that relayed by plaintiffs' counsel. However, they are aware now and it should lead to further investigation.

In addition, I believe the following recommendations must be added to the earlier list:

- *The CHS Incident Review Committee should include at least one representative from security staff to ensure that the reviews are comprehensive and include medical, mental health and custody issues that can impact the delivery of care.*
- *This case raises additional issues regarding the management of intoxication and withdrawal.*
- *Mental health review of case to determine whether a referral should have been made sooner than upon the patient's return from outside hospital after delivery. (Nursing notes describe behavior as bizarre.)*

5

| #5 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | | 01/03/11 | 01/03/11 | 01/04/11 | Adm MHU |

Intake/receiving screening positive for mental health including psychotropic medications, history of psychiatric hospitalization and current threats of self-harm. Seen for mental health assessment and sent to MHU for admission. Patient also noted to be sent to jail for RTC. Discharged 01/12/11 to Durango. Inmate appeared to become increasingly psychotic and described as same when seen by mental health 01/18/11, 01/21/11 and 01/26/11. Referred to mental health by an LPN 01/29/11 and again by detention staff 01/30/11 for irritable and bizarre behaviors. Seen by psychiatry 02/01/11 and oral antipsychotic medication ordered. (But patient consistently refusing oral medications.) 02/07/11, patient moved to 4th Ave closed custody after allegedly assaulting an officer. 02/11/11 seen by mental health and psychiatry and ordered to MHU.

In MHU, remained noncompliant with medications and continued to deteriorate psychiatrically. He refused food. He received one dose of emergency medication 02/14/11 but otherwise, refused treatment and stayed in his cell. He was placed on level 2 suicide precautions (seclusion) from 03/02/11 – 03/09/11. He was not seen regularly by psychiatry during this time and all renewal orders are telephone orders rather than written after a face-to-face assessment. Food and fluid intake were not monitored.

03/15/11 the patient was taken to Maricopa Medical Center due to dehydration. He was admitted overnight for intravenous rehydration and sent back to jail, returning to MHU. He continued to refuse medications, food, liquids and nutritional supplements. Intake and output not tracked.

03/23/11 sent out to Desert Vista for evaluation of Court Ordered Treatment (COT). Nursing noted that he was weak and shaky but was coaxed into eating and drinking once out of his cell.

03/29/11 returned from Desert Vista and COT order signed on 04/01/11. The patient was transitioned to long-acting antipsychotic medication but he continued to refuse to eat and drink and refused blood work to monitor his condition.

05/12/11 -05/17/11 transferred to Maricopa Medical Center again with severe complications/side effects of antipsychotic medication with inadequate hydration and nutrition. Discharge diagnoses: hypothermia, rhabdomyolysis, leukopenia, extrapyramidal symptoms, prolonged Q-T interval and altered mental state. Discharged to Desert Vista as persistently and acutely disabled on May 19, 2011.

*There are multiple serious problems with the management of this case:*
- *Discharge from MHU to outpatient with poor follow-up*
- *Outpatient intervention intervals too long for acuity of clinical presentation*
- *Failure to respond timely to referrals from LPN and custody staff*
- *Inappropriately high threshold for MHU re-admission consideration from Durango*
- *Quality of care issues in MHU (infrequent psychiatric assessments, no attention to basic hygiene, insufficient effort to encourage inmate to come out of his cell, lack of monitoring fluid and nutrition intake, etc.)*
- *Failure to tend to physical condition timely in MHU – clearly, medical need exceeded MHU capacity to address. Patient should have returned to infirmary rather than MHU for medical monitoring following his first and second emergency medical hospitalizations.*
- *Delays in accessing inpatient psychiatric care and COT partially attributed to RTC status*

This case is slated for a root cause analysis by the CHS Quality Assurance Committee in July.
In advance of this detailed analysis, Mental Health, Medical and Nursing Directors have planned to attend the morning case review of all MHU patients together at least one day per week to identify potential care coordination issues sooner and assist in management of the case.

| #6 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 02/02/84 | 04/28/11 | 04/28/11 | 06/10/11 | 05/04/11 |

Picked up at time of receiving screening but missed mental health assessment scheduled for 04/30/11. However, she was seen by psychiatry within six days of arrival so the "missed" assessment not critical/crucial. She does not receive mental health care when in the community, but a private doctor provides her medication prescriptions, that include a benzodiazepine. The psychiatrist ordered the same antidepressant she receives in the community and replaced the benzodiazepine with Buspar – a very reasonable clinical alternative in the jail setting. On 05/13/11, the patient reported she was greatly improved but in mid-June (06/14/11) began to complain that she doesn't like the Buspar. The MHA was eventually completed 06/10/11. Seen by psychiatry and Buspar discontinued but although patient appeared manic, no mood stabilizer was prescribed nor was Zoloft reduced or discontinued.
- *Appropriately assessed by psychiatry timely (in spite of by-passing MHA) after intake*
- *Failure to treat assessment of manic condition*
- *Outpatient care issues (frequency, intensity, types of treatment provided inadequate)*

| #7 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 11/10/79 | 5/24/11 | 5/24/11 | 06/03/11 | 06/15/11 |

Intake/receiving screen 05/24/11 at which time she reported taking Buspar "now and then" but stopping lithium altogether. (She is not considered SMI in the community but received treatment for panic and PTSD the last time she was incarcerated at Estrella in fall of 2010.) She was referred to mental health as a result of the intake screen. MHA was scheduled for 05/27/11 but not completed that date. The inmate sent a HNR to be seen by mental health on 05/30/11 but was out to court when mental health staff went to triage the request. The inmate sent another HNR 06/02/11 to be seen to get back on medications. The MHA was completed 06/03/11. The inmate was seen again in response to another HNR 06/08/11 though the psychiatric appointment did not occur until 06/15/11. Depakote, Vistaril and Thorazine were prescribed. (When the use of thorazine was questioned, it was verbally relayed to be a temporary prescription to assist with sleep due to her agitated, manic state. However, this condition and plan is not documented in the file.)
- *Problem with timely follow-up of positive screen necessitating multiple HNRs*
- *Untimely psychiatric assessment*
- *Inadequate documentation of condition and plan*
- *Inadequate follow-up with medication initiation and "agitated, manic" state*

| #8 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 03/23/85 | 04/17/11 | 04/17/11 | 04/17/11 | 04/18/11 |

Intake screen positive as reported treatment for bipolar disorder, depression and ADHD treated with Depakote in community; reports Magellan SMI. MHA completed 4/17/11 with a follow-up 04/20/11; also progress notes indicate contacts 05/04/11, 06/02/11 and 06/17/11. Psychiatrist assessment 04/18/11 and again 04/28/11. Depakote was ordered 04/26/11 but changed to lithium and Celexa 04/28/11. Lithium level ordered for 05/07/11 and result was 0.3 (low). Seen by psychiatric nurse practitioner 06/17/11 and lithium dosage increased with another level ordered to be drawn in a week's time. The next scheduled psychiatric provider appointment is 4 weeks.
- *Problem with documentation regarding delay in resuming depakote*
- *Infrequent follow-up for lithium initiation and dose titration*

| #9 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 12/31/74 | 05/10/11 | 05/10/11 | 05/16/11 | 05/16/11 |

Denied mental health problems or treatment history during intake. However, computer check the following day documents she is Magellan SMI. Refused MHA 05/15/11 but seen in medical clinic 05/16/11 by supervisor and MHA subsequently completed same day. Patient is described as guarded and suspicious. Psychiatric assessment same day and Paxil and Vistaril were ordered, but not an antipsychotic medication. Detention staff make referrals 05/25/11 and 05/26/11 for inmate's complaints of hearing voices and although seen in response by MHP, she is not seen by psychiatric provider until 06/14/11. (Medications were discontinued 05/31/11 for inmate refusal, but the inmate was not evaluated on that date.) By 06/19/11, her condition has continued to deteriorate and she is sent to MHU. She was discharged back to Estrella 06/20/11; seen by MHP in follow-up 06/21/11 and by the Estrella psychiatrist 06/27/11 (but the psychiatrist noted she did not have the patient's chart at the time of the visit.)
- *Inadequate response to acuity of patient's condition (psychiatric assessment not timely in response to detention referrals)*
- *Adequacy of MHP response in terms of not relaying for psychiatric assessment urgently*
- *Failure to prescribe antipsychotic medication for psychotic symptoms*
- *Discontinuation of medication without face-to-face psychiatric assessment*
- *Inadequate assessment in MHU with premature release and poor continuity of care (no chart available for psychiatrist appointment)*

| #10 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 06/26/68 | 01/31/11 | 01/31/11 | 02/11/11 | 03/02/11 |

Reported history of bipolar disorder and depression but no treatment with medications since September 2010 at the time of intake screening 01/31/11. MHA completed 02/11/11. Medication ordered 03/02/11. She was prescribed Thorazine for auditory hallucinations. (Dosage is consistent with treatment of psychosis.) Patient was sent to MHU 04/12/11 for banging her head; discharged back to Estrella 04/14/11. She refused MHP follow-up 04/15/11 but was seen by psychiatry 04/19/11. No further follow-up until 05/27/11 when seen in response to HNR. Thorazine discontinued at the patient's request (05/27/11) but without being seen by psychiatric provider; appointment was scheduled for 06/03/11 but she wasn't seen then either. There was an MHP appointment 06/22/11 and psychiatrist appointment 06/27/11.
- *Inadequate outpatient management (infrequent intervals, medication adjustment without face-to-face appointment)*
- *Question adequacy of MHU assessment, treatment planning and discharge to outpatient*

| #11 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 02/19/77 | 05/28/11 | 05/28/11 | 05/28/11 | MHU |

Sent to MHU (P5) on day of arrival: 05/28/11 and remained there until 06/22/11 when she was discharged to Estrella. There is no evidence of discharge planning between MHU and Estrella in preparing for discharge after a relatively lengthy MHU stay, nor does the MHU documentation support that she was clinically improved at the time of discharge. Patient was subsequently readmitted to MHU on the very next day 06/23/11 after wrapping things around her neck. Currently, in MHU only interventions appear to be very brief psychiatric appointments and weekly appointments with a counselor; goals for treatment, progress or problems addressed are not clear from documentation.
*Problems with MHU treatment including adequacy of treatment interventions (infrequent contact, no progress documented), treatment planning, poor discharge planning*

| #12 | DOB | DOA | RS | MHA | Psychiatry |
|-----|-----|-----|-----|-----|-----|
| | 02/18/61 | 04/03/11 | 04/03/11 | 04/03/11 | 04/09/11 |

Case selected for review because inmate is housed in 4th Ave SMU & identified as SMI in JMS -

Chart volume 6 of 6 reviewed:  Intake screening positive for reports of attempted suicide by overdose in past, history of taking psychotropic medications but no current suicidal thoughts; supplemental screen indicates SMI designation and history of psychiatric hospitalization.  MHA completed 04/03/11 and follow-up with MHP planned though unclear whether a referral was made for a psychiatric assessment from the documentation.  Patient seen on rounds weekly in SMU in addition to individual sessions 04/06/11 and 04/07/11.  Psychiatric assessment completed 04/09/11 – inmate anticipated he would be released 04/11/011, but he was not.  (Baseline metabolic laboratory studies ordered by psychiatrist anyway.)  Subsequent psychiatric follow-up 04/22/11, 05/05/11, 06/11/11 and 06/20/11.  Prozac started for depression 05/05/11 and dosage increased at the June appointment.  (Special Needs Treatment Plan dated 04/17/11 is generic and lists diagnoses only as Polysubstance Dependence and "Cluster B (personality disorder) traits"; goals and objectives do not address these diagnoses and "medication if indicated" is the intervention.  The plan has not been updated.)
- *Psychiatric care and follow-up appropriate and inmate stable.  (He was interviewed in the medical clinic.)*
- *Outpatient level of care issues (treatment planning documentation, frequency and type of non-medication interventions)*

| #13 | DOB | DOA | RS | MHA | Psychiatry |
|-----|-----|-----|-----|-----|-----|
| | 07/01/42 | 01/02/11 | 01/02/11 | | |

Case selected for review because inmate is housed in 4th Ave SMU & identified as SMI in JMS -

Intake screening was negative – no indications for mental health referral.  Health assessment conducted 01/13/11 included supplemental mental health questions and still no indication for referral.   Staff assigned to SMU see inmate when rounding - there are no mental health issues/problems.
*Incorrectly labeled as SMI in JMS*

| #14 | DOB | DOA | RS | MHA | Psychiatry |
|-----|-----|-----|-----|-----|-----|
| | 09/06/80 | 04/16/09 | 04/16/09 | | |

Case selected for review because inmate is housed in 4th Ave SMU & identified as SMI in JMS -

Very comprehensive clinical summary in file dated 02/22/10 but needs to be updated.  Difficult clinical case with organicity secondary to history of inhalants, polysubstance abuse, gang involvement and impulsivity; manages impulsivity better with medications but he refuses to take any.  He is described as highly profane and irritable, assaultive towards detention staff from time to time.  The rationale regarding whether or not to pursue COT medications needs to be documented, treatment plan updated and explanation for frequency (or infrequency) of interventions clearly spelled out.  Attempts to see him are made at intervals of 45-90 days and he is seen by psychiatry and MHP.
*Outpatient level of care issues (treatment planning, rationale for frequency and types of interventions needs to be documented)*

9

| #15 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 05/24/84 | 01/07/11 | 01/07/11 | 01/11/11 | 01/15/11 |

Case selected for review because inmate is housed in 4th Ave SMU & identified as SMI in JMS -

Intake screening on day of booking was positive for SMI; physician assistant did an assessment at the time of intake.  MHA 01/11/11 and referred to psychiatry.  Prescribed Effexor and Zyprexa.  Seen monthly for medication management by psychiatric provider.  MHP sees at intervals of 4-6 weeks though notes to not reflect goals, objectives or changes in treatment (intervention or interval.)  Treatment plan lists cannabis and amphetamine abuse but there is no intervention to address these issues.
Patient interviewed in medical clinic and appears stable clinically; would benefit from supportive counseling at regular and frequent intervals in addition to medication.
*Outpatient level of care issues  (treatment planning, interventions, treatment more than medication)*

| #16 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 03/14/72 | 03/31/11 | 03/31/11 | after 4/12/11 | 04/07/11 |

Intake screen positive for reports of bipolar disorder but said last follow-up with three years previously.  Seen by nurse practitioner 04/07/11 based upon positive screening report of having taken lithium, Paxil and Zyprexa in community and medications were ordered.  Underwent health appraisal 04/12/11.  MHA not done until later.  Seen by mental health on several occasions but mainly in response to HNR rather than scheduled at appropriate intervals based upon clinical condition; not referred to psychiatric provider timely to address obvious medication concerns and prominent side effects.
- *Appropriately assessed by psychiatry timely after booking (in spite of by-passing MHA)*
- *Lacking lab studies and follow-up*
- *Outpatient level of care issues (frequency, intensity & type of interventions)*

| #17 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 07/17/79 | 03/05/10 | 03/05/10 | | |

Intake screening positive for SMI, bipolar, depression and PTSD diagnoses.  Sent to MHU 11/11/10-01/11/11.  No MHP follow-up until 01/24/11 and no psychiatric provider until 02/03/11.  On 02/07/11, mental health received reports from detention intelligence that the patient said she was going to kill herself on a monitored telephone conversation; initially, does not appear that the patient was seen by mental health in response to this information, but the documentation is not clear whether the MHP stopped back to assess.  In any event, next follow-up was not until 02/24/11 and then 03/15/11.
- *Inadequate risk assessment and suicide prevention follow-up*
- *Inadequate continuity of care following MHU discharge*
- *Outpatient care issues (frequency of contact, interventions, etc.)*

| #18 | DOB | DOA | RS | MHA | Psychiatry |
|---|---|---|---|---|---|
| | 01/27/88 | 11/17/10 | 11/17/10 | | |

Admitted MHU 02/19/11-02/23/11 and returned to Estrella; no follow-up.  Readmission MHU 03/03/11-03/09/11 and returned to Estrella; no MHP follow-up, seen by psychiatrist 03/16/11.  Readmitted to MHU 03/17/11.
- *Problems with MHU treatment including adequacy of treatment and discharge planning;*
- *Poor continuity of care upon return to Estrella and readmission*
- *Outpatient care issues*