**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails,<br><br>Plaintiffs,<br><br>v.<br><br>Joseph Arpaio, Sheriff of Maricopa County; Andrew Kunasek, Mary Rose Wilcox, Denny Barney, Steve Chucri, and Clint L. Hickman, Maricopa County Supervisors,<br><br>Defendants. | No. CV-77-00479-PHX-NVW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW and**<br>**ORDER** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

I.    Summary ................................................................................................. 1

II.   Background ............................................................................................. 4

III.  Legal Standards .................................................................................... 13

      A.   Termination of Prospective Relief Under the Prison Litigation Reform Act
           ...................................................................................................... 13

      B.   Relevant Period for a "Current and Ongoing" Violation ............................ 14

      C.   Pretrial Detainees' Protection from Punishment Under the Fourteenth
           Amendment ................................................................................... 15

      D.   Eighth Amendment Standard for Medical and Mental Health Care .......... 17

      E.   Remedies ....................................................................................... 20

IV.   Findings of Fact and Conclusions of Law ............................................. 21

      A.   The Parties .................................................................................... 21

      B.   The Maricopa County Jail ............................................................. 22

      C.   Receiving Screening ...................................................................... 25

      D.   Ready Access to Needed Medical and Mental Health Care ...................... 36

      E.   Prescription Medications Without Interruption .......................................... 53

      F.   Electronic Records Management ................................................... 56

      G.   Remedies ....................................................................................... 57

      H.   Fourth Amended Judgment to Be Entered ................................................ 58

      I.   Attorney Fees ................................................................................ 58

V.    Order ..................................................................................................... 58

i

Before the Court is Defendants Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson and Mary Rose Wilcox's Motion to Terminate Third Amended Judgment on Behalf of Correctional Health Services (Doc. 2142).[1]   The Court has considered the parties' briefs, memoranda, proposed findings, and evidence and argument presented on February 25–27 and March 4–6, 2014.

## I.    SUMMARY

Pretrial detainees held in the Maricopa County Jail brought this class action in 1977 against the Maricopa County Sheriff and the Maricopa County Board of Supervisors seeking injunctive relief for alleged violations of their civil rights. Throughout the years, the injunctive relief was amended as conditions changed.   Now Defendants seek to terminate the remaining injunctive relief regarding medical, dental, and mental health care for pretrial detainees held in the Maricopa County Jail. Terminating the Court-ordered relief would end this class action and the Court's monitoring of conditions in the Maricopa County Jail, but would not end Defendants' constitutional obligations to pretrial detainees.

The Eighth Amendment requires that the Maricopa County Jail provide pretrial detainees a system of ready access to adequate medical, dental, and mental health care, which includes timely examination, diagnosis, and treatment by medical personnel qualified to do so.   It also requires that the Maricopa County Jail not be deliberately indifferent to pretrial detainees' serious medical, dental, and mental health needs, including conditions that are likely to cause future serious illness and needless suffering.

The Fourteenth Amendment requires that the Maricopa County Jail not withhold or delay medical, dental, or mental health care unless doing so is reasonably related to a legitimate governmental objective, such as protecting a pretrial detainee from likely

---

[1] On February 20, 2014, Maricopa County Supervisors Denny Barney, Steve Chucri, and Clint L. Hickman were added as Defendants, and Defendants Fulton Brock, Don Stapley, and Max W. Wilson were terminated from this action.  (Doc. 2221.)

1

harm, protecting others from likely harm, and preserving institutional security.  Lack of resources does not justify delay or denial of medical, dental, or mental health care.

The Maricopa County Jail must make reasonable efforts to prevent a pretrial detainee's confinement from causing the detainee serious medical or mental health injury. It also must make reasonable efforts to avoid depriving the detainee from obtaining or continuing necessary medical or mental health care the detainee would have obtained or continued outside of the Jail.  But the Jail is not the County's public health care provider. Several hundred pretrial detainees enter the Jail daily, approximately half need some form of health care, and nearly 40% are released within 24 hours.  Only 35% stay longer than 7 days; only 25% stay longer than 14 days.  With a high-volume, short-stay inmate population, the Jail cannot cure serious systemic inadequacies in public medical and mental health care in Maricopa County and the State of Arizona.

Defendants have shown significant improvements in many areas relevant to the Third Amended Judgment and have set in place practices that may cure or nearly cure most of the previously identified ongoing constitutional violations.  However, on August 9, 2013, they moved for termination of the Third Amended Judgment before collecting evidence that the improvements had been successfully implemented and were producing the intended results.  Some of the new practices were begun only a few days before. Thus, Defendants have not met their burden to prove that they eliminated all current and ongoing constitutional violations as of August 9, 2013.

For example, Defendants now have at least one medical provider and additional mental health staff assigned to the Jail's intake center 24 hours a day, 7 days a week.  But they have not shown they have resolved systemic deficiencies in providing pretrial detainees timely face-to-face assessment by medical and mental health providers for serious acute or chronic complex conditions.

Defendants now have designated housing for male general population pretrial detainees who need close monitoring and treatment during withdrawal from alcohol

- 2 -

and/or drugs.   But they have not shown they have resolved systemic deficiencies in providing adequate monitoring and treatment of female pretrial detainees during withdrawal or male pretrial detainees who are placed in housing for suicide monitoring, close custody, administrative segregation, disciplinary segregation, or the Special Management Unit during withdrawal.

Defendants have not shown they have resolved systemic deficiencies in articulating and implementing criteria for placement of seriously mentally ill pretrial detainees in the Mental Health Unit, its subunits, and outside mental health/psychiatric facilities.   Appropriate placement, transition, and transfer do not guarantee any particular result for an individual pretrial detainee, but they do require a mental health provider's timely clinical assessment and judgment for each seriously mentally ill pretrial detainee.

Curing these systemic deficiencies may require more medical and mental health providers than are currently caring for pretrial detainees in the Maricopa County Jail. Defendants are not required to maintain specific staffing numbers or ratios, but they must ensure that pretrial detainees with serious medical or mental health conditions are seen face-to-face by providers, providers personally diagnose and plan treatment for pretrial detainees with serious medical or mental health conditions, and providers' orders for prescriptions, lab tests, treatments, monitoring, placement, specialist referrals, and follow-up appointments are completed with urgency ordered by the provider.   Pretrial detainees' constitutional right to adequate medical and mental health care is best protected by a system that permits qualified medical and mental health providers to exercise reasonable professional judgment regarding individual pretrial detainees and that provides the resources needed to comply with the providers' orders.

Defendants have not shown that the prospective relief ordered in the Third Amended Judgment is no longer necessary to correct a current and ongoing constitutional violation or that it exceeds the constitutional minimum.   On this record, the prospective relief ordered in the Third Amended Judgment remains necessary to ensure that pretrial

detainees have ready access to adequate medical, dental, and mental health care; are not subjected to conditions that are likely to cause future serious illness and needless suffering; and are not deprived of timely medical, dental, or mental health care except where denial or delay of care is reasonably related to a legitimate governmental objective other than financial cost.

Having found constitutional violations, the Court must order remedies to correct them. Defendants' six-year history of incomplete compliance with the medical and mental health terms of the Second Amended Judgment now requires judicial crafting of remedies. Defendants will recognize that much of the specific relief ordered is what they say they will do but have not yet proven to be permanent and effective. If Defendants comply with this Order, within one year they will demonstrate that prospective relief no longer remains necessary to correct any current and ongoing violation of Plaintiffs' constitutional rights, and Court-ordered relief may be terminated before the Prison Litigation Reform Act permits another motion to terminate.

## II.    BACKGROUND

This class action was brought in 1977 against the Maricopa County Sheriff and the Maricopa County Board of Supervisors alleging that the civil rights of pretrial detainees held in the Maricopa County, Arizona, jail system had been violated. It applies only to pretrial detainees, not to convicted inmates.

On March 27, 1981, the parties entered into a consent decree that addressed and regulated aspects of the County jail operations as they applied to pretrial detainees. On January 10, 1995, the 1981 consent decree was superseded by an Amended Judgment entered by stipulation of the parties.

On October 22, 2008, upon motion by Defendants pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 and 42 U.S.C. § 1997, and after an evidentiary hearing, certain provisions of the Amended Judgment were found to remain necessary to correct a current and ongoing violation of a federal right, to extend no

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

further than necessary to correct the violation of the federal right, to be narrowly drawn, and to be the least intrusive means to correct the violation.  (Doc. 1634.)   Other provisions were modified or vacated, and the provisions remaining in effect, as originally written or as modified, were restated in the Second Amended Judgment.  (Doc. 1635.) The October 22, 2008 Order stated that the Court contemplated that the parties would "confer immediately about prompt compliance with the Second Amended Judgment, and new proceedings will be brought at Plaintiffs' initiative to enforce the Second Amended Judgment if Plaintiffs are not satisfied."   On November 21, 2008, Defendants sought appellate review of the Second Amended Judgment.

On December 5, 2008, a hearing was held regarding Defendants' compliance with the Second Amended Judgment, the parties' plans for achieving compliance, and disputes regarding selection of independent medical and mental health consultants to assist Defendants in achieving compliance.  On January 9, 2009, a hearing was held regarding Defendants' progress toward compliance with the nonmedical portions of the Second Amended Judgment and selection of team leaders for medical and mental health compliance efforts.

On January 28, 2009, upon agreement of the parties, the Court appointed Dr. Lambert N. King, medical expert, and Dr. Kathryn Burns, mental health expert, to serve as independent evaluators of Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment.  The independent evaluators conducted regularly scheduled visits to the County jails and reported their findings and recommendations to the Court beginning in June 2009.

On April 7, 2010, sixteen months after the Second Amended Judgment was entered, significant areas of failure to comply with the Second Amended Judgment's medical and mental health requirements remained.  (Doc. 1880.)  The April 7, 2010 Order stated in part:

- 5 -

Although progress has been made, it appears as though most of the improvements made regarding medical and mental health services have been those imposing little or no additional cost on Defendants. Improvements appearing to be most critically needed, *e.g.*, developing and implementing electronic medical records and medication management tools, increasing staffing, providing space for confidential mental health treatment, appear to have been disregarded or postponed to avoid expense. Further, the Court has not been advised whether Defendants are in compliance with the food and nutritional terms of the Second Amended Judgment.

Previous orders and numerous court proceedings in this matter have emphasized Congress's intent that constitutional violations regarding conditions of confinement be corrected expeditiously and judicial oversight terminated as swiftly as possible. The Court has repeatedly informed the parties of the importance of implementing long-overdue, constitutionally required corrections as quickly as possible, both for the benefit of the Plaintiff class and to avoid expenses incurred by unnecessary delay. Because correction of constitutional violations has not proceeded expeditiously to date, the parties and counsel will be ordered to meet and confer to develop a proposed procedure for achieving and demonstrating Defendants' complete compliance with the Second Amended Judgment, including a procedure for Plaintiffs to submit fee applications at appropriate intervals to be paid promptly by Defendants. The Court's purpose is to set a procedure by which full compliance with the Second Amended Judgment is either confirmed or specific implementing remedies are ordered and complied with by the end of this calendar year. To the extent fiscal choices have to be made, the Court contemplates that compliance with the minimum requirements of the United States Constitution in the discharge of the Defendants' core function of operating the county jail will take priority over other discretionary activities of the Sheriff and the County Defendants. The parties shall jointly file a report explaining their proposed procedure by June 11, 2010.

(*Id.*) The April 7, 2010 Order required the parties to meet and confer to develop a proposed schedule for confirming Defendants' full compliance with the Second Amended Judgment or ordering specific implementing remedies that would achieve full compliance by the end of 2010. It further set a hearing for June 24, 2010, on the parties' proposed

procedure for achieving Defendants' complete compliance with the Second Amended Judgment. These deadlines were subsequently extended several times.

On June 18, 2010, the parties filed a joint report with their respective positions regarding Defendants' compliance with the nonmedical portions of the Second Amended Judgment. On July 30, 2010, the parties filed a supplemental joint report regarding food, discovery, and presentation of disputes.

On July 30, 2010, the parties also filed a joint report stating each party's position regarding the status of Defendants' compliance with the medical and mental health portions of the Second Amended Judgment. (Doc. 1895.) The parties agreed to a procedure for achieving compliance with the Second Amended Judgment regarding the medical and mental health issues that remained disputed. The Court-appointed independent evaluators would determine whether Defendants were in full compliance with the Second Amended Judgment, and if Defendants were found not to be in full compliance with any provision, the evaluators would submit detailed proposed remedies and timetables for remedial action to bring Defendants into full compliance. If neither party objected to an evaluator's finding and remedial recommendation, the finding and remedy would be adopted as an order of the Court. The Court would resolve any objections after hearing evidence on the relevant issues. But this procedure never was implemented.

On October 13, 2010, the Ninth Circuit affirmed the Second Amended Judgment. On October 28, 2010, Defendants moved to terminate the nonmedical portions of the Second Amended Judgment (paragraphs 2-5 and 9-16). On November 2, 2010, Defendants filed a petition for rehearing en banc in the Ninth Circuit. On November 17, 2010, the Court denied Defendants' motion to terminate the nonmedical portions of the Second Amended Judgment for lack of jurisdiction without prejudice to refiling it after the Court of Appeals' mandate issued and jurisdiction was revested in this Court.

On January 20, 2011, the parties filed a Joint Case Management Plan Regarding Health Care, which identified Defendants' disagreement with two recommendations of the Court-appointed independent consultants: (1) physician assistants or nurse practitioners cannot substitute for licensed physicians on weekends and holidays or in providing initial health assessments of patients with or at risk of serious acute or unstable medical conditions, and (2) correctional staff posted to the intake center must receive training regarding mental health issues. (Doc. 1939.) On April 4, 2011, the Ninth Circuit mandate issued. On June 7, 2011, the parties filed a Joint Case Management Report, which stated that an evidentiary hearing regarding the medical and mental health issues was no longer necessary. The same day Defendants filed a motion to terminate the nonmedical provisions of the Second Amended Judgment. (Doc. 1980.) An evidentiary hearing on the motion was set for October 18, 2011. (Doc. 1988.)

On October 12, 2011, after conducting extensive discovery, the parties stipulated that certain nonmedical provisions of the Second Amended Judgment should be terminated and that other provisions should remain in effect. The stipulation stated that Defendants would renew the motion to terminate after April 1, 2012, and that Plaintiffs would not contest the renewed motion if Defendants successfully accomplished certain goals for the period November 1, 2011, through March 1, 2012. On October 13, 2011, the Court granted the parties' stipulation and denied Defendants' motion to terminate except as stipulated.

On April 24, 2012, Defendants moved to terminate certain provisions of the Second Amended Judgment pursuant to 18 U.S.C. § 3626(b), and Plaintiffs did not oppose the motion. On May 24, 2012, Defendants' motion was granted, and those provisions of the Second Amended Judgment (Doc. 1635) that remained in effect were restated in the Third Amended Judgment (Doc. 2094). The Third Amended Judgment provides in relevant part:

2.      Defendants shall provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population.  The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped.

3.      All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs.  When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

4.      Defendants shall ensure that the pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff.

5.      Defendants will maintain records of their compliance with this Third Amended Judgment and will provide quarterly summaries of those records to Plaintiffs' counsel.

(Doc. 2094.)

In January 2013, in their Tenth Reports to the Court, Dr. King and Dr. Burns reported significant progress toward compliance with the Third Amended Judgment and provided specific recommendations to achieve substantial compliance.  (Doc. 2099.) These reports were based primarily on site visits and records reviews made in October 2012.  On February 25, 2013, the Court ordered Defendants to file a status report stating their views and intentions with respect to the recommendations of Dr. King and Dr. Burns.

On June 14, 2013, Defendants filed a status report describing their efforts to address the concerns raised by Dr. King and Dr. Burns in their Tenth Reports.  (Doc. 2128.)  It concluded that "Drs. Burns and King's reports do not indicate any widespread systemic problems that violate inmates' constitutional rights" and "CHS continues to

perfect its level of care and treatment to the inmate population."  The status report also described the temporary electronic records system then in use and progress toward completing the permanent electronic health records system.

Regarding Dr. King's recommendations, among other things, the status report stated, "24 hour provider coverage was added to Fourth Avenue Intake in 2012," "[t]he RN and Intake provider assess (based on symptomology and medical history) which inmates require a follow-up evaluation based on individualized history and assessment," and "[a]fter the health technician conducts the Pre-Intake interview, any inmate with more significant medical issues—i.e., a chronic condition, on medications, injured, etc.— will see the RN in the pre-Intake area for a follow-up assessment."  Statements such as these did not show that improvements had been made after Dr. King's October 2012 site visit or provide evidence that any of his recommendations had been adopted and were being implemented consistently.

Defendants expressly disagreed with Dr. King's recommendation that policies and procedures of the Maricopa County Sheriff's Office ("MCSO") be modified to (1) require qualified medical personnel to examine each detainee after a use of force and determine whether the detainee should be given medical treatment and (2) require involvement of mental health professionals to attempt to obviate use of force on a detainee with probable mental illness who is passively resisting control.  In other areas, Defendants simply described current practices, some of which did not comply with Dr. King's recommendations, without expressly disagreeing with his recommendations.  For example, under the heading "Tuberculin Skin Testing Within Seven Days of Booking," the status report states, "CHS performs a skin test between ten to fourteen days from Intake to coincide with the inmate's initial health assessment."

Regarding Dr. Burns' recommendations, among other things, the June 14, 2013 status report described procedures for placement and treatment of mental health patients at the Mental Health Unit at the Lower Buckeye Jail ("MHU") and outpatient clinics.  It

stated that mental health clerk hours were increased in the intake center to provide weekend coverage beginning in December 2012, mental health audits showed improvements in the timeliness of providing care, and necessary psychiatric evaluations occur within four days of booking.  The status report also stated:  "Medications are provided as quickly as possible after verification.   The psychotropic drug audits conducted quarterly show that medications are given to patients within three to four days of booking."   Further, the report described improvements made to address issues associated with isolation in the 4th Avenue Special Management Unit.  The June 14, 2013 status report included information regarding the number of suicides per year and suicides per 100,000 for 2002–2012 and concluded that "CHS's low suicide rate indicates that patients at risk for self harm are well managed."

On July 29, 2013, Plaintiffs responded to Defendants' June 14, 2013 status report with respect to specific recommendations made by Dr. King and Dr. Burns.  (Doc. 2138.) Plaintiffs acknowledged progress made since 2008, identified recommendations for which Defendants' status report did not establish compliance, and challenged the accuracy of some of Defendants' assertions about their compliance with the recommendations.   Plaintiffs asserted that Defendants' status report did not establish compliance with recommendations such as those regarding the electronic health records system, provider staffing during intake, face-to-face provider evaluations during intake of patients with serious acute or chronic medical conditions, adequate beds and facilities for closely monitoring patients at risk for severe alcohol and drug withdrawal of all custody levels, revision of the MCSO Use-of-Force policy, on-site availability of nursing wound care, timeliness of transferring unstable patients from outpatient jails to the MHU, improvement of outpatient mental health care, timely access to appropriate mental health treatment for detainees enrolled in the Restoration to Competency Program, and issues with isolation in the 4th Avenue Special Management Unit.  For example, Plaintiffs noted that Defendants responded to some of Dr. Burns' concerns expressed in January 2013

(based on October 2012 observations) regarding treatment of seriously mentally ill patients housed in the Special Management Unit by describing improvements made in 2010.  Notwithstanding Plaintiffs' objections to Defendants' June 14, 2013 status report and insufficient time to prove the effectiveness of recent improvements, Defendants moved to terminate the Third Amended Judgment pursuant to 18 U.S.C. § 3626(A)(1). (Doc. 2142.)

On August 30, 2013, the parties stipulated to waive the automatic stay of the Third Amended Judgment, which 18 U.S.C. § 3626(e)(2) imposes thirty days after a motion to terminate is filed, to enable the parties to conduct additional discovery and present their evidence to the Court and to allow the Court sufficient time to rule.  (Doc. 2149.)  On September 10, 2013, the Court set deadlines for briefing Defendants' motion to terminate the Third Amended Judgment and set oral argument with evidentiary hearing, if requested, for December 18, 2013.  (Doc. 2156.)  Subsequently, Defendants filed a statement of facts to support their motion to terminate the Third Amended Judgment (Doc. 2158), a controverting statement of facts responding to Plaintiffs' additional facts and objecting to Plaintiffs' proposed findings of fact (Doc. 2183), proposed findings of fact (Doc. 2184), and a motion to set evidentiary hearing (Doc. 2181).  Plaintiffs filed a response to Defendants' motion to terminate (Doc. 2178), a response to Defendants' statement of facts (Doc. 2179), and proposed findings of fact (Doc. 2177).

On December 12, 2013, the Court granted Defendants' motion for evidentiary hearing, vacated the oral argument previously set, and set an evidentiary hearing for February 18, 2014.  On January 7, 2014, upon Defendants' motion, the evidentiary hearing was continued to February 25, 2014.  On January 13, 2014, the Court ordered Plaintiffs to file a statement concisely identifying specifically what actions they believed Defendants needed to take to correct any and all ongoing current violations within the scope of the Third Amended Judgment and deadlines by which Defendants reasonably could and should complete all of the corrective actions.  On January 31, 2014, Plaintiffs

filed their statement of proposed corrective actions.  (Doc. 2210.)  On February 19, 2014, the Court issued a Final Prehearing Order, which identified material issues of fact to be decided, including whether it should order any of the corrective actions proposed by Plaintiffs.   On February 25, 2014, Defendants filed a trial brief regarding Maricopa County's Medical Copayment.

An evidentiary hearing was held on February 25, 26, and 27, 2014, and March 4, 5, and 6, 2014.  On April 18, 2014, Defendants filed a supplemental brief regarding remedies adopted by other courts where a systemic constitutional violation was found. (Doc. 2261.)  On May 8, 2014, Plaintiffs filed a memorandum regarding remedies and post-trial proposed findings of fact and conclusions of law.  (Docs. 2268, 2269.)

The Court has considered all of the briefing, statements of facts, proposed findings, and evidence presented by the parties.

## III.   LEGAL STANDARDS

### A.   Termination of Prospective Relief Under the Prison Litigation Reform Act

Congress enacted the Prison Litigation Reform Act to prevent federal courts from micromanaging prisons by mere consent decrees.  *Gilmore v. California*, 220 F.3d 987, 996 (9th Cir. 2000).   Under the PLRA, courts may not grant or approve relief that requires prison administrators to do more than the constitutional minimum.  *Id.* at 999. The PLRA requires that prospective relief regarding prison conditions "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1).  Relief must be narrowly drawn, extend no further than necessary to correct the violation, and be the least intrusive means necessary to correct the violation.  *Id.*   Further, courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

The PLRA also provides that any order for prospective relief regarding prison conditions is terminable upon the motion of any party one year after the district court has entered an order denying termination of prospective relief under the PLRA. 18 U.S.C. § 3626(b)(1). The party seeking to terminate the prospective relief bears the burden of proof. *Gilmore*, 220 F.3d at 1007; *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam).

Although § 3626 refers to "immediate termination" and a "prompt ruling," the district court must inquire into current prison conditions before ruling on a motion to terminate. *Gilmore*, 220 F.3d at 1007-08. Even if the existing relief qualifies for termination under § 3626(b)(2), if there is a current and ongoing violation, the district court must modify the relief to meet the PLRA standards. *Id.* at 1008. Therefore, "[p]rospective relief shall not terminate if the court makes written findings based upon the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). If prospective relief remains necessary to correct a current and ongoing violation, the district court's authority to modify the existing prospective relief includes authority to expand or diminish the existing relief. *See Pierce v. Orange County*, 526 F.3d 1190, 1204 n.13 (9th Cir. 2008). Determining whether such relief meets § 3626(b)(3)'s need-narrowness-intrusiveness criteria "will obviously rest upon case-specific factors—namely, the extent of the current and ongoing constitutional violations." *Id.* at 1206.

## B. Relevant Period for a "Current and Ongoing" Violation

To make the findings required to terminate prospective relief, the Court must take evidence on current jail conditions, at least with respect to those conditions Plaintiffs do not concede comply with constitutional requirements. *See Gilmore*, 220 F.3d at 1010.

- 14 -

1
2
Evidence of "current and ongoing" violations must reflect conditions "as of the time termination is sought." *Id.*; *accord Pierce*, 526 F.3d at 1205.

3
4
5
6
7
8
On September 10, 2013, the Court ordered that for evidence to be relevant to Defendants' motion to terminate the Third Amended Judgment, it must tend to show whether any current and ongoing violation existed on August 9, 2013, the date Defendants filed their motion.  (Doc. 2156.)  Relevant evidence could be obtained before or after August 9, 2013, but it must show conditions as they existed on August 9, 2013.

9
**C.    Pretrial Detainees' Protection from Punishment Under the Fourteenth Amendment**

10
11
12
13
14
15
16
17
18
The Fourteenth Amendment Due Process Clause protects a pretrial detainee from punishment prior to an adjudication of guilt in accordance with due process of law.  *Bell v. Wolfish*, 441 U.S. 520, 534-35 (1979).  "This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment." *Pierce*, 526 F.3d at 1205.  The "more protective" Fourteenth Amendment standard applies to conditions of confinement for pretrial detainees and requires the government to do more than provide minimal necessities.  *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004).

19
20
21
22
23
24
25
26
27
To evaluate the constitutionality of pretrial detention conditions that are not alleged to violate any express constitutional guarantee, a district court must determine whether those conditions amount to punishment of the detainee.  *Bell*, 441 U.S. at 535; *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).  To constitute punishment, the governmental action must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement, but it does not need to cause a harm independently cognizable as a separate constitutional violation, *e.g.*, deprivation of First Amendment rights.  *Demery*, 378 F.3d at 1030.  To determine whether an action's purpose is punitive, in the absence of evidence of express

28

intent, a court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539).

Legitimate governmental objectives that may justify adverse detention conditions include maintaining security and order and operating the detention facility in a manageable fashion. *Id.* "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546. But retribution and deterrence are not legitimate governmental objectives. *Demery*, 378 F.3d at 1030-31.

To determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion, courts ordinarily should defer to the expert judgment of correction officials in the absence of substantial evidence that indicates officials have exaggerated their response to these considerations. *Bell*, 441 U.S. at 540 n.23. A reasonable relationship between the governmental objective and the challenged condition does not require an "exact fit," a showing that it is the "least restrictive alternative," or proof that the policy does in fact advance the legitimate governmental objective. *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). But it does require evidence that the correction officials' judgment is rational, *i.e.*, they might reasonably think that the policy advances a legitimate governmental objective. *Id.*

Therefore, to find that a condition of confinement for pretrial detainees constitutes a current and ongoing violation of the constitutional minimum under the Fourteenth Amendment, the Court must determine that the condition:

(1)     imposes some harm to the pretrial detainees that significantly exceeds or is independent of the inherent discomforts of confinement and

- 16 -

(2)    (a) is not reasonably related to a legitimate governmental objective or

           (b) is excessive in relation to the legitimate governmental objective.

### D.    Eighth Amendment Standard for Medical and Mental Health Care

Although the "more protective" Fourteenth Amendment standard applies here, any violation of the Eighth Amendment necessarily also violates the Fourteenth Amendment. The Eighth Amendment requires that prison officials ensure that inmates receive adequate food, clothing, shelter, sanitation, and medical care and take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Courts must consider the effect of each condition of confinement in its context, "especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981). "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, __ U.S. __, 131 S. Ct. 1910, 1928 (2011).

Specifically, prison officials must "provide a system of ready access to adequate medical care," including mental health care, that provides access to medical staff who are competent to examine inmates, diagnose illnesses, and treat medical problems or refer inmates to those who can. *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 481-84 (1995). Further, the system must be able to respond to emergencies promptly and adequately. *Id.*

Moreover, the Eighth Amendment prohibits deliberate indifference not only to an inmate's current health problems, but also to conditions of confinement that are very likely to cause future serious illness and needless suffering. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). "A medical need is serious if failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Peralta v. T.C. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc) (internal quotation marks omitted).

Deliberate indifference to serious medical needs may be manifested not only by medical providers failing to respond to a prisoner's needs, but also by detention officers intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  A policy of medical understaffing may show deliberate indifference.  *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th 1988), *vacated and remanded*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d 235 (9th Cir. 1989).  And "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy Eighth Amendment violations."  *Peralta*, 744 F.3d at 1083; *see also Spain v. Procunier*, 600 F.2d 189, 199-200 (9th Cir. 1979) (cost or inconvenience of providing adequate conditions is not a defense to the imposition of punishment in an action for injunctive relief).

Holding inmates with serious mental illness in prolonged isolated confinement may cause serious illness and needless suffering in violation of the Eighth Amendment. *See, e.g.*, *Coleman v. Brown*, 938 F. Supp. 2d 955, 979 (E.D. Cal. 2013) (mentally ill inmates in administrative segregation faced substantial risk of serious harm, including exacerbation of mental illness and potential increase in suicide risk).  To determine whether segregated confinement meets constitutional standards, courts must consider both the length of the segregated confinement of inmates with serious mental illness and the specific conditions of the confinement.  *Hutto v. Finney*, 437 U.S. 678, 686 (1978). Conditions to be considered may include:  (1) the length of time prisoners with mental illness spent in solitary confinement (approximately 22 hours or more a day); (2) the extent to which solitary confinement interfered with prisoners' ability to obtain adequate mental health treatment; (3) the conditions accompanying the solitary confinement experienced by prisoners with serious mental illness; and (4) the extent to which systemic deficiencies at the facility, *e.g.*, deficiencies in mental health programming, screening, and accountability, contributed to an overreliance on solitary confinement as a means of

controlling prisoners with serious mental illness. *Coleman v. Brown*, CV-90-00520-LKK-DAD, Doc. 4919 (E.D. Cal. Nov. 12, 2013) (publication of the United States Department of Justice, Civil Rights Division).

District courts have found that conditions of extreme social isolation likely would cause some degree of psychological trauma for most inmates and likely would cause serious mental illness or a massive exacerbation of existing mental illness for inmates with active mental illness or a history of mental illness. Thus, the confinement in a maximum security housing unit constituted a *per se* violation of the Eighth Amendment only for inmates with active mental illness or a history of mental illness. *Madrid v. Gomez*, 889 F.Supp. 1146, 1155, 1235-36, 1265-66 (N.D. Cal. 1995); *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 2012 WL 6738517 at *23 (S.D. Ind. Dec. 31, 2012) (expressly following *Madrid v. Gomez*). Similarly, a district court found that extremely isolating conditions in a Wisconsin supermaximum prison caused psychological harm to seriously mentally ill prisoners, relatively healthy prisoners who had histories of serious mental illness, and prisoners who had never suffered a breakdown in the past but were prone to break down when stress and trauma became severe. *Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1101-02 (W.D. Wis. 2001).

Recently, nearly 20 years after first granting injunctive relief to the class of seriously mentally ill prisoners confined in the California state prison system, a district court recognized defendants' significant progress overall, but found defendants' motion to terminate "clearly premature" because defendants had not sufficiently remedied Eighth Amendment violations in use of force, disciplinary measures, and segregated housing for seriously mentally ill prisoners. *Coleman v. Brown*, __ F.Supp.2d __, 2014 WL 1400964, at *1 (E.D. Cal. Apr. 11, 2014). The court found that "placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide," and "the Eighth Amendment

1   prohibits placements of seriously mentally ill inmates in conditions that pose a substantial

2   risk of exacerbation of mental illness, decompensation, or suicide." *Id.* at *20, 25.  It

3   concluded that where clinical judgment demonstrates that a proposed placement poses an

4   unacceptable level of risk, that judgment cannot be overridden by custodial requirements,

5   and an alternative placement must be made.  The court ordered defendants to develop a

6   protocol for placement decisions and a plan for alternative housing that would preclude

7   placement of any seriously mentally ill inmate in existing administrative segregation

8   units when clinical information demonstrates substantial risk of exacerbation of mental

9   illness, decompensation, or suicide from such placement.  *Id.* at *26.

10          Even under the Eighth Amendment, constitutional standards for prison conditions

11  are not fixed:

12              Underlying the eighth amendment is a fundamental premise that
13          prisoners are not to be treated as less than human beings.  The amendment
            is phrased in general terms rather than specific ones so that while the
14          underlying principle remains constant in its essentials, the precise standards
            by which we measure compliance with it do not.  It follows that when
15          confronting the question whether penal confinement in all its dimensions is
            consistent with the constitutional rule, the court's judgment must be
16          informed by current and enlightened scientific opinion as to the conditions
            necessary to insure good physical and mental health for prisoners.
17

18

19  *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (citations omitted); *see Trop v.*

20  *Dulles*, 356 U.S. 86, 100 (1958) ("The [Eighth] Amendment must draw its meaning from

21  the evolving standards of decency that mark the progress of a maturing society.").

22          **E.**    **Remedies**

23          "[C]onstitutional violations in conditions of confinement are rarely susceptible of

24  simple or straightforward solutions."  *Brown v. Plata*, __ U.S. __, 131 S. Ct. 1910, 1936

25  (2011).  "Courts may not allow constitutional violations to continue simply because a

26  remedy would involve intrusion into the realm of prison administration."  *Id.* at 1928-29.

27  Further, "[a] history of noncompliance with prior orders can justify greater court

28  involvement than is ordinarily permitted."  *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th

Cir. 2000) (affirming order that identified areas of noncompliance with prior injunction and gave more specific directions regarding how to comply with the original order). Although a district court must give prison officials opportunity to propose remedies, it has broad discretion regarding when and how that proposal should be submitted for consideration by the court. *Graves v. Arpaio*, 623 F.3d 1043, 1047 (9th Cir. 2010).

"Once a constitutional violation has been found, a district court has broad powers to fashion a remedy. A court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation." *Sharp*, 233 F.3d at 1173 (internal quotation marks and citations omitted; after failure to comply with prior injunction, district court did not abuse discretion by issuing more specific directions that were not, in and of themselves, constitutionally required). The PLRA authorizes prospective relief that is necessary to correct an ongoing constitutional violation, but does not require that the relief "exactly map" onto constitutional requirements. *Graves*, 623 F.3d at 1050. Although 18 U.S.C. § 3626(b)(3) requires that prospective relief be narrowly drawn and the least intrusive means to correct the violation, a remedy does not fail narrow tailoring simply because it will have positive collateral effects. *Plata*, 131 S. Ct. at 1940.

Federal courts may give considerable weight to expert opinion regarding how to remedy relevant constitutional violations. *Id.* at 1944. Although "courts must not confuse professional standards with constitutional requirements," "expert opinion may be relevant when determining what is obtainable and what is acceptable in corrections philosophy," and "courts are not required to disregard expert opinion solely because it adopts or accords with professional standards." *Id.* at 1944-45.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    The Parties

1.    Plaintiffs are the class of all pretrial detainees who are housed in the Maricopa County Jail, which includes multiple facilities.

- 21 -

2.      Defendants Denny Barney, Steve Chucri, Clint L. Hickman, Andrew Kunasek, and Marie Lopez Rogers[2] are the current members of the Maricopa County Board of Supervisors.

3.      Defendant Joseph Arpaio is the Maricopa County Sheriff, whose duties under A.R.S. § 11-441 include taking charge of and keeping the county jail and the prisoners in the county jail.

4.      Correctional Health Services ("CHS") is an agency of Maricopa County government and is responsible for providing health care services to those incarcerated in the Maricopa County jail system.  A.R.S. § 11-291(A).

5.      Each facility within the Maricopa County Jail was accredited by the National Commission on Correctional Health Care ("NCCHC") on March 12, 2012. NCCHC standards serve as a framework to ensure that systems, policies, and procedures are in keeping with nationally recognized best practices.  NCCHC standards include a continuous quality improvement program, which uses a structured process to find areas in the health care delivery system that need improvement and to develop and implement strategies for improvement.  A quality improvement study is one of many means through which the Maricopa County Jail can collect data to demonstrate its compliance with constitutional standards.

6.      Compliance with NCCHC standards is not equivalent to complying with constitutional standards.  Nationally recognized best practices may exceed constitutional standards in some areas and fall short in others.

**B.      The Maricopa County Jail**

7.      The average daily population of the Maricopa County Jail is approximately 8,200, which includes both pretrial detainees and sentenced inmates.  Pretrial detainees comprise the majority of the population.

---

[2] In May 2014, Mary Rose Wilcox resigned from the Maricopa County Board of Supervisors, and in June 2014 the Board selected Marie Lopez Rogers to fill the vacancy.

8.      This action applies only to pretrial detainees housed in the Maricopa County Jail.  Although some inmates housed in the Maricopa County Jail are not pretrial detainees, most of the Jail's conditions, policies, procedures, and practices do not distinguish between pretrial detainees and sentenced inmates.  Therefore, the term "inmates" used here includes both pretrial detainees and sentenced inmates, but any determination of constitutional violation applies only to pretrial detainees.

9.      Approximately 250 to 300 arrestees are processed through the 4th Avenue intake center each day.  Many have been arrested and brought to the Maricopa County Jail previously.

10.     The length of time that a pretrial detainee stays at the Maricopa County Jail ranges from less than 24 hours to more than a year.  The length of stay for most pretrial detainees is relatively short.  Approximately 40% of inmates are released within 24 hours of booking, 50% within 2 days of booking, 65% within 7 days of booking, and 75% within 14 days of booking.

11.     Housing placements are based on gender, security level classification, and medical and mental health needs.  Female pretrial detainees are housed either at the Estrella jail or in the Mental Health Unit at the Lower Buckeye jail.

12.     Maricopa County Sheriff's Office ("MCSO") personnel assign each pretrial detainee a security level classification based on certain factors, such as current offender status, arrest and conviction history, and institutional behavior.  A pretrial detainee may be classified as requiring segregation for his own protection, for the protection of others, and/or as a disciplinary sanction.  Classification determines the extent to which the pretrial detainee will be permitted contact with others and the number of hours per day the pretrial detainee will be permitted outside of his cell for recreation, showers, and other activities.  Inmates classified as close custody are further classified into four levels based on whether they are permitted out of their cells for one, two, three, or four hours a day.  MCSO staff assigns each pretrial detainee a security level classification at booking,

but it may modify the classification at any time.   MCSO policy does not require consultation with CHS staff regarding classification.

13.     The Maricopa County Jail has medical facilities at the 4th Avenue, Lower Buckeye, Towers, Estrella, and Durango jail facilities.   Each facility has private medical/mental health treatment rooms.   Each facility has identified space for group therapy sessions and programs.

14.     The Jail's central intake center is located within the 4th Avenue jail and includes holding cells for general population inmates; isolation cells for those who need to be isolated for their own protection, the protection of others, or medical reasons; and safe cells for those deemed to be suicidal or homicidal.   It has its own medical and mental health care personnel and areas for these personnel to assess pretrial detainees confidentially.

15.     The 4th Avenue jail has a central medical clinic located in the basement and smaller clinics on the second, third, and fourth floors.   The smaller clinics each have three examination rooms and two offices.   The central clinic includes a medication room, three examination rooms, four offices, an x-ray area, a laboratory, a medical records room, and a dental office.   The central clinic provides medications administration, sick call, chronic care clinics, outpatient psychiatric care, dental care, and radiology services.

16.     The Lower Buckeye jail has medical, mental health, and dental facilities, which include a 60-bed infirmary, a 260-bed Mental Health Unit ("MHU"), an outpatient clinic, and the health services administration office.   The outpatient clinic has seven offices, a two-chair dental office, a medical records room, two medication rooms, a specimen processing area, and four examination rooms.

17.     The Towers, Estrella, and Durango jails also have outpatient clinics.   The Towers jail has an office, a medication room, a specimen processing area, two medical examination rooms, and a mental health interview room.   The Estrella jail has an office, a dental office, a medical records room, a medication room, a specimen processing area,

and four examination rooms.  The Durango jail has two offices, a medical records area, a medication room, a specimen processing area, and three examination rooms.

18.     Only physicians, physician assistants, and nurse practitioners are considered medical providers.

19.     Only psychiatrists, psychiatric nurse practitioners, or physician assistants are considered mental health providers.

## C.     Receiving Screening

20.     Paragraph 2 of the Third Amended Judgment provides:

> Defendants shall provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population.  The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped.

21.     Pretrial detainees coming to the Maricopa County Jail are processed at the 4th Avenue jail intake center, beginning with an initial screening by a correctional health technician who takes vital signs, measures weight, and identifies emergent situations requiring immediate assessment by a nurse or medical provider.

22.     After the initial screening by a correctional health technician, a registered nurse performs the receiving screening.  The registered nurse takes a second set of vital signs if the first set is abnormal or the pretrial detainee has reported or shown a new complaint during the time between the initial screening by a correctional health technician and the receiving screening.

23.     Beginning on August 5, 2013, four days before the filing of this Motion to Terminate, an expanded electronic integrated health screen for the receiving screening was implemented.  The new health screen seeks responses to more than 100 questions, including medication and pharmacy queries, and gathers a complete set of vital signs.  It

permits the registered nurse to document impressions of the arresting officer as well as the registered nurse's observations.  It is designed to identify serious conditions including medical, dental, mental health, suicidal risk, substance withdrawal, communicable diseases, disability-related needs, and special diet needs.  Plaintiffs agree that the new health screen is very well designed.

24.    Registered nurses are expected to consult with all pretrial detainees who indicate they are currently taking prescribed medication, respond positively to medical or mental health questions, or have abnormal vital signs.  Almost half of inmates booked each day are identified as needing further evaluation by a registered nurse.

25.    At least one medical provider, *i.e.*, a physician, physician assistant, or nurse practitioner, is assigned to the intake center 24 hours a day, 7 days a week.

26.    The medical provider assigned to the intake center may also provide services in the 4th Avenue central clinic, which is located close to the intake center.

27.    Sometimes the medical provider assigned to the intake center also provides coverage for other facilities and is not physically present at the intake center.

Medical Care:  Timely Identification, Assessment, and Placement

28.    If a pretrial detainee is identified during the intake process as suffering from a serious health condition, such as diabetes, hypertension, hyperlipidemia, pregnancy, or any other condition requiring special follow-up care, intake procedures require the condition to be documented in the detainee's electronic record with a chronic care condition code and the detainee to be scheduled electronically for a medical appointment.

29.    During the receiving screening, if a pretrial detainee reports a chronic condition, the registered nurse may call a medical provider, *i.e.*, a physician, physician assistant, or nurse practitioner, with information regarding current vital signs, reported prescription medications, and reported medical history so that the medical provider can order medications, lab work, and follow-up appointments.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

30.    At the time of the receiving screening, a medical provider may decide to not wait to verify medications with pharmacies before ordering them.  Some medications that are kept in stock in the intake center, such as blood pressure medication, may be administered by a registered nurse during the intake process.  If a medical provider prescribes a medication that is not kept in stock in the intake center, the pretrial detainee may be sent to the clinic to begin the medication as soon as the receiving screening is completed.

31.    When the receiving screening identifies a pretrial detainee as having a serious acute or chronic medical condition, in most cases the pretrial detainee should be seen by a medical provider on an emergency or urgent basis, no later than within 24 hours.

32.    Even when the receiving screening has indicated that pretrial detainees should be seen by a medical provider, many pretrial detainees have not received timely face-to-face examinations by a medical provider.

33.    After provider coverage at intake was increased to 24 hours a day, 7 days a week in 2012, records do not show a substantial increase in the volume of face-to-face examinations by a medical provider or their timeliness.  After the increase in provider coverage, there continued to be instances in which pretrial detainees with complicated and serious medical needs were not assessed and treated by a medical provider within 24 hours after the receiving screening.

34.    If a medical provider determines that a pretrial detainee should not enter jail because of his or her medical condition, such as for a head injury or wound likely to require surgery, the medical provider may refuse to permit a pretrial detainee to be processed further.  Then the pretrial detainee would remain the responsibility of the arresting officer.

- 27 -

35.     Some pretrial detainees requiring medical stabilization are sent directly from the intake center to a hospital emergency department for medical clearance or hospital admission.

36.     Some pretrial detainees who are determined to be stable for jail but requiring a higher level of care than available in the general population are sent directly from the intake center to the infirmary.

37.     Many pretrial detainees present at the intake center with symptoms of alcohol or drug abuse.

38.     Acute alcohol withdrawal, acute opiate withdrawal, and acute benzodiazepine withdrawal are potentially dangerous, particularly if the pretrial detainee has a history of withdrawal seizures.

39.     After the receiving screening, if a pretrial detainee is determined to abuse alcohol or drugs, have a history of withdrawal seizures, and be sufficiently medically stable to come into jail, the medical provider assigned to the intake center usually sends the pretrial detainee to the intake clinic to begin medications for withdrawal.

40.     Defendants have not shown that as of August 9, 2013, pretrial detainees who presented with serious medical health needs at intake consistently were timely seen face-to-face by a medical provider.

41.     Defendants have not shown that as of August 9, 2013, necessary treatment, including laboratory studies, consistently was initiated for pretrial detainees who presented with serious medical needs at intake.

42.     Defendants have not shown that as of August 9, 2013, the receiving screening consistently identified pretrial detainees who are at risk of suffering serious harm due to withdrawal from alcohol or drugs, and it resulted in timely medication, treatment, and appropriate monitoring for them.

43.     Defendants have not shown that as of August 9, 2013, pretrial detainees consistently were provided necessary medication without interruption during or following intake.

44.     Defendants have not shown that as of August 9, 2013, pretrial detainees who presented with serious medical health needs at intake consistently were timely placed in units within the Maricopa County Jail or facilities outside the Jail that provided access to adequate treatment.

<u>Mental Health Care:  Timely Identification, Assessment, and Placement</u>

45.     The new health screen improved upon the previous screening by (a) expanding the substance abuse and mental health queries, including specific inquiry regarding psychotropic medication, previous hospitalization, and suicidal ideation; and (b) establishing a mental health "queue" system.

46.     Depending on a pretrial detainee's responses to the new health screen, the pretrial detainee may automatically be listed in one or more mental health "queues," such as for those possibly suicidal, designated Seriously Mentally Ill by the county public mental health provider,[3] currently on psychotropic medication, or refusing to answer questions.

47.     The queues indicate the priority by which pretrial detainees should be seen for further mental health assessment, including deciding whether a pretrial detainee should be placed in a safe cell.

48.     CHS policy requires that if a pretrial detainee has a positive mental health screening or does not respond to all of the mental health screening questions, the detainee is referred for further evaluation by intake mental health staff, *i.e.*, a mental health assistant or mental health professional, not a mental health provider.

---

[3] The term "seriously mentally ill" used elsewhere in this Order includes both those designated as "Seriously Mentally Ill" by the county public mental health provider and those identified by CHS as having serious mental illness.

- 29 -

49.     Intake mental health staff determines a pretrial detainee's level of acuity based on review of the mental health screening and/or face-to-face contact with the detainee.  If appropriate, an order is written for mental health follow-up for either mental health assessment or psychiatric evaluation within 24 hours, within 72 hours, within 7–10 days, or as scheduled.

50.     Timely mental health assessment is necessary to determine a pretrial detainee's mental health needs and to begin treatment.  The most seriously mentally ill detainees must be seen face-to-face by a mental health provider, *i.e.*, a psychiatrist, psychiatric nurse practitioner, or physician assistant, to begin to receive adequate care.

51.     A quality improvement study completed in October 2012 audited the charts of 192 randomly selected inmates with a length of stay of at least 21 days and who had received mental health services in the Jail between October 2010 and July 2012.  Of the 192 charts reviewed, 98 documented that the inmate had been designated as seriously mentally ill, and 184 included a completed mental health assessment.  The charts indicated that 66% of the inmates were seen as scheduled after intake, 26% were not seen as scheduled after intake, and 8% were identified as not in need of clinical follow up after intake.  It is unclear what percentage of seriously mentally ill detainees were not seen as scheduled after intake and whether there were legitimate reasons for not seeing them as scheduled.

52.     A substantial number of pretrial detainees who report they are taking psychotropic medications at the time of booking may not be seen by any mental health staff.  A quality improvement study of a sample of 80 inmates booked in April 2012 with a length of stay of at least 7 days and who admitted taking psychotropic medications found that 49 of the 80 inmates (61.3%) received a mental health assessment and 43 of the 49 (87.8%) were assessed within 7 days after booking.  That is, only 43 of 80 inmates who admitted taking psychotropic medications and remained in the Jail for at least 7 days

received a mental health assessment within 7 days after booking, and 31 of 80 did not receive a mental health assessment at all.

53.    Some pretrial detainees have been moved from the intake center to close custody housing without clearance from a mental health provider that it is safe to do so.

54.    Some pretrial detainees who require psychiatric stabilization and/or are at risk for suicide are sent directly from the intake center to the Mental Health Housing Units ("MHU").   However, no quality improvement study or other evidence shows that as of August 9, 2013, pretrial detainees who required psychiatric stabilization or were identified as being at risk for suicide during the intake process consistently were timely transferred to the MHU.

55.    On August 9, 2013, Magellan Health Services administered public behavioral health services for Maricopa County.    Magellan's records system for monitoring its patients designated as Seriously Mentally Ill permitted the jail mental health professionals to access a summary of diagnoses, prescription medications, and the last date a medication was prescribed for pretrial detainees being treated through Magellan.   For those pretrial detainees, the system provided medication and diagnosis verification without a release signed by the pretrial detainee.    On April 1, 2014, responsibility for public behavioral health services in Maricopa County was transferred to Mercy Maricopa Integrated Care.

56.    The system used to obtain information from Magellan cannot be used to obtain treatment records for pretrial detainees receiving mental health treatment from private providers or the Veterans Administration.

57.    From October 2010 through July 2012, the records of a substantial number of pretrial detainees who reported a mental health treatment history did not include signed releases of medical information.   Defendants have not shown that as of August 9, 2013, pretrial detainees' records included more signed releases, treatment records were obtained without signed releases (*e.g.*, through Magellan), or the records stated reasons

for not obtaining a signed release, *e.g.*, the detainee was physically unable to sign a release.

58.     Pretrial detainees who were prescribed psychotropic medications before entering the Jail may not be receiving medication without interruption.   A quality improvement study of 86 inmates booked in October 2012 who admitted taking psychotropic medications during the receiving screening and who stayed in the Jail for at least eight days showed that medication verification was initiated for 93% of the inmates, it was completed for 73% of the inmates, and medication was ordered for 70% of the inmates.  Of the 60 inmates for whom medication was ordered, 52 received a psychiatric evaluation, and 8 did not receive a psychiatric evaluation even though medication was ordered.  For those pretrial detainees who received medication, the average length of time from booking to giving first medication was 4.2 days.  Of the 26 patients for whom medication was not ordered, the health records of 18 had no documented rationale for not ordering medications.

59.     Defendants have not shown that as of August 9, 2013, pretrial detainees who presented with serious mental health needs at intake consistently were timely assessed by a mental health provider to initiate or continue necessary mental health treatment, including continuation of psychotropic medications prescribed before arrest.

Communicable Diseases:  Identification, Segregation, and Treatment

60.     In 2006, the Centers for Disease Control and Prevention ("CDC") updated its guidelines for the prevention and control of tuberculosis ("TB") in correctional and detention facilities to include both short- and long-term confinement facilities.   A disproportionately high percentage of TB cases in the United States occur among persons incarcerated in correctional facilities.  TB is spread through the air, and immediate isolation of infectious pretrial detainees can interrupt the spread of TB throughout a facility.

61.     The CDC recommends that facilities like the Maricopa County Jail screen all new detainees on entry for symptoms of TB.  Those with symptoms of TB should be immediately placed in an Airborne Infection Isolation Room (negative pressure isolation room) and evaluated promptly for TB.  Those who are deemed infectious should remain in isolation until treatment has rendered them noninfectious.

62.     The CDC recommends that detainees without symptoms of TB be further screened within seven days of arrival by tuberculin skin testing, QuantiFERON-TB Gold blood testing, or a chest x-ray.

63.     The CDC guidelines do not exempt detainees who had a previous negative TB test on a prior jail admission.

64.     The CDC recommends that detainees known to have HIV infection, and those at risk for HIV infection but whose HIV status is unknown, have a chest x-ray as part of the initial screening.

65.     During the receiving screening at the Maricopa County Jail, pretrial detainees are asked whether they have a history of TB or a positive TB skin test.  If they answer affirmatively, further questions are asked using a TB Symptom Assessment form.

66.     On December 6, 2013, Defendants reported their procedure requires that inmates with a risk of TB and a positive symptom assessment at intake be provided a mask and chest x-ray and be housed in the infirmary.  If the symptom assessment is negative, a chest x-ray is ordered unless there is a chest x-ray on file that is negative.  A registered nurse may initiate the chest x-ray based on the Medical Director's standing order.  A provider subsequently reviews the chest x-ray result and orders any necessary follow up visits.  The standard procedure for all other inmates is to perform a skin test coinciding with the initial health assessment 10-14 days after intake and repeat the skin test annually.

67.     In 2014, Defendants presented testimony at trial stating that if the receiving screening indicates that a pretrial detainee may have active TB, the pretrial detainee

would be provided a mask and placed in a negative air flow room in isolation. A medical provider would be contacted. The pretrial detainee would be transported to the infirmary where the provider would write orders to do three sputum samples over a 24-hour period, which are analyzed by the Maricopa County lab. If the sputum samples are positive, a fourth sample usually would be collected and sent to the Arizona state lab for further testing. At that point, the medical provider may begin treating the pretrial detainee with medication.

68.    CHS policy requires all pretrial detainees to be provided a tuberculin skin test between 10 and 14 days after the receiving screening to coincide with the detainee's initial health assessment and the skin test to be repeated annually.

69.    Although the initial health assessment is to be conducted within 14 days after intake for most detainees, it is not conducted for (1) newly arriving detainees who have had jail-administered initial health assessments within the previous year with no change in health status and (2) detainees who received initial health assessments as part of a hospitalization or prenatal care visit but may not have been tested for TB. .

70.    The CHS standard operating procedure for TB management and infection control states that on September 13, 2013, CHS suspended the placement of routine TB skin tests because of a nationwide shortage of the necessary testing material, and "only high-risk individuals will be tested/screened based on a positive symptom assessment."

71.    The Maricopa County Jail usually identifies about three cases of TB annually.

72.    Defendants have not shown that as of August 9, 2013, pretrial detainees consistently were tested for TB within 14 days after intake and the test results were timely reviewed.

73.    Defendants have not shown that as of August 9, 2013, the receiving screening resulted in the timely identification, segregation, and treatment of pretrial detainees with TB.

- 34 -

74.     Concomitant HIV infection is a leading risk factor for the progression of latent TB to active TB.

75.     During the intake process, pretrial detainees are questioned regarding HIV to determine if further evaluation is immediately necessary.  If the pretrial detainee answers that he is HIV positive or indicates an HIV risk, then the registered nurse conducts an assessment and history.  The nurse decides whether ordering chest x-rays for pretrial detainees with HIV or who are at risk for HIV infection with unknown status should be discussed with a medical provider.  If the registered nurse's assessment and discussion with a medical provider indicate that a chest x-ray is required, a chest x-ray may be ordered immediately based on the pretrial detainee's symptomology.

76.     Pretrial detainees are tested for HIV with a blood test at the initial assessment, which is to be conducted for most detainees 10 to 14 days after the receiving screening.

77.     Defendants have not shown that as of August 9, 2013, timely chest x-rays to screen for TB were consistently performed on pretrial detainees with HIV.

Sufficiency of the Receiving Screening

78.     Defendants have shown that the receiving screening recently has been significantly improved by the expanded electronic integrated health screen, use of mental health queues to prioritize additional assessment needs, registered nurses performing the screening, and increased medical provider availability for the 4th Avenue intake center.

79.     Defendants have not shown that as of August 9, 2013, the receiving screening is sufficient to identify and begin necessary segregation and treatment of those with mental or physical illness and injury.

80.     Defendants have not shown that as of August 9, 2013, the receiving screening results in timely face-to-face examination by a medical provider for pretrial detainees presenting with serious medical and/or mental health conditions.

81.    Defendants have not shown that as of August 9, 2013, the receiving screening results in timely placement of pretrial detainees who presented with serious medical and/or mental health needs at intake in units within the Maricopa County Jail or facilities outside the Jail that provided access to adequate treatment.

82.    Defendants have not shown that as of August 9, 2013, the receiving screening results in providing pretrial detainees necessary medication without interruption.

83.    Defendants have not shown that as of August 9, 2013, the receiving screening results in timely recognition, segregation, and treatment of pretrial detainees with communicable diseases.

84.    Defendants have not proven compliance with Paragraph 2 of the Third Amended Judgment as of August 9, 2013.

85.    The prospective relief ordered in Paragraph 2 of the Third Amended Judgment remains necessary to correct a current and ongoing violation of the federal right, extends no further than necessary to correct the violation of the federal right, and is narrowly drawn and the least intrusive means to correct the violation.

**D.    Ready Access to Needed Medical and Mental Health Care**

86.    Paragraph 3 of the Third Amended Judgment provides:

All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

87.    Ready access to care to meet serious medical and mental health needs means that pretrial detainees with serious medical and mental health needs will be seen face-to-face by a medical or mental health provider, *i.e.*, physician, psychiatrist, physician assistant, or nurse practitioner, for timely diagnosis, treatment, and ordering of lab tests, radiology, and prescription medication. In most cases, a pretrial detainee should

be seen by a provider for follow up.  Defendants have not shown that pretrial detainees with serious medical and mental health needs consistently have ready access to care to meet their serious medical and mental health needs.

Initial Health Assessments

88.    A CHS standard operating procedure revised September 13, 2013, states that the physical examination portion of the initial health assessment must be completed within 14 days of booking during the intake process, a scheduled physical exam, or the first clinical visit.  The physical examination may be completed by a physician, physician assistant, nurse practitioner, or registered nurse who has completed the Certified Nurse Examiner training.  A physician reviews and signs the health assessments completed by nurse practitioners, physician assistants, and registered nurses with Certified Nurse Examiner training.

89.    On June 14, 2013, Defendants projected that when the Electronic Health Record system was implemented, health assessments would be completed during the intake process, and all pretrial detainees would be screened for TB within 7 days of booking.

90.    Defendants state that registered nurses in the intake center refer all pretrial detainees with serious acute and chronic medical conditions to a medical provider for face-to-face evaluation in the intake center.

91.    Defendants state that pretrial detainees with serious medical needs are proactively assessed and treated within 24 hours after the receiving screening, including ordering and accessing basic laboratory tests.

92.    Defendants have not shown that pretrial detainees with serious medical needs are proactively assessed and treated within 24 hours after the receiving screening, including ordering and accessing basic laboratory tests.

93.     Defendants have not shown that within 24 hours after the receiving screening, all pretrial detainees identified as having a significant acute or chronic medical condition have initial health assessments.

94.     Pretrial detainees who were seen at a hospital within 14 days before arriving at the Jail usually do not receive initial health assessments.

95.     Pretrial detainees readmitted to the Jail who had a health assessment within the past 12 months and for whom the receiving screening shows no change in health status usually do not receive initial health assessments.

96.     Pretrial detainees who do not receive an initial health assessment usually will not be tested for TB because TB testing usually is performed concurrently with the initial health assessment.

97.     Pretrial detainees who do not receive an initial health assessment usually will not be tested for HIV and syphilis because HIV and syphilis testing usually is performed on blood drawn at the initial health assessment.

98.     Registered nurses with Certified Nurse Examiner training perform the majority of the initial health assessments.

99.     Registered nurses with Certified Nurse Examiner training are not qualified to perform comprehensive assessment of serious medical conditions and plan treatment and monitoring for serious medical conditions.

100.    Defendants have not shown that a medical provider performs the comprehensive assessment and develops plans for treatment and monitoring for pretrial detainees with serious medical conditions.

<u>Health Needs Requests</u>

101.    Pretrial detainees needing or wanting to access care between appointments and/or who did not identify health needs during intake may request an appointment via the Health Needs Request ("HNR") system.  All HNRs are recorded electronically, along with follow-up triage and appointments.

102.    Defendants state that all medical HNRs are triaged within 24 hours.

103.    Defendants state that any pretrial detainee who submits a medical HNR stating a clinical symptom is seen and evaluated by a nurse within 48 hours.

104.    Defendants state that all mental health HNRs stating clinical symptoms are triaged by mental health staff within 48 hours based on face-to-face assessments.

105.    Defendants have not shown that as of August 9, 2013, all medical HNRs are triaged within 24 hours, any pretrial detainee who submits a medical HNR stating a clinical symptom is seen and evaluated by a nurse within 48 hours, and all mental health HNRs stating a clinical symptom are triaged face-to-face within 48 hours.

<u>Laboratory and Radiology Services</u>

106.    Defendants have not shown that lab tests and radiological studies consistently are timely performed after ordered by a provider.

107.    Defendants have not shown that the results of lab tests and radiological studies consistently are available for review and reviewed on a timely basis.

<u>Alcohol and Drug Withdrawal</u>

108.    Alcohol and benzodiazepine withdrawal can be life threatening.

109.    Withdrawal from opiates is a serious medical need that generally causes severe pain, which may be reduced by appropriate therapy.

110.    Both MCSO and CHS personnel are provided training regarding recognition of withdrawal symptoms and procedures for reporting pretrial detainees identified with withdrawal symptoms.

111.    MCSO is notified by CHS of a pretrial detainee's need for heightened monitoring via a notification form.

112.    Pretrial detainees identified during the receiving screening as being at risk for alcohol or drug withdrawal are ordered to have withdrawal assessments twice a day for seven days.   These assessments include a full set of vital signs and a symptom assessment completed by a registered nurse.

113.   In April 2013, a housing area at the Durango jail was designated for withdrawing pretrial detainees who require more intensive clinical service and monitoring.  Only male pretrial detainees who have general population classification can be housed in the withdrawal unit at the Durango jail.

114.   The infirmary contains 60 beds, some of which can be assigned to pretrial detainees undergoing severe withdrawal.

115.   Defendants state that pretrial detainees undergoing withdrawal who are not housed in the infirmary or the Durango withdrawal unit are monitored in the housing units to which they are assigned.

116.   In 2011, CHS implemented the Clinical Opiate Withdrawal Scale ("COWS") at the Durango jail to identify and assist pretrial detainees undergoing opiate withdrawal.  Pretrial detainees receive medication based on the results of the COWS assessments.

117.   Pretrial detainees undergoing alcohol or benzodiazepine withdrawal at the Durango jail receive medications based on their Clinical Institute of Withdrawal Assessments ("CIWA").   In 2013, CHS implemented the CIWA-b to better assess benzodiazepine withdrawal symptoms distinguished from the CIWA-ar scale used to assess alcohol withdrawal.

118.   CHS's COWS and CIWA protocols are not designed as a substitute for the clinical judgment of a physician and may be inadequate for pretrial detainees with complex multisystem illnesses.

119.   Pregnant opiate-addicted pretrial detainees receive methadone via a Drug Enforcement Agency ("DEA") waiver secondary to medical necessity of the unborn child.

120.   The federal government controls methadone licensing through a lengthy process that CHS began in 2011.  Although CHS has taken steps toward obtaining methadone licensing, it does not yet have the ability to treat opiate-dependent patients,

other than pregnant women, with methadone.  CHS intends to continue its efforts to obtain methadone licensing.

121.   Defendants have not shown that designating a housing area at the Durango jail and the availability of bed space in the infirmary have resulted in pretrial detainees in withdrawal who need more intensive clinical service and monitoring actually receiving it.

122.   Defendants have not shown that pretrial detainees in withdrawal who are not placed in the Durango withdrawal unit or the infirmary consistently receive adequate monitoring and treatment in their assigned housing units.

<u>Medical Examination Following Use of Force</u>

123.   MCSO Policy CP-1 regarding Use of Force applies to any deputy, detention officer, reserve deputy, or posse member who is engaged in the performance of law enforcement or detention duties for MCSO.

124.   Under MCSO Policy CP-1, before deciding whether to use force, officers must consider whether there is an immediate threat to the officer or others; a subject is resisting arrest or attempting to evade arrest by flight; the situation threatens the safety or security of a jail's operations; the situation is tense, uncertain, or rapidly evolving; and the crime is severe.

125.   MCSO Policy CP-1 requires that an officer's decision to use force or control be based on the totality of the circumstances known to the officer at the time of the incident, his training, and the subject's actions.  Considerations include the type of resistance used by the subject.

126.   MCSO Policy CP-1 defines the actions an officer may use in an attempt to control a subject:  (a) the officer's presence and identification of the officer's authority; (b) verbal direction; (c) soft, empty-hand control ("techniques that have minimal chance of causing injury, such as escort position, handcuffing, and leg cuffs"); (d) hard, empty-hand control ("techniques that have a probability of causing injury such as closed fist strikes, palm-heel strikes, kicks, and knee strikes"); (e) intermediate weapons and control

("force that has a probability of causing injury, but is unlikely to result in death, when properly used"); (f) deadly force ("force that is likely to cause death or serious physical injury").

127.   MCSO Policy CP-1 states:   "Officers should determine whether an individual has sustained any injury as a result of the use of force or control.  Appropriate medical treatment should be obtained when necessary."

128.   MCSO Policy CP-1 leaves to the discretion of detention officers whether to request a medical examination for a pretrial detainee on whom force has been used.

129.   Following a use-of-force incident, if detention officers recognize that a pretrial detainee has an injury, they take the pretrial detainee to medical staff unless the pretrial detainee refuses and signs a medical refusal form.  The officers' perception of an injury is to be recorded in the operations manual and in the separate, written use-of-force report.

130.   In addition, following a use-of-force incident, a pretrial detainee may submit a medical and/or mental health Health Needs Request.

131.   The unwritten practice is that an MCSO supervisor responds to every use of force incident and the involved officer is moved away from the location of the incident.

132.   Every month a committee that includes the commanders of all Jail facilities meets to review all use-of-force reports to determine whether procedures are being followed and, if not, what additional training is needed.

133.   On this record, MCSO's use-of-force policy and practices do not deny pretrial detainees ready access to adequate medical, dental, or mental health care as required by Paragraph 3 of the Third Amended Judgment.

<u>Copayment Policy</u>

134.   MCSO Policy DQ-1 states that inmates may be charged a copayment for each non-emergency medical service (including dental and mental health care) requested by an inmate and provided by CHS and a copayment for each prescription that is written.

- 42 -

135.   Under the heading "Non-Emergency Medical Treatment," MCSO Policy DQ-1 states:  "All inmates will receive the same level of healthcare, regardless of their ability to pay."

136.   A.R.S. § 31-161 permits MCSO to charge a reasonable fee or copayment of not more than ten dollars for each inmate-initiated health service that is provided; for each medical visit to a physician that is referred by a physician, physician assistant, or nurse practitioner; or for prescription drugs that CHA dispenses to an inmate.  The statute provides, "An inmate shall not be refused health services for financial reasons."

137.   CHS Policy J-A-01 regarding access to care states that CHS schedules a health care visit for any inmate who requests health care without regard for ability to pay.

138.   The CHS list of copayment charges, effective July 1, 2013, set the amount of copayment at $5.00 for nursing assessments and general health medications (each medication and each refill).  It set the amount at $10.00 for seeing a medical doctor, nurse practitioner, physician assistant, dentist, and specialty provider.  It also set the amount at $10.00 for admission to a hospital, the infirmary, or the MHU.  Although the list of charges does not say copayment will be charged only on inmate-initiated services, it does say that no one will be denied care based on their ability to pay for services and that the copayment will occur "if you have money in your inmate fund account."

139.   The MCSO Inmate Rules and Regulations, which are provided in English and Spanish to inmates at booking, state:  "There is no charge for care that the medical staff or mental health services staff initiates."

140.   The MCSO Inmate Rules and Regulations also state:  "You **WILL NOT BE REFUSED** health care services because you are indigent.  The medical staff has no knowledge of your account balance."

141.   The MCSO Inmate Rules and Regulations also inform inmates that, if a copayment is charged, it will be deducted from the inmate's Inmate Fund Account.  If an inmate's account does not have sufficient funds to cover the copayment, a record of

balance due will be kept, and the amount owed will be deducted when money is deposited into the account.

142.   Inmates may purchase food from the Canteen, which is in addition to meals provided for all inmates.  Canteen charges are paid from Inmate Fund Accounts.  The MCSO Inmate Rules and Regulations caution inmates that when ordering from the Canteen, they should keep in mind that any health care copayments will be deducted from their Inmate Fund Accounts.

143.   If a pretrial detainee has money in his Inmate Fund Account, he may be charged a copayment for non-emergency medical, dental, and mental health services and for prescription medications that he requests, which may reduce the amount that he can spend at the Canteen.

144.   If a pretrial detainee does not have money in his Inmate Fund Account, he will not be denied non-emergency medical, dental, and mental health services and prescriptions.

145.   If a pretrial detainee who has money in his Inmate Fund Account avoids seeking non-emergency medical, dental, and mental health services and prescriptions because he prefers to spend money at the Canteen, he may do so, just as he is able to do outside of the Maricopa County Jail.

146.   Most of pretrial detainees' serious medical, dental, and mental health conditions that are likely to cause serious illness and needless suffering should be identified during the receiving screening or initial health assessment.  Therefore, most of the constitutionally required medical and mental health services should be initiated by CHS staff, not by pretrial detainees.

147.   On this record, the MCSO/CHS copayment policies and practice do not deny pretrial detainees ready access to adequate medical, dental, or mental health care as required by Paragraph 3 of the Third Amended Judgment.

Mental Health Care:  Access to Adequate Care

148.   CHS employs different levels of mental health staff at the Jail.  Mental health professionals are licensed professional counselors or licensed social workers. They review and triage mental health Health Needs Requests submitted by inmates and referrals made by detention staff and medical providers.  They also perform mental health assessments, specialized treatment planning, re-entry planning, and individual and group counseling.  Mental health associates work under the supervision of a mental health professional and primarily perform functions related to re-entry planning.  Psychologists provide services for pretrial detainees with more complex needs, but do not prescribe medications.

149.   Psychiatrists are physicians with an M.D. or D.O. degree, who provide psychiatric evaluations and prescribe psychiatric medications.  CHS nurse practitioners and physician assistants provide the same functions.

150.   Mental health office assistants obtain inmates' records and prescription verifications from outside the Jail and assist in scheduling appointments for inmates.

151.   The term "mental health provider" refers to a psychiatrist, psychologist, psychiatric physician assistant, or a psychiatric nurse practitioner.

152.   Defendants state that pretrial detainees who submit a mental health Health Needs Request stating clinical symptoms are assessed face-to-face by mental health staff within 48 hours.

153.   The Maricopa County Jail provides multiple types of mental health care for pretrial detainees housed in general population units, segregation or close custody units, the infirmary, and the Mental Health Unit at the Lower Buckeye jail.

154.   Defendants have created areas in each jail facility in which mental health appointments can be conducted with sound privacy.

155.   Medication management, individual therapy, group therapy, cognitive restructuring group, release planning group, and other forms of psychosocial treatment

are provided through outpatient clinics for pretrial detainees placed in general population housing.

156.    Pretrial detainees who are classified as close custody, administrative segregation, disciplinary segregation, or Special Management Unit do not have access to all of the mental health treatment programs available to those in the general population. However, they may receive psychiatric prescription medication, psychiatric medication management by a psychiatrist, and individual psychological counseling, and they may participate in programs that involve handouts and worksheets, such as for substance abuse or personal growth.

157.    When mental health providers are in the segregated housing units, they provide care in the anteroom of the cells, which provides sound privacy, but not visual privacy.  The providers are given an MCSO radio to ensure that the detention staff can be contacted when needed, but detention staff does not remain within earshot of the treatment.

158.    The most seriously mentally ill inmates and those determined to be at risk of harming themselves or others are housed in the Mental Health Unit at the Lower Buckeye jail.

159.    All of the cells in the Mental Health Unit are single cells.

160.    The Mental Health Unit is not a licensed inpatient psychiatric hospital.

161.    Pretrial detainees who need inpatient psychiatric care may be placed in the Mental Health Unit while CHS staff attempts to get them admitted to the state psychiatric hospital.  Although Defendants cannot control whether pretrial detainees who need inpatient psychiatric care will be admitted to the state psychiatric hospital, Defendants are responsible for identifying those detainees and making reasonable efforts to obtain their admission to the state psychiatric hospital.

162.    The Mental Health Unit includes subunits for different levels of care, including acute, sub-acute, and stepdown treatment subunits.  A stepdown placement is

interim housing where treatment can continue until the inmate is sufficiently stable to move to general population housing.

163. Group programs are provided in the treatment subunits of the Mental Health Unit.

164. Some pretrial detainees are transferred directly from an acute unit to general population housing without transition placement within the Mental Health Unit, they are not stable enough to remain in general population housing, and they are transferred back to the Mental Health Unit.

165. CHS requires that pretrial detainees transferred out of the Mental Health Unit be seen by a mental health provider within 24–48 hours after the transfer.

166. One subunit of the Mental Health Unit houses inmates classified at a security level greater than general population regardless of their level of acuity.

167. In May and June 2010, therapeutic cubicle spaces were built in two subunits of the Mental Health Unit in which mental health providers can conduct group therapy sessions with high security or mixed classification pretrial detainees.

168. Evaluating a pretrial detainee's mental health condition, developing or modifying the pretrial detainee's treatment plan, and deciding when a pretrial detainee should be placed in or discharged from a specific facility to obtain appropriate mental health care must be performed by a mental health provider after the provider has assessed the pretrial detainee face-to-face in space that at least provides sound privacy.

169. Many pretrial detainees with serious mental health needs do not remain in the Jail long enough to receive a full psychiatric evaluation, but every pretrial detainee with a mental health condition identified as urgent by detention, intake, medical, or mental health staff can and must be seen face-to-face by a mental health provider within 24 hours of identification.

170. Although there are criteria for placement in each level of mental health care, including subunits within the Mental Health Unit, Defendants have not shown that

the placement criteria are clearly articulated in writing and consistently and timely applied.

171. Defendants have not shown that a mental health provider determines the placement of each pretrial detainee needing mental health care after the provider has performed a face-to-face assessment, especially for admission into and discharge from the Mental Health Unit.

172. Defendants have not shown that pretrial detainees placed in acute units of the Mental Health Unit are provided sufficient opportunity to become clinically stable in stepdown treatment units before they are transferred out of the Mental Health Unit.

173. Defendants have not shown that pretrial detainees transferred out of the Mental Health Unit are assessed by a mental health professional or provider within 24–48 hours after the transfer.

174. Defendants have not shown that a mental health provider timely assesses face-to-face each pretrial detainee with a mental health condition identified as urgent by detention, intake, medical, or mental health staff.

175. Defendants have not shown that pretrial detainees who submit mental health Health Needs Requests stating clinical symptoms are assessed face-to-face by mental health staff within 48 hours.

<u>Mental Health Care:  Segregation/Isolation</u>

176. Many pretrial detainees in the Maricopa County Jail are housed in single cells with limited or no time outside of their cell and limited or no interaction with other people during a 24-hour day.

177. The longer a pretrial detainee with mental illness is in isolation, the greater the risk the pretrial detainee's mental condition will deteriorate.

178. The record does not show how many pretrial detainees are placed in segregated confinement for specific lengths of time or how many of those have or possibly have serious mental illness.

179.    Mental health staff is not consulted before a pretrial detainee identified as having serious mental health needs is classified by detention staff as close custody or administrative segregation.

180.    Weekly mental health rounds in segregation are conducted for pretrial detainees identified as having serious mental health needs to identify adverse effects of segregation on their mental health status.  The record does not show how often pretrial detainees identified as having serious mental illness and placed in segregation actually are assessed by a mental health professional and seen face-to-face by a mental health provider.

181.    Some pretrial detainees do not manifest symptoms of serious mental illness until after placement in segregated confinement.

182.    Pretrial detainees placed in segregated confinement are not provided mental health assessments if they have not been identified as seriously mentally ill, but they may submit mental health HNRs and/or detention staff may refer them for mental health care.

183.    In the Mental Health Unit, pretrial detainees confined to an intake, acute, or suicide watch subunit remain in their cells 24 hours a day, except when taken out for a health care assessment or treatment.  Pretrial detainees in sub-acute units are offered recreation and use of a dayroom alone for one hour daily.  Pretrial detainees in a close custody subunit are permitted no contact with other inmates and are moved from cells only in leg restraints and handcuffs, escorted by two officers.  In the stepdown treatment subunits, pretrial detainees are allowed out of their cells for seven hours a day and can have contact with other inmates.

184.    Defendants have not shown that pretrial detainees are timely transferred from more restrictive to less restrictive subunits of the Mental Health Unit when their mental health condition permits.

185.   Face-to-face communication with mental health staff at least twice per week would mitigate the risks of isolation inherent in segregated confinement for pretrial detainees with serious mental illness.

186.   Defendants have not shown that seriously mentally ill pretrial detainees who are confined to single cells for 22 or more hours a day have face-to-face communication with mental health staff at least twice per week.

187.   Defendants have not shown that mental health staff is consulted before a pretrial detainee identified as being seriously mentally ill is placed in any type of segregated confinement.

Mental Health Care:  Involuntary Treatment/Use of Force

188.   Involuntary treatment includes the use of restraints, the use of seclusion, and forced medication, which can place pretrial detainees at substantial risk of serious harm.

189.   Mental health staff have specialized training that makes them especially equipped to de-escalate a potential confrontation with detention staff and avoid the need for use of force or involuntary treatment.

190.   Some use of force incidents arise because of a mental health order and can be avoided by the provider modifying the order.

191.   Defendants have not shown that a mental health provider or professional is consulted before each planned involuntary treatment or use of force on a seriously mentally ill pretrial detainee.

192.   Defendants have not shown that mental health staff is involved in the implementation of any planned involuntary treatment or use of force on a seriously mentally ill pretrial detainee.

Mental Health Care:  Discipline

193.   Seriously mentally ill pretrial detainees should not be disciplined for behavior resulting from mental illness without the approval of a mental health provider.

194.    Seriously mentally ill pretrial detainees should not be placed in isolation as a disciplinary sanction.

195.    The fact that a pretrial detainee has not been designated Seriously Mentally Ill by the county public mental health provider does not mean the pretrial detainee does not have serious mental illness.

196.    Defendants do not have a written policy regarding the use of discipline for behavior resulting from serious mental illness.

197.    Defendants do not have a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against pretrial detainees with serious mental illness.

198.    Defendants do not require that mental health staff be consulted regarding discipline of a pretrial detainee identified as having serious mental illness.

<u>Mental Health Care:  Suicide Prevention</u>

199.    Five inmates housed in the Maricopa County Jail died from suicide each year in 2009, 2010, and 2011.  In 2012, there were no deaths by suicide in the Jail.  In the first eight months of 2013, two inmates died from suicide.

200.    The receiving screening performed by a registered nurse at intake includes questions regarding whether the inmate is suicidal, has ever attempted suicide in the past, or has a family history of suicide, and includes questions to follow any positive responses.  It includes asking the arresting officer whether the individual appears to be at risk to self or others and documenting the registered nurse's observations.

201.    If an inmate indicates that he attempted suicide within the past year, receiving screening procedures require that mental health staff see him while he is in the intake center.

202.    If an inmate indicates that he has attempted suicide, but not within the past year, receiving screening procedures require the registered nurse to schedule a follow-up

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

appointment in an outpatient clinic within 24 hours unless mental health staff can see him while he is in the intake center.

203.    Mental health staff decides whether an inmate should be placed in a safe cell.

204.    Defendants have not shown that mental health staff consistently assesses each pretrial detainee discharged from a safe cell within 24 hours of discharge.

205.    MCSO Policy DA-5 states that certain signs and symptoms can often foretell a possible suicide attempt and directs detention officers to err on the side of caution by alerting CHS staff immediately if they have any doubt about whether an inmate is suicidal.

206.    MCSO Policy DA-5 states that most suicides occur within the first 48 hours of incarceration.

207.    MCSO Policy DA-5 also states:  "Isolation greatly increases the likelihood of suicide; therefore, a potentially suicidal inmate shall never be placed into isolation unless the inmate is constantly supervised."

208.    MCSO Policy DA-5 provides:  "If officers have a reason to believe that an inmate may be suicidal, they shall take immediate action which includes, but is not limited to" reporting any signs or symptoms immediately to CHS staff, removing the inmate's clothing and placing the inmate in a suicide-resistant blanket or smock, and placing the inmate into a suicide-resistant cell or safe cell with "direct, continuous observation until a treatment plan is determined by medical staff."

209.    MCSO Policy DA-5 requires that all jail personnel who interact with inmates be trained regarding understanding, identifying, and managing suicidal inmates. It further requires that personnel involved in making decisions about the initiation of a suicide watch complete more specialized training provided by a licensed mental health professional using curriculum approved by CHS.

210.    Defendants have not shown that they comply with MCSO Policy DA-5's requirements that a potentially suicidal inmate never be placed into isolation unless the inmate is constantly supervised and that a potentially suicidal inmate is placed into a suicide-resistant cell or safe cell only with "direct, continuous observation until a treatment plan is determined by medical staff."

Mental Health Care:  Specialized Training for Detention Officers

211.    Defendants provide training for detention officers related to mental illness and suicide prevention.  The training provides general awareness of these subjects, but does not—and should not—train detention officers to substitute for mental health staff.

212.    Detention officers perform an important role in identifying pretrial detainees who are at risk and referring them to mental health staff for prompt assessment.

213.    Detention officers perform a critical role in maintaining institutional security and protecting the safety of pretrial detainees and others, especially during planned and unplanned uses of force, suicide prevention, and disciplinary actions.

214.    Whenever policies or procedures regarding planned and unplanned uses of force, suicide prevention, disciplinary actions, and communications between MCSO and CHS staff regarding pretrial detainees with mental illness are adopted or amended, Defendants must continue to train both MCSO and CHS staff to implement them.

Ready Access to Needed Medical and Mental Health Care

215.    Defendants have not proven compliance with Paragraph 3 of the Third Amended Judgment as of August 9, 2013.

216.    The prospective relief ordered in Paragraph 3 of the Third Amended Judgment remains necessary to correct a current and ongoing violation of the federal right, extends no further than necessary to correct the violation of the federal right, and is narrowly drawn and the least intrusive means to correct the violation.

**E.    Prescription Medications Without Interruption**

217.    Paragraph 4 of the Third Amended Judgment provides:

Defendants shall ensure that the pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff.

218. The CHS intake process requires all inmates taking prescription medications to be seen by a registered nurse, and medication verification to be initiated.

219. Defendants attribute some past delay in medication verification to not having a mental health office assistant on weekends, but now weekend staffing has been added for the purpose of obtaining inmate medical and mental health records.

220. During the intake process, some inmates do not report they have been prescribed medications, some report medications they have not been taking recently, and some cannot identify a pharmacy or provider who can verify their prescriptions. Some pharmacies and providers do not respond promptly to prescription verification requests.

221. In some cases, medications have not been timely ordered at intake, and medications have been discontinued at intake without documenting a reason for doing so.

222. The new health screening process may have increased the likelihood that medications are provided without interruption unless clinically justified, but Defendants have not produced evidence of that yet.

223. The newly implemented Electronic Health Records system likely has or will result in more information being documented in pretrial detainees' health records, but Defendants have not produced evidence of that yet.

224. Pretrial detainees' health records should show timely administration of prescription medications or reasonably diligent efforts to administer all medications prescribed. If a medication is not administered as prescribed, a detainee's health record should show whether the detainee signed a written refusal form, affirmatively refused verbally or nonverbally, did not appear for medication administration without explanation, or did not appear for medication for known reasons, such as a court appearance.

- 54 -

225.   Even when prescriptions have been verified, there may be clinical reasons for a medical or mental health provider to modify or discontinue a pretrial detainee's previous prescription.   Pretrial detainees' records should include the provider's clinical reasons for each prescription modification and discontinuance.

226.   Psychotropic medications should not be prescribed, altered, renewed, or discontinued without a face-to-face examination by a mental health provider in an area that affords sound privacy.

227.   CHS requires quarterly audits of placement of inmates on psychotropic medications and timely renewal of medications, but Defendants have not shown that psychotropic medications are administered without interruption.

228.   CHS conducted a psychotropic medication audit for a sample of 81 inmates who were booked in July 2013, admitted to taking psychotropic medications, and remained in the Jail for at least 7 days.  Of the 81 inmates in the sample, 66 (81%) had medication verification initiated, 54 (67%) had the medication verification completed, 52 (64%) received a psychiatric evaluation, and the average number of days from booking to psychiatric evaluation for the 52 who received a psychiatric evaluation was 4.8.  Of the 49 inmates for whom medication was ordered, 45 received a psychiatric evaluation.  Of the 32 health records of the inmates for whom medication was not ordered, 8 contained rationale for not ordering medication and 24 did not.

229.   Defendants have not proven compliance with Paragraph 4 of the Third Amended Judgment as of August 9, 2013.

230.   The prospective relief ordered in Paragraph 4 of the Third Amended Judgment remains necessary to correct a current and ongoing violation of the federal right, extends no further than necessary to correct the violation of the federal right, and is narrowly drawn and the least intrusive means to correct the violation.

**F.      Electronic Records Management**

231.    As of August 2013, CHS used its electronic Jail Management System to manage medical records, track inmate locations for pretrial detainees with medical needs, and produce reports necessary for health care staff and detention officers to provide access to adequate health care until the permanent Electronic Health Records system was fully implemented.

232.    The Jail Management System included urgency codes to triage inmates and electronically schedule appointments.   It generated a daily schedule to manage and prioritize appointments.

233.    The Electronic Health Records system includes the expanded electronic integrated health screen that identifies serious conditions and veterans, which was implemented at the 4th Avenue intake center on August 5, 2013.

234.    The Electronic Health Records system tracks HNRs, including date of submission, date triaged, and date the inmate was seen.

235.    In 2013 CHS purchased 80 laptop computers that nursing staff can use with the Electronic Health Records system during medication passes so that medication administration can be tracked in real-time.

236.    In August 2013, CHS completed its wireless network.

237.    In September 2013, the Electronic Health Records system was fully implemented in all Jail facilities.

238.    An electronic health records system is not itself constitutionally required, but managing the health records, housing locations, HNRs, prescriptions, appointment scheduling, and necessary follow up for thousands of pretrial detainees to ensure ready access to health care and continuity of medications likely would be impossible without one.

239.    Remedies that will be ordered require Defendants to collect and summarize data showing they have implemented certain policies and procedures.  Defendants may, but are not required to, obtain the data from the Electronic Health Records system.

**G.     Remedies**

240.    Defendants have had adequate opportunity to propose remedies for current and ongoing Jail policies and practices that Plaintiffs contend violate constitutional requirements, respond to Plaintiffs' proposed remedies for those constitutional violations, and show whether any of the challenged Jail policies and practices are reasonably related to legitimate governmental objectives, such as Jail security and the safety of inmates or staff.  Defendants had those opportunities for nearly five years before they filed this Motion to Terminate.

241.    Having found constitutional violations, the Court may not allow constitutional violations to continue merely because remedies intrude into functions of prison administration, and Defendants' history of noncompliance with prior orders justifies greater court involvement than usually permitted.

242.    Having found constitutional violations, the Court will order remedies that do not exactly track constitutional standards but that are practical measures necessary to correct constitutional violations.

243.    For each constitutional violation found, Defendants will be ordered to (1) adopt new policies or amend existing policies within 60 days as specifically ordered, (2) implement the new or amended policies within 150 days, (3) collect and summarize compliance and results/outcome data for a period of 180 days after implementation of the new or amended policies, and (4) report to the Court and to Plaintiffs documentation of their completion of each of the three preceding requirements within 15 days after each deadline.

244.    If Defendants comply with this Order and its deadlines, within one year they will demonstrate that prospective relief no longer remains necessary to correct any

current and ongoing violation of Plaintiffs' constitutional rights, and Court-ordered relief may be terminated before the PLRA permits another motion to terminate.   18 U.S.C. § 3626(b)(1).

### H.    Fourth Amended Judgment to Be Entered

245.    Based on the foregoing findings of fact and conclusions of law, Defendants' motion to terminate the Third Amended Judgment will be denied, and additional prospective relief will be ordered to remedy ongoing constitutional violations. The Court will enter by separate document a Fourth Amended Judgment that restates the Third Amended Judgment and adds the specific relief required by this Order.

### I.    Attorney Fees

246.    Pursuant to 42 U.S.C. § 1988(b) for the award of attorney fees, Plaintiffs are the prevailing party on Defendants' Motion to Terminate Third Amended Judgment on Behalf of Correctional Health Services (Doc. 2142).

247.    Subject to the limitations of 42 U.S.C. § 1997e(d), Plaintiffs are entitled to award of attorney fees incurred in defending against the Motion to Terminate.  Fees may be claimed under the procedures in Fed. R. Civ. P. 54(d)(2) and LRCiv 54.2 upon entry of this Order.  If enforcement proceedings become necessary, future fees may be claimed and will be determined and awarded at appropriate intervals during the enforcement proceedings.

## V.    ORDER

Based on the foregoing findings of fact and conclusions of law,

IT IS ORDERED that Defendants Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson and Mary Rose Wilcox's Motion to Terminate Third Amended Judgment on Behalf of Correctional Health Services (Doc. 2142) is denied.

IT IS FURTHER ORDERED:

1.      By **December 1, 2014**, Defendants will adopt policies and procedures or amend existing policies and procedures to require the following:

- 58 -

a.   A registered nurse will perform the receiving screening for each pretrial detainee processed in the 4th Avenue jail intake center.

b.   If the receiving screening indicates a pretrial detainee is suffering from a serious acute or chronic health condition, a physician, physician assistant, or nurse practitioner will conduct a face-to-face examination of the pretrial detainee within 24 hours after the receiving screening.

c.   If the receiving screening indicates a pretrial detainee has symptoms of tuberculosis, the pretrial detainee immediately will be placed in an Airborne Infection Isolation Room and evaluated promptly for tuberculosis.

d.   If the receiving screening indicates a pretrial detainee is known to have HIV infection or is at risk for HIV infection with unknown status, a chest x-ray of the pretrial detainee will be performed and the results reviewed by a physician, physician assistant, or nurse practitioner before the pretrial detainee is placed in a housing unit.

e.   If a pretrial detainee has a positive mental health screening or does not respond to all of the mental health screening questions, the detainee will be assessed by mental health staff while the pretrial detainee is in the intake center.  The mental health staff will identify the urgency with which the pretrial detainee must be seen by a mental health provider, *i.e.*, a psychiatrist, psychiatric nurse practitioner, or physician assistant.

f.   If the receiving screening indicates a pretrial detainee is at risk for suicide, a psychiatrist, psychiatric nurse practitioner, or physician assistant will conduct a face-to-face assessment of the pretrial detainee within 24 hours after the receiving screening.

g.   Pretrial detainees will be tested for tuberculosis within 14 days after the receiving screening unless they have been tested with negative results within the past year.

h.   Pretrial detainees with serious acute and chronic medical conditions will be evaluated face-to-face by a medical provider and will receive an initial health assessment within 24 hours after the receiving screening.

i.   A medical provider will develop plans for treatment and monitoring for pretrial detainees with serious medical conditions.

j.   All medical Health Needs Requests will be triaged within 24 hours of their submission.

k.   Each pretrial detainee who submits a medical Health Needs Request stating or indicating a clinical symptom will be seen by a nurse within 48 hours of submitting the Health Needs Request.

l.   When a physician, physician assistant, or nurse practitioner orders a lab test or radiological study, the physician, physician assistant, or nurse practitioner will identify the urgency with which the test or study must be performed, *e.g.*, within 24 hours, 72 hours, or 7–10 days, and the urgency with which the results of the test or study must be returned.   The test or study will be performed within the timeframe ordered by a physician, physician assistant, or nurse practitioner.

m.   Pretrial detainees identified during the receiving screening as being at risk of serious harm from alcohol or drug withdrawal will be assessed by a registered nurse twice a day for at least seven days regardless of whether they are assigned to a housing unit designated for withdrawing inmates or their classification status.   The nurse will

- 60 -

document each assessment and identify the urgency with which the pretrial detainee should be seen by a physician, physician assistant, or nurse practitioner.  If a pretrial detainee is not seen face-to-face by a physician, physician assistant, or nurse practitioner within the timeframe recommended by the nurse, the reason will be documented in the pretrial detainee's medical record.

n.      All mental health Health Needs Requests stating or indicating a clinical symptom will be triaged face-to-face within 48 hours of their submission.

o.      Pretrial detainees with a mental health condition identified as urgent by detention, intake, medical, or mental health staff will be seen face-to-face by a mental health provider within 24 hours of the identification.

p.      Mental health providers will assess pretrial detainees in an area outside of their cells that affords sound privacy except when there are legitimate safety, security, and treatment reasons for not doing so.

q.      Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit.

r.      A mental health provider will determine the placement of each seriously mentally ill pretrial detainee after performing a face-to-face assessment, including upon admission into, transfer within, and discharge from the Mental Health Unit.

s.      Pretrial detainees discharged from the Mental Health Unit will be assessed by mental health staff within 48 hours after discharge.

t.   MCSO will consult with CHS mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement.

u.   Seriously mentally ill pretrial detainees who are confined to single cells for 22 or more hours a day will have face-to-face communication with mental health staff at least twice per week.

v.   A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.

w.   Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.

x.   Defendants will adopt and implement a written policy regarding the use of discipline for behavior resulting from serious mental illness.

y.   Defendants will adopt and implement a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against seriously mentally ill pretrial detainees.

z.   Defendants will adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee.

aa.   A potentially suicidal pretrial detainee will not be placed in isolation without constant supervision.

bb.   A potentially suicidal pretrial detainee will be placed into a suicide-resistant cell or safe cell only with "direct, continuous observation until a treatment plan is determined by medical staff."

cc.     When a pretrial detainee is discharged from suicide watch or a safe cell, the pretrial detainee will be assessed by mental health staff within 24 hours of discharge.

dd.     Defendants will document in pretrial detainees' health records evidence of timely administration of prescription medications or reasonably diligent efforts to administer all medications prescribed and explanation for any delay.

ee.     A pretrial detainee's psychotropic medications will not be prescribed, altered, renewed, or discontinued without a face-to-face examination by a psychiatrist, psychiatric physician assistant, or psychiatric nurse practitioner in an area that affords sound privacy.

2.     By **December 16, 2014**, Defendants will file with the Court a copy of each policy adopted or amended to comply with this Order and identify the specific policy provisions that demonstrate compliance.

3.     By **February 27, 2015**, Defendants will fully implement each of the policies ordered herein, including hiring additional staff, providing training, and making facility modifications, as needed.

4.     By **March 16, 2015**, Defendants will file with the Court a summary of actions taken to implement each of the policies.

5.     Beginning **March 2, 2015**, Defendants will collect and summarize data for a period of 180 days that shows the extent to which Defendants are complying with this Order.

6.     On **September 15, 2015**, Defendants will file with the Court a report of the data collected and summarized in compliance with this Order.

IT IS FURTHER ORDERED that, for the convenience of the parties, those provisions of the Third Amended Judgment that remain in effect and the additional

prospective relief granted by this Order are restated in the Fourth Amended Judgment entered this day.

Dated this 30th day of September, 2014.

_____
Neil V. Wake
United States District Judge