**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails,

Plaintiffs,

v.

Paul Penzone, Sheriff of Maricopa County; Bill Gates, Steve Gallardo, Denny Barney, Steve Chucri, and Clint L. Hickman, Maricopa County Supervisors,

Defendants.

No. CV-77-00479-PHX-NVW

**ORDER**

TABLE OF CONTENTS

I.      Prison Litigation Reform Act........................................................................ 1

II.     Background ................................................................................................... 2

III.    Plaintiffs' Motion for Evidentiary Hearing (Doc. 2380) ........................... 14

IV.     Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment (Doc. 2373) 16

        A. 2014 Findings, Conclusions, and Orders............................................. 19

        B. 2015 Evidence ..................................................................................... 27

V.      Compliance with the Revised Fourth Amended Judgment........................ 34

        A. Subparagraph 5(a)(1):  A registered nurse will perform the receiving screening for each pretrial detainee processed in the 4th Avenue jail intake center. .......... 36

        B. Subparagraph 5(a)(2):  If the receiving screening indicates a pretrial detainee is suffering from a serious acute or chronic health condition, a physician,

physician assistant, or nurse practitioner will conduct a face-to-face examination of the pretrial detainee within 24 hours after the receiving screening.................................................................................................... 36

C.  Subparagraph 5(a)(3):  If the receiving screening indicates a pretrial detainee has symptoms of tuberculosis, the pretrial detainee immediately will be placed in an Airborne Infection Isolation Room and evaluated promptly for tuberculosis....................................................................................................... 37

D.  Subparagraph 5(a)(4):  If the receiving screening indicates a pretrial detainee is known to have HIV infection or is at risk for HIV infection with unknown status, a chest x-ray of the pretrial detainee will be performed and the results reviewed by a physician, physician assistant, or nurse practitioner before the pretrial detainee is placed in a housing unit. ...................................................... 38

E.  Subparagraph 5(a)(5):  If a pretrial detainee has a positive mental health screening or does not respond to all of the mental health screening questions, the detainee will be assessed by mental health staff while the pretrial detainee is in the intake center.  The mental health staff will identify the urgency with which the pretrial detainee must be seen by a mental health provider, *i.e.*, a psychiatrist, psychiatric nurse practitioner, or physician assistant...................... 39

F.  Subparagraph 5(a)(6):  If the receiving screening indicates a pretrial detainee is at risk for suicide, a psychiatrist, psychiatric nurse practitioner, or physician assistant will conduct a face-to-face assessment of the pretrial detainee within 24 hours after the receiving screening................................................................. 40

G.  Subparagraph 5(a)(7):  Pretrial detainees will be tested for tuberculosis within 14 days after the receiving screening unless they have been tested with negative results within the past year................................................................. 41

H.  Subparagraph 5(a)(8):   Pretrial detainees with serious acute and chronic medical conditions will be evaluated face-to-face by a medical provider and will receive an initial health assessment within 24 hours after the receiving screening........................................................................................................ 42

I.  Subparagraph 5(a)(9):  A medical provider will develop plans for treatment and monitoring for pretrial detainees with serious medical conditions. ............ 43

J.  Subparagraph 5(a)(10):  All medical Health Needs Requests will be triaged within 24 hours of their submission. ................................................................... 44

K.  Subparagraph 5(a)(11):  Each pretrial detainee who submits a medical Health Needs Request stating or indicating a clinical symptom will be seen by a nurse within 48 hours of submitting the Health Needs Request.................................... 44

L.  Subparagraph 5(a)(12):   When a physician, physician assistant, or nurse practitioner orders a lab test or radiological study, the physician, physician assistant, or nurse practitioner will identify the urgency with which the test or

study must be performed, *e.g.*, within 24 hours, 72 hours, or 7–10 days, and the urgency with which the results of the test or study must be returned.  The test or study will be performed within the timeframe ordered by a physician, physician assistant, or nurse practitioner............................................................ 45

M. Subparagraph 5(a)(13):  Pretrial detainees identified during the receiving screening as being at risk of serious harm from alcohol or drug withdrawal will be assessed by a registered nurse twice a day for at least seven days regardless of whether they are assigned to a housing unit designated for withdrawing inmates or their classification status.  The nurse will document each assessment and identify the urgency with which the pretrial detainee should be seen by a physician, physician assistant, or nurse practitioner.  If a pretrial detainee is not seen face-to-face by a physician, physician assistant, or nurse practitioner within the timeframe recommended by the nurse, the reason will be documented in the pretrial detainee's medical record. ................................... 46

N. Subparagraph 5(a)(14):  All mental health Health Needs Requests stating or indicating a clinical symptom will be triaged face-to-face within 48 hours of their submission. ................................................................................................ 46

O. Subparagraph 5(a)(15):  Upon referral by detention, intake, medical, or mental health staff, pretrial detainees who display active symptoms of mental illness or otherwise demonstrate an emergent mental health need will be seen face-to-face by a mental health provider within 24 hours of the referral. ....................... 47

P. Subparagraph 5(a)(16):  Mental health providers will assess pretrial detainees in an area outside of their cells that affords sound privacy except when there are legitimate safety, security, and treatment reasons for not doing so. ............. 49

Q. Subparagraph 5(a)(17):  Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit. ............................................................... 51

R. Subparagraph 5(a)(18):  A mental health provider will determine the placement of each seriously mentally ill pretrial detainee after performing a face-to-face assessment, including upon admission into, transfer within, and discharge from the Mental Health Unit. ...................................................................................... 52

S. Subparagraph 5(a)(19):  Pretrial detainees discharged from the Mental Health Unit will be assessed by mental health staff within 48 hours after discharge..... 54

T. Subparagraph 5(a)(20):  MCSO will consult with CHS mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement. ...................................................................................... 54

U. Subparagraph 5(a)(21):  Seriously mentally ill pretrial detainees who are confined to single cells for 22 or more hours a day will have face-to-face communication with mental health staff at least twice per week........................ 55

V. Subparagraph 5(a)(22):   A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee. ............................................................... 56

Subparagraph 5(a)(23):   Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee. ............................................................... 56

W. Subparagraph 5(a)(24):  Defendants will adopt and implement a written policy regarding the use of discipline for behavior resulting from serious mental illness. ................................................................................................................. 58

Subparagraph 5(a)(25):  Defendants will adopt and implement a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against seriously mentally ill pretrial detainees. ................................................. 58

Subparagraph 5(a)(26):  Defendants will adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee. ............................................................... 58

X. Subparagraph 5(a)(27):   A potentially suicidal pretrial detainee will not be placed in isolation without constant supervision................................................. 58

Y. Subparagraph 5(a)(28):   A potentially suicidal pretrial detainee will be placed into a suicide-resistant cell or safe cell only with "direct, continuous observation until a treatment plan is determined by medical staff."................... 59

Z. Subparagraph 5(a)(29):   When a pretrial detainee is discharged from suicide watch or a safe cell, the pretrial detainee will be assessed by mental health staff within 24 hours of discharge. ............................................................... 59

AA. Subparagraph 5(a)(30):   Defendants will document in pretrial detainees' health records evidence of timely administration of prescription medications or reasonably diligent efforts to administer all medications prescribed and explanation for any delay. ................................................................... 60

BB. Subparagraph 5(a)(31):  A pretrial detainee's psychotropic medications will not be prescribed, altered, renewed, or discontinued without a face-to-face examination by a psychiatrist, psychiatric physician assistant, or psychiatric nurse practitioner in an area that affords sound privacy. .................................... 61

Before the Court are the following:

(1) Defendants' Report of Data Collected and Summarized (Doc. 2333) regarding Defendants' compliance with Paragraph 5 of the Revised Fourth Amended Judgment, Defendants' supplemental report (Doc. 2336), Plaintiffs' response (Doc. 2372), and Defendants' reply (Doc. 2378);

(2) Plaintiffs' Motion to Enforce Fourth Amended Judgment and for Additional Relief (Doc. 2373), Defendants' response (Doc. 2376) and Plaintiffs' reply (Doc. 2379); and

(3) Plaintiffs' Motion for Evidentiary Hearing (Doc. 2380), Defendants' response (Doc. 2384), and Plaintiffs' reply (Doc. 2389).

Collectively, Defendants' compliance reports and Plaintiffs' motions dispute whether the Revised Fourth Amended Judgment should be terminated, whether additional prospective relief under the Prison Litigation Reform Act is required, and whether another evidentiary hearing is required to decide those issues.   On February 15, 2017, oral argument was heard regarding the pending motions and Defendants' proof of compliance with the Revised Fourth Amended Judgment.

## I.      PRISON LITIGATION REFORM ACT

Congress enacted the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 and 42 U.S.C. § 1997, to prevent federal courts from micromanaging prisons by consent decrees.  *Gilmore v. California*, 220 F.3d 987, 996 (9th Cir. 2000).  The PLRA requires that prospective relief regarding prison conditions "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1).  Relief must be narrowly drawn, extend no further than necessary to correct the violation, and be the least intrusive means necessary to correct the violation.  *Id.* Further, courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  *Id.*

A party seeking to terminate prospective relief under § 3626(b) bears the burden of proof.  *Gilmore*, 220 F.3d at 1007; *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir.

2010) (per curiam).  "Prospective relief shall not terminate if the court makes written findings based upon the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).  If prospective relief remains necessary to correct a current and ongoing violation, the district court's authority to modify the existing prospective relief includes authority to expand or diminish the existing relief.  *See Pierce v. Orange County*, 526 F.3d 1190, 1204 n.13 (9th Cir. 2008).

To make the findings required to terminate prospective relief, the Court must take evidence on current jail conditions, at least with respect to those conditions Plaintiffs do not concede comply with constitutional requirements.  *See Gilmore*, 220 F.3d at 1010.  Evidence of "current and ongoing" violations must reflect conditions "as of the time termination is sought."  *Id.*; *accord Pierce*, 526 F.3d at 1205.

## II. BACKGROUND

The issues presented for decision can be fully understood only in the context of this case's lengthy history, particularly the past eight years during which all parties have made substantial efforts to improve jail conditions with significant court involvement.  *See* David Marcus, *Finding the Civil Trial's Democratic Future After Its Demise*, 15 Nev. L.J. 1523, 1530–46 (2015).  Pretrial detainees held in the Maricopa County Jail brought this class action in 1977 against the Maricopa County Sheriff and the Maricopa County Board of Supervisors seeking injunctive relief for alleged violations of their civil rights.  On March 27, 1981, the parties entered into a consent decree that addressed and regulated aspects of the County jail operations as they applied to pretrial detainees.

On January 10, 1995, upon stipulation of the parties, the 1981 consent decree was superseded by the Amended Judgment.  The stipulated Amended Judgment expressly did not represent a judicial determination of any constitutionally mandated standards applicable to the Maricopa County Jail.  The 116-paragraph Amended Judgment included

specific requirements regarding population and housing limitations; dayroom access; access to reading materials; access to religious services; mail; telephone privileges; clothes and towels; sanitation, safety, hygiene, and toilet facilities; access to law library; medical, dental and psychiatric care; intake areas; mechanical restraints and segregation; recreation time outside; inmate classification; visitation; food; staff members, training, and screening; facilities for the handicapped; disciplinary policy and procedures; inmate grievance policy and procedures; reports and record keeping; and security override.

The Amended Judgment included the following provisions:

> 56.     Defendants shall provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population.  The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped.

> 57.     All pretrial detainees confined in the jails shall have access to medical services and facilities which conform to the standards designated as "essential" by the National Commission on Correctional Health Care ("NCCHC") Standards for Health Services in Jails, as amended from time to time.  When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

> . . . .

> 61.     Defendants shall ensure that the pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff.

(Doc. 705 at 12–13.)

In November 2003, Defendants renewed a prior motion to terminate the Amended Judgment, an evidentiary hearing was initiated, and the parties engaged in further discovery, but the motion was not decided.  On April 3, 2008, the case was assigned to

the undersigned judge.  On April 25, 2008, Defendants' motion to terminate the Amended Judgment was set for evidentiary hearing commencing August 12, 2008.

Although evidence of "current and ongoing" violations usually must reflect conditions as of the time termination is sought, Defendants had been seeking termination for nearly five years.  Therefore, it was necessary to determine the period for which evidence would be considered relevant to current conditions.  The Court initially ordered the parties to plan for discovery and trial regarding jail conditions during the period of July 1, 2007, through June 30, 2008.  Subsequently, upon request of the parties, the relevant evidentiary period for evaluating current conditions was reduced to July 1, 2007, through May 31, 2008, to facilitate providing information to expert witnesses before their tours and inspections of jail facilities.

In August and September 2008, a thirteen-day evidentiary hearing was held to decide whether prospective relief in the Amended Judgment should be continued, modified, or terminated.  On October 22, 2008, the Court made detailed findings of fact and conclusions of law and entered the Second Amended Judgment.  Certain provisions of the Amended Judgment were found to remain necessary to correct a current and ongoing violation of a federal right, to extend no further than necessary to correct the violation of the federal right, to be narrowly drawn, and to be the least intrusive means to correct the violation.  Other provisions were modified or vacated based on the evidence presented.  The provisions remaining in effect, as originally written or as modified, were restated in the Second Amended Judgment.

The sixteen-paragraph Second Amended Judgment included requirements for the number of detainees per cell, court holding cell capacities, maximum housing temperature for detainees who take prescribed psychotropic medications, provision of cleaning supplies, toilet and wash basin facilities in intake areas and court holding cells, length of stay in intake areas, outdoor recreation, nutrition, recordkeeping, and visual observation of intake areas, court holding cells, the Lower Buckeye jail psychiatric unit,

and segregation units.   Paragraph 6 of the Second Amended Judgment continued Paragraph 56 of the Amended Judgment, regarding receiving screenings, without modification.  Paragraph 8 of the Second Amended Judgment continued Paragraph 61 of the Amended Judgment, regarding continuity of prescription medications, without modification.

With respect to Paragraph 57 of the Amended Judgment, regarding access to medical services and facilities, the Court found that "pretrial detainees have a constitutional right to access to adequate health care, but there is no constitutional requirement that the adequacy of health care be defined by the NCCHC."  (Doc. 1634 at 43, ¶ 180.)  The Court further found:

> 182.   Paragraph 57 of the Amended Judgment does not exceed the constitutional minimum to the extent it requires Defendants to ensure pretrial detainees' ready access to care to meet their serious medical, dental, and mental health needs, which means that in a timely manner, a pretrial detainee can be seen by a clinician, receive a professional clinical judgment, and receive care that is ordered.
>
> . . . .
>
> 211.   Some of the seriously mentally ill pretrial detainees are housed in the psychiatric unit at the Lower Buckeye jail, and the most seriously mentally ill of those are housed in cells that do not permit psychiatrists and pretrial detainees to have visual contact while communicating or to have private therapeutic communications.  Mental health staff frequently provide cell-side treatment without privacy in other housing units as well.   In some cases, this detriment to therapeutic treatment is necessary to preserve the safety and security of staff and pretrial detainees; in some cases, it is not.
>
> 212.   Many of the pretrial detainees housed at the Lower Buckeye jail psychiatric unit need hospital level psychiatric care.
>
> 213.   The psychiatric unit at the Lower Buckeye jail does not provide hospital level psychiatric care.
>
> 214.   Many of the pretrial detainees housed at the Lower Buckeye jail psychiatric unit are maintained in segregation lockdown with little or no meaningful therapeutic treatment, which results in needless suffering and deterioration.

. . . .

216.    Regarding paragraph 57 of the Amended Judgment, Defendants do not ensure that pretrial detainees receive access to adequate medical and mental health care because Correctional Health Services does not provide timely in-person assessment of the urgency of their need for treatment, is not able to readily retrieve information from pretrial detainees' medical and mental health records and housing records, and does not identify and appropriately treat many pretrial detainees with serious mental illness.

(*Id.* at 43, 46–47.)  Therefore, Paragraph 57 of the Amended Judgment was renumbered as Paragraph 7 of the Second Amended Judgment and modified to state:

7.    All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs.  When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

(Doc. 1635 at 2–3.)

In addition to making detailed findings and entering the Second Amended Judgment on October 22, 2008, the Court ordered the parties to confer immediately regarding prompt compliance and to submit status reports.  A status conference was held on December 5, 2008.  On January 9, 2009, a hearing was held regarding Defendants' progress toward compliance with the nonmedical portions of the Second Amended Judgment.  On January 28, 2009, upon stipulation of the parties, the Court appointed a medical expert and a mental health expert to serve as independent evaluators of Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment.  In June 2009, the Court began receiving quarterly reports from the experts.  By April 2010, the Court concluded that "significant areas of failure to comply with the Second Amended Judgment's medical and mental health requirements remain" and ordered the parties to jointly "develop a proposed procedure for achieving and demonstrating Defendants' complete compliance with the Second Amended Judgment." (Doc. 1880 at 3–4.)  In the April 7, 2010 Order, the Court stated:  "The Court's purpose is

to set a procedure by which full compliance with the Second Amended Judgment is either confirmed or specific implementing remedies are ordered and complied with by the end of this calendar year." (*Id.* at 4.)

On July 30, 2010, the parties filed a joint report stating each party's position regarding the status of Defendants' compliance with the medical and mental health portions of the Second Amended Judgment. The parties agreed to a procedure for achieving compliance with the Second Amended Judgment regarding the medical and mental health issues that remained disputed. The independent evaluators would determine whether Defendants were in full compliance with the Second Amended Judgment, and if Defendants were found not to be in full compliance with any provision, the evaluators would submit detailed proposed remedies and timetables for remedial action to bring Defendants into full compliance. If neither party objected to an evaluator's finding and remedial recommendation, the finding and remedy would be adopted as an order of the Court. The Court would resolve any objections after hearing evidence on the relevant issues. But this procedure never was implemented.

In January 2011, the parties reported Defendants' disagreement with two of the independent evaluators' recommendations, but in June 2011 the parties jointly reported that an evidentiary hearing regarding medical and mental health remedies was no longer necessary. On June 7, 2011, Defendants filed a motion to terminate the nonmedical provisions of the Second Amended Judgment. An evidentiary hearing on the motion was set, and the parties conducted extensive discovery. However, on October 12, 2011, the parties stipulated that certain nonmedical provisions should be terminated and others should remain in effect without an evidentiary hearing. The stipulation stated that Defendants would renew the motion to terminate the remaining nonmedical provisions after April 1, 2012, and that Plaintiffs would not contest the renewed motion if Defendants successfully accomplished certain goals for the period November 1, 2011, through March 1, 2012.

On April 24, 2012, Defendants moved to terminate the remaining nonmedical provisions of the Second Amended Judgment, and Plaintiffs did not oppose the motion. On May 24, 2012, Defendants' motion was granted, and those provisions of the Second Amended Judgment that remained in effect were restated in the Third Amended Judgment.  The remaining substantive provisions were:

> 2.    Defendants shall provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population.  The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped.

> 3.    All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs.  When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

> 4.    Defendants shall ensure that the pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff.

(Doc. 2094.)  Thus, the Third Amended Judgment of 2012 essentially consisted only of Paragraphs 56, 57, and 61 of the Amended Judgment of 1995.

In October 2012, the independent evaluators visited the jails, conducted interviews, and reviewed medical records.  In January 2013, the evaluators reported that Defendants had made significant progress toward compliance with the Third Amended Judgment, and the evaluators provided specific recommendations for achieving substantial compliance.  In June 2013, Defendants filed a status report describing their efforts to address the evaluators' concerns and identified certain recommendations with which they disagreed.  In response, Plaintiffs identified recommendations for which Defendants had not shown evidence of compliance and also challenged the accuracy of

some of Defendants' assertions about their compliance with the evaluators' recommendations.

On August 9, 2013, Defendants moved to terminate the Third Amended Judgment. The Court ordered that for evidence to be relevant to the motion, it must tend to show whether any current and ongoing constitutional violation existed on August 9, 2013. In addition to filing briefs and statements of facts with supporting exhibits, the parties presented evidence and argument for six days in February and March 2014.

On September 30, 2014, the Court made detailed findings of fact and conclusions of law regarding whether and to what extent prospective relief in the Third Amended Judgment should be terminated. In many instances, Defendants demonstrated they had recently adopted or revised policies and procedures designed to correct deficiencies identified by the independent evaluators and/or Plaintiffs, but they were unable to produce evidence that the revised policies and procedures had been fully and consistently implemented or that the identified systemic deficiencies had been corrected. For example, an expanded electronic integrated health screen for the receiving screening at intake was implemented on August 5, 2013, only four days before Defendants filed their motion to terminate. Defendants also developed a new electronic health records system, but it was not fully implemented until September 2013, after the relevant evidentiary period. The Court found:

> 238. An electronic health records system is not itself constitutionally required, but managing the health records, housing locations, [Health Needs Requests], prescriptions, appointment scheduling, and necessary follow up for thousands of pretrial detainees to ensure ready access to health care and continuity of medications likely would be impossible without one.

(Doc. 2283 at 58.) Because Defendants did not prove compliance with any of the three substantive paragraphs of the Third Amended Judgment, *i.e.*, sufficient screening at intake, ready access to care for serious medical and mental health needs, and continuity of prescription medications, the Court found that the prospective relief ordered in those

three paragraphs remained necessary to correct current and ongoing constitutional violations.

Also on September 30, 2014, after six years of reviewing evidence, expert opinion, and legal argument regarding conditions in the Maricopa County Jail, and after allowing both parties opportunity to propose remedies to correct constitutional deficiencies, the Court ordered remedies that did not exactly track constitutional standards but were practical, concrete measures necessary to correct constitutional violations.  Defendants were ordered to, within 60 days, adopt new policies or amend existing policies regarding 31 specific requirements for providing medical and mental health care, implement the policies within 150 days, collect and summarize compliance data for a period of 180 days after implementation of the policies, and report documentation showing completion of each stage.  The Court stated, "If Defendants comply with this Order and its deadlines, within one year they will demonstrate that prospective relief no longer remains necessary to correct any current and ongoing violation of Plaintiffs' constitutional rights, and Court-ordered relief may be terminated before the PLRA permits another motion to terminate." (Doc. 2283 at 5960.)

Therefore, Paragraphs 2, 3, and 4 of the Fourth Amended Judgment continue the prospective relief in the Third Amended Judgment, and Paragraph 5 of the Fourth Amended Judgment defines specifically how Defendants will prove their compliance with Paragraphs 2, 3, and 4.  Paragraph 5(a) identifies the 31 specific requirements for providing medical and mental health care that are expected to become institutionalized through appropriate policies, staffing, training, and monitoring.

On October 14, 2014, Plaintiffs moved for reconsideration of five remedial provisions of the Fourth Amended Judgment.  On December 10, 2014, the Court granted Plaintiffs' motion in part, amended one of the 31 subparagraphs of Paragraph 5(a) of the Fourth Amended Judgment, and entered the Revised Fourth Amended Judgment.

In January 2015, the Court clarified that Plaintiffs' counsel were permitted to tour the jail facilities, speak with pretrial detainees and staff, review records on-site, and review copies of records off-site upon reasonable request. It further stated that the Revised Fourth Amended Judgment "requires Defendants to meet a series of deadlines and anticipates that Plaintiffs will promptly bring to the Court's attention any perceived lack of compliance with each requirement." (Doc. 2309.) On September 14, 2015, the Court further explained Plaintiffs' role:

> [T]he time for monitoring Defendants' compliance actions required by the Revised Fourth Amended Judgment began in December 2014 when Defendants filed their newly adopted or revised policies. It continued through the 180-day period when Defendants were required to demonstrate their implementation of those policies. Plaintiffs' counsel has had opportunity to conduct on-site tours and interviews as well as off-site record reviews to confirm that Defendants are in fact doing what they say they are doing. Data collection for 180 days enabled Defendants to monitor implementation, make any needed corrections, and satisfy their burden of proof. Defendants' September 15, 2015 report will be a summary of the compliance data, which Plaintiffs may challenge. But Plaintiffs do not need additional counsel to begin investigation of potential constitutional violations after the report is filed. **To be clear, this litigation is now strictly limited to whether Defendants have satisfied the requirements of Paragraph 5 of the Revised Fourth Amended Judgment. Plaintiffs' class counsel has no authority to investigate any potential constitutional violations outside of Paragraph 5.**

(Doc. 2331, emphasis added.) Also on September 14, 2015, the Court clarified that Defendants were to collect and summarize data showing the extent of their compliance and to report to the Court only a summary of their evidence showing compliance related to each of the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment.

On September 15, 2015, Defendants filed a report of the data they had collected and summarized pursuant to the Revised Fourth Amended Judgment. On September 16, 2015, the Court ordered Defendants to file a supplemental report regarding seven subparagraphs of Paragraph 5(a), explaining why the reported compliance rates should be

considered sufficient to establish proof of compliance.   On September 25, 2015, Defendants filed a supplemental report.   On October 15, 2015, the Court granted Plaintiffs' request that they be permitted to file their response to Defendants' compliance reports by January 15, 2016.  The Court further ordered that Plaintiffs' response address only whether Defendants had demonstrated compliance with Paragraph 5 of the Revised Fourth Amended Judgment related to each of the 31 subparagraphs of Paragraph 5(a):

> The Revised Fourth Amended Judgment required Defendants to collect and summarize data for a period of 180 days that showed the extent to which Defendants were complying with the Revised Fourth Amended Judgment and to file a report of the data collected and summarized on September 15, 2015.  (Doc. 2299.)  The Court clarified that Defendants' report should address the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment, explaining what and how data was collected to determine compliance and what level of compliance was found.  (Doc. 2332.)  . . . .

> . . . .

> Plaintiffs' response to Defendants' compliance reports will be limited to addressing whether Defendants have demonstrated compliance with the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment.  The time has expired for Plaintiffs to object to the policies and procedures adopted or amended to comply with the Revised Fourth Amended Judgment and the actions taken to implement each of the policies (*e.g.*, hiring staff, training, modifying facilities), which Defendants reported December 16, 2014, and March 16, 2015, respectively.  **Only two issues remain to be decided:   (1) whether Defendants' compliance reports accurately portray the extent to which the relevant policies and procedures have been implemented and (2) whether the reported levels of compliance demonstrate that the remedies ordered by the Revised Fourth Amended Judgment have been sufficiently implemented to resolve the systemic deficiencies previously found by the Court.**  (*See* Findings of Fact and Conclusions of Law (Doc. 2283).)

(Doc. 2344, emphasis added.)   Plaintiffs moved for reconsideration of that order, requesting opportunity for Plaintiffs and their experts to review individual medical records off-site and to conduct a site visit at the jail to review medical records.

The Court granted Plaintiffs' motion for reconsideration to the extent that Plaintiffs' counsel and their medical experts were permitted to review individual medical records on-site within certain limitations, Defendants were permitted to produce paper copies of some of the requested records, and Plaintiffs' time to respond to Defendants' compliance reports was extended to February 26, 2016.  The Court further ordered that Plaintiffs' records review would focus on the accuracy of Defendants' compliance reports and the significance of any lack of compliance.  The Court explained:

> To clarify, at this stage of the litigation, the question is not whether the remedies ordered have in fact resolved the previously found systemic deficiencies, but whether the remedies have been implemented consistently enough.  What is "enough" is context-specific.  **The Court has already determined that adequate compliance with the specific standards previously stated will meet minimum constitutional standards.**  The Court will not go behind those determinations in the current proceedings, and **Plaintiffs will not be granted discovery to attempt to argue and prove some other measure of constitutional requirements.**  This case has always been about systemic failures amounting to constitutional violations.  Proof of some individual failures does not establish systemic constitutional failures, and discovery regarding mere individual failures is not warranted.
>
> . . . .
>
> In its September 30, 2014 Findings of Fact and Conclusions of Law, the Court explained that because Defendants had not shown they had resolved certain systemic deficiencies after six years, it was necessary for the Court to craft remedies to correct constitutional violations.  (Doc. 2283 at 6.)  After giving Plaintiffs and Defendants opportunity to propose and debate specific remedies, the Court ordered "remedies that do not exactly track constitutional standards but that are practical measures necessary to correct constitutional violations."  (*Id.* at 59.)  Each remedy was intentionally written to provide a clear standard by which compliance could be decided even though the Eighth and Fourteenth Amendments do not demand a particular action.  **Therefore, the Court will evaluate Defendants' compliance with the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment exactly as they are written.**
>
> . . . .
>
> However, Plaintiffs are not required to accept as true Defendants' assertions about their compliance.  They are entitled to examine how data

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

were collected, whether the reported data were relevant to the ordered remedy, and whether the data show sufficient compliance.

(Doc. 2352, emphasis added.)

After several delays in providing Plaintiffs with copies of requested medical records, Plaintiffs' time to respond to Defendants' compliance reports was extended to April 1, 2016.  In addition to filing a response, Plaintiffs also filed a motion requesting the Court to order additional specific relief regarding Paragraph 3 of the Revised Fourth Amended Judgment.   Subsequently, Plaintiffs moved for an evidentiary hearing to resolve factual disputes related to Paragraph 5 and their motion to enforce Paragraph 3.

### III.    PLAINTIFFS' MOTION FOR EVIDENTIARY HEARING (DOC. 2380)

Plaintiffs request that the Court set an evidentiary hearing "to resolve factual disputes between the parties as to Defendants' compliance with the general orders and the thirty-one implementing remedies of the [Revised] Fourth Amended Judgment, as well as the existence of current and ongoing constitutional violations in the provision of medical and mental health care at the Jail."  (*Id.* at 12.)  Plaintiffs also request that the Court "order its own mental health expert, Kathryn Burns, M.D., to report to the Court on Defendants' current compliance with the mental health remedies."  (*Id.*)

As previously explained, Paragraph 5 of the Revised Fourth Amended Judgment specifies what Defendants must prove to show compliance with the general orders of Paragraphs 2, 3, and 4.  After finding that Defendants had not proved that the prospective relief ordered in Paragraphs 2, 3, and 4 of the Third Amended Complaint no longer remained necessary to correct a current and ongoing violation of pretrial detainees' constitutional rights, and after considering remedies proposed by the parties, the Court identified 31 requirements that Defendants must satisfy to prove they had corrected the remaining constitutional deficiencies.  To increase the likelihood that Defendants would continue compliance after court monitoring ends, in Paragraph 5 of the Revised Fourth Amended Judgment the Court ordered Defendants to adopt or revise policies regarding the 31 requirements, file the new or revised policies on the public record, and fully

implement each of the policies, including hiring additional staff, providing training, and making facility modifications, as needed.  The Court ordered Defendants to report actions taken to implement each of the policies and then to collect data showing consistent implementation of those policies for 180 days.  Plaintiffs were expected to monitor each step of this process, were provided the raw data as well as summary reports, and were allowed to review records with their experts.  But they were not allowed to investigate potential constitutional violations outside of Paragraph 5 of the Revised Fourth Amended Judgment because the time for doing so had passed.

Plaintiffs contend that *Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016), requires the Court to hold an evidentiary hearing before considering termination of the Revised Fourth Amended Judgment.  Relying on *Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011), *Rouser* treated the consent decree as a contract and held that the district court should not have vacated the consent decree without finding (1) the goals of the consent decree had been adequately met and (2) defendants had substantially complied with each of the decree's terms for a substantial period before terminating the decree.  *Rouser*, 825 F.3d at 1081.  In *Rouser*, the district court vacated the consent decree four months after finding that defendants had not complied with certain provisions, despite receiving no evidence of compliance and making no findings of compliance.  The Ninth Circuit acknowledged that heightened deference applies to a district court's decisions where it has been overseeing complex institutional reform for a long period of time, but found special deference was not warranted where the district court had managed the institutional reform litigation for only two of the case's twenty years.  *Id.* at 1080–81.  Neither *Rouser* nor *Otter* mandates a further evidentiary hearing in the present case.

The task before the Court is not to determine whether goals of a consent decree, *i.e.*, a contract between the parties, have been satisfied.  The Second Amended Judgment and the Third Amended Judgment were not consent decrees.  They ordered prospective relief based on detailed evidentiary findings and only after the Court concluded the

specific relief extended no further than necessary to correct the violation of the federal right, it was narrowly drawn, and it was the least intrusive means to correct the violation. The Revised Fourth Amended Judgment also is not a consent decree.  After multiple rounds of evidentiary hearings and detailed findings of fact and conclusions of law, it became plain that in order for Defendants to bear their burden of proof, the prospective relief must include concrete, demonstrable requirements that would show the correction of constitutional violations was systemic and consistent, *i.e.*, institutionalized.   Thus, specific constitutional deficiencies were identified, and specific remedies tailored to address those deficiencies were ordered in the Revised Fourth Amended Judgment.  Now the Court must determine whether Defendants fully implemented the ordered remedies during the 180-day period beginning March 2, 2015.  As a result, Plaintiffs' request for an evidentiary hearing and their request that the Court order Dr. Burns to report on current compliance with mental health remedies are untimely.

The parties have been provided multiple opportunities to submit evidence regarding Defendants' compliance with the Revised Fourth Amended Judgment. Therefore, Plaintiffs' motion for a further evidentiary hearing will be denied.

## IV.  PLAINTIFFS' MOTION TO ENFORCE THE REVISED FOURTH AMENDED JUDGMENT (DOC. 2373)

Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment essentially asks the Court to reconsider its 2014 findings and conclusions regarding termination of the Third Amended Judgment.   Plaintiffs claim that Defendants are in violation of Paragraph 3 of the Revised Fourth Amended Judgment, which states:

> 3.     All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs.  When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

(Doc. 2094.)  Paragraph 3 requires that pretrial detainees be "transferred to another jail or other location," when necessary.  It does not order Defendants to transfer detainees to a facility outside of the Maricopa County Jail except to the extent necessary to provide "ready access to care to meet their serious medical and mental health needs."

Paragraph 5 of the Fourth Amended Judgment defines specifically how Defendants will prove their compliance with Paragraph 3.  It does not require Defendants to ensure placement of seriously mentally ill detainees in any facility outside of the Maricopa County Jail.  It does not require hospitalization of seriously mentally ill detainees.  Nor does it require Maricopa County to designate a facility outside of the Jail for its program to provide competency restoration treatment or seek court-ordered treatment and/or civil commitment on an expedited basis.  Rather, with respect to mental health care, Paragraph 5 requires:

- If a pretrial detainee has a positive mental health screening or does not respond to all of the mental health screening questions, the detainee will be assessed by mental health staff while the pretrial detainee is in the intake center.  The mental health staff will identify the urgency with which the pretrial detainee must be seen by a mental health provider, *i.e.*, a psychiatrist, psychiatric nurse practitioner, or physician assistant.
- All mental health Health Needs Requests stating or indicating a clinical symptom will be triaged face-to-face within 48 hours of their submission.
- Pretrial detainees with a mental health condition identified as urgent by detention, intake, medical, or mental health staff will be seen face-to-face by a mental health provider within 24 hours of the identification.
- Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit.

- A mental health provider will determine the placement of each seriously mentally ill pretrial detainee after performing a face-to-face assessment, including upon admission into, transfer within, and discharge from the Mental Health Unit.
- Pretrial detainees discharged from the Mental Health Unit will be assessed by mental health staff within 48 hours after discharge.
- Seriously mentally ill pretrial detainees who are confined to single cells for 22 or more hours a day will have face-to-face communication with mental health staff at least twice per week.
- A pretrial detainee's psychotropic medications will not be prescribed, altered, renewed, or discontinued without a face-to-face examination by a psychiatrist, psychiatric physician assistant, or psychiatric nurse practitioner in an area that affords sound privacy.

Plaintiffs contend that the Maricopa County Jail does not provide inpatient or hospital-level psychiatric care and Defendants fail to transfer detainees who need such services to outside psychiatric hospitals.  Defendants assert that pretrial detainees receive more care and monitoring in the Mental Health Unit than they would in a psychiatric hospital.  Neither Plaintiffs nor Defendants define the term "inpatient" care or provide objective standards for determining what constitutes "inpatient" or "hospital-level" psychiatric care.  In 2014, the Court found that the Mental Health Unit was not a licensed inpatient psychiatric hospital, but it did not determine whether it provided inpatient psychiatric care or the equivalent of hospital-level psychiatric care.

Rather than seeking enforcement of the Revised Fourth Amended Judgment, Plaintiffs actually seek new injunctive relief to resolve longstanding problems outside the scope of this action.  Plaintiffs ask the Court to order Defendants to ensure that patients are timely transferred to the Arizona State Hospital or, alternatively, order Defendants to "better utilize the county-operated Desert Vista psychiatric facility or form contracts with

other psychiatric facilities that can provide appropriate care."[1]  In addition, Plaintiffs seek an order that Defendants identify and transfer patients in need of inpatient care to Desert Vista or other facilities not only for court-ordered evaluations, but also for longer periods of treatment.

Plaintiffs assert that a substantial proportion of those who need psychiatric hospitalization are in Maricopa County's Restoration to Competency ("RTC") program. Plaintiffs contend that Defendants should transfer all detainees deemed incompetent to proceed in their criminal cases to outside psychiatric facilities for treatment to restore them to competency.  Plaintiffs also contend that many detainees who refuse treatment have been denied access to adequate care because Defendants generally do not seek court-ordered treatment for detainees in the RTC program.  Plaintiffs contend that the evidence that some detainees were civilly committed after restoration attempts failed and criminal charges were dismissed demonstrates that those detainees needed court-ordered treatment and/or psychiatric hospitalization before conclusion of the RTC program. Plaintiffs' arguments, couched as a motion to enforce the Revised Fourth Amended Judgment, seek remedies that were not ordered in Paragraph 5 of the Revised Fourth Amended Judgment.

### A.     2014 Findings, Conclusions, and Orders

Plaintiffs contend that problems with Defendants' provision of inpatient care are longstanding and were documented as early as 2009.  They rely substantially on the Eleventh Report of Kathryn A. Burns (Doc. 22-15-1) based on her May 2013 site visit, Dr. Burns' prior reports, and Dr. Burns' March 5, 2014 trial testimony (Doc. 2248)—all of which was considered by the Court in 2014.  In 2014, the parties briefed, produced evidence, and argued how the Maricopa County Jail should provide adequate and timely assessment, placement, and treatment of seriously mentally ill pretrial detainees.

---

[1] The Desert Vista psychiatric facility is not operated by Defendants.  It is operated by the Maricopa Integrated Health System, which is a health care district governed by the Maricopa County Special Health Care District Board.

On January 13, 2014, before hearing evidence regarding termination of the Third Amended Judgment, the Court ordered Plaintiffs to file "a statement concisely identifying specifically what actions, in Plaintiffs' opinion, Defendants must take to correct any and all current and ongoing systemic constitutional violations within the scope of the Third Amended Judgment and deadlines by which Defendants reasonably can and should complete all of the corrective actions." (Doc. 2194.) Plaintiffs proposed the following:

> Defendants shall ensure that prisoners[2] are timely transferred to a psychiatric facility when they cannot be adequately treated at the Jail, and that there is continuity of care for prisoners returning to the Jail after psychiatric hospitalization.
>
> *Within 90 days*, Defendants shall revise their policies and procedures to ensure the following:
>
> Defendants transfer to a psychiatric facility all prisoners who require an inpatient level of care, and those who otherwise cannot be adequately treated at the Jail, even if previous efforts have failed. They address all efforts they have made and plan to make in monthly treatment team meetings, and document their ongoing and planned efforts in these prisoners' treatment plans.
>
> *Within 180 days*, Defendants shall develop a memorandum of understanding with a psychiatric facility or facilities for the admission of prisoners in need of psychiatric hospitalization who cannot be adequately treated at the Jail. The memorandum establishes admission and discharge criteria for prisoners in need of acute stabilization, and for prisoners in need of chronic mental health care.
>
> *Within 180 days*, Defendants shall have implemented the provisions described above.

(Doc. 2210-1 at 16.) Plaintiffs' proposed relief did not provide objective standards or definitions for timeliness, adequacy of treatment available at the Jail, and inpatient level of care. Moreover, it required Defendants to *ensure* placement of pretrial detainees in outside psychiatric facilities without regard to the detainees' constitutional and statutory

---

[2] Despite Plaintiffs' use of the term "prisoner," this case involves only pretrial detainees. The Maricopa County Jail houses both pretrial detainees and sentenced inmates, but the majority of the Jail population consists of pretrial detainees.

rights regarding refusing treatment, establishing incompetency as a defense to criminal charges, and avoiding involuntary civil commitment.

On February 14, 2014, Plaintiffs filed the Eleventh Report of Kathryn A. Burns, M.D., M.P.H., on Correctional Health Services Compliance with Third Amended Judgment. (Doc. 2215.) Dr. Burns reported that she had visited the Jail on May 8–10, 2013, reviewed a sample of medical records, and reviewed with Dr. Dawn Noggle, Maricopa County Correctional Health Services Mental Health Director, the status of all of the recommendations Dr. Burns had made in February 2011. Dr. Burns summarized the status of her 2011 recommendations. Among other things, she reported that the absolute number of petitions for hospitalization had increased, but information regarding the timeliness of the hospitalization process was not available. Dr. Burns noted, "Chart reviews and site visits have consistently demonstrated delays in access to psychiatric inpatient care, particularly for RTC inmates in the [Mental Health Unit]." (Doc. 2215-1 at 9.) Dr. Burns reported that Defendants were unable to use the Maricopa County Integrated Health System (*i.e.*, Desert Vista) and:

> Arrangements have been made to use Arizona State Hospital for inmates in RTC that need acute care although this procedure has not yet been utilized. [Correctional Health Services] reports expediting the [court-ordered evaluation and court-ordered treatment] process and triaging for evaluators those inmates that clinically appear not able to be restored. (This leads to an earlier evaluation, subsequent finding of incompetence and access to the hospital by way of civil commitment.)

(*Id.*)

On September 30, 2014, the Court found, among other things:

> 158.   The most seriously mentally ill inmates and those determined to be at risk of harming themselves or others are housed in the Mental Health Unit at the Lower Buckeye jail.

> 159.   All of the cells in the Mental Health Unit are single cells.

> 160.   The Mental Health Unit is not a licensed inpatient psychiatric hospital.

161.    Pretrial detainees who need inpatient psychiatric care may be placed in the Mental Health Unit while CHS[3] staff attempts to get them admitted to the state psychiatric hospital.    Although Defendants cannot control whether pretrial detainees who need inpatient psychiatric care will be admitted to the state psychiatric hospital, Defendants are responsible for identifying those detainees and making reasonable efforts to obtain their admission to the state psychiatric hospital.

162.    The Mental Health Unit includes subunits for different levels of care, including acute, sub-acute, and stepdown treatment subunits.    A stepdown placement is interim housing where treatment can continue until the inmate is sufficiently stable to move to general population housing.

163.    Group programs are provided in the treatment subunits of the Mental Health Unit.

. . . .

166.    One subunit of the Mental Health Unit houses inmates classified at a security level greater than general population regardless of their level of acuity.

167.    In May and June 2010, therapeutic cubicle spaces were built in two subunits of the Mental Health Unit in which mental health providers can conduct group therapy sessions with high security or mixed classification pretrial detainees.

168.    Evaluating a pretrial detainee's mental health condition, developing or modifying the pretrial detainee's treatment plan, and deciding when a pretrial detainee should be placed in or discharged from a specific facility to obtain appropriate mental health care must be performed by a mental health provider after the provider has assessed the pretrial detainee face-to-face in space that at least provides sound privacy.

169.    Many pretrial detainees with serious mental health needs do not remain in the Jail long enough to receive a full psychiatric evaluation, but every pretrial detainee with a mental health condition identified as urgent by detention, intake, medical, or mental health staff can and must be seen face-to-face by a mental health provider within 24 hours of identification.

170.    Although there are criteria for placement in each level of mental health care, including subunits within the Mental Health Unit, Defendants have not shown that the placement criteria are clearly articulated in writing and consistently and timely applied.

---

[3] CHS means Correctional Health Services.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

171.   Defendants have not shown that a mental health provider determines the placement of each pretrial detainee needing mental health care after the provider has performed a face-to-face assessment, especially for admission into and discharge from the Mental Health Unit.

(Doc. 2283 at 48–50.)   The Court concluded that the prospective relief ordered in Paragraph 3 of the Third Amended Judgment remained necessary to correct a current and ongoing violation of the federal right and ordered remedies that were "practical measures necessary to correct constitutional violations."  (Doc. 2283 at 59.)

Although the Court found that the Mental Health Unit is not a licensed inpatient psychiatric hospital, the Court stated that pretrial detainees who need inpatient psychiatric care may be placed in the Mental Health Unit while staff attempts to get them admitted to the state psychiatric hospital.  The Court acknowledged that Defendants cannot control whether pretrial detainees who need inpatient psychiatric care will be admitted to the state psychiatric hospital, but expected Defendants to make reasonable efforts to place detainees needing inpatient psychiatric care in the state psychiatric hospital.

The Revised Fourth Amended Judgment required Defendants to adopt policies and procedures or amend existing policies and procedures to more clearly articulate placement criteria and assess detainees before and after placement:

(17)   Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit.

(18)   A mental health provider will determine the placement of each seriously mentally ill pretrial detainee after performing a face-to-face assessment, including upon admission into, transfer within, and discharge from the Mental Health Unit.

(19)   Pretrial detainees discharged from the Mental Health Unit will be assessed by mental health staff within 48 hours after discharge.

(Doc. 2299 at 5, ¶ 5(a).)   The Revised Fourth Amended Judgment further required Defendants to file a copy of each policy adopted or revised to comply with Paragraph 5(a), fully implement each of the policies, file a summary of actions taken to implement each of the policies, collect and summarize data for a period of 180 days that shows the

extent of Defendants' compliance, and file a report of the compliance data collected and summarized.  (*Id.* at 6-7, ¶ 5(b)–(f).)

The Revised Fourth Amended Judgment does not require Defendants to *ensure* placement of certain detainees in the state psychiatric hospital or in an outside facility for long-term psychiatric care.  Defendants are responsible for identifying pretrial detainees who need psychiatric services that cannot be provided within the Maricopa County Jail and making reasonable efforts to transfer them to outside facilities, but they cannot ensure the outcome of their efforts.  Moreover, Defendants cannot override pretrial detainees' constitutional and statutory rights to refuse involuntary treatment and/or civil commitment and to have criminal charges dismissed for lack of competence to stand trial.

Because court-ordered treatment and involuntary commitment may result in a serious deprivation of liberty, statutory requirements must be strictly complied with. *Matter of Commitment of Alleged Mentally Disordered Pers.*, 181 Ariz. 290, 293, 889 P.2d 1088, 1091 (1995).  In Arizona, mental health proceedings are adversarial, and the proposed patient is provided counsel and an evidentiary hearing.  A.R.S. §§ 36-536(A), 36-539.  Arizona law establishes procedures for obtaining a court-ordered evaluation of a person "alleged to be, as a result of a mental disorder, a danger to self or to others or a person with a persistent or acute disability or a grave disability and who is unwilling or unable to undergo a voluntary evaluation."  A.R.S. § 36-520 *et seq.*  An application for court-ordered evaluation must be submitted to the screening agency, which will conduct a prepetition screening.  If the screening agency determines there is reasonable cause to believe that "the proposed patient is, as a result of mental disorder, a danger to self or to others or has a persistent or acute disability or a grave disability and that the proposed patient is unable or unwilling to voluntarily receive evaluation or is likely to present a danger to self or to others, has a grave disability or will further deteriorate before receiving a voluntary evaluation," the agency will file a petition for court-ordered evaluation.  A.R.S. § 36-521(D).  An application for emergency admission for evaluation

may be made if the applicant "believes on the basis of personal observation that the person is, as a result of a mental disorder, a danger to self or others, and that during the time necessary to complete the prepetition screening procedures set forth in §§ 36-520 and 36-521 the person is likely without immediate hospitalization to suffer serious physical harm or serious illness or is likely to inflict serious physical harm upon another person." A.R.S. § 36-524.

A pretrial detainee may be transferred from the Maricopa County Jail to an outside facility for mental health treatment only upon a court-ordered conditional release. A petition for involuntary mental health court-ordered treatment must be accompanied by:

> the affidavits of the two physicians who participated in the evaluation and by the affidavit of the applicant for the evaluation, if any. The affidavits of the physicians shall describe in detail the behavior that indicates that the person, as a result of mental disorder, is a danger to self or to others, has a persistent or acute disability or a grave disability and shall be based on the physician's observations of the patient and the physician's study of information about the patient. A summary of the facts that support the allegations of the petition shall be included. The affidavit shall also include any of the results of the physical examination of the patient if relevant to the patient's psychiatric condition.

A.R.S. § 36-533(B). The Arizona state hospital or the department of health services is not required to provide civil commitment treatment that exceeds the maximum funded capacity. A.R.S. §§ 36-503.03, 36-206(D). If the Arizona state hospital reaches its funded capacity in civil commitment treatment programs, it must establish a waiting list for admission based on the date of the court order.

The Revised Fourth Amended Judgment also does not require the Maricopa County Board of Supervisors to change its designation of the Maricopa County Jail as its program to provide competency restoration treatment. Under Arizona law, "[a] person shall not be tried, convicted, sentenced or punished for an offense if the court determines that the person is incompetent to stand trial." A.R.S. § 13-4502(A). If a court determines that reasonable grounds exist for a competency examination, the court shall appoint two or more mental health experts to examine the defendant, issue a report, and, if necessary,

testify regarding the defendant's competency.  A.R.S. § 13-4505(A).  Within thirty days after the report is submitted, the court shall hold an evidentiary hearing to determine the defendant's competency to stand trial.  A.R.S. § 13-4510(A).  "If the court initially finds that the defendant is incompetent to stand trial, the court shall order treatment for the restoration of competency unless there is clear and convincing evidence that the defendant will not be restored to competency within fifteen months.  The court may extend the restoration treatment by six months if the court determines that the defendant is making progress toward the goal of restoration."  A.R.S. § 13-4510(C).

A court may order a defendant to undergo out of custody competency restoration treatment, but if it determines that confinement is necessary for treatment, the court must commit the defendant to the competency restoration treatment program designated by the county board of supervisors.  A.R.S. § 13-4512(A).  A county competency restoration treatment program may provide treatment to a defendant in the county jail, including inpatient treatment, or it may obtain court orders to transport the defendant to other providers, including the Arizona state hospital, for inpatient, in custody competency restoration treatment.  A.R.S. § 13-4512(C).  The court shall select the least restrictive treatment alternative after considering whether confinement is necessary for treatment, the likelihood that the defendant is a threat to public safety, the defendant's participation and cooperation during an outpatient examination, and the defendant's willingness to submit to outpatient competency restoration treatment as a condition of pretrial release, if the defendant is eligible for pretrial release.  A.R.S. § 13-4512(D).  The court's order for competency restoration treatment must state whether the defendant is incompetent to refuse treatment, including medication, and is subject to involuntary treatment.  A.R.S. § 13-4512(E).

The Maricopa County Board of Supervisors designated the Maricopa County Jail as its program to provide competency restoration treatment based on multiple factors, including that using the Arizona state hospital to provide such treatment resulted in

delays in the criminal justice process and longer incarceration for pretrial detainees. All but one of the other counties in Arizona have their RTC programs within their jails. The Revised Fourth Amended Judgment does not affect the Maricopa County Board of Supervisors' designation of the Maricopa County Jail as its RTC program.

Providing constitutionally adequate mental health care for pretrial detainees confined in the Maricopa County Jail presents important, complex, and challenging issues. Plaintiffs' motion brings attention to public policy concerns regarding who should provide and how to provide appropriate mental health care for the chronically and seriously mentally ill, avoid repetitive incarceration, and balance individual freedom with safety concerns. But this class action on behalf of pretrial detainees confined in the Maricopa County Jail addresses only confinement conditions within Defendants' control. As the Court previously stated:

> The Maricopa County Jail must make reasonable efforts to prevent a pretrial detainee's confinement from causing the detainee serious medical or mental health injury. It also must make reasonable efforts to avoid depriving the detainee from obtaining or continuing necessary medical or mental health care the detainee would have obtained or continued outside of the Jail. But the Jail is not the County's public health care provider. Several hundred pretrial detainees enter the Jail daily, approximately half need some form of health care, and nearly 40% are released within 24 hours. Only 35% stay longer than 7 days; only 25% stay longer than 14 days. With a high-volume, short-stay inmate population, the Jail cannot cure serious systemic inadequacies in public medical and mental health care in Maricopa County and the State of Arizona.

(Doc. 2283 at 4.) To the extent that Plaintiffs advocate on behalf of the seriously mentally ill residents of Maricopa County generally and seek to increase the availability of inpatient psychiatric care and to accelerate procedures resulting in civil commitment, they must do it in a different lawsuit.

## B. 2015 Evidence

Defendants contend that differentiated subunits with the Mental Health Unit currently provide adequate treatment for most seriously mentally ill pretrial detainees.

They assert that the Maricopa County Jail's Mental Health Unit provides inpatient care, and the Mental Health Unit currently has seven full-time psychiatric providers and coverage 365 days per year by at least two psychiatric providers, which is more coverage than is provided by the Arizona State Hospital.  Defendants assert that all new admission patients are seen within 24 hours, acute patients are seen daily, nursing staff make daily rounds, and group and individual services are provided according to patient need and acuity.  Defendants assert that patients remain in the acute units only for the time they are acutely agitated or at risk.  Defendants have requested that some pretrial detainees be transferred to psychiatric facilities outside of the Jail, but the transfers usually are not accepted until after detainees have been found incompetent and unrestorable and they have been civilly committed.

Plaintiffs contend that the Mental Health Unit does not provide inpatient care because in 2014 the Court found that the Mental Health Unit was not "a licensed inpatient psychiatric hospital."  However, the question here is not whether the Mental Health Unit is licensed or can be labeled "inpatient" or "hospital-level"—it is whether Defendants are providing constitutionally adequate treatment for seriously mentally ill pretrial detainees.

Plaintiffs rely on the Declaration of Pablo Stewart (Doc. 2372-3), dated April 1, 2016, to support their contention that Defendants are not currently providing psychiatric hospitalization for pretrial detainees who need such care.  Dr. Stewart stated that it is his opinion now, as it was in 2013, "that the Jail does not have a reliable system in place to ensure the timely transfer of seriously ill prisoners to an inpatient psychiatric facility." (Doc. 2372-3 at 127, ¶ 348.)  He further opined that "The problems are particularly acute with regard to RTC patients in need of hospitalization."  (*Id.*)  Dr. Stewart found that from March through August 2015, there were 235 inmates in the Jail's RTC program, and they were "the most seriously mentally ill prisoners in the Jail's population."  (*Id.* at 125, ¶ 343.)  He observed that many of the inmates in the RTC program refuse treatment and

will not be approved for involuntary treatment, and he opined that the delays in treatment harm recovery.   From his review of the records of 47 selected patients, Dr. Stewart concluded that 34 of those patients were "in need of a higher level of care" and "were not receiving adequate treatment at the Jail."   (*Id.* at 128, ¶ 349.)   He further stated, "While many of these men and women are eventually hospitalized, that only happens after they are deemed incompetent, their criminal charges are dismissed and they are civilly committed."   (*Id.*)

Dr. Stewart opined:

> In my own recent record reviews, I found numerous prisoners in need of acute stabilization who were not petitioned for a COT Order, or whose COT petitions were unnecessarily delayed.   I also found prisoners whose COT Orders were not timely renewed or were not fully utilized to address their non-compliance with treatment.   Nor was there a reliable process in place to transfer to an inpatient facility those prisoners in need of that care who could otherwise not be adequately treated at the Jail.   Many of these prisoners spend months locked alone in their cells for up to 24 hours daily, with no significant treatment offered to them other than medications.   They include prisoners who refuse treatment and are actively psychotic.   Their living conditions, coupled with the lack of appropriate care, results in their unnecessarily suffering.   It is also my opinion that prisoners returning from the hospital are at risk of deteriorating once back at the Jail.   I attribute this risk of deterioration to the conditions at the Jail coupled with the inadequate treatment they are likely to receive.

(*Id.* at 125, ¶ 343.)[4]

Because delay in treatment risks serious harm, Dr. Stewart opined that Defendants should seek court orders for involuntary treatment more quickly—that is, before a patient is found incompetent and unrestorable, before criminal charges are dismissed.   But Dr. Stewart did not explain what "higher level of care" a psychiatric hospital would provide if a court will not order involuntary treatment for an RTC pretrial detainee and the detainee continues to refuse treatment.   Dr. Stewart opined that pretrial detainees were

---

[4] "COT" refers to "court-ordered treatment."

subjected to additional and needless suffering during completion of the RTC process, but he did not explain how their suffering would be reduced by psychiatric hospitalization.

Dr. Stewart's general conclusions are based on his observations and opinions regarding 47 patients whose medical records he reviewed[5] and, in some cases, met with in person. Of those, Dr. Stewart identified 34 patients who, in his opinion, had not received adequate treatment at the Jail. Most of the 34 patients were in the RTC program. Dr. Stewart opined that some of the patients should have been involuntarily medicated, either with a court order or on an emergency basis, and that many of them should have been hospitalized before court determination of incompetence and restorability. Many did receive court-ordered treatment and/or were hospitalized, but not as quickly as Dr. Stewart deemed appropriate. In a few cases, Defendants sought transfer to Desert Vista, but Desert Vista would accept patients only after civil commitment, not on conditional release. Dr. Stewart also opined that placement of mentally ill detainees in single cells exacerbated their psychiatric impairment. In some instances, Dr. Stewart disagreed with the type or dosage of medication prescribed, the placement within the Jail, and transitions between placements. Generally, his criticism of the treatment provided was that it had not been effective for these seriously mentally ill patients.

Treatment solutions for these patients are not simple. Even after being civilly committed to a psychiatric hospital, many patients are released, booked again, and returned to the Jail. For example, patient CB was identified by the community provider as Seriously Mentally Ill but was not currently being treated. He was homeless, engaged in chronic substance abuse, and had multiple prior bookings. He was psychotic, uncooperative, and at times agitated and verbally abusive. He refused medication. Dr. Stewart opined that Jail staff should have petitioned for court-ordered treatment immediately when he was booked in August 2014. Instead, he was placed in a single cell where he did not present a danger to others and was monitored for danger to self until he

---

[5] The 47 patients Plaintiffs selected for Dr. Stewart to review were not randomly selected.

was found incompetent and unrestorable and was civilly committed on May 28, 2015. On June 4, 2015, patient CB was released to Desert Vista hospital. On June 29, 2015, he was booked again and placed in segregation. Despite continuing on medications from Desert Vista, he showed signs of deterioration.

Similarly, patient DY was booked January 29, 2015, and on July 21, 2015, found to be incompetent and unrestorable and was civilly committed. On August 11, 2015, after treatment at Desert Vista, patient DY was booked again. Although there was a court order for involuntary treatment, it did not authorize involuntary medication at the Jail because the Jail is not a licensed inpatient psychiatric facility. Dr. Stewart opined that Defendants should have attempted to get a court order for outpatient treatment. He further opined that patient DY should not have been placed in segregation, despite previous incidents in which he assaulted a cellmate, because it likely exacerbated his mental illness. Dr. Noggle stated that patient DY did not display any contraindications to segregation and he was monitored for any negative effects of segregation.

Patient DC was placed in the Mental Health Unit when he was screened at intake on March 27, 2015. He was transitioned from the acute subunit to step-down units. Patient DC's charges were dropped, and he was released on April 1, 2015. Jail staff arranged for a community clinic navigator to pick up patient DC at the jail upon release. Patient DC was booked again on May 9, 2015, screened, and placed at the Mental Health Unit. Again, he was transitioned from the acute subunit to step-down units. Patient DC was placed in the RTC program on July 8, 2015. On September 8, 2015, he was deemed incompetent and unrestorable, and he was civilly committed. He remained in the Mental Health Unit until he was released to Desert Vista hospital on September 21, 2015. Dr. Stewart disagreed with the dosage of medication prescribed for patient DC and opined that he was prescribed a variety of medications that produced little to no positive clinical effects. Dr. Noggle stated that notes in Patient DC's medical record documented sporadic unstable behavior, hypomanic symptoms, but no psychiatric distress.

Patient VW was placed in the Mental Health Unit when he was screened at intake and was housed in step-down subunits from February 25, 2015, to May 29, 2015, during which he was seen by a psychiatric provider nine times.  Although patient VW refused psychiatric medication, he exhibited stable behavior and was an active participant in socialization groups and one-on-one sessions.  He was transferred to general population and followed by mental health staff.  On May 7, 2015, he began the RTC program.  On June 18, 2015, patient VW was transferred back to the Mental Health Unit because he threatened to harm his cellmate and custody staff and he was responding to internal stimuli.  Subsequently, he consented to psychiatric medication.  Patient VW was found incompetent on July 10, 2015, and accepted into Desert Vista hospital.

Patient PW was booked on January 29, 2015, and assessed as stable for general population.  He initially declined psychiatric services, but later agreed to a trial of psychiatric medication.  He subsequently refused the medication because of its side effects.  He began the RTC program on May 11, 2015, was found incompetent on June 25, 2015, and was released to Desert Vista on July 13, 2015.  Dr. Stewart cites this case as another example of an overtly psychotic patient who, in Dr. Stewart's opinion, should have been hospitalized much sooner.

Patient AD was initially placed on suicide watch and then was transferred to a segregation unit at the Estrella jail.  After a suicide attempt, she was transferred to the Mental Health Unit and then transferred back to the segregation unit.  Eight months after booking, Dr. Stewart met with patient AD and described her as very psychotic, hearing voices, calm, and sitting quietly in the recreation yard.  Dr. Stewart opined that patient AD was not receiving adequate care because she required close monitoring to avoid self-harm and that placement in segregation exacerbated her mental illness.  Dr. Noggle stated that medical records documented patient AD was monitored by mental health staff and her psychiatric provider, and there were no incidents of self-harm noted around the time that Dr. Stewart met with patient AD.

Patient RG was booked on October 7, 2012, and consistently refused medications since then.  On December 9, 2014, he was placed in the Special Management Unit because of his custody classification.[6]  In February 2015 he made nonsensical statements, yelled profanities, and appeared psychotic.  In April 2015 he again yelled profanities and kicked the door.  Dr. Stewart concluded patient RG was extremely psychotic and agitated, living in unsanitary conditions in his cell, not eating adequately, and at serious risk of harming others.  Dr. Stewart opined that keeping patient RG in the Special Management Unit exacerbated his illness and patient RG should be immediately transferred to an inpatient psychiatric facility for acute medication stabilization.  Dr. Noggle said that patient RG was assessed for acute needs frequently and offered medication, but he continuously refused medication.  Because he was housed in a single cell, he was unable to hurt others.  Although patient RG's cell was messy, he was not an acute danger to himself or others in that environment, and he was eating, drinking, and sleeping.

These examples and the other patient records reviewed by Dr. Stewart demonstrate that there are seriously mentally ill persons in Maricopa County who are not engaged in treatment, or are not being successfully treated, by community mental health providers. Some are charged with crimes, confined in the Maricopa County Jail, and quickly identified as seriously mentally ill.  Their constitutional and statutory rights to refuse treatment, be provided counsel and hearing before civil commitment, and have criminal charges dismissed for lack of competence cannot be disregarded.  Dr. Stewart prefers that the restoration to competency process be completed at a psychiatric facility outside the Jail, but he did not explain how the time without treatment can be reduced without compromising detainees' rights to establish lack of competence to stand trial.  Further, Dr. Stewart did not opine regarding the likelihood that treatment for the chronically

---

[6] Inmates classified as closed-custody are those who pose a serious threat to life, property, staff, other inmates, or to the orderly operation of the jail and may be locked in their cells for up to 23 hours daily.

seriously mental ill would be effective even if treatment begins at intake, especially if they have not engaged in or been compliant with treatment offered by community providers. Finally, the Jail mental health staff cannot force outside psychiatric facilities to accept pretrial detainees for whom criminal charges have not been dismissed, and state and county mental health care statutes and policies are not within the scope of this lawsuit.

In summary, the Court previously considered the issues, evidence, and expert opinions Plaintiffs present in their Motion to Enforce the Revised Fourth Amended Judgment. Upon reconsideration, the 2014 evidence, supplemented by 2015 evidence, does not show that prospective relief in addition to that ordered in Paragraph 5 of the Revised Fourth Amended Judgment is constitutionally required. Defendants must provide differentiated levels of mental health care ranging from outpatient to acute units and must assess, place, monitor, and transition pretrial detainees appropriately. When clinically necessary, Defendants must make reasonable efforts to obtain court-ordered evaluations, treatment, and transfer to outside facilities. Defendants cannot ensure the results of their efforts.

Therefore, Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment and for Additional Relief (Doc. 2373) will be denied.

**V.    COMPLIANCE WITH THE REVISED FOURTH AMENDED JUDGMENT**

Paragraph 5(a) of the Revised Fourth Amended Judgment required Defendants to adopt policies and procedures or amend existing policies and procedures to establish requirements stated in 31 subparagraphs. Paragraph 5(b) required Defendants to file with the Court a copy of each policy adopted or amended to comply with Paragraph 5(a) and identify the specific policy provisions that demonstrated compliance. Paragraph 5(c) required Defendants to fully implement each of the policies, including hiring additional staff, providing training, and making facility modifications, as needed. Paragraph 5(d) required Defendants to file with the Court a summary of actions taken to implement each

of the policies.  Paragraph 5(e) required Defendants to collect and summarize data for a period of 180 days beginning March 2, 2015.  Paragraph 5(f) required Defendants to file with the Court a report of the data collected and summarized.  Defendants timely completed the requirements of Paragraphs 5(a), (b), (c), (d), (e), and (f).  However, satisfaction of reporting requirements does not establish that Defendants have demonstrated compliance with the Revised Fourth Amended Judgment.

As previously stated:

> Only two issues remain to be decided:  (1) whether Defendants' compliance reports accurately portray the extent to which the relevant policies and procedures have been implemented and (2) whether the reported levels of compliance demonstrate that the remedies ordered by the Revised Fourth Amended Judgment have been sufficiently implemented to resolve the systemic deficiencies previously found by the Court.

(Doc. 2344.)  Whether a certain level of compliance demonstrates that a remedy has been "sufficiently implemented" is context-specific.  (Doc. 2352.)

The day after Defendants filed their initial summary compliance report, the Court ordered Defendants to file a supplemental report explaining why the reported compliance rates for each of subparagraphs 5(a)(6), (8), (15), (18), (20), (29), and (31) were sufficient to establish proof of compliance, including any factors to be considered in interpreting them.  In addition to filing the summary reports, Defendants provided Plaintiffs the raw data collected and permitted Plaintiffs' counsel and experts to conduct site visits and record reviews.

Plaintiffs' response to Defendants' compliance reports includes expert opinions regarding medical care, mental health care, and jail policies and procedures.  Plaintiffs' medical experts, Robert L. Cohen, M.D., and Madeleine LaMarre, MN, FNP-BC, reviewed 49 health records, selected from patients who were known to have serious medical needs based on predetermined criteria.  On multiple occasions, Plaintiffs' mental health expert, Pablo Stewart, M.D., toured Maricopa County Jail facilities, reviewed reports, selected medical records, and other materials.  Plaintiffs submitted the expert

opinion of Eldon Vail, a former correctional administrator, regarding use of force practices and policies, disciplinary policies and practices, and segregation placement of mentally ill inmates.   Defendants responded to Plaintiffs' expert opinions with declarations by Dawn Noggle, Ph.D., the Maricopa County Correctional Health Services Mental Health Director, and Jeffrey Alvarez, M.D., the Medical Director of Maricopa County Correctional Health Services.

### A. Subparagraph 5(a)(1):  A registered nurse will perform the receiving screening for each pretrial detainee processed in the 4th Avenue jail intake center.

Defendants reported compliance rates of 99.98% for March 2015 and 100% for April through August 2015.  Plaintiffs' medical experts found that a registered nurse performed the receiving screening for each pretrial detainee in 48 of 49 records reviewed, which is 98%.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(1).

### B. Subparagraph 5(a)(2):  If the receiving screening indicates a pretrial detainee is suffering from a serious acute or chronic health condition, a physician, physician assistant, or nurse practitioner will conduct a face-to-face examination of the pretrial detainee within 24 hours after the receiving screening.

Subparagraph 5(a)(2) relies on an extensive receiving screening process coupled with the clinical judgment of a registered nurse to identify those who require prompt in-person assessment by a medical provider[7] to avoid exacerbation of serious conditions and needless suffering.  Defendants reported the following monthly compliance rates for March through August 2015:  89%, 84%, 83%, 88%, 92%, and 87%.

Plaintiffs' experts reviewed the records of 48 patients who had been identified as having a serious acute or chronic health condition by the time of the records review and

---

[7] As used in the Revised Fourth Amended Judgment, the term "medical provider" refers only to physicians, physician assistants, and nurse practitioners.  (Doc. 2283 at 27, ¶ 18.)

opined that only 29 of the 48 patients had been seen by a medical provider within 24 hours of the receiving screening.  Most, if not all, of the remaining 19 were not included in Defendants' compliance data.  However, at intake, some of the 19 patients who Plaintiffs contend should have been seen by a provider within 24 hours did not report relevant medical history or symptoms and did not display relevant symptoms.  Those patients were not identified at intake as suffering from a serious acute or chronic health condition and therefore were not included in Defendants' compliance data.  Some of the 19 patients were sentenced inmates, not pretrial detainees, and therefore properly not included in Defendants' compliance data.  Some of the 19 patients were seen at a hospital for assessment and clearance immediately before intake and therefore were not seen again by a provider at the Jail within 24 hours of intake.

Some of Plaintiffs' references to specific patients are factually inconsistent with Defendants' records.  Individual discrepancies do not need to be resolved to determine whether Defendants are consistently implementing their policy to provide face-to-face examinations of certain pretrial detainees identified during the receiving screening within 24 hours after the receiving screening.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(2).

**C.     Subparagraph 5(a)(3):  If the receiving screening indicates a pretrial detainee has symptoms of tuberculosis, the pretrial detainee immediately will be placed in an Airborne Infection Isolation Room and evaluated promptly for tuberculosis.**

Defendants reported monthly compliance rates of 100% for March through August 2015.  Among the 49 records Plaintiffs' medical experts reviewed, no patient reported symptoms of tuberculosis.  Therefore, they were unable to evaluate the accuracy of Defendants' reported compliance rates.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(3).

**D.**   **Subparagraph 5(a)(4):  If the receiving screening indicates a pretrial detainee is known to have HIV infection or is at risk for HIV infection with unknown status, a chest x-ray of the pretrial detainee will be performed and the results reviewed by a physician, physician assistant, or nurse practitioner before the pretrial detainee is placed in a housing unit.**

Subparagraph 5(a)(4) is intended to identify any pretrial detainees who have tuberculosis among those with HIV or at risk for HIV infection.  Plaintiffs' experts dispute Defendants' criteria for "at risk for HIV infection," contending that all pretrial detainees with a history of injectable drug use and unknown HIV status must receive a chest x-ray.  Dr. Alvarez opined that is unreasonable to segregate patients and expose them to a chest x-ray based solely on a history of injectable drug use if they show no symptoms of HIV or tuberculosis.  The Revised Fourth Amended Judgment does not require Defendants to define "at risk for HIV infection" to include all pretrial detainees with a history of injectable drug use and unknown HIV status.

Defendants reported the following monthly compliance rates for March through August 2015:  85%, 100%, 97%, 100%, 100%, and 100%.  Plaintiffs' experts found that 11 of 15 patients whose records they reviewed did not receive a chest x-ray before housing placement.  The 11 cases primarily involved patients with a history of injectable drug use and unknown HIV status and were not included in Defendants' compliance data.  Defendants provided an explanation for each of the nine cases that Defendants described.  Three of the nine patients were cleared by a hospital before they were admitted to the Jail.  One was housed alone and sent to the hospital two days after booking.  One was housed alone and received a chest x-ray three days after booking.  One was admitted to and housed in the infirmary; subsequently he received a chest x-ray.  One had received a chest x-ray less than six months before during a prior admission to the Jail and reported no health information or symptoms at intake that would have warranted another chest x-ray.  One did not report a positive HIV status at intake; his status was determined two months later as the result of hospitalization.  One was seen by a provider at intake and had no symptoms of HIV or tuberculosis.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(4).

**E.    Subparagraph 5(a)(5):  If a pretrial detainee has a positive mental health screening or does not respond to all of the mental health screening questions, the detainee will be assessed by mental health staff while the pretrial detainee is in the intake center.  The mental health staff will identify the urgency with which the pretrial detainee must be seen by a mental health provider, *i.e.*, a psychiatrist, psychiatric nurse practitioner, or physician assistant.**

Defendants reported the following monthly compliance rates for March through August 2015:  43%, 57%, 82%, 85%, 93%, and 98%.  Defendants explained that the Mental Health Director reviewed monthly detailed reports regularly to find compliance problems and retrain staff to improve compliance.  Compliance rates improved significantly after the first two months.

Subparagraph 5(a)(5) requires mental health staff to assess and triage pretrial detainees with a positive mental health screening before they leave the intake center. Defendants' policy directs mental health staff to assess, triage, and schedule appointments with psychiatric providers within time limits based on the assessments. Plaintiffs contend that Defendants failed to measure whether patients received a timely provider assessment, which is not required by subparagraph 5(a)(5).

Plaintiffs also contend that Defendants' methodology for determining compliance with subparagraph 5(a)(5) is flawed because Defendants' policy requires mental health staff to assign triage codes during intake and no triage codes were documented.  Rather, as subparagraph 5(a)(5) requires, mental health staff indicated the urgency with which pretrial detainees should be seen by a mental health provider.  Dr. Noggle reported that clinical decision making, not triage codes, determined the urgency with which mental health appointments were scheduled.

Plaintiffs do not dispute that detainees with positive mental health screens were assessed by mental health staff during intake and scheduled to be seen by mental health providers.  They contend that some patients were not seen by a provider within 24 hours

despite mental health staff indicating "urgent" or "emergent" for scheduling priority. However, of the 47 patient files Dr. Stewart reviewed, at least 11 of the patients were placed in the Mental Health Unit directly from intake.  Three others were transferred to the Mental Health Unit the day after booking.  Dr. Stewart opined that some or all of these patients should have been seen by a mental health provider within 24 hours, but they were not.  This alleged deficiency is better addressed by subparagraph 5(a)(18), which requires that a mental health provider will determine placement of each seriously mentally ill pretrial detainee after performing a face-to-face assessment, including placement in the Mental Health Unit.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(5).

**F.**     **Subparagraph 5(a)(6):  If the receiving screening indicates a pretrial detainee is at risk for suicide, a psychiatrist, psychiatric nurse practitioner, or physician assistant will conduct a face-to-face assessment of the pretrial detainee within 24 hours after the receiving screening.**

Plaintiffs contend that Defendants erred by determining compliance based on precisely what the Revised Fourth Amended Judgment ordered—face-to-face assessment within 24 hours—and not whether pretrial detainees identified as being at risk for suicide were consistently placed at the Mental Health Unit or appropriate facilities outside the Jail.  As previously explained, Plaintiffs' compliance with the Revised Fourth Amended Judgment is determined by their satisfaction of the literal requirements of Paragraph 5.

Defendants initially reported the following monthly compliance rates for March through August 2015:  79%, 71%, 71%, 76%, 81%, and 81%.  After the Court ordered Defendants to file supplemental briefing, Defendants conducted chart audits for all pretrial detainees who should have been seen within 24 hours and were not.  Defendants determined that the majority of those detainees had been seen by a provider within 24 hours, and the encounter was documented on a form other than the one included in the electronic reporting.  In most of the remaining cases, the suicide risk was not identified

during the receiving screening, and the time within which the detainees were seen by a provider is irrelevant to subparagraph 5(a)(6). Defendants reported the following revised monthly compliance rates for March through August 2015:  96.5%, 98.7%, 92.9%, 98.7%, 99.5%, and 98.9%.

Defendants' initial analysis and supplemental analysis after chart audits appear to count pretrial detainees released within 24 hours as instances of compliance, instead of excluding them, thereby somewhat inflating the compliance rates. Also, by adding the percentage of pretrial detainees released within 24 hours to the percentage assessed by a provider within 24 hours, Defendants double counted any pretrial detainees who were both assessed and released within 24 hours. Nevertheless, it is not realistic that a sufficient number of at-risk detainees were identified, seen by a provider, and released within 24 hours to significantly affect the monthly compliance rates.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(6).

**G.    Subparagraph 5(a)(7):  Pretrial detainees will be tested for tuberculosis within 14 days after the receiving screening unless they have been tested with negative results within the past year.**

Defendants reported the following monthly compliance rates for March through August 2015:  98%, 98%, 99%, 99%, 99%, and 99%. Plaintiffs' experts found compliance in 39 of 46 applicable records. They identified four cases as noncompliant that Defendants reported as compliant and identified two cases as noncompliant that were not included in Defendants' analysis. Dr. Alvarez reviewed each of these six cases and explained that one was a sentenced inmate who was hospitalized during the first 14 days after intake and another was released within 24 hours. The records for the remaining four cases documented that the pretrial detainees were tested for tuberculosis within 14 days after the receiving screening.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(7).

- 41 -

**H.      Subparagraph 5(a)(8):    Pretrial detainees with serious acute and chronic medical conditions will be evaluated face-to-face by a medical provider and will receive an initial health assessment within 24 hours after the receiving screening.**

Subparagraph 5(a)(2) requires that pretrial detainees identified during the receiving screening as having serious acute and chronic medical conditions be evaluated in person by a physician, physician assistant, or nurse practitioner within 24 hours after the receiving screening.    Subparagraph 5(a)(8) requires that pretrial detainees with serious acute and chronic medical conditions be evaluated in person by a medical provider, *i.e.*, a physician, physician assistant, or nurse practitioner, within 24 hours after the receiving screening *and* receive an initial health assessment within 24 hours after the receiving screening.

The physical examination portion of an initial health assessment may be completed by a physician, physician assistant, nurse practitioner, or registered nurse who has completed the Certified Nurse Examiner training.    A physician must review health assessments completed by nurse practitioners, physician assistants, and registered nurses with Certified Nurse Examiner training.    An initial health assessment does not constitute a comprehensive assessment of serious medical conditions and treatment plan.    As required in subparagraph 5(a)(9), plans for treatment and monitoring of pretrial detainees with serious medical conditions must be developed by a medical provider.

Regarding providing initial health assessments within 24 hours, Defendants initially reported the following monthly compliance rates for March through August 2015:  89%, 83%, 83%, 87%, 89%, and 86%.    In their supplemental report, Defendants added to the initial compliance rates the percentage of relevant pretrial detainees who were released within 24 hours, which yielded the following monthly compliance rates:  93%, 87%, 86%, 92%, 94%, and 96%.    As previously noted, including those released within 24 hours in the total somewhat inflates the compliance rates, and adding the percentages double counts any pretrial detainees who both received an initial health assessment and were released within 24 hours.

Defendants explained that a frequent reason for pretrial detainees with serious acute and chronic medical conditions not receiving initial health assessments within 24 hours after the receiving screening is that the detainees have been taken to court for initial appearances. Many of those receive their initial health assessments within 24 to 30 hours after the receiving screening. Defendants do not have an automated method for determining the precise number for whom initial health assessments are delayed for court appearances, but they reported the percentage of relevant pretrial detainees who received initial health assessments within 30 hours after the receiving screening: 99.5%, 97.4%, 95.7%, 98.9%, 98.3%, and 99.6%. It is not apparent whether these rates include any pretrial detainees who were released within 24 hours.

Plaintiffs dispute Defendants' compliance with subparagraph 5(a)(8) because they interpreted it as requiring that initial health assessments be provided by a medical provider. Plaintiffs' experts reviewed 47 applicable records and found that in 23 records the pretrial detainees were evaluated face-to-face by a medical provider and received an initial health assessment by a medical provider. Of the remaining 24 cases, three were sentenced inmates, some did not report or display serious acute and chronic medical conditions during the receiving screening, four were given a provider assessment at intake and required no follow-up, and some were assessed at the hospital. One of the cases identified by Plaintiffs as noncompliant was described by Dr. Alvarez as a complicated patient who should have been seen by a provider at intake and was not.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(8).

**I.     Subparagraph 5(a)(9):  A medical provider will develop plans for treatment and monitoring for pretrial detainees with serious medical conditions.**

Subparagraph 5(a)(9) requires that a physician, physician assistant, or nurse practitioner develop treatment and monitoring plans for pretrial detainees. This provision does not require Defendants to demonstrate that within 24 hours of admission a medical

provider ordered medications, labs, and follow-up appointments that addressed all of the patient's presenting conditions, both acute and chronic.   In some cases, a medical provider may determine that an acute condition should be treated and stabilized before routine labs and medication are ordered for a chronic condition.  Defendants reported the following monthly compliance rates for March through August 2015:  98%, 98%, 98%, 97%, 96%, and 96%.  Plaintiffs dispute those rates based upon their experts' incorrect interpretation of the requirements of subparagraph 5(a)(9).

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(9).

**J.      Subparagraph 5(a)(10):  All medical Health Needs Requests will be triaged within 24 hours of their submission.**

Defendants reported compliance rates of 98% or 99% for each month.  Plaintiffs' experts reviewed 31 Health Needs Requests and found all of them were triaged within 24 hours of submission.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(10).

**K.      Subparagraph 5(a)(11):  Each pretrial detainee who submits a medical Health Needs Request stating or indicating a clinical symptom will be seen by a nurse within 48 hours of submitting the Health Needs Request.**

To evaluate compliance with subparagraph 5(a)(11), Defendants determined whether pretrial detainees were seen by a nurse within 36 hours of Health Needs Requests being triaged, assuming that all Health Needs Requests are triaged within 12 hours.  Because the average time from submission to triage is slightly more than three hours, actual compliance rates are likely greater than those reported.  Defendants reported the following monthly compliance rates for March through August 2015:  84%, 84%, 81%, 83%, 81%, and 84%.  Plaintiffs' experts' review of 33 Health Needs Requests showed that 28 (85%) were seen by a nurse within 48 hours of submission.

1

2

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(11).

3

4

5

6

7

**L.**     **Subparagraph 5(a)(12):   When a physician, physician assistant, or nurse practitioner orders a lab test or radiological study, the physician, physician assistant, or nurse practitioner will identify the urgency with which the test or study must be performed, *e.g.*, within 24 hours, 72 hours, or 7–10 days, and the urgency with which the results of the test or study must be returned.  The test or study will be performed within the timeframe ordered by a physician, physician assistant, or nurse practitioner.**

8

9

10

11

12

13

14

When the Jail's medical providers order a lab test or radiological study, they do not always explicitly identify the urgency with which the test or study must be performed.  A provider can request that a test be performed immediately, on a specific day or time, or within a time frame.  When the provider does not do so, the test is considered routine and timely if it is performed within the next thirty days.  Defendants contend that the provider implicitly identifies a test as non-urgent when the provider does not identify it as urgent.

15

16

17

18

19

20

21

22

23

24

Because the urgency of an order for lab test or radiological study is not documented in the electronic health record system, Defendants were unable to generate automated reports of the timeliness with which tests were completed.  Therefore, to determine compliance with subparagraph 5(a)(12), Defendants reviewed a sample of lab and x-ray orders for each reporting month.  Orders for routine labs and/or x-rays were deemed completed on time if they were completed within 30 days of the provider order.  Priority labs and/or x-rays were deemed completed on time if they were completed within the time frame ordered by the provider.  In 100% of the charts reviewed, the lab or x-ray was either completed on time or the pretrial detainee was released from custody prior to the deadline.

25

26

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(12).

27

28

1

2

3

4

5

6

7

**M.** **Subparagraph 5(a)(13): Pretrial detainees identified during the receiving screening as being at risk of serious harm from alcohol or drug withdrawal will be assessed by a registered nurse twice a day for at least seven days regardless of whether they are assigned to a housing unit designated for withdrawing inmates or their classification status. The nurse will document each assessment and identify the urgency with which the pretrial detainee should be seen by a physician, physician assistant, or nurse practitioner. If a pretrial detainee is not seen face-to-face by a physician, physician assistant, or nurse practitioner within the timeframe recommended by the nurse, the reason will be documented in the pretrial detainee's medical record.**

8

9

10

11

12

13

14

Defendants reported the average number of days in detox and the average number of nursing assessments for three categories of patients over the six-month period. For each category, the averages do not show that patients were assessed by a registered nurse twice a day for at least seven days. Defendants explained that the averages were affected by pretrial detainees being removed from withdrawal precautions based on clinical evaluations. Plaintiffs' experts found that 31 of 34 applicable records, *i.e.*, 91%, showed that the patient was assessed by a registered nurse twice a day for at least seven days.

15

16

17

Defendants reported the following percentages of pretrial detainees who were seen face-to-face by a medical provider within the time requested for March through August 2015: 88%, 94%, 87%, 89%, 95%, and 87%. Plaintiffs do not dispute this.

18

19

20

Plaintiffs agree that Defendants are in compliance with subparagraph 5(a)(13). The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(13).

21

22

**N.** **Subparagraph 5(a)(14): All mental health Health Needs Requests stating or indicating a clinical symptom will be triaged face-to-face within 48 hours of their submission.**

23

24

25

26

27

Defendants reported compliance rates of 82% in March, 94% in April, 96% in May, 94% in June, 95% in July, and 94% in August based on whether pretrial detainees who submitted mental health Health Needs Requests stating a clinical symptom were seen by mental health staff within 48 hours. The monthly triage time averages for March

28

through August 2015 were 18.6 hours, 15.7 hours, 18.4 hours, 15.7 hours, 14.2 hours, and 15.8 hours.

Plaintiffs contend that the triage process requires actual assessment and the data collected by Defendants indicates only whether face-to-face contact with mental health staff, not whether an assessment was conducted.  Subparagraph 5(a)(14) was ordered to avoid situations in which written statements by pretrial detainees failed to adequately communicate mental health needs, resulting in delay or denial of necessary mental health care.  This remedy only requires mental health staff to communicate face-to-face with each pretrial detainee who submits a mental health Health Needs Request indicating a clinical symptom.

Plaintiffs further contend that Defendants' policy SOP J-E-07 requires that detainees with "urgent psychiatric need" be seen by a provider within 24 hours, but the compliance data collected does not show the triage category assigned to each Health Needs Request and the date of follow-up provider assessment, if any.  Defendants were not ordered to provide data showing compliance with Jail policies.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(14).

**O.      Subparagraph 5(a)(15):  Upon referral by detention, intake, medical, or mental health staff, pretrial detainees who display active symptoms of mental illness or otherwise demonstrate an emergent mental health need will be seen face-to-face by a mental health provider within 24 hours of the referral.**

Defendants initially reported the following monthly compliance rates for March through August 2015:  69%, 45%, 50%, 72%, 74%, and 75%.  Data for March, April, and May were obtained through manual chart audits.  Enhancements to the electronic health record system in June permitted electronic data retrieval for June, July, and August. Defendants' supplemental compliance report stated that the compliance rate for May should have been 67% and the initial report included pretrial detainees who had been released within 24 hours of referrals.  By counting the released pretrial detainees as

though they were seen within 24 hours, Defendants adjusted their compliance rates to 69%, 47%, 70%, 75%, 74%, and 77%.[8]

Defendants then conducted chart audits for June, July, and August and found that many referrals included in the electronically generated reports did not involve "pretrial detainees who display active symptoms of mental illness or otherwise demonstrate an emergent mental health need."  The chart audits revealed additional reporting errors. After corrections, Defendants reported the following monthly compliance rates for June, July, and August 2015:  94%, 95%, and 96%.

Defendants report that detention staff members are asked to refer to mental health staff anyone for whom they have a concern because detention staff members are not trained to determine whether a pretrial detainee is displaying active symptoms of mental illness or demonstrating an emergent mental health need.  Then a mental health staff member responds within three hours to assess the detainee and determine whether the mental health need requires a provider assessment within 24 hours of the initial referral.

Plaintiffs dispute Defendants' compliance with subparagraph 5(a)(15) primarily because, in Dr. Stewart's opinion, certain referrals were inaccurately triaged by mental health staff.  As explained above, Dr. Stewart reviewed the records of 47 selected patients, many of whom were in the RTC program, refused treatment, and eventually were hospitalized after their criminal charges were dismissed.  Some were placed in the Mental Health Unit.  Of the 47 records Dr. Stewart reviewed, he opined that 32 were relevant to subparagraph 5(a)(15).  He opined that 21 of the 32 records (66%) were noncompliant with subparagraph 5(a)(15).  Many of the examples Dr. Stewart described were seriously mentally ill patients who were being treated on an ongoing basis but were not referred to a provider every time a referral was made by detention staff.

---

[8] As previously explained, released detainees should have been excluded from the analysis entirely.  Nevertheless, including them here does not make a significant difference.

In addition, Dr. Stewart reviewed the electronic medical charts for 13 of 19 patients who were initially identified as noncompliant with subparagraph 5(a)(15) and then were changed to compliant or were removed from Defendants' analysis.  He opined that four of the patients displayed symptoms that required a provider assessment and were either not referred to a provider or not seen within 24 hours.  Some of the referrals that Dr. Stewart deemed to be noncompliant were not marked "urgent" and therefore not included in Defendants' data analysis.  For example, Dr. Stewart described a patient who was referred by detention staff on two consecutive days and seen by a provider within 24 hours of the second referral.  Defendants assert that the first referral was not marked urgent, and the second one was.   Some of Dr. Stewart's criticisms are based on Defendants' failure to include referrals from March, April, and May 2015 in the electronic health record system, which Defendants explained did not include the relevant information until June.

The purpose of subparagraph 5(a)(15) is to give greater priority to mental health referrals from detention, intake, medical, or mental health staff regarding pretrial detainees who need to be seen by a mental provider within 24 hours than to mental health Health Needs Requests, which often are less urgent.  Dr. Stewart found instances where, in his opinion, seriously mentally ill patients were not seen as frequently or as urgently as he would recommend.  Nevertheless, after resolving documentation and data collection issues, Defendants provided evidence that they complied with the requirements of subparagraph 5(a)(15) for June, July, and August 2015.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(15).

**P.      Subparagraph 5(a)(16):  Mental health providers will assess pretrial detainees in an area outside of their cells that affords sound privacy except when there are legitimate safety, security, and treatment reasons for not doing so.**

Defendants reported the following monthly compliance rates for March through August 2015:  89%, 100%, 99%, 89%, 99.5%, and 96%.  For March, April, and May

2015, Defendants conducted manual chart audits of randomly selected records.  For June, July, and August 2015, Defendants' electronic records showed whether each psychiatric assessment was conducted privately or cell-side and whether one of five reasons for conducting the non-private assessment existed.  The five reasons were "Safety Concerns," "Security Concerns," "Treatment Reasons," "Patient Refusal," and "Patient Unavailable."  Defendants conducted chart audits on all patients shown as being seen without sound privacy to determine whether a legitimate reason was documented. Defendants counted an assessment as noncompliant only when the assessment was conducted in a non-private space and none of the five reasons was entered into the record.

Plaintiffs contend that Defendants should have reported the total percentage of non-confidential assessments and should have provided more specific information regarding each non-private assessment to show that the reason selected was legitimate or justified.  As a practical matter, however, neither Plaintiffs' counsel nor Dr. Stewart would have been able to determine whether a legitimate safety or security reason existed, and they would have been only able to second-guess a mental health provider's determination that "treatment reasons" existed for not conducting an assessment in a private location outside of the cell.  Notes that a patient was "neat, calm, and oriented" do not necessarily mean that a patient should be moved from his or her cell.

Dr. Stewart stated that he reviewed 33 records for compliance with subparagraph 5(a)(16).  Presumably, the 33 records were selected from the records of the 47 patients selected for review by Dr. Stewart, many of whom were in the RTC program and hospitalized after being declared incompetent.  Dr. Stewart found 16 of the 33 records noncompliant because the reason for a non-private assessment was not documented, the provider's notes did not adequately support the documented reason for a non-private assessment, the notes did not clearly state whether the assessment was conducted in a private space, or the assessment was not included in Defendants' compliance data.  The 33 records reviewed by Dr. Stewart is not a representative sample, and even if it were, it

is a very small sample of the mental health patients seen by providers during the six-month period.  Moreover, Dr. Stewart's opinion that 16 records showed noncompliance does not explain how many of those 16 records he found noncompliant because he disagreed with the legitimacy of the reason provided.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(16).

> **Q.     Subparagraph 5(a)(17):  Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit.**

On December 11, 2014, Defendants revised Standard Operating Procedure SOP J-G-04 regarding the Jail's provision of basic mental health services.  Among other things, it establishes admission criteria for the Mental Health Unit, the process for admission to the Mental Health Unit, initial placement upon admission to the Mental Health Unit, criteria for transfer to any of four step-down psychiatric units within the Mental Health Unit, procedures regarding discharge from the Mental Health Unit to general population, procedures for outpatient mental health services, and documentation of level of care classification.  (Doc. 2304-1 at 137–147.)

Plaintiffs' expert, Dr. Stewart, opined that the Mental Health Unit admission criteria remain too high and the discharge criteria remain too low, resulting in many seriously mentally ill inmates being inappropriately placed in outpatient care.  As previously discussed, Dr. Stewart reviewed the records of 47 selected patients, many of whom were in the RTC program.  In his opinion, 29 of the 47 records demonstrated delayed admission to the Mental Health Unit, premature discharge from the Mental Health Unit, inadequate use of step-down units, and/or inadequate care in the outpatient setting.  Dr. Stewart does not specifically explain how these 29 examples show that Defendants have not adopted and implemented placement criteria rather than his disagreement with the clinical judgment of the Jail's mental health providers.

Subparagraph 5(a)(17) requires that Defendants adopt and implement written criteria.  Defendants provided Plaintiffs their revised procedure in December 2014, and Plaintiffs raised no objection.  Defendants filed a summary of their actions taken to implement the revised procedure.  However, Defendants have provided no evidence of the extent to which they have actually implemented SOP J-G-04.

Defendants have not shown that they have sufficiently implemented the remedy described in subparagraph 5(a)(17).

**R.**  **Subparagraph 5(a)(18):  A mental health provider will determine the placement of each seriously mentally ill pretrial detainee after performing a face-to-face assessment, including upon admission into, transfer within, and discharge from the Mental Health Unit.**

Standard Operating Procedure SOP J-G-04 provides that inmates presenting with acute or chronic mental health needs who cannot be managed in general population may be housed in the Mental Health Unit.  It provides criteria for admission to the Mental Health Unit and establishes an admission process.  But SOP J-G-04 does not expressly require face-to-face assessment by a mental health provider before a pretrial detainee is placed in the Mental Health Unit.  A "mental health provider" includes a psychiatrist, psychiatric nurse practitioner, or physician assistant.  SOP J-G-04 requires that an admission form be completed by the "referring Provider or Licensed Nurse (Registered Nurse [RN] or Licensed Practical Nurse (LPN)) with Provider phone order."  It requires that a psychiatric provider see each patient for face-to-face evaluation "by the next day after admission" to the Mental Health Unit.  It also requires that a psychiatric provider conduct a clinical assessment to determine if it is appropriate to transfer a patient to other Mental Health Unit subunits for further treatment or to general population.

Notwithstanding the express language of SOP J-G-04, Defendants analyzed data regarding whether seriously mentally ill pretrial detainees received face-to-face assessment by a mental health provider before admission into, transfer within, or discharge from the Mental Health Unit.  Defendants initially reported the following monthly compliance rates for March through August 2015:  72%, 74%, 73%, 83%, 82%,

and 85%.  These rates were calculated by adding the percentage of seriously mentally ill pretrial detainees who received a face-to-face assessment prior to their admission into, transfer within, or discharge from the Mental Health Unit to the percentage of pretrial detainees who were released within 24 hours each month.  Subparagraph 5(a)(18) requires assessment *before* placement—what happens after placement is irrelevant. Therefore, the monthly compliance rates should have been reported as 64%, 67%, 66%, 76%, 77%, and 77%.

Defendants' manual audit of cases deemed noncompliant found that many involved transfers to different cells, not different levels of care, within the Mental Housing Unit.  In other cases, a provider assessed the patient before the patient was transferred, but entered the documentation after the patient was transferred.  Defendants explained that a provider usually will see multiple patients during his shift and enter notes for all patients at the end of his shift, but the electronically generated reports are based on the time the provider entered his note, not the time the patient was actually seen.  Because housing transfers must be completed by noon, frequently a provider sees a patient in the morning and orders transfer, the patient is transferred at noon, and the provider enters his note in the afternoon.

After correcting for these circumstances, Defendants reported monthly compliance rates for June, July, and August 2015 of 92%, 87%, and 96%.  Defendants did not explain whether they included the percentage of pretrial detainees released within 24 hours to calculate the corrected compliance rates; if so, the corrected rates should have been reported as 85%, 82%, and 88%.

SOP J-G-04 does not require face-to-face assessment by a mental health provider before a pretrial detainee, who is not placed in the Mental Health Unit, is placed in outpatient care.  It articulates three levels of outpatient care and states that mental health staff "begin the assessment, treatment planning and re-entry planning process." Subparagraph 5(a)(18) requires that a mental health provider assess and determine the

placement of each "seriously mentally ill" pretrial detainee and does not define "seriously mentally ill."   However, elsewhere, the Revised Fourth Amended Judgment requires a mental health screening at intake for every pretrial detainee and, upon referral at intake or at any time, a face-to-face examination by a mental health provider for any pretrial detainee who displays active symptoms of mental illness or emergent mental health need. Therefore, pretrial detainees may receive outpatient mental health services without a face-to-face examination by a mental health provider, but only if they do not display active symptoms of mental illness or emergent mental health need.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(18).

**S.     Subparagraph 5(a)(19):  Pretrial detainees discharged from the Mental Health Unit will be assessed by mental health staff within 48 hours after discharge.**

Defendants reported the following monthly compliance rates for March through August 2015:   93%, 90%, 85%, 88%, 96%, and 92%.   Plaintiffs contend that this provision was intended "to address the problem of clinically unstable patients being prematurely discharged from the [Mental Health Unit] and lingering in outpatient care without being timely readmitted to the [Mental Health Unit]."  Of 18 records reviewed by Dr. Stewart, 3 indicated that patients were not seen within 48 hours of discharge.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(19).

**T.     Subparagraph 5(a)(20):  MCSO[9] will consult with CHS mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement.**

Defendants initially reported the following monthly compliance rates for March through August 2015:   59%, 50%, 67%, 61%, 57%, and 80%.   They determined compliance based on whether a consultation with mental health staff occurred each time

---

[9] MCSO means Maricopa County Sheriff's Office.

that MCSO requested an evaluation, not based on whether a consultation occurred before a pretrial detainee was placed in segregation.

Defendants performed chart review audits for June, July, and August 2015 and found reporting errors for July and August, including duplicate entries.  Defendants removed duplicates from cases identified as noncompliant, but did not do so for those identified as compliant.  The corrected compliance rates for June, July, and August 2015 are 61%, 80%, and 92%.  Even if these rates were based on what subparagraph 5(a)(20) requires, *i.e.*, consultation before placement in segregation, they do not show sufficient implementation.

Defendants have not shown that they have sufficiently implemented the remedy described in subparagraph 5(a)(20).

> **U.    Subparagraph 5(a)(21):  Seriously mentally ill pretrial detainees who are confined to single cells for 22 or more hours a day will have face-to-face communication with mental health staff at least twice per week.**

Defendants reported the following monthly compliance rates for March through August 2015:  88%, 98%, 98%, 99.6%, 98%, and 95%.  To determine compliance, Defendants generated electronic reports each month that included data for each seriously mentally ill pretrial detainee who appeared to be in some type of segregation during that month and then conducted a manual audit of the third week of each month to verify compliance.

Plaintiffs contend that Defendants' measure of compliance shows only that there were two contacts each week, not whether the contacts consisted of verbal interaction, mental status, and observations and whether patients were given opportunity to communicate health care concerns, as Defendants' procedure SOP J-E-09 requires.  Of the records Dr. Stewart reviewed, he identified 39 records in which a patient was housed in segregation, and he looked closely at the records of mental health rounds in 13 of the 39.  Dr. Stewart opined that Defendants failed to comply with SOP J-E-09 in each of the 13 cases.  Dr. Stewart reported that in many of the 13 cases the staff checked off the

boxes for no health concerns noted and no observable change in mental health status, despite other notes that indicated the patient was actively symptomatic.  In his opinion, the minimal contact with mental health staff during segregation rounds did not mitigate the risk of mental health deterioration related to isolation.  Nevertheless, Dr. Stewart's review indicated that mental health staff had face-to-face communication at least twice per week with each of the 13 patients.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(21).

> **V.   Subparagraph 5(a)(22):  A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.**
>
> **Subparagraph 5(a)(23):  Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.**

For subparagraphs 5(a)(22) and 5(a)(23), Defendants reported that the monthly compliance rate for March through August 2015 was 100%.  Defendants reported they had revised procedure J-A-08 to require that MCSO consult with CHS before each planned use of force or involuntary treatment on a seriously mentally ill or mental health chronic care patient and to require that for any planned use of force or involuntary treatment deemed necessary, mental health staff be involved in the implementation of the planned use of force or involuntary treatment.  Defendants generated electronic reports for each month that included data for each pretrial detainee identified as a seriously mentally ill or mental health chronic care patient in which the MCSO consulted with CHS on a planned use of force.  The electronic reports compared the date and time of a request by MCSO for a consultation by mental health staff to the date and time of the planned use of force.  In other words, they evaluated whether mental health staff were responsive to requests from MCSO.  They did not evaluate whether MCSO consistently requested a consultation before each planned use of force involving a pretrial detainee identified as a seriously mentally ill or mental health chronic care patient.

Eldon Vail, a former correctional administrator, reviewed MCSO's policies and documentation regarding planned use of force and consultation with mental health staff. He opined that, unlike the related CHS policies, the MCSO use-of-force policy does not require that detention staff document consultation with mental health staff.  Mr. Vail reviewed 33 incident summaries from March through June 2015, that appeared to be planned use of force events involving seriously mentally ill detainees.  He found that 14 of the 33 did not mention mental health consultation.  When Mr. Vail reviewed records for use-of-force incidents during June, July, and August 2015, he found documentation of mental health staff involvement in 32 of 64 incidents.  By examining the medical files for the 64 inmates, Mr. Vail found documentation for 38 showing that there was some level of involvement by mental health staff.   Defendants disagree with Mr. Vail's characterization of certain incidents as involving planned use of force and contend that some of his expectations exceed the requirements of the Revised Fourth Amended Judgment.

Dr. Stewart opined that Defendants' analysis also was flawed because it did not include patients not identified as a seriously mentally ill or mental health chronic care patient but who were suspected of being seriously mentally ill.  Subparagraphs 5(a)(22) and (23) do not require MCSO staff to determine whether a patient is "suspected" of serious mental illness.  Nor do subparagraphs 5(a)(22) and (23) require Defendants to be able to report whether mental health consultations have occurred regarding pretrial detainees who have not been designated as seriously mentally ill or mental health chronic care patients.

Defendants have provided no evidence regarding whether MCSO staff consistently seek a consultation with mental health staff before implementing a planned use of force or involuntary treatment involving a seriously mentally ill pretrial detainee. They have provided no evidence that mental health staff members are consistently

involved in the implementation of planned use of force or involuntary treatment involving a seriously mentally ill pretrial detainee.

The Court finds that Defendants have not shown that they have sufficiently implemented the remedy described in subparagraphs 5(a)(22) and 5(a)(23).

**W.      Subparagraph 5(a)(24):   Defendants will adopt and implement a written policy regarding the use of discipline for behavior resulting from serious mental illness.**

**Subparagraph 5(a)(25):   Defendants will adopt and implement a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against seriously mentally ill pretrial detainees.**

**Subparagraph 5(a)(26):   Defendants will adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee.**

Defendants reported that on December 11, 2014, they revised procedures J-A-08 and J-E-09 to satisfy the requirements of subparagraphs 5(a)(24), 5(a)(25), 5(a)(26). Defendants provided Plaintiffs their revised procedures in December 2014, and Plaintiffs raised no objection.  Defendants filed a summary of their actions taken to implement the revised procedures.  However, Defendants have provided no evidence of the extent to which they have actually implemented the revised procedures.

The Court finds that Defendants have not shown that they have sufficiently implemented the remedies described in subparagraphs 5(a)(24), 5(a)(25), 5(a)(26).

**X.      Subparagraph 5(a)(27):   A potentially suicidal pretrial detainee will not be placed in isolation without constant supervision.**

Based on pretrial detainees who were "actively suicidal," Defendants reported the following monthly compliance rates for March through August 2015:  72%, 86%, 72%, 89%, 97%, and 95%.  They did not report compliance rates for "potentially suicidal" pretrial detainees.

Dr. Noggle opined that there is mental health distinction between "potentially suicidal" and "actively suicidal."  She asserted that CHS relies on the definition provided by the National Commission on Correctional Health Care to determine which inmates

may be potentially suicidal, which "allows CHS to cast a wide protective net." But Defendants have not explained why they have complied with subparagraph 5(a)(27) only with respect to pretrial detainees who are "actively suicidal" and not those who are "potentially suicidal."

The Court finds that Defendants have not shown they have sufficiently implemented the remedy described in subparagraph 5(a)(27).

**Y.**   **Subparagraph 5(a)(28):  A potentially suicidal pretrial detainee will be placed into a suicide-resistant cell or safe cell only with "direct, continuous observation until a treatment plan is determined by medical staff."**

Based on pretrial detainees who were "actively suicidal," Defendants reported the following monthly compliance rates for March through August 2015:  72%, 91%, 72%, 89%, 97%, and 100%.  They did not report compliance rates for "potentially suicidal" pretrial detainees.

As explained above, Dr. Noggle opined that there is mental health distinction between "potentially suicidal" and "actively suicidal" and asserted that CHS relies on the definition provided by the National Commission on Correctional Health Care to determine which inmates may be potentially suicidal.  But Defendants have not explained why they have complied with subparagraph 5(a)(28) only with respect to pretrial detainees who are "actively suicidal" and not those who are "potentially suicidal."

The Court finds that Defendants have not shown they have sufficiently implemented the remedy described in subparagraph 5(a)(28).

**Z.**   **Subparagraph 5(a)(29):  When a pretrial detainee is discharged from suicide watch or a safe cell, the pretrial detainee will be assessed by mental health staff within 24 hours of discharge.**

Defendants initially reported the following monthly compliance rates for March through August 2015:  68%, 65%, 62%, 73%, 76%, and 82%.  In their supplemental report, Defendants added to the initial compliance rates the percentage of relevant pretrial detainees who were released within 24 hours, which yielded the following monthly

compliance rates:  79%, 75%, 72%, 84%, 87%, and 91%.  As previously noted, including those released within 24 hours in the total somewhat inflates the compliance rates, and adding the percentages double counts any pretrial detainees who were both assessed by mental health staff and released within 24 hours.  Even taken at face value, however, these compliance rates indicate that 10-15% of pretrial detainees remain at the Jail and are not assessed by mental health staff within 24 hours of discharge from suicide watch or a safe cell.

Defendants offer no justification for noncompliance with subparagraph 5(a)(29).  A possible explanation is that their revised procedure J-G-05 is ambiguous.  It requires that patients discharged from suicide watch "are scheduled to be seen," not that they actually are seen, within 24 hours of discharge.

The Court finds that Defendants have not sufficiently implemented the remedy described in subparagraph 5(a)(29).

**AA. Subparagraph 5(a)(30): Defendants will document in pretrial detainees' health records evidence of timely administration of prescription medications or reasonably diligent efforts to administer all medications prescribed and explanation for any delay.**

Defendants reported the following monthly compliance rates for March through August 2015:  97.3%, 97.4%, 97.4%, 97.1%, 97.3%, and 97.6%.  Dr. Cohen reviewed 49 records and opined that 12 of the 49 records demonstrated serious problems with continuity of medications.  Defendants provided explanations for the cases identified by Dr. Cohen, such as the patient was hospitalized during the relevant timeframe.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(30).

**BB.   Subparagraph 5(a)(31):   A pretrial detainee's psychotropic medications will not be prescribed, altered, renewed, or discontinued without a face-to-face examination by a psychiatrist, psychiatric physician assistant, or psychiatric nurse practitioner in an area that affords sound privacy.**

Defendants initially reported the following monthly compliance rates for March through August 2015:  79%, 78%, 89%, 80%, 85%, and 80%.  Many of those reported as noncompliant involved a face-to-face examination that was conducted without sound privacy for various legitimate reasons.  Including those as compliant resulted in the following adjusted monthly compliance rates:  90%, 85%, 89%, 88%, 92%, and 83%.

Defendants conducted manual chart audits for June, July, and August 2015 for the 22 patients shown on the electronic reports as not being seen at all.  In each of the 22 cases, Defendants found that the pretrial detainee was seen or there was documentation in the record regarding why the patient was not seen.  In 3 cases, the pretrial detainee was not seen by a provider.  In 2 of those, an appointment was scheduled, but the pretrial detainee was released from custody before the appointment.  In the third case, the pretrial detainee was at court at the time of the scheduled appointment.  After the manual chart audits, Defendants reported for June, July, and August 2015:  face-to-face examination with sound privacy, 88%, 93%, and 88%; face-to-face examination without sound privacy, 8%, 7%, and 10%; combined, 96%, 100%, and 98%.

Dr. Stewart reviewed a sample of medical charts and found discrepancies, inadequate documentation, and what he considered insufficient reasons for seeing a patient cell-side rather than in an area with sound privacy.  He found that in some cases the assessment occurred after the medication was ordered or so far in advance of the order that the assessment seemed unrelated.  Because Dr. Stewart did not identify specifically which patient charts he found to be noncompliant, Defendants were not able to respond specifically to his contentions.

The Court finds that Defendants have sufficiently implemented the remedy described in subparagraph 5(a)(31).

1        IT IS THEREFORE ORDERED that Plaintiffs' Motion to Enforce Fourth
2    Amended Judgment and for Additional Relief (Doc. 2373) is denied.

3        IT IS FURTHER ORDERED that Plaintiffs' Motion for Evidentiary Hearing
4    (Doc. 2380) is denied.

5        IT IS FURTHER ORDERED finding that Defendants have demonstrated
6    compliance with the following subparagraphs of Paragraph 5(a) of the Revised Fourth
7    Amended Judgment:  (1), (2), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14),
8    (15), (16), (18), (19), (21), (30), and (31).

9        IT IS FURTHER ORDERED finding that Defendants have not demonstrated
10   compliance with the following subparagraphs of Paragraph 5(a) of the Revised Fourth
11   Amended Judgment:  (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29).

12       IT IS FURTHER ORDERED that by **March 17, 2017**, Defendants will meet and
13   confer with Plaintiffs regarding Defendants' plan for collecting and summarizing data to
14   show compliance with the following subparagraphs of Paragraph 5(a) of the Revised
15   Fourth Amended Judgment:  (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29).

16       IT IS FURTHER ORDERED that Defendants will collect and summarize data for
17   the months of **April, May, and June 2017** (*i.e.*, April 1-June 30, 2017, summarized
18   monthly) that shows the extent to which Defendants have complied with the following
19   subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment:  (17), (20),
20   (22), (23), (24), (25), (26), (27), (28), and (29).

21       IT IS FURTHER ORDERED that upon reasonable notice to Defendants, during
22   April, May, and June 2017, Plaintiffs' counsel and experts may tour the Maricopa County
23   Jails facilities, speak with pretrial detainees and staff, and review records on-site related
24   to the following subparagraphs of Paragraph 5(a) of the Revised Fourth Amended
25   Judgment:  (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29).

26       IT IS FURTHER ORDERED that by **July 28, 2017**, Defendants file with the
27   Court a report of their corrective actions, compliance data collection procedures, and

28

compliance data summaries for April, May, and June 2017 related to the following subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment:  (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29).

IT IS FURTHER ORDERED that beginning **August 1, 2017**, Defendants make available to Plaintiffs the raw data summarized in Defendants' compliance report filed with the Court, electronically to the extent practical.

IT IS FURTHER ORDERED that Plaintiffs file a response to Defendants' compliance report by **September 1, 2017**.

IT IS FURTHER ORDERED that Defendants file a reply in support of their compliance report by **September 22, 2017**.

Dated this 1st day of March, 2017.


_____
Neil V. Wake
Senior United States District Judge