**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails,<br><br>Plaintiffs,<br><br>v.<br><br>Paul Penzone, Sheriff of Maricopa County; Bill Gates, Steve Gallardo, Denny Barney, Steve Chucri, and Clint L. Hickman, Maricopa County Supervisors,<br><br>Defendants. | No. CV-77-00479-PHX-NVW<br><br>**ORDER** |

TABLE OF CONTENTS

I.     Prison Litigation Reform Act .................................................................................. 1

II.    Background .............................................................................................................. 2

III.   Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment (Doc. 2434) and Defendants' Motion to Strike Plaintiffs' Reply (Doc. 2451) ............... 15

IV.    Plaintiffs' Motion to Re-Open Discovery and for a Scheduling Order (Doc. 2435) ....................................................................................................................... 18

V.     Compliance with the Revised Fourth Amended Judgment .................................... 21

     A.     Subparagraph 5(a)(17):  Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit. ....................................... 22

          1.  General Population ................................................................................. 22

2. Mental Health Unit .................................................................................. 23

B.  Subparagraph 5(a)(20):  MCSO will consult with CHS mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement.................................................................................. 24

C.  Subparagraph 5(a)(22):  A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.......................................................... 26

Subparagraph 5(a)(23):  Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.......................................................... 26

D.  Subparagraph 5(a)(24):  Defendants will adopt and implement a written policy regarding the use of discipline for behavior resulting from serious mental illness.................................................................................................. 27

Subparagraph 5(a)(25):  Defendants will adopt and implement a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against seriously mentally ill pretrial detainees............................... 27

Subparagraph 5(a)(26):  Defendants will adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee................................................ 27

E.  Subparagraph 5(a)(27):  A potentially suicidal pretrial detainee will not be placed in isolation without constant supervision. ........................................... 33

Subparagraph 5(a)(28):  A potentially suicidal pretrial detainee will be placed into a suicide-resistant cell or safe cell only with "direct, continuous observation until a treatment plan is determined by medical staff."........................................................................................................... 33

F.  Subparagraph 5(a)(29):  When a pretrial detainee is discharged from suicide watch or a safe cell, the pretrial detainee will be assessed by mental health staff within 24 hours of discharge....................................................... 35

Before the Court are the following:

(1) Defendants' Report Regarding Corrective Actions, Compliance Data Collection Procedures and Compliance Data Summaries for April, May, and June 2017 (Doc. 2417), Defendants' supplemental report (Doc. 2425), Plaintiffs' response (Doc. 2436), Defendants' reply (Doc. 2444), and Defendants' second supplemental report (Doc. 2473);

(2) Plaintiffs' Motion to Enforce Fourth Amended Judgment and for Additional Relief (Doc. 2434), Defendants' response (Doc. 2441), Plaintiffs' reply (Doc. 2449), Defendants' motion to strike Plaintiffs' reply (Doc. 2451), Plaintiffs' response to the motion to strike (Doc. 2452), and Defendants' reply supporting the motion to strike (Doc. 2454); and

(3) Plaintiffs' Motion to Re-Open Discovery and for a Scheduling Order (Doc. 2435), Defendants' response (Doc. 2442), and Plaintiffs' reply (Doc. 2447).

Collectively, Defendants' compliance reports and Plaintiffs' motions dispute whether the Revised Fourth Amended Judgment should be terminated, whether additional prospective relief under the Prison Litigation Reform Act is required, and whether additional discovery and another evidentiary hearing is required to decide those issues. On June 21, 2018, oral argument was heard regarding the pending motions and Defendants' proof of compliance with the Revised Fourth Amended Judgment.

## I.    PRISON LITIGATION REFORM ACT

Congress enacted the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 and 42 U.S.C. § 1997, to prevent federal courts from micromanaging prisons by consent decrees. *Gilmore v. California*, 220 F.3d 987, 996 (9th Cir. 2000). The PLRA requires that prospective relief regarding prison conditions "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). Relief must be narrowly drawn, extend no further than necessary to correct the violation, and be the least intrusive means necessary to correct the violation. *Id.*

Further, courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

A party seeking to terminate prospective relief under § 3626(b) bears the burden of proof. *Gilmore*, 220 F.3d at 1007; *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam). "Prospective relief shall not terminate if the court makes written findings based upon the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). If prospective relief remains necessary to correct a current and ongoing violation, the district court's authority to modify the existing prospective relief includes authority to expand or diminish the existing relief. *See Pierce v. Orange County*, 526 F.3d 1190, 1204 n.13 (9th Cir. 2008).

To make the findings required to terminate prospective relief, the Court must take evidence on current jail conditions, at least with respect to those conditions Plaintiffs do not concede comply with constitutional requirements. *See Gilmore*, 220 F.3d at 1010. Evidence of "current and ongoing" violations must reflect conditions "as of the time termination is sought." *Id.*; *accord Pierce*, 526 F.3d at 1205.

## II.    BACKGROUND

Although this case's lengthy history has been summarized in previous orders, for the sake of completeness, much of it is repeated here because the issues presented for decision can be fully understood only in context. *See* David Marcus, *Finding the Civil Trial's Democratic Future After Its Demise*, 15 Nev. L.J. 1523, 1530–46 (2015). Pretrial detainees held in the Maricopa County Jails brought this class action in 1977 against the Maricopa County Sheriff and the Maricopa County Board of Supervisors seeking injunctive relief for violations of their civil rights. On March 27, 1981, the parties entered into a consent decree that addressed and regulated aspects of the County jail operations as they applied to pretrial detainees.

On January 10, 1995, upon stipulation of the parties, the 1981 consent decree was superseded by the Amended Judgment. The stipulated Amended Judgment expressly did not represent a judicial determination of any constitutionally mandated standards applicable to the Maricopa County Jails. The 116-paragraph Amended Judgment included specific requirements regarding population and housing limitations; dayroom access; access to reading materials; access to religious services; mail; telephone privileges; clothes and towels; sanitation, safety, hygiene, and toilet facilities; access to law library; medical, dental and psychiatric care; intake areas; mechanical restraints and segregation; recreation time outside; inmate classification; visitation; food; staff members, training, and screening; facilities for the handicapped; disciplinary policy and procedures; inmate grievance policy and procedures; reports and record keeping; and security override.

In November 2003, Defendants renewed a prior motion to terminate the Amended Judgment, an evidentiary hearing was initiated, and the parties engaged in further discovery, but the motion was not decided. By virtue of 18 U.S.C. § 3626(e), once that motion was not ruled on within 90 days, the consent injunction was automatically stayed. Defendants were no longer required to comply with the consent injunction after February 12, 2004. On April 3, 2008, the case was reassigned to the undersigned judge. On April 25, 2008, Defendants' motion to terminate the Amended Judgment was set for evidentiary hearing commencing August 12, 2008.

Although evidence of "current and ongoing" violations usually must reflect conditions as of the time termination is sought, Defendants had been seeking termination for nearly five years. Therefore, it was necessary to determine the period for which evidence would be considered relevant to current conditions. The Court initially ordered the parties to plan for discovery and trial regarding jail conditions during the period of July 1, 2007, through June 30, 2008. Subsequently, upon request of the parties, the relevant evidentiary period for evaluating current conditions was reduced to July 1, 2007,

through May 31, 2008, to facilitate providing information to expert witnesses before their tours and inspections of jail facilities.

In August and September 2008, a thirteen-day evidentiary hearing was held to decide whether prospective relief in the Amended Judgment should be continued, modified, or terminated. On October 22, 2008, the Court made detailed findings of fact and conclusions of law and entered the Second Amended Judgment. Certain provisions of the Amended Judgment were found to remain necessary to correct a current and ongoing violation of a federal right, to extend no further than necessary to correct the violation of the federal right, to be narrowly drawn, and to be the least intrusive means to correct the violation. Other provisions were modified or vacated based on the evidence presented. The provisions remaining in effect, as originally written or as modified, were restated in the Second Amended Judgment.

The sixteen-paragraph Second Amended Judgment included requirements for the number of detainees per cell, court holding cell capacities, maximum housing temperature for detainees who take prescribed psychotropic medications, provision of cleaning supplies, toilet and wash basin facilities in intake areas and court holding cells, length of stay in intake areas, outdoor recreation, nutrition, recordkeeping, and visual observation of intake areas, court holding cells, the Lower Buckeye jail psychiatric unit, and segregation units.

With respect to Paragraph 57 of the Amended Judgment, regarding access to medical services and facilities, the Court found:

> 182. Paragraph 57 of the Amended Judgment does not exceed the constitutional minimum to the extent it requires Defendants to ensure pretrial detainees' ready access to care to meet their serious medical, dental, and mental health needs, which means that in a timely manner, a pretrial detainee can be seen by a clinician, receive a professional clinical judgment, and receive care that is ordered.

> . . . .

> 216. Regarding paragraph 57 of the Amended Judgment, Defendants do not ensure that pretrial detainees receive access to adequate

- 4 -

medical and mental health care because Correctional Health Services does not provide timely in-person assessment of the urgency of their need for treatment, is not able to readily retrieve information from pretrial detainees' medical and mental health records and housing records, and does not identify and appropriately treat many pretrial detainees with serious mental illness.

(Doc. 1634 at 43, 46–47.) Therefore, Paragraph 57 of the Amended Judgment was renumbered as Paragraph 7 of the Second Amended Judgment and modified to state:

7. All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

(Doc. 1635 at 2–3.)

In addition to making detailed findings and entering the Second Amended Judgment on October 22, 2008, the Court ordered the parties to confer immediately regarding prompt compliance and to submit status reports. A status conference was held on December 5, 2008. On January 9, 2009, a hearing was held regarding Defendants' progress toward compliance with the nonmedical portions of the Second Amended Judgment. On January 28, 2009, upon stipulation of the parties, the Court appointed a medical expert and a mental health expert to serve as independent evaluators of Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment. In June 2009, the Court began receiving quarterly reports from the experts. By April 2010, the Court concluded that "significant areas of failure to comply with the Second Amended Judgment's medical and mental health requirements remain" and ordered the parties to jointly "develop a proposed procedure for achieving and demonstrating Defendants' complete compliance with the Second Amended Judgment." (Doc. 1880 at 3–4.) In the April 7, 2010 Order, the Court stated: "The Court's purpose is to set a procedure by which full compliance with the Second Amended Judgment is either

confirmed or specific implementing remedies are ordered and complied with by the end of this calendar year." (*Id.* at 4.)

On July 30, 2010, the parties filed a joint report stating each party's position regarding the status of Defendants' compliance with the medical and mental health portions of the Second Amended Judgment. The parties agreed to a procedure for achieving compliance with the Second Amended Judgment regarding the medical and mental health issues that remained disputed. The independent evaluators would determine whether Defendants were in full compliance with the Second Amended Judgment, and if Defendants were found not to be in full compliance with any provision, the evaluators would submit detailed proposed remedies and timetables for remedial action to bring Defendants into full compliance. If neither party objected to an evaluator's finding and remedial recommendation, the finding and remedy would be adopted as an order of the Court. The Court would resolve any objections after hearing evidence on the relevant issues. But this procedure never was implemented.

In January 2011, the parties reported Defendants' disagreement with two of the independent evaluators' recommendations, but in June 2011 the parties jointly reported that an evidentiary hearing regarding medical and mental health remedies was no longer necessary. On June 7, 2011, Defendants filed a motion to terminate the nonmedical provisions of the Second Amended Judgment. An evidentiary hearing on the motion was set, and the parties conducted extensive discovery. However, on October 12, 2011, the parties stipulated that certain nonmedical provisions should be terminated and others should remain in effect without an evidentiary hearing. The stipulation stated that Defendants would renew the motion to terminate the remaining nonmedical provisions after April 1, 2012, and that Plaintiffs would not contest the renewed motion if Defendants successfully accomplished certain goals for the period November 1, 2011, through March 1, 2012.

On April 24, 2012, Defendants moved to terminate the remaining nonmedical provisions of the Second Amended Judgment, and Plaintiffs did not oppose the motion. On May 24, 2012, Defendants' motion was granted, and those provisions of the Second Amended Judgment that remained in effect were restated in the Third Amended Judgment. The remaining substantive provisions were:

> 2. Defendants shall provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population. The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped.

> 3. All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

> 4. Defendants shall ensure that the pretrial detainees' prescription medications are provided without interruption where medically prescribed by correctional medical staff.

(Doc. 2094.)

In October 2012, the independent evaluators visited the jails, conducted interviews, and reviewed medical records. In January 2013, the evaluators reported that Defendants had made significant progress toward compliance with the Third Amended Judgment, and the evaluators provided specific recommendations for achieving substantial compliance. In June 2013, Defendants filed a status report describing their efforts to address the evaluators' concerns and identified certain recommendations with which they disagreed. In response, Plaintiffs identified recommendations for which Defendants had not shown evidence of compliance and also challenged the accuracy of

some of Defendants' assertions about their compliance with the evaluators' recommendations.

On August 9, 2013, Defendants moved to terminate the Third Amended Judgment. The Court ordered that for evidence to be relevant to the motion, it must tend to show whether any current and ongoing constitutional violation existed on August 9, 2013. In addition to filing briefs and statements of facts with supporting exhibits, the parties presented evidence and argument for six days in February and March 2014.

On September 30, 2014, the Court made detailed findings of fact and conclusions of law regarding whether and to what extent prospective relief in the Third Amended Judgment should be terminated. In many instances, Defendants demonstrated they had recently adopted or revised policies and procedures designed to correct deficiencies identified by the independent evaluators and/or Plaintiffs, but they were unable to produce evidence that the revised policies and procedures had been fully and consistently implemented or that the identified systemic deficiencies had been corrected. For example, an expanded electronic integrated health screen for the receiving screening at intake was implemented on August 5, 2013, only four days before Defendants filed their motion to terminate. Defendants also developed a new electronic health records system, but it was not fully implemented until September 2013, after the relevant evidentiary period. Because Defendants did not prove compliance with any of the three substantive paragraphs of the Third Amended Judgment, *i.e.*, sufficient screening at intake, ready access to care for serious medical and mental health needs, and continuity of prescription medications, the Court found that the prospective relief ordered in those three paragraphs remained necessary to correct current and ongoing constitutional violations.

Also on September 30, 2014, after six years of reviewing evidence, expert opinion, and legal argument regarding conditions in the Maricopa County Jails, and after allowing both parties opportunity to propose remedies to correct constitutional deficiencies, the Court ordered remedies that did not exactly track constitutional standards but were

practical, concrete measures necessary to correct constitutional violations. Defendants were ordered to, within 60 days, adopt new policies or amend existing policies regarding 31 specific requirements for providing medical and mental health care, implement the policies within 150 days, collect and summarize compliance data for a period of 180 days after implementation of the policies, and report documentation showing completion of each stage. The Court stated, "If Defendants comply with this Order and its deadlines, within one year they will demonstrate that prospective relief no longer remains necessary to correct any current and ongoing violation of Plaintiffs' constitutional rights, and Court-ordered relief may be terminated before the PLRA permits another motion to terminate." (Doc. 2283 at 5960.)

Therefore, Paragraphs 2, 3, and 4 of the Fourth Amended Judgment continued the prospective relief in the Third Amended Judgment, and Paragraph 5 of the Fourth Amended Judgment defined specifically how Defendants would prove their compliance with Paragraphs 2, 3, and 4. Paragraph 5(a) identified the 31 specific requirements for providing medical and mental health care that were expected to become institutionalized through appropriate policies, staffing, training, and monitoring.

On October 14, 2014, Plaintiffs moved for reconsideration of five remedial provisions of the Fourth Amended Judgment. On December 10, 2014, the Court granted Plaintiffs' motion in part, amended one of the 31 subparagraphs of Paragraph 5(a) of the Fourth Amended Judgment, and entered the Revised Fourth Amended Judgment. (Doc. 2299.)

In January 2015, the Court clarified that Plaintiffs' counsel were permitted to tour the jail facilities, speak with pretrial detainees and staff, review records on-site, and review copies of records off-site upon reasonable request. It further stated that the Revised Fourth Amended Judgment "requires Defendants to meet a series of deadlines and anticipates that Plaintiffs will promptly bring to the Court's attention any perceived

lack of compliance with each requirement." (Doc. 2309.)  On September 14, 2015, the Court further explained Plaintiffs' role:

> [T]he time for monitoring Defendants' compliance actions required by the Revised Fourth Amended Judgment began in December 2014 when Defendants filed their newly adopted or revised policies.  It continued through the 180-day period when Defendants were required to demonstrate their implementation of those policies.  Plaintiffs' counsel has had opportunity to conduct on-site tours and interviews as well as off-site record reviews to confirm that Defendants are in fact doing what they say they are doing.  Data collection for 180 days enabled Defendants to monitor implementation, make any needed corrections, and satisfy their burden of proof.  Defendants' September 15, 2015 report will be a summary of the compliance data, which Plaintiffs may challenge.  But Plaintiffs do not need additional counsel to begin investigation of potential constitutional violations after the report is filed.  **To be clear, this litigation is now strictly limited to whether Defendants have satisfied the requirements of Paragraph 5 of the Revised Fourth Amended Judgment.  Plaintiffs' class counsel has no authority to investigate any potential constitutional violations outside of Paragraph 5.**

(Doc. 2331, emphasis added.)

On September 15, 2015, Defendants filed a report of the data they had collected and summarized pursuant to the Revised Fourth Amended Judgment.  On September 16, 2015, the Court ordered Defendants to file a supplemental report regarding seven subparagraphs of Paragraph 5(a), explaining why the reported compliance rates should be considered sufficient to establish proof of compliance.  On September 25, 2015, Defendants filed a supplemental report.  On October 15, 2015, the Court granted Plaintiffs' request that they be permitted to file their response to Defendants' compliance reports by January 15, 2016.  The Court further ordered that Plaintiffs' response address only whether Defendants had demonstrated compliance with Paragraph 5 of the Revised Fourth Amended Judgment related to each of the 31 subparagraphs of Paragraph 5(a):

> The Revised Fourth Amended Judgment required Defendants to collect and summarize data for a period of 180 days that showed the extent to which Defendants were complying with the Revised Fourth Amended Judgment and to file a report of the data collected and summarized on September 15, 2015.  (Doc. 2299.)  The Court clarified that Defendants'

report should address the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment, explaining what and how data was collected to determine compliance and what level of compliance was found. (Doc. 2332.) . . . .

. . . .

Plaintiffs' response to Defendants' compliance reports will be limited to addressing whether Defendants have demonstrated compliance with the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment. The time has expired for Plaintiffs to object to the policies and procedures adopted or amended to comply with the Revised Fourth Amended Judgment and the actions taken to implement each of the policies (*e.g.*, hiring staff, training, modifying facilities), which Defendants reported December 16, 2014, and March 16, 2015, respectively. **Only two issues remain to be decided: (1) whether Defendants' compliance reports accurately portray the extent to which the relevant policies and procedures have been implemented and (2) whether the reported levels of compliance demonstrate that the remedies ordered by the Revised Fourth Amended Judgment have been sufficiently implemented to resolve the systemic deficiencies previously found by the Court.** (*See* Findings of Fact and Conclusions of Law (Doc. 2283).)

(Doc. 2344, emphasis added.) Plaintiffs moved for reconsideration of that order, requesting opportunity for Plaintiffs and their experts to review individual medical records off-site and to conduct a site visit at the Jails to review medical records.

The Court granted Plaintiffs' motion for reconsideration to the extent that Plaintiffs' counsel and their medical experts were permitted to review individual medical records on-site within certain limitations, Defendants were permitted to produce paper copies of some of the requested records, and Plaintiffs' time to respond to Defendants' compliance reports was extended to February 26, 2016. The Court further ordered that Plaintiffs' records review focus on the accuracy of Defendants' compliance reports and the significance of any lack of compliance. The Court explained:

To clarify, at this stage of the litigation, the question is not whether the remedies ordered have in fact resolved the previously found systemic deficiencies, but whether the remedies have been implemented consistently enough. What is "enough" is context-specific. **The Court has already determined that adequate compliance with the specific standards previously stated will meet minimum constitutional standards.** The

Court will not go behind those determinations in the current proceedings, and **Plaintiffs will not be granted discovery to attempt to argue and prove some other measure of constitutional requirements.** This case has always been about systemic failures amounting to constitutional violations. Proof of some individual failures does not establish systemic constitutional failures, and discovery regarding mere individual failures is not warranted.

. . . .

In its September 30, 2014 Findings of Fact and Conclusions of Law, the Court explained that because Defendants had not shown they had resolved certain systemic deficiencies after six years, it was necessary for the Court to craft remedies to correct constitutional violations. (Doc. 2283 at 6.) After giving Plaintiffs and Defendants opportunity to propose and debate specific remedies, the Court ordered "remedies that do not exactly track constitutional standards but that are practical measures necessary to correct constitutional violations." (*Id.* at 59.) Each remedy was intentionally written to provide a clear standard by which compliance could be decided even though the Eighth and Fourteenth Amendments do not demand a particular action. **Therefore, the Court will evaluate Defendants' compliance with the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment exactly as they are written.**

. . . .

However, Plaintiffs are not required to accept as true Defendants' assertions about their compliance. They are entitled to examine how data were collected, whether the reported data were relevant to the ordered remedy, and whether the data show sufficient compliance.

(Doc. 2352, emphasis added.)

After several delays in providing Plaintiffs with copies of requested medical records, Plaintiffs' time to respond to Defendants' compliance reports was extended to April 1, 2016. In addition to filing a response, Plaintiffs also filed a Motion to Enforce the Revised Fourth Amended Judgment and a Motion for Evidentiary Hearing. On February 15, 2017, oral argument was heard on Plaintiffs' motions and Defendants' compliance with the Revised Fourth Amended Judgment.

On March 1, 2017, the Court denied Plaintiffs' motions, found Defendants had demonstrated compliance with certain subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment, and found Defendants had not demonstrated compliance

with subparagraphs (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29). The Court ordered Defendants to collect and summarize data for the months of April, May, and June 2017 that showed the extent to which Defendants had complied with the following subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment: (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29). To avoid any objections by Plaintiffs to Defendants' evaluation methodology, the Court ordered Defendants to meet and confer with Plaintiffs by March 17, 2017, regarding Defendants' plan for collecting and summarizing data to show compliance with the identified subparagraphs. Deadlines for reporting compliance summaries, disclosing raw data, and additional briefing were set.

On March 1, 2017, the Court also ordered that upon reasonable notice to Defendants, during April, May, and June 2017, Plaintiffs' counsel and experts were permitted to tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records related to subparagraphs (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29). Subsequently, deadlines were extended to permit Plaintiffs to tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records on-site and off-site through December 22, 2017. Plaintiffs' counsel and experts also were provided remote access to the Jails' electronic medical records system through December 22, 2017. Plaintiffs' request to photograph and/or video record cells and anterooms holding prisoners in the Mental Health Unit and the Jails' lockdown units was denied.

On March 16, 2017, Defendants provided a written plan for collecting and summarizing compliance data for review and consideration by Plaintiffs. Defendants' proposed plan included proposed procedures, policies, implementation plan, data collection methods, and sample reports for each of the ten pertinent subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment. On March 17, 2017, Plaintiffs and Defendants telephonically conferred regarding Defendants' proposed plan. Plaintiffs did not communicate to Defendants or to the Court that they had any objections to the

proposed methodologies for evaluating Defendants' compliance with the ten pertinent subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment.

On July 28, 2017, Defendants filed their Report Regarding Corrective Actions, Compliance Data Collection and Compliance Data Summaries for April, May, and June 2017. (Doc. 2417.) On August 2, 2017, Defendants served Plaintiffs with the raw data summarized in Defendants' compliance report. On September 8, 2017, Defendants supplemented their production of raw data. On September 29, 2017, Defendants filed a supplemental report regarding compliance with subparagraph (17) of Paragraph 5(a) of the Revised Fourth Amended Judgment and produced to Plaintiffs a supplement of the raw data summarized in Defendants' compliance reports. (Doc. 2425.) On November 16, 2017, Defendants again supplemented their production of raw data.

On December 22, 2017, Plaintiffs filed their response to Defendants' compliance reports, a Motion to Enforce Fourth Amended Judgment and for Additional Relief, and a Motion to Re-Open Discovery and for a Scheduling Order. Plaintiffs' response and motions are duplicative in many respects, but will be addressed separately. Defendants moved to strike Plaintiffs' reply in support of their Motion to Enforce because it constituted an unauthorized sur-reply regarding Defendants' compliance reports.

On June 21, 2018, oral argument was heard on Defendants' compliance reports and all pending motions. On June 22, 2018, Defendants were granted leave to supplement their compliance reports regarding subparagraphs (22) and (23) of Paragraph 5(a) of the Revised Fourth Amended Judgment. On July 13, 2018, Defendants filed their supplemental report regarding subparagraphs (22) and (23). Plaintiffs' request for additional discovery was granted, and Plaintiffs' time to respond to Defendants' supplemental report and Defendants' time to reply were extended. Therefore, Defendants' compliance with subparagraphs (22) and (23) of Paragraph 5(a) of the Revised Fourth Amended Judgment will be decided by a later order.

### III. PLAINTIFFS' MOTION TO ENFORCE THE REVISED FOURTH AMENDED JUDGMENT (DOC. 2434) AND DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' REPLY (DOC. 2451)

Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment is a motion to reconsider the Court's previous rulings, particularly the procedure by which Defendants would prove compliance with the Revised Fourth Amended Judgment. Defendants' response is three pages long. Rather than supporting Plaintiffs' Motion to Enforce, Plaintiffs' 11-page reply, plus 38 pages of declarations, expressly responds to Defendants' reply in support of their compliance reports—in other words, Plaintiffs' reply to the Motion to Enforce primarily consists of an unauthorized sur-reply to the compliance briefing.

Plaintiffs contend that regardless of Defendants' compliance with subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment, the Court is not permitted to terminate the Revised Fourth Amended Judgment unless Defendants prove their compliance with Paragraph 3, which states:

> 3. All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services.

(Doc. 2299.) The Court has rejected Plaintiffs' contention on multiple occasions.

As summarized above, after several rounds of assessment and improvement efforts, the Court concluded that it was necessary to define clear, measurable standards by which Defendants' compliance with Paragraphs 2, 3, and 4 would be determined. Paragraph 5 was ordered to establish how Defendants would prove their compliance with the Revised Fourth Amended Judgment. The Court has repeatedly explained that Paragraph 5 defined exactly how Defendants would prove their compliance with Paragraphs 2, 3, and 4 of the Revised Fourth Amended Judgment and that Defendants' compliance will be assessed based on specific evidence the parties present relevant to the

subparagraphs of Paragraph 5. For example, on September 14, 2015, the Court stated: "To be clear, this litigation is now strictly limited to whether Defendants have satisfied the requirements of Paragraph 5 of the Revised Fourth Amended Judgment." (Doc. 2331.) On November 25, 2015, the Court stated: "The Court has already determined that adequate compliance with the specific standards previously stated will meet minimum constitutional standards." (Doc. 2352 at 2.) Further, the Court has stated that if Defendants demonstrated compliance, Court-ordered relief may be terminated. (Doc. 2283.)

Yet Plaintiffs continue to seek unfocused, exploratory litigation to prove that Defendants are in violation of Paragraph 3 of the Revised Fourth Amended Judgment. Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment asks the Court to order mental health expert Dr. Kathryn Burns to assess Defendants' compliance with the Revised Fourth Amended Judgment and to "recommend additional remedies (if any) that are necessary to correct all current and ongoing violations." (Doc. 2434 at 17.) At the same time, Plaintiffs assert, "There are now current and ongoing violations that have not been resolved by the existing relief and require additional remedies." (*Id.*) Plaintiffs' Motion to Enforce disregards the fact that the Court already assessed the existence of constitutional violations; considered the parties' proposed remedies; ordered specific remedies; provided Plaintiffs extensive access to the Jails' records, pretrial detainees, staff, and raw data supporting Defendants' compliance reports; and ordered Plaintiffs to respond to those reports.

In addition, Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment essentially seeks reconsideration of subparagraph (20) of Paragraph 5(a) of the Revised Fourth Amended Judgment, which states: "MCSO[1] will consult with CHS[2] mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement." Plaintiffs contend that the Court should prohibit housing seriously

---

[1] MCSO means Maricopa County Sheriff's Office.
[2] CHS means Correctional Health Services.

mentally ill pretrial detainees in single cells with extremely limited or no access to recreation, fresh air, and sunlight. However, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In crafting the remedies ordered by the Revised Fourth Amended Judgment, the Court sought to hold medical and detention staff accountable for making reasoned decisions based on professional judgment and safety and security considerations without imposing rigid rules for which exceptions might exist.

Plaintiffs also disagree with subparagraphs 5(a)(22)-(26), which require Defendants to adopt certain policies and require consultation between MCSO and mental health staff before certain actions are taken, because they disagree with the revised policies and/or they believe the policies have not been consistently implemented. Plaintiffs had a great deal of time to object to the policies and did not. Further, Plaintiffs were ordered to respond to Defendants' compliance reports with evidence of noncompliance. They filed a response to the compliance reports and do not need to repeat assertions of noncompliance in a separate motion.

Plaintiffs' Reply in Support of Their Motion to Enforce Fourth Amended Judgment and for Additional Relief (Doc. 2449) expressly responds to Defendants' reply in support of their compliance reports. Thus, Plaintiffs' Reply constitutes a sur-reply which Plaintiffs did not seek leave to file. In response to Defendants' motion to strike Plaintiffs' reply, Plaintiffs admit there is "substantial overlap between the parties' respective compliance reports and Plaintiffs' enforcement motion" and that both address "whether Defendants have demonstrated their compliance with the Fourth Amended Judgment." (Doc. 2452 at 3.) Plaintiffs also admit, "The reply responds to arguments raised by Defendants, and to objections and challenges made to the experts' findings and methodology related to Defendants' compliance with the Judgment." And Plaintiffs' reply supporting their enforcement motion explicitly cites to Defendants' reply

supporting their compliance reports. Plaintiffs rationalize that they were permitted to file a reply supporting their enforcement motion, the enforcement motion essentially covers the same content as the compliance reports, and therefore they can use their right to file a reply supporting their enforcement motion as an opportunity to rebut Defendants' reply supporting their compliance report. The argument demonstrates that Plaintiffs' Motion to Enforce is duplicative and unnecessary and that Plaintiff's supporting reply is improper.

"The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence." LRCiv 7.2(g). Plaintiffs' Motion to Enforce seeks reconsideration of orders issued more than three years ago and repeatedly restated. They have not shown manifest error, new facts, or new legal authority.

Therefore, Plaintiffs' Motion to Enforce the Revised Fourth Amended Judgment and for Additional Relief (Doc. 2434) will be denied. Further, Defendants' Motion to Strike Plaintiffs' Reply to the Motion to Enforce and Declarations (Doc. 2451) will be granted.

## IV. PLAINTIFFS' MOTION TO RE-OPEN DISCOVERY AND FOR A SCHEDULING ORDER (DOC. 2435)

Plaintiffs request that the Court re-open discovery and set deadlines for discovery and submission of evidence regarding whether there are current and ongoing constitutional violations as to mental health services at the Maricopa County Jails, repeating much of their August 2, 2016 Motion for Evidentiary Hearing (Doc. 2380), which the Court denied on March 1, 2017 (Doc. 2404). Although Plaintiffs insist that they have not asked for an evidentiary hearing this time, they contend that the Court must "take evidence as to current and ongoing conditions" before terminating the Revised Fourth Amended Judgment and imply that the procedures ordered by the Court do not constitute "taking evidence as to current and ongoing conditions" to determine whether there are current and ongoing constitutional violations regarding mental health services at

the Maricopa County Jails. Plaintiffs further contend that "even if the Court were to find that Defendants have fully complied with the provisions of the Judgment, they would not be entitled to termination of all relief, if current and ongoing constitutional violations persist." (Doc. 2435 at 4.) Plaintiffs' Motion to Re-Open Discovery is an extension of their Motion to Enforce, applying the same reasoning to justify additional discovery not limited to Paragraph 5 of the Revised Fourth Amended Judgment.

Implicitly relying on Paragraph 3 of the Revised Fourth Amended Judgment, Plaintiffs assert: "The Fourth Amended Judgment covers the entire continuum of mental health care. (Doc. 2299.) Since Plaintiffs do not concede compliance with any provision of that Judgment, the Court must take evidence as to all conditions related to Plaintiffs' mental health claims under the PLRA." (Doc. 2447 at 4.) Plaintiffs further contend that the Court cannot terminate the Revised Fourth Amended Judgment based on the existing record because it is "restricted to a small subset of issues within the mental health claims." (Doc 2447 at 2.) Plaintiffs essentially seek reconsideration of orders issued more than three years ago and repeatedly restated in order to launch a broad investigation of "the entire continuum of mental health care" in the Maricopa County Jails. As explained above, since 2008 Plaintiffs have had extensive opportunity to investigate "the entire continuum of mental health care" and to propose remedial relief, and the Court has reduced the scope of this case as Defendants have demonstrated compliance. Plaintiffs have not shown manifest error, new facts, or new legal authority to justify reconsideration of the Court's prior rulings. *See* LRCiv 7.2(g).

Plaintiffs also contend that the evidentiary record before the Court is not "current." Under the PLRA, upon motion of any party or intervener,

> Prospective relief shall not terminate if the court makes written findings based upon the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3). Before ruling on a motion to terminate, the court must inquire into current conditions at a prison. *Gilmore v. California*, 220 F.3d 987, 1008 (9th Cir. 2000). "The record" in § 3626(b)(3) means "a record reflecting conditions as of the time termination is sought." *Id.* at 1010.

Defendants filed their most recent motion to terminate prospective relief on August 9, 2013. A six-day evidentiary hearing was held in February and March 2014. Evidence was considered relevant if it tended to show whether any current and ongoing constitutional violation existed on August 9, 2013, the time termination was sought. Parties were ordered to propose remedies to correct constitutional deficiencies. On September 30, 2014, the Court made detailed findings of fact and conclusions of law and denied Defendants' motion to terminate prospective relief. Thus, there is no pending motion to terminate prospective relief, but there is a Court-ordered plan for Defendants to correct and prove correction of systemic constitutional violations that were identified based on the record reflecting conditions as of August 9, 2013. The Court also directed Plaintiffs to monitor Defendants' compliance actions and promptly bring to the Court's attention any perceived lack of compliance with each requirement, such as incomplete or inadequate revision of policies.

Institutional change is complicated. Proof of actual institutional change requires data collection over a period of months, plus summarizing and reporting. Revision of data collection methods is sometimes necessary. Testing the accuracy of data collection and summarizing requires additional time. With each round of implementation, assessment, and reporting, Plaintiffs have requested and received extensions of time to tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, review records, and file their response to Defendants' compliance reports. Plaintiffs' interpretation of "current" as requiring re-opening of discovery immediately before the Court determines whether to terminate any provisions of previously ordered prospective relief would make it impossible to ever have a record of "current" conditions or

1
2

demonstrable proof that corrections had become institutionalized. And it would ensure eternal judicial oversight of the Maricopa County Jails.

3
4

Therefore, Plaintiffs' Motion to Re-Open Discovery and for a Scheduling Order (Doc. 2435) will be denied.

5

## V. COMPLIANCE WITH THE REVISED FOURTH AMENDED JUDGMENT

6

As previously stated:

7
8
9
10

Only two issues remain to be decided: (1) whether Defendants' compliance reports accurately portray the extent to which the relevant policies and procedures have been implemented and (2) whether the reported levels of compliance demonstrate that the remedies ordered by the Revised Fourth Amended Judgment have been sufficiently implemented to resolve the systemic deficiencies previously found by the Court.

11
12
13
14
15
16
17
18
19
20

(Doc. 2344 at 3; Doc. 2404 at 12.) On March 1, 2017, upon review of the evidence, the Court found that Defendants had demonstrated compliance with the Revised Fourth Amended Judgment except with respect to the following subparagraphs of Paragraph 5(a): (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29). The Court now considers evidence Defendants collected in April, May, and June 2017 and Plaintiffs' response to determine whether Defendants have demonstrated compliance with the requirements of subparagraphs (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29). Plaintiffs' response did not address subparagraphs (27), (28), and (29). Plaintiffs have therefore waived any objection to Defendants' assertion of compliance with subparagraphs (27), (28), and (29).

21
22
23
24
25
26
27

The Court gives little weight to Plaintiffs' belated contention that Defendants' compliance assessments have "serious methodological flaws." Defendants were ordered to meet and confer with Plaintiffs by March 17, 2017, regarding the methodology to be used for collecting and summarizing compliance data so that any objections by Plaintiffs could be resolved before Defendants began collecting data in April 2017. Plaintiffs did not object to or disagree with Defendants' proposed methodology. Any objections that could have been made by Plaintiffs before April 2017 are therefore waived. However,

28

the Court considers and determines whether the data Defendants report they collected and summarized does in fact demonstrate compliance with subparagraphs (17), (20), (22), (23), (24), (25), (26), (27), (28), and (29) of the Revised Fourth Amended Judgment.

**A.    Subparagraph 5(a)(17):  Defendants will adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit.**

CHS Standard Operating Procedure J-G-04 "Basic Mental Health Services" provides the written criteria for placing pretrial detainees[3] in each level of mental health care, including both within and outside of the Mental Health Unit.  The level of care is documented in the electronic health records system with a mental health assessment form, a psychologist progress note, and/or a sick call form.

**1.    General Population**

Subparagraph 5(a)(17) of the Revised Fourth Amended Judgment requires Defendants to "adopt and implement written criteria for placing pretrial detainees in each level of mental health care."  It does not require Defendants to justify the appropriateness of individual level of care placements.

CHS Standard Operating Procedure J-G-04(K)(8), as revised in 2016 and 2017, defines three levels of care for mental health services provided in general population:

a.    B (Basic) for individuals with current mental health symptoms but minimal mental health risk and minimum to medium Recidivism Risk Score (RRS).

b.    S (Supportive) for individuals with mental health symptoms and medium mental health risk and medium to high level RRS.

c.    I (Intensive) for individuals at high mental health risk due to more serious, often enduring, mental health symptoms and other risk factors, such as self harming behavior, requiring more frequent assessment, treatment and monitoring.

(Doc. 2417-1 at 89-90.)

---

[3] Although the Revised Fourth Amended Judgment applies only to pretrial detainees, Defendants' medical and mental health care records do not distinguish between sentenced and unsentenced patients.

To prove compliance with subparagraph 5(a)(17), Defendants generated a report of all inmates on the mental health caseload that showed whether each inmate was assigned a level of care. Defendants reported that during April, May, and June 2017, a total of 4,204 patients were seen by mental health staff. Of those, 4,116 (97.91%) had a recorded level of care, which included the rationale for the level of care.[4]

Plaintiffs now object to Defendants' evaluation methodology for subparagraph 5(a)(17) because it did not include review of individual health care records to assess whether the assigned level of care was appropriate and timely assigned. However, Plaintiffs were provided opportunity to review and object to Defendants' evaluation methodology before Defendants began collecting compliance data, and Plaintiffs did not raise any objections.

### 2. Mental Health Unit

Defendants reported that every patient (100%) enrolled and housed in the Mental Health Unit for April, May, and June 2017 was ordered to a specific level of care and that the rationale for the level of care for each patient was documented in the electronic health records.

In December 2014, CHS Standard Operating Procedure J-G-04(C)(7) defined admission criteria for four types of subunits within the Mental Health Unit and directed that patients be transferred to a stepdown psychiatric unit when they could be managed in a less intensive level of care. CHS Standard Operating Procedure J-G-04(F), as revised in 2016 and 2017, does not refer to specific housing units within the Mental Health Unit, but instead defines three levels of care, using the same criteria as in the previous version, and omits the fourth. (Doc. 2417-1 at 84.) Under the current policy, psychiatric providers determine patients' level of care, conduct clinical assessments to determine if patients' level of care should be changed, and enter orders for all changes in level of care.

---

[4] These numbers include both patients housed in general population and patients housed in the Mental Health Unit.

Because a patient may move through all levels of care in the same housing unit, there is not an unreasonable risk that patients will not be provided opportunity to stabilize with less intensive care before discharge from the Mental Health Unit.

Defendants assert that all patients admitted to the Mental Health Unit are initially placed at level of care 1. Therefore, it is not surprising that 100% of patients admitted to the Mental Health Unit had a recorded level of care.

Subparagraph 5(a)(17) of the Revised Fourth Amended Judgment requires Defendants to "adopt and implement written criteria for placing pretrial detainees in each level of mental health care, including subunits within the Mental Health Unit." It does not require Defendants to designate subunits within the Mental Health Unit or to link level of care placement to housing assignment. Subparagraph 5(a)(17) also does not require Defendants to justify psychiatric providers' determinations of specific patients' levels of care, including whether and to what extent psychosocial rehabilitation services are provided.

Defendants have shown that they have sufficiently implemented the remedy described in subparagraph 5(a)(17).

**B.     Subparagraph 5(a)(20): MCSO will consult with CHS mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement.**

CHS Standard Operating Procedure J-E-09 "Segregated Inmates" requires that "MCSO contact[] Mental Health Staff before placing any SMI patient in segregation" and that "Mental Health Staff review health records for all patients designated as seriously mentally ill before patients are placed in segregation." MCSO policy DI-3 "Restrictive Housing Operation" states:

C.     CHS staff will be consulted before placing an inmate into any type of restrictive housing, as specified in this Policy. If immediate placement is necessary due to safety and security reasons, CHS shall be contacted immediately following the placement.

D.     Upon placing an inmate into restrictive housing detention personnel making the placement shall review the "Comments" section of the

inmate's Booking Record in the Jail Management System (JMS). If there is a comment designating the inmate as "Seriously Mentally Ill (SMI)" or "Mental Health Chronic Care (MHCC)," detention personnel shall notify the Mental Health Unit and an on-duty detention supervisor.

"Restrictive housing" is defined as "Any type of detention that involves: removal from the general inmate population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another inmate; and the inability to leave the room or cell for the vast majority of the day, typically 22 hours or more." Although the CHS policy does not expressly include pretrial detainees designated as Mental Health Chronic Care, the MCSO policy does, and subparagraph 5(a)(20) imposes consultation responsibilities on MCSO, not CHS.

For subparagraph 5(a)(20), Defendants reported that MCSO generated a summary report for the months of April, May, and June 2017 that showed the number of segregated placements of pretrial detainees who were designated Seriously Mentally Ill or Mental Health Chronic Care and the number of those placements for which MCSO consulted with CHS mental health staff. These numbers showed the following compliance rates: 96% in April, 94% in May, and 96% in June. Defendants did not report the numbers of pretrial detainees who were considered for segregated placement but were not placed in segregation after consultation with CHS mental health staff.[5]

Plaintiffs disagree with specific provisions of CHS Standard Operating Procedure J-E-09 and the methodology used to determine compliance.[6] They contend that Defendants did not assess compliance with the substantive terms of their policy, such as whether CHS determined that no contraindications to segregation were present when

---

[5] MCSO does not place pretrial detainees in the Mental Health Unit, and therefore MCSO does not need to consult with CHS mental health staff regarding placing pretrial detainees in the Mental Health Unit.

[6] Plaintiffs were provided opportunity to review and object to Defendants' evaluation methodology before Defendants began collecting compliance data, and Plaintiffs did not raise any objections.

medical records showed substantial histories of serious mental illness. Plaintiffs also contend that many patient records showed determination of segregation levels without clinical justification or involvement of providers, rather than only mental health staff. These criticisms are not relevant to compliance with subparagraph 5(a)(20).

As stated above, "the Court will evaluate Defendants' compliance with the 31 subparagraphs of Paragraph 5(a) of the Revised Fourth Amended Judgment exactly as they are written." (Doc. 2352.) Plaintiffs do not dispute that Defendants have demonstrated compliance with the requirement that "MCSO will consult with CHS mental health staff before placing a seriously mentally ill pretrial detainee in any type of segregated confinement."

Defendants have shown that they have sufficiently implemented the remedy described in subparagraph 5(a)(20).

**C.** **Subparagraph 5(a)(22): A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.**

**Subparagraph 5(a)(23): Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.**

During oral argument on June 21, 2018, Defendants requested leave to supplement their compliance reports regarding subparagraphs 5(a)(22) and (23), which they did on July 13, 2018. Subsequently, Plaintiffs requested additional discovery and extension of time to respond to Defendants' supplemental report. Therefore, the Court will decide whether Defendants have proven sufficient implementation of the remedies described in subparagraphs 5(a)(22) and (23) in a later order after completion of the additional discovery and reporting. The Court expressly does not do so at this time.

**D.** **Subparagraph 5(a)(24):** **Defendants will adopt and implement a written policy regarding the use of discipline for behavior resulting from serious mental illness.**

**Subparagraph 5(a)(25):** **Defendants will adopt and implement a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against seriously mentally ill pretrial detainees.**

**Subparagraph 5(a)(26):** **Defendants will adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee.**

"[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547.

Previous to the Revised Fourth Amended Judgment, the Defendants did not have a written policy regarding the use of discipline for behavior resulting from serious mental illness or a written policy regarding the use of isolation in a disciplinary segregation unit as a sanction against pretrial detainees with serious mental illness. (Doc. 2283 at 53.) The Defendants did not require that mental health staff be consulted regarding discipline of a pretrial detainee identified as having serious mental illness. (*Id.*) The Court ordered Defendants to adopt and implement such policies but did not dictate the content of the policies. To avoid arbitrary and random discipline, Defendants must state and implement standards for various levels of disciplinary actions against seriously mentally ill detainees. They must provide consultation with mental health staff regarding proposed discipline and potential exacerbation of an inmate's serious mental illness, especially the use of isolation.

**1. Written Policies and Procedures Regarding Discipline of Seriously Mentally Ill Pretrial Detainees**

CHS Standard Operating Procedure J-A-08(17) establishes the following requirements for discipline for the seriously mentally ill:

a.   CHS Mental Health staff will receive a written referral, Disciplinary Action Report (DAR), from MCSO regarding discipline of any seriously mentally ill patient.

b.   CHS Mental Health staff will provide recommendations to MCSO to document on the DAR, including the following:

   1.   Assessment of relationship of mental illness to the behavior

   2.   Potential impact of discipline, particularly if the sanction includes use of isolation in disciplinary segregation

   3.   Recommendations for MCSO's consideration regarding discipline

      a.   Dis Level 1 signifies no mental health contraindications to the individual receiving sanctions as decided by MCSO

      b.   Dis Level 2 signifies that the individual's mental illness may have contributed to the behavior and should be considered in MCSO's decision regarding discipline

c.   CHS Mental Health staff will document the above assessment and recommendations in the electronic health record on MCSO-CHS Correspondence form.

CHS Standard Operating Procedure J-E-09(C) requires that "MCSO contact[] Mental Health Staff before placing any SMI patient in segregation" and that "Mental Health staff review and document considerations regarding impact of segregation in the patient's health record and provide written considerations to MCSO." It appears that the "written considerations" should state whether (1) "there are no contraindications to segregation," (2) "due to the patient's mental illness, isolation over time may contribute to increased psychiatric distress," or (3) due to the severity of the patient's mental illness, segregation is likely contraindicated." The policy further requires: "When use of isolation is used as a sanction against a seriously mentally ill patient, the Mental Health

Staff will communicate any considerations and recommendations in writing specific to the use of isolation as a sanction."

MCSO policy DJ-2 establishes the Inmate Disciplinary Procedure, which includes disciplinary hearings conducted by hearing sergeants. Subsection (4)(E)(5) of the policy states:

> The hearing sergeant shall identify in each disciplinary case, if Correctional Health Services (CHS) has deemed an inmate to be Seriously Mentally Ill (SMI) or as Mental Health Chronic Care (MHCC). The hearing sergeant shall consult with CHS mental health staff when an inmate is deemed SMI or MHCC prior to a disciplinary hearing.
>
> a. The hearing sergeant and mental health staff shall determine reasonable disciplinary sanctions, which would not necessarily disrupt an inmate's mental health services.
>
> b. Recommendations by mental health staff not to sanction a SMI or MHCC inmate, who has committed a serious jail rule violation involving violence or a jail facility security concern, shall be referred to the Custody Bureau Hearing Unit Commander for review.

In addition, MCSO policy DI-3(1)(D) states that upon placing an inmate into restrictive housing, detention personnel will review the inmate's booking record. If there is a comment designating the inmate as "Seriously Mentally Ill (SMI)" or "Mental Health Chronic Care (MHCC)," detention personnel will notify the Mental Health Unit and an on-duty detention supervisor.

These standard operating procedures and policies require reflection by CHS personnel on serious mental illness effects from discipline and communication to MCSO discipline decision makers. They do not dictate the outcome of any discipline decision.

### 2. Compliance with subparagraphs 5(a)(24) and (25)

Defendants have not identified any written policy expressly addressing the use of discipline for behavior resulting from serious mental illness, which is required by subparagraph 5(a)(24), or any written policy expressly addressing the use of isolation in a disciplinary segregation unit as a sanction against seriously mentally ill pretrial detainees, which is required by subparagraph 5(a)(25). The Revised Fourth Amended Judgment

does not mandate the content of the policies required by subparagraphs 5(a)(24) and (25). It does not prohibit imposing discipline on seriously mentally ill pretrial detainees for behavior resulting from serious mental illness. It does not prohibit assigning seriously mentally ill pretrial detainees to disciplinary segregation.

Defendants have adopted written policies that require mental health staff to be consulted regarding discipline of any seriously mentally ill pretrial detainee, but Plaintiffs object that these policies do not require that in making a disciplinary decision the MCSO hearing sergeant actually consider information and recommendations from CHS mental health staff regarding whether a pretrial detainee's mental illness caused or contributed to behavior warranting discipline and whether a proposed disciplinary sanction is likely to adversely affect the pretrial detainee's mental health condition.

This objection is excessively formalistic. The obvious import of the policies is that the CHS recommendations must be considered, though they are not mandatory. To read the policies otherwise is to infer a power of bad faith in administering the policies. A power of bad faith is never read into anything.

Plaintiffs object that these policies do not provide any general principles regarding how the information and recommendations from CHS mental health staff should be considered in disciplinary decisions, resulting in some MCSO staff thinking absolute deference to CHS recommendations is required, and other MCSO staff apparently giving little or no consideration to CHS recommendations. This is a more weighty objection, as the same form comments from CHS staff result in opposite decisions in large numbers. But the structure of the policies already makes clear that the CHS comments must be considered but are not binding. It is not necessary for the policies to say it again, but this Court does say it again for the benefit of MCSO discipline decision makers.

Therefore, Defendants have shown compliance with subparagraphs 5(a)(24) and (25).

### 3. Compliance with subparagraph 5(a)(26)

Subparagraph 5(a)(26) requires Defendants to "adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee." Defendants have adopted written policies requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee, but they have not shown that they have adequately implemented the policy of documentation concerning disciplinary isolation.

CHS Standard Operating Procedure J-A-08(17)(b) states, "CHS Mental Health staff will provide recommendations to MCSO to document on the [Disciplinary Action Report] . . . ." MCSO solicits and receives recommendations from CHS mental health staff by email, but MCSO often does not document CHS recommendations on the Disciplinary Action Report itself. Indeed, the MCSO Report does not even call for such documentation.

The Standard Operating Procedure requires the recommendations from CHS mental health staff to include assessment of the relationship of the patient's mental illness to the behavior and the potential impact of the discipline on mental health. Recommendations from CHS mental health staff are often conclusory, such as "Please consider mental health when sanctioning," "Behavior is likely caused by mental illness," and "has contraindications." Sometimes such language is accompanied by a comment indicating that sanctions are approved.

Defendants do not elaborate on how CHS staff complied with CHS Standard Operating Procedure J-A-08(17)(b) by providing to MCSO documentation of CHS mental health staff's assessment of the relationship of the patient's mental illness to his or her behavior, the potential impact of discipline, and discipline level.

To determine the level of compliance with subparagraphs 5(a)(24), 5(a)(25), and 5(a)(26), Defendants reviewed the Disciplinary Action Reports of inmates identified as Seriously Mentally Ill or Mental Health Chronic Care and the email communications between CHS staff and MCSO regarding each of the Disciplinary Action Reports.

MCSO generated a monthly report that included the Disciplinary Action Report number, the inmate's name, the facility, whether the inmate was sanctioned, and whether the sanction was suspended due to consultation with CHS. Defendants report that in 100% of the 1,508 instances in which a Disciplinary Action Report was created for an inmate designated as Seriously Mentally Ill or Mental Health Chronic Care, MCSO consulted with CHS (apparently by email).

Defendants also report that in 956 of the 1,508 instances in which a Disciplinary Action Report was created for an inmate designated as Seriously Mentally Ill or Mental Health Chronic Care, the inmate was sanctioned, but in 226 of the 956 instances the sanction was suspended. In other words, for the months of April, May, and June 2017, MCSO generated 1,508 Disciplinary Action Reports for such inmates, which resulted in the imposition of sanctions that were not suspended 730 times. The often conclusory comments of CHS staff on proposed discipline are generally sufficient for CHS compliance and MCSO discipline decision making. They reflect the realities of 18 discipline proposals a day resulting in nine disciplines imposed for such persons. A written precis of the detainee's mental health history and prospects will usually be unnecessary to express the CHS staff person's conclusion.

The Disciplinary Action Report form does not provide space for documenting CHS recommendations other than checking either "yes" or "no" for "Approved for sanctions." Defendants do not give data showing the correlation between the recommendations of CHS staff and the imposition of sanctions. They do give the following conclusions:

> If CHS recommended that the proposed discipline had no contraindications, this meant that the inmate was approved for sanctions. (Ex. A ¶ 27.) If, on the other hand, CHS responded that the inmate's mental illness may have contributed to the behavior, MCSO concluded that the inmate should not be approved for the proposed sanctions. (Ex. C ¶ 27.) . . . MCSO then followed these recommendations.

(Doc. 2444 at 15.)

Under CHS Standard Operating Procedure J-E-09(C), if the recommended sanction is segregation, more persuasive evidence of compliance is needed. For example, the Disciplinary Action Report itself could call for confirmation that the consultation and consideration occurred. Mental health staff are required to document in the electronic health record and communicate to MCSO whether (1) "there are no contraindications to segregation," (2) "due to the patient's mental illness, isolation over time may contribute to increased psychiatric distress," or (3) "due to the severity of the patient's mental illness, segregation is likely contraindicated." For this especially significant form of discipline, the generally conclusory comments of CHS staff are insufficient to show compliance. The Disciplinary Action Report itself could also call for clear indication that the CHS comment concerning isolation was accepted or overridden.

Defendants have generally shown compliance with subparagraph 5(a)(26), but not for consultation concerning disciplinary isolation. Defendants will be ordered to propose how they will demonstrate that before a seriously mentally ill pretrial detainee is placed in disciplinary isolation, CHS mental health staff are consulted and their recommendations addressing the potential effects of isolation on the pretrial detainee's mental health are received and considered. Defendants may propose using data from April, May, and June 2017 or a more recent three-month period.

**E.**   **Subparagraph 5(a)(27): A potentially suicidal pretrial detainee will not be placed in isolation without constant supervision.**

**Subparagraph 5(a)(28): A potentially suicidal pretrial detainee will be placed into a suicide-resistant cell or safe cell only with "direct, continuous observation until a treatment plan is determined by medical staff."**

For subparagraphs 5(a)(27) and (28), Defendants reported 100% compliance for the months of April, May, and June 2017. Plaintiffs do not dispute Defendants' compliance with subparagraphs 5(a)(27) and (28).

CHS Standard Operating Procedure J-G-05 "Suicide Prevention Program" requires assessment of suicide risk at intake and for patients who demonstrate suicidal behavior in

general population, the infirmary, or the Mental Health Unit.  CHS Standard Operating Procedure J-G-05 defines two risk categories for individuals determined to be at risk for suicide:  "active suicide watch" and "potentially suicidal."

When an individual is designated as either "active suicide watch" or "potentially suicidal" at intake, CHS Standard Operating Procedure J-G-05 directs:  "All patients at imminent risk for suicide:  (a) Will not be placed in isolation without constant supervision.  (b) Will be placed in a safe cell only with direct, continuous observation until a treatment plan is determined by medical staff."

Under CHS Standard Operating Procedure J-G-05, for individuals housed in general population, the infirmary, or the Mental Health Unit, CHS staff who observe or receive notification of patient suicidal concerns must immediately notify MCSO to ensure the patient is not left alone until evaluation for risk category is completed by mental health staff.  If indicated, a psychiatric or intake provider initiates orders for risk category/watch status, intervention, and transfer to an appropriate housing area.  After orders are obtained, CHS staff notifies MCSO of the patient's watch status and associated housing requirements.  If a patient is placed on active watch status, a CHS or MCSO staff must be physically present and maintain visual inspection of the patient continuously.  If a patient is placed on potential watch status, monitoring is performed by MCSO staff at staggered intervals not to exceed every 15 minutes.  Video monitoring of all patients at the 4th Avenue Jail and the Mental Health Unit provides additional constant observation of patients on either active or potential watch status at those locations.

To determine the level of compliance with subparagraphs 5(a)(27) and (28), Defendants generated detailed reports from the Jail's electronic health record system for each patient admitted to active or potential suicide watch during April, May, and June 2017.  These reports showed the date and time each patient was put on suicide watch and the date and time that a treatment plan was ordered.  A patient cannot be placed in a safe cell without a treatment plan.  The reports showed that each patient on suicide watch was

constantly monitored until the treatment plan was in place. The reports further showed that each patient on suicide watch was placed in a suicide-resistant cell or safe cell and was constantly monitored.

The Court finds, and Plaintiffs do not dispute, that Defendants have shown they have sufficiently implemented the remedy described in subparagraphs 5(a)(27) and (28).

**F.** **Subparagraph 5(a)(29): When a pretrial detainee is discharged from suicide watch or a safe cell, the pretrial detainee will be assessed by mental health staff within 24 hours of discharge.**

For subparagraph 5(a)(29), Defendants reported the following compliance rates: 93% in April 2017, 90.06% in May 2017, and 89.88% June 2017. Plaintiffs do not dispute Defendants' compliance with subparagraph 5(a)(29).

CHS Standard Operating Procedure J-G-05 "Suicide Prevention Program" requires that patients discharged from suicide watch are scheduled and seen by mental health staff within 24 hours. It requires mental health staff to evaluate the patient to ensure safety and to determine the frequency of contact. It further requires mental health staff to conduct regularly scheduled follow-up assessments based on evaluation and treatment plan goals until the patient is released from custody.

To determine the level of compliance with subparagraph 5(a)(29), Defendants generated detailed reports from the Jail's electronic health record system for each patient discharged from suicide watch or a safe cell during April, May, and June 2017. These reports showed the date and time of discharge and the date and time of assessment by mental health staff. A patient who was released from custody before expiration of the 24-hour assessment period was excluded from Defendants' compliance reporting.

Defendants tracked assessments performed within 30 hours after discharge in addition to assessments performed within 24 hours after discharge. They reported that in April 2017, 95.29% of the patients discharged from suicide watch were assessed within 30 hours after discharge; in May 2017, 95.13% were assessed within 30 hours after discharge; and in June 2017, 96.03% were assessed within 30 hours after discharge.

The Court finds, and Plaintiffs do not dispute, that Defendants have shown they have sufficiently implemented the remedy described in subparagraph 5(a)(29).

IT IS THEREFORE ORDERED that:

1.      Defendants' Motion to Strike Plaintiffs' Reply to the Motion to Enforce and Declarations (Doc. 2451) is granted.

2.      Plaintiffs' Motion to Enforce Fourth Amended Judgment and for Additional Relief (Doc. 2434) is denied.

3.      Plaintiffs' Motion to Re-Open Discovery and for a Scheduling Order (Doc. 2435) is denied.

IT IS FURTHER ORDERED that:

1.      Defendants have demonstrated compliance with subparagraphs (17), (20), (24), (25), (27), (28), and (29) of Paragraph 5(a) of the Revised Fourth Amended Judgment.

2.      Defendants have demonstrated compliance with subparagraph (26) of Paragraph 5(a) of the Revised Fourth Amended Judgment except to the extent that further evidence is required concerning instances of disciplinary isolation.

3.      Defendants' compliance with subparagraphs (22) and (23) of Paragraph 5(a) of the Revised Fourth Amended Judgment is undecided pending completion of supplemental briefing.

4.      Adjudication of compliance with Paragraph 5(a) and lifting of that paragraph and paragraphs 2, 3, and 4 of the Revised Fourth Amended Judgment is withheld until adjudication of compliance with subparagraphs (22), (23), and (26) of Paragraph 5(a).

/ / /

/ / /

/ / /

5.     By September 21, 2018, Defendants shall file a proposed plan for demonstrating compliance with subparagraph (26) of Paragraph 5(a) of the Revised Fourth Amended Judgment concerning instances of disciplinary isolation.

Dated this 22nd day of August, 2018.

_____
Neil V. Wake
Senior United States District Judge