# EXHIBIT 1

Eric Balaban (admitted *pro hac vice*)
Gabriel Eber (admitted *pro hac vice*)
ACLU National Prison Project
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
(202) 548-6605
ebalaban@aclu.org
geber@aclu.org


Attorneys for Plaintiffs


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Fred Graves, et al., | ) | |
| Plaintiffs, | ) | No. CV 77-479-PHX-NVW |
| | ) | |
| v. | ) | |
| | ) | **DECLARATION OF** |
| Paul Penzone, et al., | ) | **ELDON VAIL** |
| Defendants. | ) | |
| | ) | |


1.      Plaintiff's counsel have retained me to analyze the available

information and offer my opinions on whether or not:

        a. The Defendants (including Maricopa County Sheriff's Office

        ("MCSO")) have complied with the Court's orders regarding

        changes to their Planned Use of Force (PUOF) and involuntary

        treatment policies and practices;

        b. The Defendants have complied with the Court's orders regarding

        changes to their disciplinary policies and practices;

        c. The Defendants have complied with the Court's orders regarding

        changes to segregation placement of mentally ill inmates;

1

d. The current status of the Defendants compliance with the Court's orders places pretrial detainees at an unreasonable risk of harm; and.

e. The Defendants methodology for assessing its own compliance with the Court's orders is reliable.

2.     For this report I only comment on PUOF and involuntary treatment policies and practices, as that is the only raw data provided by the Defendants in their Supplemental Report filed July 13, 2018. This material was supplemented with additional documents on August 17, 2018 and with information included in the Defendants' Reply submitted on October 1, 2018.

3. This report is submitted as a revision to my report of September 17, 2018. In the Defendants' Reply they identify 18 PUOF situations that they say I missed in my original September report. They are correct about 16 of them.[1] This report is submitted in an effort to give the Court the most accurate analysis possible for their review.[2]

4.     In my previous work on this case, I submitted reports of my findings on February 9, 2018, December 22, 2017, April 1, 2016 and December 15, 2013.

5.     For this report I relied upon the documents and data submitted by the Defendants' for April, May, and June 2017 related to specific subparagraphs of the Revised Fourth Amended Judgment, specifically subparagraphs 5(a)(22) and 5(a)(23) submitted with their Supplemental Report of July 13, 2018, supplemented by additional material from August 17, 2018 and in the Defendants' Reply of October 1, 2018.

6.     It is critically important to note that there are differences between the data I received for my report of December 22, 2017 and that received on July 13, 2018 and August 17, 2018, even though the area of study is exactly the same—April – June 2017. Each time I have received documents they have revealed

---

[1] The Defendants say I missed 18 but it appears 2 that they identified are not in the materials I received in July and August. I only received the detail for these events in the exhibit attached to their Reply. All 18 of these events are shown in Exhibit 3 in red.

[2] I also moved an event on June 3 on Exhibit 3 from non-compliant to compliant.

additional events related to Planned Use of Force Events. And as acknowledged above, it has been difficult for me as well as the Defendants to accurately identify use of force events in the MCSO jails. The information is produced in separate files for Incident Reports, Operational Journals (OJ's) and for CHS notes. Each of those files is organized more or less in chronological order and events in each file must be collated to describe and understand each individual PUOF situation. I missed 16 PUOF situations in the OJ files. Likewise, the Defendants failed to provide IR's for 11 PUOF events in their disclosure of July 13, 2018 that were included in their disclosure of August 17, 2018. These difficulties could be avoided if the Defendants simply reported their data in a collated fashion or absent that approach, in a list that identifies for each event the documents relied up, by Bates number, to reach their conclusions. An example of this approach, absent the Bates numbers, was included in the Defendants' Reply, Exhibit B. It was very helpful to see each event listed in this fashion.

7. My compensation for work on this case is $150 per hour. My qualifications are attached to this report as **Exhibit 1**. Additional details of the documents reviewed during my work for this report is attached as **Exhibit 2**.

8. The Defendants struggle to present an accurate record to illustrate they are in compliance with the Court's Order. For example, from my review of the records the total number of PUOF events they claim to have occurred is different from the actual count based on my review of the documents they have provided for this report. This inconsistency is troubling.

9. In their Supplemental Report they claim the following:

| Month | # of PUOF | # Events w/ CHS Present | Compliance Rate |
|---|---|---|---|
| April | 9 | 9 | 100% |
| May | 12 | 12 | 100% |
| June | 1 | 1 | 100%[3] |

---

[3] Defendants Supplemental Report Regarding Corrective Actions, Compliance Data and Defs' Reply re [2473] Supplemental Report

10.    But considering all of the information in the documents provided in July, the result of my own analysis is more thorough. For April, in **Exhibit 3**[4] I have identified 29 PUOF situations and can document 14 times where the MCSO is clearly in compliance with the court order, 7 times when they are not in compliance and 8 times where it is not clear what happened and that I have identified in **Exhibit 3** as "Further Review Needed". I use this last category because in those 8 cases it is difficult to determine exactly what occurred from the records. In April in each of those 8 cases force was not used but it is not clear if CHS staff responded to the scene of a potential PUOF situation as required by the prison's relevant policy and the Court's Order.

11.    When the additional detail from the documents received in August 2018 and the information from the Defendant's Reply received in October 2018 is added to the April totals, (which are listed separately in **Exhibit 3**), the results are:

    4735—PUOF Situations

    240—Compliant

    137—Non-compliant

    108—Further Review Needed

12.    For May (I include here the information made available for both July, August and October):

    4336—PUOF Situations

    312826—Compliant

    795—Non-compliant

    55—Further Review Needed[5]

13.    For June, which also include the totals for July, August and October 2018:

    2117—PUOF Situations

---

[4] In Exhibit 3 I note in the comments section if consultation occurred. Compliance or non-compliance in Exhibit 3 relates to 5 (a) (23).

[5] Like April, none of these events where I categorize as "Further Review Needed" resulted in actual use of force in May or June.

11~~1~~—Compliant

6~~3~~—Non-compliant

4~~4~~—Further Review Needed

1~~4~~.     These are clearly dramatic differences. I am very concerned that the MCSO does not have a review system in place to accurately track the total number of PUOF situations in their jails (which I will comment on later in this report). Every time I receive documents, the raw data underlying PUOF totals change. This is most recently illustrated in the difference between what the Defendants' provided in July with their Supplemental Report and what was added with their August disclosure, which was requested by the Plaintiffs'. MCSO's own totals are much lower than what a careful review of the records reveals.

1~~5~~.     One source of the difference is that I report on PUOF situations, not just events where force was actually used. It appears that MCSO only tracked PUOF events where force was actually used. However, the Revised Fourth Amended Judgment requires Defendants to adopt and implement polices to do the following:

> (22) A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.

> (23) Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.

1~~6~~.     For the issue of consultation only, as required by 5 (a) (22), the compliance results are:

| Month | # of PUOF | # Events w/ CHS consult | Compliance Rate |
| --- | --- | --- | --- |
| April | 47~~35~~ | 35~~28~~ | 74~~80~~% |
| May | 43~~36~~ | 39~~32~~ | 90~~89~~% |
| June | 21~~17~~ | 17~~74~~ | 81~~82~~% |

5

17.     But the Court requires in 5 (a) (23) that mental health staff be involved in the implementation of any planned use of force or episode of involuntary treatment. That is where I am most focused in my report since the Court's Order makes no reference to whether or not force actually occurred.  The policies the Defendants adopted to satisfy these remedies is consistent:  CHS Policy J-A-08 (Doc. 2304-1) requires mental health staff to respond to a request from MCSO for assistance as rapidly as possible, to reassess the need for involuntary treatment and obtain orders discontinuing treatment if no longer warranted, and document all interventions they offer in the electronic health record. The Court also requires that mental health staff be involved in the implementation and not medical staff, which is also reflected in policy. If the records show that medical staff such as a registered nurse (RN) or licensed practical nurse (LPN) responded in a PUOF situation, I counted that as non-compliant.

18.     Combining the information from the documents received in both July and August 2018 (as well at the information from the Defendants' Reply of October 2018) in order to compare apples to apples and illustrate what happens when force actually does occur, my analysis reveals:

| Month | # of PUOF | # of Events w/ CHS MH Present | Compliance Rate |
|-------|-----------|-------------------------------|-----------------|
| April | 19 | 10 | 53% |
| May | 15~~15~~ | 13 | 87% |
| June | 10~~9~~ | 5 | 50~~6~~% |

19.     This analysis is for 5 (a) (23) and is much different from the 100% compliance rate offered by the Defendants' in their Supplemental Report. The total number of times force actually was used is much higher in my analysis than what they have reported. This is further made more complicated because as I illustrate in **Exhibit 3**, there are several times where it is not clear in the records whether or not force actually occurred—1 in April, 5 in May and 2 in June. I have not included these in the chart immediately above for times when force was actually used.

6

20.    In order to try to better understand exactly what and how MCSO is tracking this information I was on two phone calls with the Defendants' on September 14, 2018. On the first call was Lt. Brent Williams from the MCSO and on the second call was Dr. Bobbi Stalcup from CHS. On both calls were Michelle Iafrate for the Defendants and Eric Balaban and Eileen Ulate for the Plaintiffs.

21.    During the first call with Lt. Williams he did his best to explain how the information was collected for the Defendants' Supplemental Report. However, he was relatively new to the position and was not the person who actually compiled the information. The person who did, Commander Jim Seibert, was not on the call, and was not produced despite Mr. Balaban's request.

22.    Lt. Williams explained the process to collect the information as best he could. He indicated that the jail's morning reports were reviewed to identify PUOF's on a daily basis. If PUOF's were identified in the morning report then the related OJ would be reviewed to see if the event was in compliance. For involuntary treatment situations, the OJ's would be searched using key terms, but Lt. Williams did not know which terms were used.  Lt. Williams also said that late or open OJ entries were reviewed since these may not be in the morning reports. Lt. Williams stated the term "planned us of force" was a search term Cmdr. Siebert and his team used to search for pertinent events in the late or open OJ entries, but did not know if there were other search terms. Whether or not mental health staff were consulted and/or involved in the PUOF was determined largely based on the verbiage in the OJ's. The Lieutenant seemed to indicate that whether or not force was used in a PUOF situation that the event was reviewed, but he was not sure. He said that IR's and Use of Force reports were reviewed if force was used but he did not know if Cmdr. Siebert reviewed IR's for unplanned use of force events.   Lt. Williams indicated a "Use of Force report" was different than an incident report. I did not receive a single "Use of Force report," just incident reports.   Lt. Williams stated that Defendants found compliance with sub provisions 5(a)(22) (requiring consultation) if there was documented consultation

with CHS staff in the OJ entry.  He did not know if an employee list was reviewed.
He did not know if Cmdr. Siebert and his team considered consultation with
medical staff as opposed to mental health staff constituted compliance.  Lt.
Williams offered that he would consider it non-compliant if medical staff
(including nursing staff), as opposed to mental health staff, were consulted.   As to
5(a)(23) (requiring implementation), Lt. Williams also did not know if Cmdr.
Siebert and team consulted an employee list, did not know what specific terms
they looked for to determine if an event was compliant, and again offered that he
would find non-compliant events where there was consultation with medical staff
(including nursing staff).  Lt. Williams stated mental health was limited to MHAs,
MHPs, psychologists, and psychiatric providers, such as psychiatrists.  For
episodes of involuntary treatment, Lt. Williams was not sure if Cmdr. Siebert and
team checked an employee list to determine if mental health staff was involved in
implementation.  He acknowledged that moving a prisoners from one cell to
another if ordered by a mental health provider should be deemed an involuntary
treatment event, as should placing a prisoner in therapeutic restraints.

23.     Dr. Stalcup was involved in the creation of the data for the
Supplemental Report for CHS. A list of PUOF's for the three-month monitoring
period was reported to CHS on excel spreadsheets. She indicated that there were
two spreadsheets, one for all PUOF's and another for PUOF's where force was
used. Dr. Stalcup did not know how these lists were generated by MCSO, or what
specific criteria was used to search events to generate the list.  These lists were
never produced to me. She then indicated CHS reviews the health record of the
individual prisoner to determine compliance. She confirmed that compliance for
consultation and involvement with implementation in a PUOF or involuntary
treatment event must be with mental health staff and not medical staff. Dr. Stalcup
defined mental health staff as mental health associates (MHAs), mental health
professionals (MHPs), mental health licensed associates (MHLAs) and mental
health providers.  Mental health staff does not include RNs or LPNs.  For

8

involuntary treatment situations she searched the health record to see if there was a speed letter.   She did not review the incident reports or further review the medical record to see if mental health staff was actually involved in the implementation of the involuntary treatment episode. She did not assess the timeliness of the actions of mental health staff. She did say she looked to see if staff attempted to de-escalate the situation and told the patient that force may have to be used if the patient did not comply.  For involuntary treatment, Dr. Stalcup looked for nothing other than a speed letter, and did not determine if mental health staff was actually present when involuntary treatment was given.  Dr. Stalcup acknowledged that moving a prisoners from one cell to another should be considered an involuntary treatment event if ordered by a mental health provider, as should incidents of involuntary medication, and use of therapeutic restraints.  Dr. Stalcup did not know if mental health staff were present and involved in all such events as a matter of either policy or practice.  Dr. Stalcup also acknowledged that she did not review PUOF incidents where force was not used, according to the MCSO spreadsheet.

24.    I am also concerned that the OJ entries are the lynch pin in identifying PUOF's and what happened in each situation. The language in these brief notes is not standardized and the narrative is not always clear or complete. In my opinion this is very likely the source of my difficulty in determining in several situations whether or not force was used in a particular situation.

25.    And, as I have reported above, if the data for PUOF situations is collected or reviewed whether or not force occurred, as Lt. Williams suggests, it was not compiled or offered in the Defendants' Supplemental Report.

26.    Finally, Dr. Stalcup's focus on the "speed letter" for compliance is of concern. Some of the documents in the CHS files were entitled "speed letter" but other times the reference was in the narrative of different records with different titles. But more importantly, language in those speed letters sometimes appears to authorize MCSO to use force before the situation has even begun to be

played out. For example, a speed letter related to an event that occurred on April

17, 2017 says:

> Transfer to P3 by any means necessary. Therapeutic
> Restraints.[6]

If this is the case and "by any means necessary" guides the action of MCSO staff

without the involvement of CHS staff to attempt to de-escalate a PUOF situation

that may evolve from an involuntary treatment situation, in my opinion this is not

in compliance with the court's order.

   27.    The Defendants identified 9 PUOF situations for April in their

Supplemental Report where force was actually used and I identified 19. But I also

include in my exhibit an additional 2819 situations where force was not used,

including 1 situation where the records were not clear whether or not force was

actually used.

   28.    An additional concern for the month of April is for situations where

medical staff responded and it is clear they are not mental health staff, as required.

These 76 events are:

| | |
|---|---|
| April 4 | RN responded[7] |
| April 5 | Nurse responded[8] |
| April 10 | LPN spoke with inmate[9] |
| April 10 | RN spoke with inmate[10] |
| April 24 | RN spoke with inmate[11] |
| April 25 | RN spoke with inmate[12] |
| April 29 | RN on the scene[13] |

---

[6] MC Confidential 004481 2017
[7] MC Confidential 004572 2017
[8] MC Confidential 004462 2017
[9] MC Confidential 004649 2017
[10] MC Confidential 004633 2017
[11] MC Confidential 004491 2017
[12] MC Confidential 004493 2017
[13] MC Confidential 004496 2017

1    I counted these situations as non-compliant with the direction of the Court.

2       29.    And, I identified 10 PUOF situations where the records indicate that

3    CHS was consulted but did not respond.[14] These are the situations that I indicate

4    on **Exhibit 3** as "Further Review Needed". These events were identified as

5    potential PUOF situations in MSCO's own records in their OJ entries. Whether or

6    not force was used in these situations, it could have been. Having mental health

7    staff present is a measure that would have reduced the risk of harm for these

8    prisoners.

9       30.    The event where I cannot determine if force occurred was on April 7'

10   2017. It is not clear from the CHS file or the OJ entries whether or not force was

11   used. The CHS file says the individual was to be placed in a safe cell but nothing

12   more.[15] The OJ file says, "it necessary to have a planned use of force with (the)

13   inmate" but does not say whether or not force actually occurred. The OJ file also

14   documents consultation only and does not address if CHS staff were involved in

     implementation.[16]

15      31.    In my review of the April 2018 records I found one event where

16   MCSO says force did not occur but I disagree and conclude that force was indeed

17   used. In this event, which happened on April 24' 2017 there was a "forced clothing

18   removal".[17] In my opinion this action constitutes a use of force.

19      32.    Another problem with the April data includes events I identified that

20   were clearly PUOF's but there are no IR's. In one of them that occurred on April

21   12, 2017 the relevant OJ says:

22              Officer S. placed a spit mask on inmate M and started
23              to go for the seat belt, when inmate M tried to block
                him, but Officer W came in from the other side and
24              pulled inmate M's torso down to the bench seat.

25   [14] MC Confidential 004454, 004459, 004465, 004477, 004480, 004487, 004489, 004490,
     004492 2017
26   [15] MC Confidential 004885 2017
27   [16] MC Confidential 004465 2017
     [17] MC Confidential 004491 2017
28

                                                                                      11

> Officer S was able to free the seat belt lock, but
> inmate M had hold of the best as officers pulled him
> out, but eventually were able to free his hand and then
> placed him into a wheel chair…"[18]

There should have been an IR provided, as this language describing, "hands on" is clearly a PUOF event.[19] This example illustrates my concern that all the information necessary to determine compliance with the Court's Order may not be accurately captured in CHS or MCSO's records.

~~3.  Another PUOF where there was no IR provided happened on April 3ʳ 2017. There is only an OJ entry to describe what happened in this situation. It says:~~

~~A chemical agent was then deployed (Clear Out) and inmate P was removed from the cell.[20]~~

~~This is obviously a PUOF event and there should have been an IR.[21]~~

3~~3~~.  The Defendants identified 12~~3~~ PUOF events for May of 2017 in their Supplemental Report where forced was actually used and I identified 15. I also include in **Exhibit 3**, 2~~8~~ situations that were identified as PUOF but where force was not used, including 5 where it was not clear from the records whether or not force actually occurred.

3~~4~~.  The first of the situations where it is not clear occurred on May 1, 2017. The relevant OJ entry says:

> Officers entered the cell to place a belly belt on Inmate
> G and the inmate became aggressive. A belly belt was
> placed on the inmate and no force was used.[22]

---

[18] MC Confidential 004473 2017
[19] In my exhibit I do count this event as compliant as an "MHU Manager" arrived at the scene and attempted to de-escalate the situation.
[20] ~~MC Confidential 004458 2017~~
[21] ~~I also counted this event as compliant as a MHP attempted to de-escalate the situation~~
[22] MC Confidential 004497 2017

12

The possible response to the inmate becoming "aggressive" suggests that force may have been used to gain control of this described behavior. The language in the OJ is inconclusive.

35. The second event also occurred on May 1st. In this situation the OJ identifies the event as a PUOF. The officers entered the cell when the inmate refused to submit to cuffs for transport. There is no indication whether or not force actually occurred.[23]

36. The third event of concern about whether or not force occurred took place on May 9, 2017. For this situation the OJ file says:

> Supervisor Sgt. N found it necessary to have a planned use of force with inmate S.[24]

There is no further information in the OJ entry or the CHS file that provides clarification about whether force was necessary in this event.

37. The fourth event occurred on May 12, 2017.[25] In this situation the OJ indicates that the shield team had to enter the cell after the inmate refused to cuff and in order to "secure" the inmate. There is insufficient detail in the records to determine if force occurred.

38. The fifth such event occurred on May 15, 2017. In this event the OJ says:

> The shield was used on entrance but because (the) inmate was sitting on the toilet the shield was unable to be used. The officers were able to get her onto the floor in a prone position, get her handcuffed without any force being used.[26]

The CHS file says that force was used but that the patient, "became compliant

---

[23] MC Confidential 004499 2017
[24] MC Confidential 004505 2017
[25] MC Confidential 004510 2017
[26] MC Confidential 004517 2017

13

once the officers went into the cell".[27] It is not clear what technique was used to get the inmate "onto the floor" but it would be reasonable to assume it involved going "hands on". However, on **Exhibit 3** I went with the category of "unknown" whether or not force occurred.

39.     An additional concern for the month of May, like I expressed for April in the above text, is for situations where medical staff responded and not mental health staff, as required. These 5 events are as follows:

| | |
|---|---|
| May 4 | CHS said RN would have to respond[28] |
| May 9 | RN's arrived[29] |
| May 13 | RN spoke with inmate[30] |
| May 20 | RN spoke with inmate[31] |
| May 22 | RN spoke with inmate[32] |

I counted these situations as non-compliant with the direction of the Court as these are medical and not mental health staff.

40.     I also identified 5 PUOF situations where the records indicate that CHS was consulted but did not respond.[33] I do not believe these are in compliance with the Court's direction but I put them in the category of "Further Review Needed" in my **Exhibit 3**. These events were identified as potential PUOF situations in MSCO's own records in their OJ entries. Whether or not force was used in these situations, it could have been. Having mental health staff present is a measure that would have reduced the risk of harm for these prisoners.

41.     Another example of the problems with MCSO record keeping occurred on May 18. On this date there were two PUOF's on the same inmate, a little more than an hour apart. Both, according to the records were PUOF's. There

---

[27] MC Confidential 004974 2017
[28] MC Confidential 004501 2017
[29] MC Confidential 004505 2017
[30] MC Confidential 004512 2017
[31] MC Confidential 004524 2017
[32] MC Confidential 004527 2017
[33] MC Confidential 004504, 004506, 004509, 004511, 004530, 004534 2017

are no IR's for either incident, only OJ entries for each event.[34]

42.    This is a problem in other examples as well. On May 1 there was a PUOF but there is no IR. There is only a notation in the CHS file that says, "Detention did extract from his cell".[35]

43.    On May 27 there was a PUOF event but there is no IR. The OJ entry describes the use of force that occurred.[36]

44.    It is very clear that MCSO does not have a system in place to track their use of force events.

45.    In their Supplemental Report, MCSO identified 13 PUOF event for the month of June 2017. But from the documents received I identified 109 where force was actually used. Adding in 110 additional PUOF situations my total is 2117 for the month, including 2 situations where I could not determine from the records whether or not force actually occurred.

46.    For an event on June 1, 2017 the CHS file says, "Pt. was standing and was placed on the floor at times". It goes on to say, "Pt. was not violent no spray used".[37] Despite a chemical spray not being used, the phrase, "placed on the floor" in my experience is a use of force. Since there is no IR for this event, it is impossible to determine what actually happened

47.    In another event on June 15, 2017, there is conflicting information in the record about whether or not a use of force occurred. The CHS file says it did not. It says, "Pt. allowed medical staff to administer shot WITHOUT use of force.[38] But, an OJ entry for the same date says, "Inmate J was denied dayroom due to a use of force from S.R.T. on the first shift".[39] It is impossible due to these conflicting reports whether or not force occurred.

[34] MC Confidential 004522 2017
[35] MC Confidential 004937 2017
[36] MC Confidential 004531 2017
[37] MC Confidential 005015 2017
[38] MC Confidential 005048 2017
[39] MC Confidential 004550 2017

15

48.     Similar to the pattern in April and May, in the month of June sometime medical staff responded to the scene and not mental health staff:

|  |  |
|---|---|
| June 10 | Medical staff responded; IR says mental health were not available[40] |
| June 28 | RN responded[41] |

I counted these situations as non-compliant with the direction of the Court as these are medical and not mental health staff.

49.     Also similar to the pattern in April and May, in June there were 54 PUOF situations[42] where mental health was consulted but did not respond to help de-escalate the situation and another where the CHS staff member reports simply observing the situation[43]. These situations were identified as potential PUOF situations in MSCO's own records in their OJ entries. Whether or not force was used in these situations, it could have been. Having mental health staff present is a measure that would have reduced the risk of harm for these prisoners.

50.     Included in my totals above are an additional 7 situations that the MCSO classified at Spontaneous Use of Force (SUOF) where there were opportunities to manage them as PUOF situations. My opinions are consistent with the definition of the pertinent MCSO policy, which defines a planned use of force as "[a]n incident involving an inmate who is not posing an immediate threat to officers, staff, or other inmates."  Policy CP-1 (Doc. 2304-1).  These are listed separately in **Exhibit 3**.

51.     For example, on April 7, 2017 an inmate was placed in a safe cell but refused going to his knees. Instead of closing the cell door and calling for assistance from mental health, force was immediately deployed. Officers were injured in this event and the Taser was deployed on the inmate. It is possible that

---

[40] MC Confidential 006131 2017
[41] MC Confidential 006259 2017
[42] MC Confidential 004539, 004545, 004547, 004548, 004549 004550, 006327 2017
[43] MC Confidential 005038 2017

had mental health staff been called, force and the injuries to the officers could have been avoided.[44]

52. In another example, on April 14, 2017 the inmate was securely in his cell but was refusing his medication. He stuck his hands through the cuff port in the cell door and refused to move them. The incident report indicates that an officer then attempted to kick the cell door shut.[45] Such behavior on the part of the officer was dangerous and could have resulted in serious injury to the inmate. I have seen examples of this dangerous practice in other jurisdictions where serious injuries did occur. It is akin to corporal punishment. The correct approach would be to back away from the cell door, perhaps insert a standing cell shield to place in front of the door and continue to observe the inmate while calling mental health staff for assistance.

53. On June 28, 2017 an inmate was in restraints and was moved to a flat cell. Once placed in the cell he failed to respond to orders to get down on his knees. Rather than secure the cell door and call mental health staff for assistance, the officers went "hands on" and forced the inmate down.[46] Once again, it is entirely possible that force could have been avoided had mental health staff been called and had a chance to de-escalate the situation.

54. I wrote a report for this case and submitted it in December 2017.[47] I went back to that report and compared some of the source documents provided by the Defendants for that report to the documents provided for this one. I found multiple discrepancies.

55. In writing my December report, I discovered a PUOF that occurred on April 21st regarding an inmate that was only listed in a Disciplinary Action Report (DAR).[48] Plaintiffs then asked Defendants if there was an IR for this event

---

[44] MC Confidential 005507 – 005508 2017
[45] MC Confidential 005624 – 005625 2017
[46] MC Confidential 006274 – 006275 2017
[47] 2436 – 4 Declaration of Eldon Vail, December 22, 2017
[48] MC Confidential 001924 2017 and referenced on page 13 in my December declaration

and it was provided.[49] In this event two RN's responded and spoke with the inmate and it is not clear if they were mental health staff. No IR to this event was included in the documents received for this report in July. It was provided in the documents received in August and is included in my **Exhibit 3**.

56. Equally troubling, in the records provided for my December report, the OJ says there was a PUOF event for an inmate on June 19, 2017. The OJ note says:

> Inmate refused to lock down from day room. A cell
> extraction was performed…[50]

The OJ file for my December report goes on to say that CHS was consulted but there is no reference to their involvement in the PUOF. I did not include this event in my Exhibit 3 but would list it as non-compliant since CHS was not involved in the implementation. But there is no such reference to this event in the OJ files submitted for this report, nor is there an IR. I stumbled across the omission by accident. Given the unreliability of the documents produced by the MCSO, there may well be more.

57. I did not conduct a complete comparison of the documents provided by the Defendants for my December report and the documents provided for this one as it would be enormously time consuming. The ones listed above were just the easiest to find. It is likely there are more.   Defendants have had my report for months, and as a part of engaging in a sound a reliable methodology should have checked all non-compliant or questionable/incomplete events I identified to determine themselves whether they were compliant or not.  Evidently, they did not do so.

58. I am not confident that the Defendants have produced sufficient information in order to make a thorough determination of their practices with the Court's Order regarding use of force. Incident reports and other documents that

---

[49] MC Confidential 004230 – 004251 2017
[50] MC Confidential 000998 2017

1  were included last December differ from those provided for this report. From my

2  **Exhibit 3** there are a number of PUOF events where force was used yet no

3  incident reports were ever provided.

4         April 12           Hands on[51]

5         April 24           Forced clothing removal[52]

6         May 18           MK9 fogger deployed[53]

7         May 27           Hands on[54]

8         May 24           Inmate placed on floor[55]

9         June 19           OJ says cell extraction performed[56]

10  This is yet another example of the difficulty the MCSO has producing a complete set of records for review.

11  59. The inconsistency of the records received that are all supposed to

12  apply to the time period in question causes me to be concerned that the MCSO is

13  not properly tracking their requirements of the Court Order. Every time I get

14  documents for the same time period the available information changes, often as a

15  result of Plaintiffs reviewing records and identifying those that were missing from

16  the last batch. The ways the records are organized make it difficult for MCSO to

17  provide documents resulting in confusion for all the parties involved, including

18  this writer. In this revised report I have done my best to accurately report and

19  analyze all of the available information.

20  60.. As I said in my last report:

21  MCSO also have a number of problems with its
22  methodology in its own assessment of compliance that
22  renders its results unreliable. Finally, MCSO's failure
23  to ensure the involvement of mental health staff in
23  planned use of force incidents places seriously

---

[51] MC Confidential 004473 2017
[52] MC Confidential 004491 2017
[53] MC Confidential 004522 2017
[54] MC Confidential 004531 2017
[55] MC Confidential 006324 – 006325 2017
[56] MC Confidential 006327 2017

19

1
2
3

mentally ill prisoners at an unreasonable risk of being
subjected to unnecessary force. Such uses of force can
result in physical harm, and exacerbate their
underlying illness.[57]

4

My opinion has not changed, and applies equally to involuntary treatment events.

5
6
7
8
9
10
11
12
13
14
15
16
17

61.    At least part of the problem may be with their policy on Incident
Report Guidelines.[58] A structured review of use of force incidents driven by clear
policy is typical and necessary to assess use of force incidents in corrections. This
policy contains none of the elements required by the Court Order, which is further
revealed in actual practice when one reviews the actual incident reports. Although
it may be found in the narrative of the reviews of use of force events, it is not
readily clear when reviewing those records whether or not the event was a PUOF
or an SUOF. Reference to the actions of mental health staff is buried in the text
and is often difficult to find. The associated OJ's and CHS files are not attached
and rarely referenced. This appears to be a policy written for the law enforcement
functions of the MSCO and does not comply with similar policies written solely
for corrections. I recommend a separate policy be developed, or this policy be
amended, or that the requirements for a proper use of force review be articulated
in the MCSO policy on Use of Force, CP-1.

18
19

62.    That Use of Force policy still lacks specific reference to the
requirements of the Court's Order, specifically the language requiring:

20
21
22

(23) Mental health staff will be involved in the
implementation of any planned use of force or
involuntary treatment on a seriously mentally ill
pretrial detainee.

23
24
25

There is a significant difference between simply consulting with versus the
"involvement in the implementation of any planned use of force" and
understanding that difference is critical for the MCSO to regularly and routinely

26

27
28

---

[57] 2436 – 4 Declaration of Eldon Vail, December 22, 2017, pages 6 and 7
[58] Graves 000035 - 000043

reduce the risk of harm to prisoners, as well as to their own staff. Involving the mental health staff in an effort to de-escalate potential use of force situations works and is evidenced by the numerous times the need for force is eliminated when mental health staff are involved. One of these two policies should reflect the specific language of the Court Order and be monitored for each and every use of force event that occurs in the MCSO jails.

63.    Again, as I said in my last report:

> Amend the MCSO Use of Force policy and define "consultation" and "implementation" by mental health staff in a planned use of force situation. Insert the word "de-escalation" in both policies so that the purpose of involving mental health staff is clear to all involved.

> Require documentation by MCSO of mental health staff's involvement in planned use of force events and most importantly, revise the Incident Summary form to include a place for this information. Require detention administrators to regularly and routinely account for it during their review process.

64.    If I were the correctional administrator offering as compliance with the Court Order or policy a sample of how I am doing, I would not want to offer data from over a year ago. I would want to offer a much more recent sample, certainly from 2018 and not 2017.   I would not rely on data for a three-month period over a year ago to determine that compliance with policy was reached and demonstrated.

65.    And last, in none of the documents offered for my review for this report have the Defendants provided information about the disciplinary process or the use of segregation for mentally ill prisoners as set forth in subparagraphs 5(a)(26), both of which remain unaddressed in their current motion.

I declare under penalty of perjury that the foregoing is true and correct, this 22nd day of October, 2018.

_____

/s/ Eldon Vail