**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails,<br><br>Plaintiffs,<br><br>v.<br><br>Paul Penzone, Sheriff of Maricopa County; Bill Gates, Steve Gallardo, Denny Barney, Steve Chucri, and Clint L. Hickman, Maricopa County Supervisors,<br><br>Defendants. | No. CV-77-00479-PHX-NVW<br><br>**ORDER** |

Before the Court are:

(1) Plaintiffs' Motion for Leave to File Amended/Corrected Expert Report (Doc. 2490), the response (Doc. 2491), and the reply (Doc. 2492);

(2) Defendants' Supplemental Report Regarding Corrective Actions, Compliance Data Collection Procedures, and Compliance Data Summaries for April, May, and June 2017 (Doc. 2473), the response (Doc. 2484), and the reply (Doc. 2487); and

(3) Defendants' Proposed Plan for Demonstrating Compliance Regarding Subparagraph 5(a)(26) of Revised Fourth Amended Judgment (Doc. 2485), the response (Doc. 2488), and the reply (Doc. 2489).

## I.     BACKGROUND

The Revised Fourth Amended Judgment was entered on September 30, 2014, and ordered specific remedies to correct constitutional deficiencies, which included adopting or amending policies to satisfy 31 specific requirements for providing medical and mental health care, implementing the policies, and demonstrating implementation of the policies. (Doc. 2299.)  On March 1, 2017, the Court found that Defendants had demonstrated compliance with 21 of the 31 specific requirements but had not yet demonstrated compliance with the remaining 10 requirements. (Doc. 2404.)  On August 22, 2018, the Court found that Defendants had demonstrated compliance with 7 of the 10 remaining specific requirements. (Doc. 2483.)  The Court granted Defendants' request to submit supplemental briefing regarding subparagraphs (22) and (23) of Paragraph 5(a) of the Revised Fourth Amended Judgment and ordered Defendants to file a proposed plan for demonstrating compliance with subparagraph (26) of Paragraph 5(a) of the Revised Fourth Amended Judgment concerning instances of disciplinary isolation.  (*Id.*)

## II.     TERMS

MCSO:  Maricopa County Sheriff's Office

CHS:  Correctional Health Services

SMI:  Seriously Mentally Ill, as identified by community health providers

MHCC:  Mental Health Chronic Care, as identified by CHS

TechCare:  CHS's electronic medical records program

Operation Journal:  MCSO's electronic records program

Speed letter:  a communication from CHS to MCSO regarding planned involuntary treatment or action with assistance from MCSO if force is needed

DAR:  Disciplinary Action Report

## III.   PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED/CORRECTED EXPERT REPORT (DOC. 2490)

Plaintiffs submitted an expert report with their response to Defendants' Supplemental Report (Doc. 2473) regarding subparagraphs 5(a)(22) and (23).  Defendants

subsequently identified errors in the expert report, which included Plaintiffs' expert's omission of 16 planned use-of-force incidents and his assertion that Defendants had failed to produce one incident report. Plaintiffs seek leave to file a corrected report that includes the 16 incidents, concede Defendants had produced the one report, and do not address Defendants' other objections. Defendants object to Plaintiffs filing a corrected expert report because it provides Plaintiffs' expert additional opportunity to analyze the 16 incident reports he previously overlooked. Defendants' response to Plaintiffs' motion to amend was filed ten days late without requesting leave to do so.

Plaintiffs' corrected report does not raise new issues or unfairly prejudice Defendants. Plaintiffs' Motion for Leave to File Amended/Corrected Expert Report (Doc. 2490) will be granted.

## IV. DEFENDANTS' SUPPLEMENTAL REPORT (DOC. 2473) REGARDING SUBPARAGRAPHS 5(a)(22) AND (23) OF THE REVISED FOURTH AMENDED JUDGMENT

### A. Subparagraph 5(a)(22): Prior Consultation with Mental Health Providers

Subparagraph 5(a)(22) states:

(22) A mental health provider or professional will be consulted before each planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.

(Doc. 2299 at 5.) Defendants report that they reviewed entries in the Operation Journal to identify all planned uses of force in April, May, and June 2017. For each of the Operation Journal entries involving a pretrial detainee designated as SMI or MHCC, Defendants identified the name and/or CHS identification number for the mental health provider or professional consulted before a planned use of force from the Operation Journal, a speed letter from CHS requesting MCSO's assistance, an incident report generated if force was used, the medical chart, and/or correspondence in TechCare. Defendants assessed a potential planned use of force or involuntary treatment as compliant if the Operation Journal and/or TechCare records showed that a consultation occurred.

For April 2017, Defendants identified 38 planned uses of force and CHS requests for assistance involving seriously mentally ill pretrial detainees. Of those 38 events, MCSO consulted a CHS mental health provider or professional 37 times.

For May 2017, Defendants identified 35 planned uses of force and CHS requests for assistance involving seriously mentally ill pretrial detainees. Of those 35 events, MCSO consulted a CHS mental health provider or professional 35 times.

For June 2017, Defendants identified 14 planned uses of force and CHS requests for assistance involving seriously mentally ill pretrial detainees. Of those 14 events, MCSO consulted a CHS mental health provider or professional 14 times.

In Mr. Vail's amended opinion, he concluded that MCSO consulted a CHS mental health provider or professional in 35 of 47 (74.4%) planned uses of force in April 2017, 39 of 43 (90.7%) planned uses of force in May 2017, and 17 of 21 (81.0%) planned uses of force in June 2017. Mr. Vail identified 9 more planned uses of force and CHS requests for assistance involving seriously mentally ill pretrial detainees than did Defendants for April 2017, 4 more for May 2017, and 3 more for June 2017. Defendants identified three uses of force they considered spontaneous that Mr. Vail considered as planned. They also identified two situations included by Mr. Vail that involved inmates who were not designated as SMI or MHCC. Mr. Vail also deemed some events as non-compliant when CHS generated a speed letter to MCSO, but no force was used and no response from CHS mental health staff was documented. If a speed letter was generated by mental health staff, a response from mental health staff was unnecessary.[1] Mr. Vail also described certain situations that he thinks require further review although force was not used, but he did not explain whether he included these situations in his summary for subparagraph 5(a)(22). In fact, Mr. Vail said he focused more on Defendants' compliance with subparagraph 5(a)(23) than he did on Defendants' compliance with subparagraph 5(a)(22).

---

[1] Defendants state that a speed letter is generated by a psychiatric or intake provider based on an assessment by CHS mental health staff or a licensed nurse who has received mental health training and supervision.

Even if the Court adopts all of Mr. Vail's characterizations of planned uses of force and CHS requests for assistance for April, May, and June 2017, Defendants have shown that they have sufficiently implemented the remedy described in subparagraph 5(a)(22).

**B.    Subparagraph 5(a)(23): Involvement of Mental Health Staff During Implementation**

Subparagraph 5(a)(23) states:

> (23) Mental health staff will be involved in the implementation of any planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee.

(Doc. 2299 at 5.)   Defendants report that they reviewed the planned uses of force that MCSO implemented and CHS requests for assistance for involuntary treatment when force was used as documented in the Operation Journal, TechCare, and incident reports. Defendants assessed a planned use of force or request for assistance as compliant if a CHS mental health staff was physically present during the use of force.  Defendants found that a CHS mental health staff was physically present during 9 of 9 planned uses of force or involuntary treatment in April 2017, during 12 of 12 planned uses of force or involuntary treatment in May 2017, and during 1 of 1 planned use of force or involuntary treatment in June 2017.

In Mr. Vail's amended opinion, he found that CHS mental health staff were present during the implementation of 10 of 19 (52.6%) planned uses of force or involuntary treatment in April 2017, 13 of 15 (86.7%) planned uses of force or involuntary treatment in May 2017, and 5 of 10 (50.0%) planned uses of force or involuntary treatment in June 2017.  To determine these compliance rates, Mr. Vail did not include situations for which the records did not clearly indicate whether force or involuntary treatment occurred. Nevertheless, Mr. Vail found more situations during which planned use of force or involuntary treatment on a seriously mentally ill pretrial detainee was implemented than did Defendants, likely for the same reasons he included more situations in his analysis regarding subparagraph 5(a)(22).

Mr. Vail opined that nine use-of-force situations occurred in April 2017 that did not comply with subparagraph 5(a)(23). In five of the nine, a speed letter was generated, nursing staff responded, and there is no documentation of a response from mental health staff. In the remaining four situations, Mr. Vail opined there was use of force and mental health staff should have been called, but it was not a planned use of force.

Mr. Vail opined that two use-of-force situations occurred in May 2017 that did not comply with subparagraph 5(a)(23). In one, a nurse responded to a planned use of force, mental health staff was notified, but mental health staff did not respond. In the other situation, there was a speed letter for a restraint bed, the inmate submitted to one restraint but then resisted. Mr. Vail opined that mental health staff should have been called when the inmate resisted.

Mr. Vail opined that five use-of-force situations occurred in June 2017 that did not comply with subparagraph 5(a)(23). In one, the Operation Journal indicates a cell extraction was performed and CHS was consulted, but no response was documented. In one, a speed letter was generated to place the inmate in therapeutic restraints, and a nurse responded. In one, medical staff responded to a planned use of force because mental health staff were unavailable. In the remaining two situations, the use of force was not planned, but Mr. Vail opined that mental health staff should have been called.

Involving mental health staff when use of force or involuntary treatment is planned is intended to reduce the need to use force. However, it is unrealistic to think that every situation can be anticipated. It also is unrealistic to think that all spontaneous uses of force can be put on hold while mental health staff are summoned. Regarding planned situations, according to Mr. Vail there were eight times in three months that medical or nursing staff responded, and the involvement of mental health staff was not documented. Even if the eight situations were accurately identified and classified by Mr. Vail, they involve a very small percentage of the pretrial detainees who are identified as seriously mentally ill.

Defendants have shown that they have sufficiently implemented the remedy described in subparagraph 5(a)(23).

**V. DEFENDANTS' PROPOSED PLAN FOR DEMONSTRATING COMPLIANCE REGARDING SUBPARAGRAPH 5(a)(26) OF THE REVISED FOURTH AMENDED JUDGMENT (DOC. 2485)**

Subparagraph 5(a)(26) requires Defendants to "adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee." The Court found Defendants had generally shown compliance with subparagraph 5(a)(26), but not for consultation concerning disciplinary isolation. Defendants were ordered to "propose how they will demonstrate that before a seriously mentally ill pretrial detainee is placed in disciplinary isolation, CHS mental health staff are consulted and their recommendations addressing the potential effects of isolation on the pretrial detainee's mental health are received and considered." (Doc. 2483 at 35.)

Again, the purpose of subparagraph 5(a)(26) was to articulate a minimum constitutional measure of disciplinary isolation of seriously mentally ill detainees. The minimum is consideration of effects of the isolation on the mental health of the detainee. That requires demonstration that mental health staff are consulted and that corrections staff make their disciplinary decision in light of the consultation. The subparagraph does not state any substantive standard that must be met for disciplinary isolation. The consultation requirement should end disciplinary isolation in ignorance of the likely mental health consequences for the specific detainee, without trampling on the authority of corrections staff.

Accordingly, the objective of proof of compliance with subparagraph 5(a)(26) is to show such consultation occurs and reaches disciplinary decision-makers, at least as a general matter.

Defendants' description of how they would demonstrate that is convoluted, indirect, and not understandable in important respects. Plaintiffs' objections are well-taken in some respects and overly demanding in others. For example, Defendants' proposed "eight step process" is not fully grounded in their written policies, don't all have to be followed, and require some reconstructed rather than contemporaneous record keeping. As such, they are difficult to validate for accuracy after the fact. But then, subparagraph 5(a)(26) does

not require Defendants to prove compliance with each term of their adopted policies and procedures.

Ten years have passed since Defendants were found in continuing violation of constitutional standards under the 1981 consent decree and its amendments. Defendants have undertaken multiple rounds of attempted cure. Progress has been made each time, but after multiple attempts Defendants still do not have it all right. The Court has deferred to Defendants' initiative to propose cures, but after ten years and in light of Defendants' inability even now to come up with a persuasive and effective cure of this last continuing constitutional violation, it is time for the Court to direct a cure and have this over with.

Defendants will be directed to come up with a process and contemporaneous record keeping that will show for a three-month period: all pretrial detainees for whom a DAR was issued for possible disciplinary isolation, which of them had been designated as seriously mentally ill, whether CHS mental health staff was consulted for each, the content of each consultation or recommendation, and whether disciplinary segregation was imposed or sanctions were suspended. The report should explain how sanctions proposed by MCSO were communicated to CHS, that consultations with CHS mental health staff occurred, and that recommendations by CHS mental health staff were considered by MCSO. The plan and the report pursuant to it should explain how these communications were documented and how the evidence of the communications was collected.

To comply with the Court's order, Defendants must show, if a DAR was issued to a seriously mentally ill pretrial detainee already placed in segregated housing and MCSO proposed disciplinary segregation as a sanction, that MCSO consulted with CHS mental health staff regarding the proposed sanction and considered their recommendations. MCSO must consult with CHS mental health staff every time disciplinary isolation is considered for a seriously mentally ill pretrial detainee regardless of current housing placement. A proposal for disciplinary isolation for a detainee already in disciplinary housing is a proposal for extension of disciplinary housing. There is no reason why extension of disciplinary housing should be exempt from consultation with CHS.

Defendants will be ordered to confer with Plaintiffs and submit a plan for demonstrating that "before a seriously mentally ill pretrial detainee is placed in disciplinary isolation, CHS mental health staff are consulted and their recommendations addressing the potential effects of isolation on the pretrial detainee's mental health are received and considered." The plan must include a three-month data collection period in 2019 during which data will be contemporaneously collected for each seriously mentally ill pretrial detainee for whom a DAR is generated.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Leave to File Amended/Corrected Expert Report (Doc. 2490) is granted.

IT IS FURTHER ORDERED that Defendants have demonstrated compliance with subparagraphs (22) and (23) of Paragraph 5(a) of the Revised Fourth Amended Judgment.

IT IS FURTHER ORDERED that subparagraph (26) of Paragraph 5(a) of the Revised Fourth Amended Judgment remains in effect.

IT IS FURTHER ORDERED that by March 1, 2019, Defendants provide Plaintiffs with a proposed plan complying with the foregoing requirements, Plaintiffs may provide Defendants with an alternative proposed plan by March 29, 2019.

IT IS FURTHER ORDERED that by April 19, 2019, Defendants' counsel meet in person and confer with Plaintiffs' counsel regarding the proposed plan or plans.

IT IS FURTHER ORDERED that by May 3, 2019, the parties file a joint plan or separate plans for complying with the foregoing requirements.

IT IS FURTHER ORDERED setting a hearing on May 16, 2019, at 10:00 a.m. on the plan.

Dated this 15th day of January 2019.

Neil V. Wake
Senior United States District Judge