Eric Balaban (admitted *pro hac vice*)
ACLU National Prison Project
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
(202) 548-6601
ebalaban@aclu.org

(additional counsel listed on signature page)

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>Paul Penzone, et al.,<br><br>    Defendants. | No. CIV 77-479-PHX-NVW<br>**PLAINTIFFS' PROPOSED PLAN FOR DEMONSTRATING COMPLIANCE WITH SUBPARAGRAPH 5(a)(26) OF REVISED FOURTH AMENDMENT JUDGMENT** |

Provision 5(a)(26) of the Revised Fourth Amendment Judgment requires that "Defendants will adopt and implement a written policy requiring that mental health staff be consulted regarding discipline of any seriously mentally ill pretrial detainee." (Doc. 2299, p. 6).

On January 15, 2019, the Court ordered Defendants to submit a proposed plan to Plaintiffs for demonstrating compliance with subparagraph 5(a)(26) of the Revised Fourth Amended Judgment, for Plaintiffs to respond and the parties to confer, and the parties thereafter to "file a joint plan or separate plans" for demonstrating compliance with subparagraph 5(a)(26). (Doc. 2493 at 9). Though the parties have substantially narrowed the areas of dispute as to a compliance plan, they have been unable to agree on a joint plan. *See* Ex. B-F (communications over compliance plan). Plaintiffs hereby

- 1 -

submit their compliance plan pursuant to the Court's order, noting below the remaining areas of disagreement with Defendants. *See* Ex. A.

I. **Background**

The Court has stated that in order to "avoid arbitrary and random discipline" the Defendants "must provide consultation with mental health staff regarding proposed discipline and potential exacerbation of a detainee's serious mental illness, especially the use of isolation." (Doc. 2483 at 27). The Court's decision aligns with a well-settled body of controlling law holding, "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have 'presum[ed]malicious and sadistic intent." *Wood v. Beauclair,* 692 F.3d 1041, 1050 (9th Cir. 2012).

Courts in the Ninth Circuit repeatedly have held that punishing prisoners suffering from mental illness for behavior that is the product of their illness, or subjecting them to punishment that poses a risk of exacerbating their symptoms, violates the Constitution. *Coleman v. Wilson*, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995) (use of discipline "to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses" violated seriously mentally ill prisoners' Eighth Amendment rights); *Casey v. Lewis*, 834 F. Supp. 1477 (D. Ariz. 1993) ("punish[ing] . . . inmates by locking them in small, bare segregation cells for their actions that are the result of their mental illnesses . . . without mental health care" was "inexcusable" and in violation of the Eighth Amendment); *Arnold ex rel. H.B. v. Lewis*, 803 F. Supp. 246, 256 (D. Ariz. 1992) (placement of schizophrenic prisoner in lockdown "as punishment for the symptoms of her mental illness," thus exposing her to conditions that placed her at risk of deterioration violated the Eighth Amendment).

This line of cases is consistent with Ninth Circuit law holding that "the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Jones v. City of Los Angeles* 444

F.3d 1118, 1132 (9th Cir. 2006), *vacated on other grounds*, 505 F.3d 1006 (9th Cir. 2007)) (citing *Powell v. Texas*, 392 U.S. 514, 548, 50 n.2 (1968) (White, J. concurring in the judgment)). *See Martin v. City of Boise,* 902 F.3d 103, 1047-48 (9th Cir. 2018) (same reasoning as *Jones* used to invalidate ordinance criminalizing homelessness).

*Jones* and *Martin*, in turn, follow a long line of cases from the Supreme Court invalidating punishment of persons who lack the capacity to conform their conduct to the requirements of the law, or for whom punishment either offends our shared standard of decency, or does not acts as a deterrent or serve a retributive purpose. *See, e.g., Madison v. Alabama*, 139 S. Ct. 718, 728, 729 (2019) (barring execution of defendants who lack understanding for the reason of their punishment as "lack[ing] retributive purpose" and "offend[ing] morality."); *Panetti v. Quarterman*, 551 U.S. 930 (2007) ("the execution of an insane person simply offends humanity . . .provides no example to others" and serves no retributive purposes); *Ford v. Wainwright*, 477 U.S. 399 (1986) (prohibiting execution of insane defendants; reasoning "[w]hether its aim be to protect the condemned from fear and pain without comfort or understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the restriction finds enforcement in the Eighth Amendment."); *Robinson v. California,* 370 U.S. 660, 666 (1962) (invalidating statute criminalizing addiction, reasoning, [i]t is unlikely that any State . . . would attempt to make it a criminal offense for a person to be mentally ill," and that "a law which made a criminal offense of such a disease would . . . be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.").

If anything, Plaintiffs' claims here are even stronger than those of the plaintiffs vindicated in *Arnold, Coleman,* and *Casey* because those cases found liability under the deliberate indifference standard applicable to sentenced inmates' claims under the Eighth Amendment, which requires proof of both objectively dangerous conditions and a subjectively culpable state of mind by prison officials. *See Farmer v. Brennan,* 511

- 3 -

U.S. 825, 834 (1994). The class of pretrial detainees in this case are entitled to the more extensive protections of the Due Process Clause of the Fourteenth Amendment, which does not require proof of subjectively culpable state of mind. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (analyzing detainee's excessive force claim); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (applying *Kingsley* to detainee's health care claims).

## II. Introduction

The Court last year asked both parties to submit plans to assess compliance with subparagraph 5(a)(26). Finding neither plan submitted by the parties for assessing compliance with this remedy completely acceptable, the Court ordered them to confer in an effort to agree on a joint plan. (Doc. 2493 at 9). While the parties have agreed to the bulk of a compliance plan, there remain a handful of disputes the Court must resolve.

Plaintiffs note that they may need additional data to assess compliance with 5(a)(26) once they have the chance to review the raw data produced by Defendants, and speak with their clients and with staff most knowledgeable and responsible for Defendants' methodology. The plan Plaintiffs provide, however, is their best effort to identify all data they believe they will need, based on previous reviews.

## III. Plaintiffs' Compliance Plan

Filed as Exhibit A is Plaintiffs' proposed plan for demonstrating compliance with subparagraph 5(a)(26) of the Revised Fourth Amended Judgment. Plaintiffs have left in plain type the provisions of that plan (or portions thereof) that Defendants have agreed to implement. The language in bold type Defendants have not agreed to. Plaintiffs address those disagreements below.

### A. Data to Capture Discipline of All Seriously Mentally Ill Patients

The parties agree that they must identify all seriously mentally ill prisoners who have potentially been subject to discipline in order to assess compliance with subparagraph 5(a)(26). They disagree on how to do so. Plaintiffs propose that the list

- 4 -

of all prisoners who have been subject to discipline be cross-referenced with the Jail's mental health caseload, and all incidents involving caseload patients be assessed. *See* Ex. A (provisions 1, 3, 4.a.).[1] Defendants propose that the list be cross-checked with the caseload, but that compliance review be limited to those designated on the caseload as either Seriously Mentally Ill (SMI) or Mental Health Chronic Care (MHCC). *See* Ex. D (Apr. 12, 2019 letter from M. Iafrate to E. Balaban).

The remedy itself is not written so as to apply only to those patients already "designated SMI/MHCC" on Defendants' caseload. See Doc. 2299 at 6. Rather, the remedy requires meaningful consultation regarding the potential discipline of any "seriously mentally ill pretrial detainee." *Id.* Limiting review to only those disciplinary incidents involving already-designated SMI/MHCC patients creates a risk of excluding incidents involving seriously mentally ill detainees.

During negotiations this year over the plan, Plaintiffs requested, but have yet to receive, the pertinent policies and protocols addressing how the designations on the caseload are made, by whom, and what the various designations mean. Without this information, Plaintiffs are left to guess as to how much of a risk Defendants' approach presents. Regardless of how it works, there remains a risk: there may be seriously mentally ill patients who are not designated correctly; there may be patients who have been designated correctly, but do not appear under the correct designation on the list; there may be patients who are disciplined but only later designated SMI/MHCC. None of the disciplinary incidents involving these seriously mentally ill men and women would be assessed.

A related dispute between the parties is how to identify all disciplinary incidents. Defendants propose that they only search all Disciplinary Action Reports (DARs), while Plaintiffs propose they also review additional databases that may capture disciplinary

---

[1] Plaintiffs also propose that Defendants produce all Disciplinary Action Reports (DARs) for the reporting period, while Defendants offer only to produce those involving patients already designated SMI or MHCC. *See* Part G, *infra*.

- 5 -

incidents, such as housing records showing all prisoners who were moved into pre-hearing detention. *See* Ex. A, provision 2. Defendants' approach again threatens to exclude from review disciplinary incidents not captured via a DAR. While certainly almost all discipline will be documented via DAR, searching other data will ensure that any errors or omissions in the DARs, or in how the DARs are reviewed, are rectified.

The databases Plaintiffs have proposed be searched are ones that jail staff by policy are required to use to enter information as to discipline. *See, e.g.,* Doc. 2417-1, p. 197 (Policy DJ-2, requiring entry of disciplinary data into Jail Management System (JMS) and Onbase). There is no reason to fail to look at other data points that may uncover pertinent events, particularly since Defendants themselves have searched these databases to identify pertinent events in assessing their own compliance as to other remedies in the Judgment. *See, e.g.,* Doc. 2473 (Defendants queries of JMS to assess compliance with various provisions of the Fourth Amended Judgment).

**B.    Assessment of Relationship of Illness to Behavior**

Plaintiffs propose that Defendants report on whether mental health staff in reviewing potential discipline assessed the relationship of mental illness to the behavior *See* Ex. A, provision 4.e.1. Defendants object. *See* Ex. D. at 2. Plaintiffs' proposal is taken word-for-word from Defendants' own policy:

> 17.    Discipline for the seriously mentally ill
> . . .
> b.    CHS Mental Health Staff will provide recommendations to MCSO to document on the DAR, including the following:
> > 1) Assessment of relationship of mental illness to the behavior.

Doc. 2417-1 at 176 (Policy J-A-08.D.17)

Subparagraph 5(a)(26) is rendered meaningless unless there is a meaningful assessment done by mental health staff as to whether a seriously mentally ill detainee's behavior is the product of their illness. Otherwise, the Jail's disciplinary system as to

those with serious illness is the very "arbitrary and random" system the remedy was intended to prohibit. (Doc. 2483 at 27).

Defendants object to assessing compliance with their own policy because they deem those provisions to be related to subparagraph 5(a)(25), not 5(a)(26). But 5(a)(25) clearly only relates to "the use of isolation in a disciplinary segregation unit as a sanction" (Doc. 2299 at 5). That provision does not address any other forms of punishment. It also does not address whether the detainee should be held responsible/sanctioned in the first place. That process is only covered by subparagraph 5(a)(26).

### C. Recommendations for Discipline

Defendants also object to assessing whether mental health staff "provide[d] recommendations for MCSO's consideration regarding discipline." *See* Ex. A, provision 4.e.3. Again, Defendants assert that compliance with this provision is required by subparagraph 5(a)(25), not 5(a)(26). Plaintiffs' response is the same as above: subparagraph 25 only addresses use of isolation as a disciplinary sanction, not any other aspect of discipline of the seriously mentally ill, which subparagraph (26) plainly covers. The objected-to language, again, is taken directly from Defendants' own policy on discipline for seriously mentally ill detainees. (Doc. 2417-1 at 17). The recommendations go to both responsibility and to possible sanctions, both areas covered by both the policy and subparagraph 5(a)(26). *See, e.g.,* Doc. 2417-1 at 176-77 (Policy J-A-08 requires mental health staff to provide recommendations on, *inter alia*, whether the detainee's mental illness "may have contributed to the behavior," and the potential impact of discipline of the health of the detainee.)

### D. Correct Segregation Level and Suitability for Segregation

Defendants' policy requires that mental health staff review the health records for all seriously mentally ill patients before their placement in segregation as a disciplinary sanction, "review and document considerations regarding impact of segregation," and

- 7 -

"provide written consideration to MCSO," using a three-level scale: level 1 is for patients for whom there is no contraindication for segregation; level 2 is for patients for whom "isolation over time may contribute to increased psychiatric distress;" and level 3 is for patients for whom segregation is "likely contraindicated." (Doc. 2417-1 at 155-56) (Policy J-E-09).

The policy further requires specific recommendations from mental health staff when use of isolation is considered as a possible disciplinary sanction. *Id.* at 156 (Policy J-E-09.C.2.). Further, it establishes safeguards "if there is any concern or question regarding the patient's suitability for segregation." *Id.* (Policy J-E-09.D.). These include requiring a provider be contacted and then determine appropriate accommodations for that patient. *Id.*

Plaintiffs have proposed that Defendant assess their compliance with these provisions. *See* Ex. A, provision 4.e.4.b-c. Defendants object. They argue that they are not required to conduct a "clinical reassessment of the staff's original determination." Ex. D at 2-3. But Defendants are asking the Court to accept without evidence that staff made these "original determination[s]" in the first place. It is possible that staff failed to select *any* segregation level; or that providers failed to do anything after staff referred to them patients for whom there was a concern over their suitability for segregation; or that nursing staff failed to notify MCSO if the provider determined that segregation was contraindicated. Under Defendants' proposal, none of these clear violations of policy would even be identified.

The safeguards embodied by Defendants' policy are there to ensure that the disciplinary process addresses the risk of punishing prisoners for behavior that is the product of their illness, and of imposing sanctions that are clinically contraindicated, the same risks 5(a)(26) seeks to address. The safeguards themselves require staff to exercise judgment based on established criteria. The levels, for example, require staff to determine how much risk is posed by placing a particular patient in segregation, based

on that patient's acuity. The policy is useless if staff is not abiding by it. The only way to determine if this is happening is to assess staff performance. Surely it would violate subparagraph 5(a)(26) if a staff member were simply ticking off the box for level 1 (no contraindications) for every patient he reviewed, even for acutely psychotic patients for whom a provider had already determined that segregation is contraindicated.

It cannot be the case that all subparagraph 5(a)(26) requires is that all boxes on a form are completed, regardless of content. As the Court has held, subparagraph 5(a)(26) requires "more persuasive evidence of compliance." (Doc. 2483 at 33). To determine compliance, the staff conducting the review must themselves review the medical records to see if, in fact, the appropriate segregation level was chosen for the patient. Staff must look at the records and determine if there was reason for "concern or question regarding the patient's suitability for segregation," and, if it be the case, whether the safeguards required by policy were followed. Again, it is a meaningless exercise if all staff looks at for compliance is whether one of the three boxes was checked on a pre-printed form. As the Court further has held, "for this especially significant form of discipline, the generally conclusory comments of CHS staff are insufficient to show compliance." *Id.*

This approach is consistent with the approach other courts have taken in assessing compliance with similar remedies. For example, in *Coleman*, the plaintiffs alleged in 2014 that even under the new assessment tool designed by defendants to comply with the 1995 court-ordered remedy requiring meaningful mental health involvement on prisoner discipline, mentally ill inmates "rarely, if ever" were diverted from disciplinary sanctions. *Coleman v. Brown,* 28 F. Supp. 3d 1068, 1089 (E.D. Cal. 2014). The defendant's own expert in the case conceded that "diversion of mentally ill inmates from sanctions . . . 'should happen at least sometimes'" if the assessment tool is used properly. *Id.* In giving more time to defendants to show that its assessment tool complied with the agreed upon plan, the court noted that the issue turned on whether the

- 9 -

plan would actually lead to penalty-mitigation for behavior caused by mental illness. *Id*. at 1089-90. The steps Plaintiffs have proposed, all required by Defendants' own policies, will likewise ensure that there is meaningful involvement of mental health staff in the disciplinary process for mentally ill prisoners.

### E. Rule Violation Referrals

Both parties agree that Defendants should assess whether the Custody Bureau Hearing Unit Commander reviewed violent incidents where mental health staff recommended not to sanction the detainee. However, they have proposed slightly different language in their plans. *Compare* Ex. A, provision 4.f.1. *with* Ex. D. at 3. Both proposals partially track the relevant policy. *See* Doc. 2417-1 at 195 (Policy DJ-2.4.E.5.b.). The language Defendants have proposed poses the risk of excluding pertinent incidents in two ways. First, it limits review to instances where mental health staff has recommended disciplinary level 3. Plaintiffs have instead proposed that all incidents where staff has recommended not to sanction the detainee be reviewed. It is possible that staff will recommend no sanctions (as documented via correspondence or otherwise in the detainee's medical record), but will fail to correctly choose level 3 on the applicable form. Under defendants' proposal, this incident will not be reviewed, while it will be reviewed under Plaintiffs' proposal. Second, Defendants want to limit reviewed to those patients already designated SMI-MHCC, which could also lead to exclusion of pertinent incidents, such as ones where the detainee is SMI/MHCC, but the caseload or the associated DAR does not note this correctly.

### F. Sanctions and Disposition

Defendants object to the three final sub provisions of Plaintiffs' compliance plan, arguing they are repetitive *See* Ex. A, provisions g.-i. They claim provision g. is covered by provision f. *See* Ex. D at 3. This is not accurate. Provision f. covers mental health staff recommendations as to whether to sanction a detainee (responsibility), while provision g covers staff's recommendations "as to sanction," which policy also requires.

- 10 -

Likewise, neither provision h (requiring reporting on the actual disposition of the charge) or I (requiring reporting on the sanctions ordered) repeats earlier requests.

### G. Plaintiffs' Investigation

Plaintiffs propose that all DARS be produced to them, while Defendants have agreed only to produce those DARS for SMI/MHCC detainees. *See* Ex. A, provision 5; Ex. D at 3. A review of all DARs may reveal incidents involving seriously mentally ill detainees who do not appear on the caseload whatsoever. Each DAR packet includes narratives describing the behavior that give rise to the charge. These narratives may also describe behavior that appears to be the product of illness, like speaking incoherently, responding to internal stimuli, or engaging in acts of self-mutilation. These incidents require additional review to determine if, in fact, the detainee involved is seriously mentally ill, and if so, then if discipline was handled consistent with subparagraph 5(a)(26) and Defendants' own policies.

Defendants also did not agree to provide a spreadsheet or list identifying which documents they relied on for each finding they make in their compliance report. This has proved to be necessary given the significant problems Plaintiffs have had in responding to Defendants' previous reports, in part because it was extremely difficult to determine what Defendants had relied on to reach their findings. *See, e.g.,* Doc. 2490-2 (describing difficulties in assessing Defendants' methodology and findings given the lack of clarity as to the documents they relied on for each finding)

Defendants have not agreed to allow class counsel to conduct a site visit at the Jail so they can tour the lockdown units, the Mental Health Unit's (MHU) closed units, and the Special Management Unit (SMU), and speak with their clients housed there. Ex. A, provision 6. These are the units most likely to hold seriously mentally ill detainees who have been subject to discipline. Counsel's tour may reveal instances of discipline not otherwise documented.

Finally, Defendant oppose allowing Plaintiffs to depose the person(s) most knowledgeable about the compliance methodology and conclusions set forth in Defendants' to-be-filed compliance report. *See* Ex. A, provision 7; Ex. D at 3. This discovery has also proved to be necessary given the experiences in previous compliance rounds. In the last round, the Court ordered Defendants to make available to Plaintiffs for interviews "staff person(s) responsible for and most knowledgeable of the methodology employed by Defendants in assessing compliance as provided in Defendants' supplemental report."). (Doc. 2481). Defendants, however, violated the Court's order, producing an MCSO lieutenant who played no role in designing or implementing the methodology Defendants sued to produce their last report. *See* Doc. 2484 at 5-6.

Depositions are necessary now because there have been repeated instances where the parties have lacked a shared recollection as to previous interviews, including those the Court ordered for the last round of compliance briefing. For example, Defendants claimed that Plaintiffs admitted while interviewing staff that they had not reviewed a compliance flowsheet they had submitted. Doc. 2487 at 3. This is not accurate. Both undersigned counsel and Plaintiffs' expert Eldon Vail confirmed they had read the flowsheet during the call. *See* Doc. 2488-1 ¶ 6. Permitting Plaintiffs depose knowledgeable staff will eliminate the possibility of any further miscommunication, or questions over what was and was not said, thus relieving the parties and the Court from having to sift through the respective recollections of counsel and staff.

DATED this 3rd day of May, 2019.

ACLU NATIONAL PRISON PROJECT

By  s/Eric Balaban

Eric Balaban (admitted *pro hac vice*)
ACLU National Prison Project
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
(202) 548-6601
ebalaban@alcu.org

Kathleen Brody
American Civil Liberties Union of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014-5059

Attorneys for Plaintiffs

---

**CERTIFICATE OF SERVICE**

Re:  CIV 77-479-PHX-NVW

I hereby certify that on May 3, 2019, I electronically transmitted the attached document and appended exhibits to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

- Kathleen Brody
- Michele Iafrate
- Sherle Flaggman

Dated: May 3, 2019.

   s/Eric Balaban